**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VOLUSION, LLC[1] | ) Case No. 20-50082 (DRJ) |
| Debtor. | ) |
| | ) |
| | ) |

**DEBTOR'S MOTION FOR ENTRY OF ORDER (I) AUTHORIZING THE APPOINTMENT OF INDEPENDENT MANAGERS EFFECTIVE AS OF THE PETITION DATE; (II) DIRECTING THE DEBTOR TO MAINTAIN THE INDEPENDENT MANAGERS; (III) AUTHORIZING THE PAYMENT OF MANAGER FEES; AND (IV) AUTHORIZING THE DEBTOR'S PERFORMANCE OF ITS OBLIGATIONS TO EACH OF THE INDEPENDENT MANAGERS PURSUANT TO THE COMPANY AGREEMENT**

> **THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 14 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

The above-captioned debtor and debtor in possession (the "Debtor") submits this motion (the "Motion") for entry of an order, substantially in the form of the order filed with this Motion (the "Order"), (i) authorizing the Debtor to appoint Independent Managers (as defined below); (ii) directing the Debtor to maintain the Independent Managers; (iii) authorizing the payment of Manager Fees (as defined below); and (iv) authorizing the Debtor's performance of its obligations

---

[1] The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is: Volusion, LLC (9037). The Debtor's service address is: 1835A Kramer Lane, Suite 100, Austin, Texas 78758.

to each of the Independent Managers pursuant to the terms of the Second Amended and Restated Limited Liability Company Agreement of the Debtor, dated November 23, 2016 (as amended from time to time), attached hereto as <u>Exhibit A</u>[2] (the "<u>Company Agreement</u>"). In support of this Motion, the Debtor respectfully states as follows:

### Jurisdiction and Venue

1.      The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157.  The Debtor consents, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), to the entry of a final order by the Court.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The bases for the relief requested herein are sections 105(a) and 363(b)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), and Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "<u>Bankruptcy Local Rules</u>").

### Background

3.      On July 27, 2020 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Case</u>").  The Debtor is operating its business and managing its properties as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Case.

4.      A detailed description of the Debtor's business and the facts precipitating the filing of the Chapter 11 Case are set forth in the *Debtor's Emergency Motion for Authority to Use Cash Collateral and Granting Adequate Protection to Prepetition Secured Parties. See* Docket No. 4.

---

[2]      Exhibits to the Company Agreement are not included in Exhibit A attached hereto.

5.     Prior to the Petition Date, the Debtor has been negatively impacted by financial difficulties.  As a result, the Debtor was unable to meet certain of its imminent expenses, including payment of its matured term loan.

6.     To help stabilize its operations and reorganize its business, the Debtor hired professionals immediately prior to the Petition Date. The Debtor hired Conway MacKenzie Management Services, LLC ("Conway MacKenzie") pursuant to the terms of an engagement letter dated as of June 24, 2020 (the "Engagement Letter").  Conway MacKenzie is an advisory firm that specializes in financial and operational corporate restructuring, valuation, forensic accounting, complex litigation support, and computations involved in court proceedings and dispute resolution. Conway MacKenzie serves chapter 11 debtors, as well as their trustees, creditors, stakeholders and professionals in roles including financial advisor, interim manager, officer (including chief restructuring officer), fiduciary, expert witness, financier and M&A advisor.

7.     Pursuant to the terms of the Engagement Letter, Timothy B. Stallkamp was appointed as Chief Restructuring Officer of the Debtor on June 24, 2020 and has acted in such capacity since such appointment. Mr. Stallkamp will, among other things, (i) manage the Debtor's operations and (ii) manage the Debtor's efforts to reorganize its assets and liabilities for the benefit of its stakeholders, including, without limitation, carrying out its duties as debtor in possession. Mr. Stallkamp will report directly to the board of managers of the Debtor (the "Board").

### The Board Actions

8.     Prior to the Petition Date, the following independent managers were appointed to the Board:  Troy Pike, Jeremy Rosenthal and Curt Lindeman (the "Independent Managers"). Debtor submits that the service of the Independent Managers provides experienced, qualified and independent individuals to oversee the bankruptcy process.

9.      Prior to the Petition Date, the Board considered presentations by the Debtor's management and the financial and legal advisors of the Debtor regarding the liabilities and liquidity of the Debtor, the strategic alternatives available to it, and the effect of the foregoing on the Debtor's business (the "Board Actions").

### The Independent Managers

10.     The Independent Managers, as established below, are qualified to serve on the Board. The Debtor agrees to pay $6,000 per month to each Independent Manager for manager fees (the "Manager Fees"). The Debtor believes that the Manager Fees are reasonable in light of the anticipated work that will be necessary for Independent Managers to undertake in this chapter 11 case. The Manager Fees will be paid monthly in the ordinary course of business.

11.     Troy Pike is a successful private equity and operational executive with over 25 years of executive experience. Mr. Pike has worked across industries (healthcare, pharmacy, auto retail, communications technology, distribution, chemical manufacturing, sports and entertainment, education, franchised quick service restaurants, etc.) with some of the world's leading companies (Walmart, Lands' End, IBM, McDonald's, Discovery Communications, Home Depot, Carl's Jr., BMW, Toyota, et al). Mr. Pike has a track record of tackling tough problems, repeatedly and successfully growing businesses, and creating enterprise value. Attached hereto as Exhibit B is a copy of Mr. Pike's biography.

12.     Jeremy Rosenthal has significant experience guiding companies, boards, sponsors and lenders through out-of-court recapitalizations, workouts and asset sales and in-court bankruptcy solutions. Mr. Rosenthal previously practiced restructuring law for 16 years and was a partner at Sidley Austin LLP. Mr. Rosenthal was recognized by The Best Lawyers in America for 2016, 2017 and 2018 in Bankruptcy and Reorganization Law. Attached hereto as Exhibit C is a copy of Mr. Rosenthal's biography.

4

13.     Curt Lindeman, founder of Lindeman, Esq., has extensive experience representing corporations and businesses of various sizes and in numerous industries. Prior to founding Lindeman, Esq., Mr. Lindeman was Vice President, General Counsel and Corporate Secretary of U.S. Concrete, Inc., a NASDAQ traded company. Mr. Lindeman began his legal career in the Corporate Finance and Securities division of Shook, Hardy & Bacon, L.L.P., before serving in-house with Coral Energy, L.P. and Coach USA, Inc. Mr. Lindeman currently serves as Chairman of the Board of Directors of Access Media Holdings, LLC. Attached hereto as <u>Exhibit D</u> is a copy of Mr. Lindeman's biography.

### Relief Requested

14.     The Debtor seeks entry of an order (i) authorizing the appointment of the Independent Managers effective as of the Petition Date; (ii) directing the Debtor to maintain the appointment of the Independent Managers[3]; (iii) authorizing payment of the Manager Fees; and (iv) authorizing the Debtor's performance of its obligations to each of the Independent Managers pursuant to the terms of the Company Agreement.

### Basis for Relief

15.     Section 363(b)(1) of the Bankruptcy Code authorizes a debtor, after notice and a hearing, to "use" property other than in the ordinary course of business. Courts have required that decisions to use property outside of the ordinary course of business pursuant to section 363(b)(1) of the Bankruptcy Code be based upon the sound business judgment of the debtor. *See* 11 U.S.C. § 363(b); *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986). When a debtor articulates a reasonable basis for its business decisions, courts will generally not entertain objections to the debtor's conduct. *See In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011);

---

[3] To the extent an Independent Manager should resign or become unable to serve, the Debtor requests that the remaining Independent Managers be authorized to appoint a replacement manager.

*Comm. of Asbestos- Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also Official Comm. of Unsecured Creditors of LTV Aerospace and Def. Co. v. The LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992) (a judge determining a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) ("courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence" (citing *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992)).

16.     Section 105(a) of the Bankruptcy Code authorizes the bankruptcy court to carry out the provisions of section 363(b) of the Bankruptcy Code. *See* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

17.     Typically, the appointment of independent managers prior to a bankruptcy filing does not require the approval of the Court. However, given the complicated nature of the ownership and capital structure of the Debtor and in an abundance of caution, the Debtor seeks entry of order authorizing the appointment of the Independent Managers to the extent the appointments are outside of the ordinary course, directing the Debtor to maintain the appointments and authorizing payment of the Manager Fees.

18.     The Board Actions were an appropriate exercise of business judgment because they will improve oversight of the transition of the Debtor into chapter 11, while assuring appropriate safeguards for the interest of the Debtor's creditors and estate.  The Independent Managers are

knowledgeable, experienced and qualified professionals who can provide effective oversight. The Board Actions were specifically designed to ensure that the Independent Managers will have the authority, independence and resources to evaluate matters with respect to the restructuring of the Debtor. The appointment of the Independent Managers is in the best interests of the estate and is supported by good business reasons. In light of the foregoing, the Debtor respectfully requests that the Court approve the Board Actions and pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code as the sound exercise of the Debtor's business judgment and as being in the best interest of the Debtor's estate.

### Notice

19.     Notice of the hearing on the relief requested in this Motion has been provided by the Debtor in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Local Bankruptcy Rules, and is sufficient under the circumstances. Without limiting the forgoing, due notice was afforded, whether by facsimile, electronic mail, overnight courier or hand delivery, to parties-in-interest, including: (a) the Office of the United States Trustee for the Southern District of Texas; (b) entities listed as holding the 20 largest unsecured claims against the Debtor; (c) the agent under the Debtor's prepetition credit facility; (d) the Office of the United States Attorney for the Southern District of Texas; (e) the state attorneys general for states in which the Debtor conducts business; (f) the Internal Revenue Service; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtor respectfully requests that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

July 30, 2020                    /s/ *Matthew D. Cavenaugh*
                                Matthew D. Cavenaugh (TX Bar No. 24062656)
                                Jennifer F. Wertz (TX Bar No. 24072822)

                                **JACKSON WALKER L.L.P.**
                                1401 McKinney Street, Suite 1900
                                Houston, Texas 77010
                                Telephone: (713) 752-4200
                                Facsimile: (713) 752-4221
                                Email: mcavenaugh@jw.com
                                Email: jwertz@jw.com

                                **PROPOSED COUNSEL FOR THE DEBTOR
                                AND DEBTOR IN POSSESSION**

**<u>Certificate of Service</u>**

I certify that on July 30, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

# EXHIBIT A

**Company Agreement**

[See attached.]

# SECOND AMENDED AND RESTATED

# LIMITED LIABILITY COMPANY AGREEMENT

# OF

# VOLUSION, LLC

### a Delaware Limited Liability Company

**November 23, 2016**

MEMBERSHIP INTERESTS IN VOLUSION, LLC HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED FOR SALE, SOLD OR OTHERWISE TRANSFERRED UNLESS SUBSEQUENTLY REGISTERED UNDER SUCH ACTS OR UNLESS AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.   THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT CONTAINS ADDITIONAL RESTRICTIONS ON SALES AND OTHER TRANSFERS OF MEMBERSHIP INTERESTS.

36416976v7

# Table of Contents

|  |  | *Page* |
|---|---|---|
| Article I | DEFINITIONS | 1 |
| 1.1 | Definitions | 1 |
| 1.2 | Construction | 15 |
| 1.3 | GAAP and Consolidation | 15 |
| Article II | ORGANIZATION | 15 |
| 2.1 | Continuation | 15 |
| 2.2 | Name | 16 |
| 2.3 | Registered Office; Registered Agent; Principal Office in the United States; Other Offices | 16 |
| 2.4 | Purposes and Powers | 16 |
| 2.5 | Qualification in Other Jurisdictions | 17 |
| 2.6 | No State-Law Partnership | 17 |
| 2.7 | Term | 18 |
| Article III | MEMBERSHIP AND MEMBERSHIP INTERESTS | 18 |
| 3.1 | Admission as Members; Restatement of Original Agreement | 18 |
| 3.2 | Units of Membership Interests | 18 |
| 3.3 | Warrants | 18 |
| 3.4 | Future Issuances of Equity Securities; Admission Procedures | 19 |
| 3.5 | Preemptive Rights | 20 |
| 3.6 | Unit Certificates | 22 |
| 3.7 | Non-Equity Securities | 22 |
| 3.8 | Nature of Interests | 22 |
| 3.9 | Main Street Members | 22 |
| Article IV | CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS | 22 |
| 4.1 | Capital Contributions | 22 |
| 4.2 | Subsequent Capital Contributions | 22 |
| 4.3 | No Return of Capital Contributions | 22 |
| 4.4 | Capital Accounts | 23 |
| 4.5 | Indemnity Payments | 24 |
| Article V | ALLOCATIONS | 24 |
| 5.1 | General Allocation Rule | 24 |
| 5.2 | Special Tax Allocations | 24 |
| 5.3 | Other Allocation Rules | 26 |
| 5.4 | Contributed Property; Code Section 704(c); Corrective Allocations Relating to Noncompensatory Options | 26 |
| 5.5 | Intent of Allocations | 27 |
| 5.6 | Acknowledgement of Allocation Rules | 27 |

**Table of Contents**
(continued)

| | | |
|---|---|---|
| Article VI | DISTRIBUTIONS | 28 |
| 6.1 | General | 28 |
| 6.2 | Deemed Distributions Resulting from Sales of Units | 29 |
| 6.3 | Tax Distributions | 29 |
| 6.4 | Amounts Withheld | 30 |
| 6.5 | Subordination | 30 |
| Article VII | MANAGEMENT BY BOARD OF MANAGERS | 31 |
| 7.1 | Board of Managers | 31 |
| 7.2 | No Member Management | 31 |
| 7.3 | Limitations on Board of Managers Authority | 31 |
| 7.4 | Number of Managers | 33 |
| 7.5 | Qualifications | 33 |
| 7.6 | Election; Term | 33 |
| 7.7 | Vacancies | 33 |
| 7.8 | Removal | 33 |
| 7.9 | Place of Meetings | 34 |
| 7.10 | Regular Meetings | 34 |
| 7.11 | Special Meetings | 34 |
| 7.12 | Attendance at and Notice of Meetings | 34 |
| 7.13 | Quorum of and Action by Managers | 34 |
| 7.14 | Unanimous Written Consent | 34 |
| 7.15 | Telephonic Meetings | 35 |
| 7.16 | Compensation; Reimbursement of Expenses | 35 |
| 7.17 | Committees of the Board of Managers | 35 |
| 7.18 | Minutes of Meetings | 35 |
| 7.19 | Outside Activities of Managers; Competition | 35 |
| 7.20 | Interested Transactions | 36 |
| 7.21 | Reliance by Third Parties | 37 |
| Article VIII | OFFICERS | 37 |
| 8.1 | Qualifications | 37 |
| 8.2 | Authority | 37 |
| 8.3 | Designation and Election | 37 |
| 8.4 | Vacancies | 37 |
| 8.5 | Removal | 37 |
| 8.6 | Chairman of the Board | 38 |
| 8.7 | Chief Executive Officer | 38 |
| 8.8 | President; Vice Presidents; Chief Financial Officer | 38 |
| 8.9 | Secretary | 38 |
| 8.10 | Delegation of Authority | 39 |
| 8.11 | Initial Officers | 39 |

**Table of Contents**
**(continued)**

*Page*

| | | |
|---|---|---|
| Article IX | MEETINGS OF MEMBERS | 39 |
| 9.1 | Place of Meetings | 39 |
| 9.2 | Annual Meeting | 39 |
| 9.3 | Special Meetings | 39 |
| 9.4 | Notice of Meeting | 39 |
| 9.5 | Waiver of Notice | 40 |
| 9.6 | Record Dates | 40 |
| 9.7 | Quorum | 40 |
| 9.8 | Voting | 40 |
| 9.9 | Conduct of Meetings of Members | 42 |
| 9.10 | Proxies | 42 |
| 9.11 | Written Consent | 43 |
| 9.12 | Telephonic Meetings | 43 |
| Article X | TRANSFER OF INTERESTS | 43 |
| 10.1 | Register | 43 |
| 10.2 | Record Holders | 43 |
| 10.3 | Assignment of Rights | 43 |
| Article XI | RESTRICTIONS ON TRANSFER; REGISTRATION RIGHTS | 43 |
| 11.1 | Restrictions on Transfer of Units and other Equity Securities | 43 |
| 11.2 | Options to Purchase Units Proposed to be Transferred | 44 |
| 11.3 | Value Determination | 53 |
| 11.4 | Transfer Costs and Expenses | 54 |
| 11.5 | Prohibited Transfers | 54 |
| 11.6 | Admission of Substituted Members | 54 |
| 11.7 | Rights of Unadmitted Members | 55 |
| 11.8 | Treatment of Transferred Membership Interests | 55 |
| 11.9 | Registration under the Securities Act | 56 |
| 11.10 | Additional Provisions Concerning Registration | 59 |
| Article XII | OPTIONS ON WARRANTS AND UNITS | 63 |
| 12.1 | Call and Put Options on Warrants | 63 |
| Article XIII | BOOKS, RECORDS AND INFORMATION; FISCAL YEAR | 63 |
| 13.1 | Books and Records | 63 |
| 13.2 | Financial Statements and Tax Information | 63 |
| 13.3 | Fiscal Year | 65 |

**Table of Contents**
**(continued)**

*Page*

Article XIV   TAX MATTERS ...................................................................................... 65

14.1   Partnership for Tax Purposes .................................................................. 65
14.2   Tax Matters Member................................................................................ 65
14.3   Tax Returns.............................................................................................. 65
14.4   Tax Elections ........................................................................................... 65

Article XV   LIABILITY AND INDEMNIFICATION ........................................... 66

15.1   No Liability for Company Debts; Limited Liability............................... 66
15.2   Good Faith Actions; Exculpation............................................................ 66
15.3   Indemnification ....................................................................................... 67
15.4   Company Responsibility for Indemnification Obligations ..................... 69

Article XVI   DISSOLUTION, LIQUIDATION AND TERMINATION ................ 70

16.1   Dissolution .............................................................................................. 70
16.2   Liquidation .............................................................................................. 70
16.3   Application of Company Assets .............................................................. 71
16.4   Deficit Capital Accounts ......................................................................... 71
16.5   Certificate of Cancellation; Termination ................................................ 71
16.6   Claims of the Members ........................................................................... 72
16.7   Waiver of Partition .................................................................................. 72

Article XVII   MISCELLANEOUS .......................................................................... 72

17.1   Article 8 of the Uniform Commercial Code ........................................... 72
17.2   Confidentiality ........................................................................................ 72
17.3   Representations and Warranties of the Members .................................... 73
17.4   Notices ..................................................................................................... 74
17.5   Amendment .............................................................................................. 75
17.6   Waiver ...................................................................................................... 75
17.7   ENTIRE AGREEMENT........................................................................... 75
17.8   Parties in Interest; Assignment ............................................................... 76
17.9   Severability .............................................................................................. 76
17.10   Specific Enforcement .............................................................................. 76
17.11   Joinder of Spouses ................................................................................... 76
17.12   Notice to Members................................................................................... 76
17.13   Counterparts ............................................................................................ 76
17.14   Counsel to the Main Street Members....................................................... 76
17.15   Counsel to the Company .......................................................................... 77
17.16   Authorization of Certain Transactions..................................................... 77
17.17   Third Party Beneficiaries ........................................................................ 77
17.18   Governing Law ........................................................................................ 77

**Table of Contents**
**(continued)**

*Page*

EXHIBITS:

Exhibit A        Members and Warrant Holders
Exhibit B        Addendum for Spouses

**SECOND AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**VOLUSION, LLC**
a Delaware Limited Liability Company

THIS SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "*Agreement*") of Volusion, LLC, a Delaware limited liability company (the "*Company*"), dated and effective as of November 23, 2016 (the "*Effective Date*"), is agreed to and adopted by the Members (as defined below) and the Company.

## RECITALS

WHEREAS, on January 13, 2015, the equity owners of Volusion, Inc., a Delaware corporation (the "*Owners*"), formed KSCO Holdings, Inc., a Texas corporation ("*KSCO*");

WHEREAS, pursuant to that certain contribution agreement, dated as of January 22, 2015, by and among the Owners and KSCO (the "*Contribution Agreement*"), the Owners exchanged their equity ownership in Volusion, Inc. for equity ownership of KSCO;

WHEREAS, on January 26, 2015, Volusion, Inc. converted to a limited liability company under Delaware law;

WHEREAS, the Company is the limited liability company that was formed by the conversion of Volusion, Inc. pursuant to its Certificate that was filed with the Secretary of State of the State of Delaware on January 26, 2015, in accordance with the Act, and the First Amended and Restated Limited Liability Company Agreement of the Company (the "*Original Agreement*"), dated effective as of January 26, 2015 (the "*Original Effective Date*");

WHEREAS, immediately prior to the Original Effective Date, KSCO was the sole member of the Company;

WHEREAS, on the Original Effective Date, each Main Street Member (as defined below) made cash Capital Contributions in the amounts reflected on Exhibit A and, in exchange, received the Units reflected on Exhibit A;

WHEREAS, the Members desire to enter into this Agreement to govern the affairs of the Company and the conduct of its business and to amend and restate the Original Agreement of the Company in its entirety as set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     Definitions.  As used in this Agreement, the following terms have the following meanings:

36416976

"*Act*" means the Delaware Limited Liability Company Act and any successor statute, as amended from time to time.

"*Adjusted Capital Account Deficit*" means, with respect to any Member, the deficit balance, if any, in the Capital Account of such Member at the end of the relevant Allocation Year, after giving effect to the following adjustments:

      (i)     credit to that Member's Capital Account of any amounts which that Member is deemed obligated to restore pursuant to the penultimate sentence in each of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations; and

      (ii)     debit to that Member's Capital Account of the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted accordingly.

"*Affiliate*" means with respect to a specified Person, any Person that directly or indirectly controls, is controlled by, or is under common control with, the specified Person.  As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person.  The term "Affiliate" of a Person shall be deemed to include any executive officer, director or member of board of managers, or holder, directly or indirectly, of five percent (5%) or more of the voting interests of such Person.

"*Agreement*" has the meaning specified in the introductory paragraph.

"*Allocation Period*" means the time period for which allocations are determined.

"*Allocation Year*" means (i) the period commencing on the Original Effective Date and ending on December 31, 2015, (ii) any subsequent twelve-month period commencing on January 1 and ending on December 31, and (iii) any portion of a period described in clauses (i) or (ii) for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to <u>Article V</u>.

"*Board of Managers*" has the meaning specified in <u>Section 7.1(a)</u>.

"*Business Day*" means any day other than a Saturday, a Sunday, or a holiday on which commercial banking institutions located in Houston, Texas are authorized or required to close.

"*Capital Accounts*" means the capital accounts to be established and maintained for the respective Members under <u>Article IV</u>.

"*Capital Contributions*"  means, with respect to a Member, the amount of money, and the Gross Asset Value of any assets other than money, contributed to the Company by that Member.  References in this Agreement to the Capital Contributions of a Member include Capital Contributions made by that Member's predecessors in interest.

"*Certificate*" has the meaning specified in <u>Section 2.1</u>.

"*Chairman*" has the meaning specified in <u>Section 7.4</u>.

"*Co-Sale Notice*" has the meaning specified in <u>Section 11.2(d)(iv)(A)</u>.

"*Co-Sale Purchaser*" has the meaning specified in <u>Section 11.2(d)(iv)(A)</u>.

"*Co-Sale Rights*" has the meaning specified in <u>Section 11.2(d)(iv)(B)</u>.

"*Co-Sale Sale Date*" has the meaning specified in <u>Section 11.2(d)(iv)(A)</u>.

"*Co-Sale Units*" has the meaning specified in <u>Section 11.2(d)(iv)(A)</u>.

"*Code*" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"*Commission*" means the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act and/or the Exchange Act.

"*Company*" has the meaning specified in the introductory paragraph.

"*Company Counsel*" has the meaning specified in <u>Section 17.15</u>.

"*Confidential Information*" means any proprietary or confidential information of or relating to the Company, including any business information, intellectual property, trade secrets or other information relating to the businesses, products, services, customers (whether former, current or prospective), vendors, technology, assets or liabilities of the Company, except for any information that is generally available to the public (otherwise than through a breach by the party disclosing the same of its obligations under this Agreement or a breach of its fiduciary duties to the Company).

"*Contribution Agreement*" has the meaning specified in the Recitals of this Agreement.

"*Controlled Entity*" means, with respect to any Person, any entity that is and continues to be "exclusively controlled" by such Person, with the term "exclusively control" meaning for purposes of this definition, the exclusive power to direct the management and policies of such entity, directly or indirectly, whether through ownership of voting securities or partnership or other ownership interests, or by contract or otherwise.

"*Covered Person*" means each Person that is or was a Member, Manager, or if and to the extent determined by the Board of Managers of the Company, an officer or employee or agent of the Company or any of its Affiliates, or who is or was serving at the request of the Company as a member, officer, or director of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, and any other Person the Managers determine to designate as a Covered Person.

"*Current Market Price*" means the fair value of such security or item, as of the applicable valuation date, as determined in good faith by the Board of Managers, which shall (i) be based on the number of Equity Securities outstanding as of the applicable valuation date, on a Fully Diluted Basis and assuming that the conditions to the exercise of the Warrants have been satisfied, (ii) be made without regard to any blockage, marketability, minority interest, limitation on transferability discount or any other similar discount, and (iii) be made at a minimum assumed equity value of at least (A) fifteen (15) times the Company's trailing twelve (12) month EBITDA (as defined in the Loan Agreement except that EBITDA for purposes of determining Current Market Price shall be pro forma based on Commission allowable addbacks rather than historical), minus (B) the aggregate amount of all Funded Debt (as such term is defined in the Loan Agreement) plus (C) cash and cash equivalents and marketable securities; provided, however, that the Board of Managers and any appraiser(s) shall use the equity value determined in accordance with this clause (iii) as a minimum for purposes of determining "Current Market Price", and the Board of Managers and any appraiser(s) may determine the "Current Market Price" to be in excess of such equity value in their discretion.   In determining the Current Market Price as of any valuation date, the Board of Managers shall be entitled to rely on the determination of an independent and nationally or regionally recognized firm specializing in security valuations chosen by the Company and agreeable to the affected Main Street Member(s), provided that (x) such valuation has been conducted within the 6 month period prior to the valuation date and (y) the Board of Managers determines in good faith that the material inputs and assumptions of such valuation firm would reasonably apply as of such date.   Any initial determination by the Board of Managers is subject to being challenged by a Main Street Member as provided in Section 12.2(c).

"*Deemed Preferred Distributions*" has the meaning specified in Section 6.2.

"*Default*" has the meaning specified in the Loan Agreement.

"*Demand Notice*" has the meaning specified in Section 11.9(b).

"*Demand Registration*" has the meaning specified in Section 11.9(b).

"*Depreciation*" means, for each Allocation Year or other period, an amount equal to the depreciation, amortization (including pursuant to Code Sections 195, 197 and 709), or other cost recovery deduction allowable with respect to a Company asset for such Allocation Year or period for federal income tax purposes, except that (1) with respect to an asset the Gross Asset Value of which differs from its adjusted basis for U.S. federal income tax purposes and which difference is being eliminated by use of the "remedial

method" as defined in Treasury Regulations Section 1.704-3(d), Depreciation for such period shall be the amount of the book basis recovered for such period under the rules prescribed in Treasury Regulations Section 1.704-3(d)(2), and (2) with respect to any other asset the Gross Asset Value of which differs from its adjusted basis for federal income tax purposes at the beginning of such Allocation Year, "*Depreciation*" means an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Allocation Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Allocation Year is zero, "*Depreciation*" means an amount determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board of Managers.

"*Designated Co-Sale Units*" has the meaning specified in Section 11.2(d)(iv)(B).

"*Disputed Items*" has the meaning specified in Section 12.2(c)(iii).

"*Drag-Along Members*" has the meaning specified in Section 11.2(d)(vii).

"*Drag-Along Notice*" has the meaning specified in Section 11.2(d)(vii).

"*Drag-Along Right*" has the meaning specified in Section 11.2(d)(vii).

"*Effective Date*" has the meaning specified in the introductory paragraph of this Agreement.

"*Eligible Member*" means each Member that, together with its Affiliates, owns at least 5% of the Equity Securities of the Company on a Fully Diluted Basis; *provided* that in the case of the Main Street Members, "*Eligible Member*" shall mean any Main Street Member that, together with all other Main Street Members and its and their Affiliates and any Holders (after exercise of any Warrants), collectively owns at least 5% of the Equity Securities of the Company on a Fully Diluted Basis (excluding the impact of any dilution resulting from any equity issued by the Company through an issuance which the Preemptive Rights in Section 3.5 did not apply).

"*Equity Incentive Plan*" means an equity incentive plan approved by the Board of Managers that allows for the issuance of restricted units, incentive options or other similar incentive equity to employees or Managers of the Company of up to 20% of the Equity Securities of the Company on a Fully Diluted Basis as of the Original Effective Date.

"*Equity Securities*" means equity securities of the Company, and includes Units of all classes (including non-voting), whether or not now authorized, and all options, warrants, rights, subscriptions, and other securities, agreements, or commitments convertible into, or exchangeable for, or evidencing a right to receive or purchase Units or other equity securities of the Company.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and any similar or successor federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time.  Reference to a particular section of the Exchange Act shall include a reference to the comparable section, if any, of any such similar or successor federal statute.

"*Fair Market Value*" means, for purposes of this Agreement, the fair market value with no deduction for lack of marketability or minority interest; determined in accordance with the procedures set forth in Section 11.3.

"*Family Group*" means, with respect to any natural Person, such Person's spouse and descendants (whether natural or adopted).

"*First Resort Indemnitors*" has the meaning specified in Section 15.4(a).

"*Fully Diluted Basis*" means, with respect to the Equity Securities at any time of determination, the number of Units that would be issued and outstanding at such time, assuming that all options, rights, warrants (including the Warrant(s) and the KSCO Warrant(s)) or other convertible or derivative securities or instruments or other rights to acquire Units have been exercised or converted, as applicable, in full, regardless of whether any such options, rights, warrants, convertible or derivative securities or instruments or other rights are then vested or exercisable or convertible in accordance with their terms.

"*Fully Diluted Percentage Interest*" means, with respect to any Member or other holder of Equity Securities, as of any date, the proportionate amount of Units held by such Member or other holder in relation to the total number of Units that are then outstanding on a Fully Diluted Basis.  The Fully Diluted Percentage Interest of each Member and other holder of Equity Securities at the time of the execution of this Agreement is as set forth on Exhibit A.  In the event all or any portion of a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Fully Diluted Percentage Interest of the transferor to the extent it relates to the transferred Membership Interest.

"*GAAP*" means United States generally accepted accounting principles consistently applied throughout the specified period and, if applicable, the immediately preceding comparable period.

"*Governmental Entity*" means any U.S. federal, state, local or foreign court, executive office, legislature, governmental agency or ministry, commission, or administrative, regulatory or self-regulatory authority or instrumentality.

"*Gross Asset Value*" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except that:

      (i)     the initial "*Gross Asset Value*" of any asset contributed by a Member to the Company shall be the gross fair market value of that asset, as determined by the Board of Managers;

(ii)     the *"Gross Asset Values"* of all Company assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account) as determined by the Board of Managers in connection with the following events:  (A) immediately prior to the acquisition of an interest in the Company by any new or existing Member in exchange for such Member's contribution of more than a *de minimis* amount of money or other property to the Company or such Member's provision of services to or for the benefit of the Company (other than a *de minimis* interest); (B) immediately prior to the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an interest in the Company; (C) immediately prior to the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g) (other than pursuant to Code Section 708(b)(1)(B)); (D) immediately prior to the issuance of a Noncompensatory Option (other than an option for a *de minimis* interest in the Company); (E) immediately after the acquisition of an interest in the Company upon the exercise of a Noncompensatory Option in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(s), and (F) such other times the Board of Managers reasonably determines necessary or advisable in order to comply with Treasury Regulations Sections 1.704-1(b), *provided* that an adjustment described in clauses (A), (B), (D) and (E) of this subsection (ii) shall be made only if the Board of Managers reasonably determines that an adjustment is necessary to reflect the relative economic interests of the Members in the Company; *provided, further*, if any Noncompensatory Option is outstanding upon the occurrence of an event described in clauses (A) through (F), Gross Asset Values shall be adjusted in accordance with Treasury Regulation Sections 1.704-1(b)(2)(iv)(f)(1) and 1.704-1(b)(2)(iv)(h)(2); *provided, further,* in making allocations of items of income gain, loss and deduction attributable to unrealized income, gain, loss and deduction in Company assets as a result of an adjustment to the Gross Asset Values of the Company property after exercise of a Noncompensatory Option, the Company shall follow the rules prescribed in Treasury Regulations Section 1.704-1(b)(2)(iv)(s);

(iii)     the *"Gross Asset Value"* of any Company assets distributed to any Member shall be adjusted to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset on the date of distribution as determined by the Board of Managers; and

(iv)     the *"Gross Asset Values"* of Company assets shall be increased (or decreased) to reflect any adjustments to their adjusted basis pursuant to Code Sections 734(b) or 743(b), but only to the extent that the adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) and subsection (vi) of the definition of "*Profits*" and "*Losses*"; *provided, however*, that Gross Asset Values shall not be adjusted pursuant to this subsection (iv) to the extent that an adjustment pursuant to subsection (ii) is required in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to the foregoing subsections (i), (ii) or (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset, for purposes of computing Profits and Losses.

"*Holder*" has the meaning specified in the Warrant Agreements.

"*Hypothetical Tax Amount*" has the meaning specified in Section 6.3.

"*Indebtedness*" of a Person means any indebtedness for borrowed money or deferred purchase price of property as evidenced by a note, bond, or other instrument.

"*Indemnifiable Losses*" has the meaning specified in Section 15.3(a).

"*Independent Arbiter*" has the meaning specified in Section 12.2(c)(iii).

"*KSCO*" has the meaning specified in the Recitals of this Agreement.

"*KSCO Shareholder Agreement*" means that certain Shareholder Agreement of KSCO, dated as of January 26, 2015, by and among KSCO and the shareholders of KSCO.

"*KSCO Warrants*" means one or more warrants to purchase up to 500,000 Units in the aggregate outstanding on the Original Effective Date.

"*Last Resort Indemnitors*" has the meaning specified in Section 15.4.

"*Law*" means a law, statute, ordinance, rule, code or regulation enacted or promulgated, or order, directive, instruction or other legally binding guideline or policy issued or rendered by, any Governmental Entity.

"*Lenders*" has the meaning specified in the Loan Agreement.

"*Lien*" means a lien, mortgage, deed of trust, deed to secure debt, pledge, hypothecation, assignment, deposit arrangement, easement, preference, priority, assessment, security interest, charge, claim, adverse claim, levy, interest of other Persons, or any other encumbrance of any kind.

"*Liquidating Agents*" has the meaning specified in Section 16.2.

"*Liquidity Event*" means distributions by the Company outside of the ordinary course of business, including in connection with (i) a merger, consolidation, reorganization, recapitalization or other similar transaction with the Company that would result in the Members of the Company immediately prior to such merger, consolidation, reorganization or other similar transaction owning less than fifty percent (50%) of the equity securities or other equity interests (measured by voting power) of the surviving, resulting or acquiring entity (or of its parent if such parent owns one hundred percent (100%) of the surviving, resulting or acquiring entity); *provided, that* each Member shall

receive its applicable portion of the aggregate proceeds, merger consideration or other consideration of such transaction in accordance with this Agreement; (ii) a sale of all or substantially all of the assets of the Company or other change of control of the Company; (iii) any liquidation, dissolution or winding up of the Company, whether voluntary or involuntary; (iv) a transaction through which the Company obtains a loan or takes on Indebtedness to fund a distribution to its Members; (v) the return of capital distributions to the Company's Members other than pursuant to distributions specifically authorized under this Agreement; or (vi) distributions by the Company to its Members of proceeds raised by the Company or any of its subsidiaries from an initial public offering or other securities offerings.

"*Loan Agreement*" means the Loan Agreement by and between the Company and the Lenders dated as of the Original Effective Date and as amended and restated on the Effective Date, as hereafter amended or modified.

"*Loan Documents*" has the meaning specified in the Loan Agreement.

"*Main Street Counsel*" has the meaning specified in Section 17.14.

"*Main Street Members*" means the Members designated as "Main Street Members" on Exhibit A hereto.

"*Main Street Manager*" has the meaning specified in Section 9.8(b).

"*Main Street Observer*" has the meaning specified in Section 9.8(b)(iv).

"*Management Person*" means Kevin Sproles.

"*Manager*" shall mean any member of the Board of Managers.

"*Member*" means each of, and "*Members*" means collectively, the Persons executing this Agreement effective as of the Effective Date or hereafter admitted to the Company as a member as provided in this Agreement, and for purposes of Section 3.5 and Article XI shall include all holders of Units on a Fully Diluted Basis; but, does not include any Person who has ceased to be a member in the Company.

"*Member Nonrecourse Debt*" has the same meaning as the term "partner nonrecourse debt" in Section 1.704-2(b)(4) of the Treasury Regulations.

"*Member Nonrecourse Debt Minimum Gain*" means an amount, with respect to each Member Nonrecourse Debt, equal to the Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, as set forth in Section 1.704-2(i)(2) of the Treasury Regulations.

"*Member Nonrecourse Deductions*" has the same meaning as the term "partner nonrecourse deductions" in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"*Membership Interests*" means the ownership interests of the Members in the Company, including rights to liquidating and other distributions, allocations, and information, and the right to vote, consent or approve (but only to the extent set forth in this Agreement).

"*Minimum Gain*" means the aggregate gain, if any, that would be realized by the Company for purposes of computing income or loss with respect to each Company asset if each Company asset were to be disposed of by the Company in a taxable transaction for no consideration other than in full satisfaction of all nonrecourse liabilities of the Company secured by that asset. "*Minimum Gain*" with respect to each Company asset shall be further determined in accordance with the rules of Section 1.704-2(b) and Section 1.704-2(d) of the Treasury Regulation and any subsequent rule or regulation governing the determination of minimum gain. A Member's share of Minimum Gain at the end of any Allocation Year shall equal the aggregate Nonrecourse Deductions allocated to the Member (and his predecessors in interest) up to that time, less that Member's (and his predecessors') aggregate share of decreases in Minimum Gain determined in accordance with Section 1.704-2(g) of the Treasury Regulation.

"*Noncompensatory Option*" has the meaning given such term in Treasury Regulations Section 1.721-2(f) and Section 1.761-3(b)(2) that is not treated as an interest in the Company pursuant to Treasury Regulations Section 1.761-3(a).

"*Nonrecourse Deductions*" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

"*Nonrecourse Liability*" has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

"*Non-Warrant Percentage Interest*" means, with respect to any Main Street Member, as of any date, the proportionate amount of Units held by such Main Street Member, excluding any Units issued upon exercise of a Warrant to such Main Street Member, in relation to the total number of Units that are then outstanding.

"*Obligation*" has the meaning specified in the Loan Agreement.

"*Offered Units*" has the meaning specified in Section 11.2(a)(ii).

"*Original Agreement*" has the meaning specified in the Recitals of this Agreement.

"*Original Effective Date*" has the meaning specified in the introductory paragraph of this Agreement.

"*Outside Managers*" means those individuals from time to time serving as Managers who are not officers or employees of the Company or one or more of its Subsidiaries.

"*Owners*" has the meaning specified in the Recitals of this Agreement.

"*Participating Registrable Members*" has the meaning specified in Section 11.9(a).

"*Percentage Interest*" means, with respect to any Member, as of any date, the proportionate amount of Units held by such Member in relation to the total number of Units that are then outstanding.  The initial Percentage Interest of each Member is as set forth on Exhibit A at the time of the execution of this Agreement.  In the event all or any portion of a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Percentage Interest of the transferor to the extent it relates to the transferred Membership Interest.

"*Permitted Transfer*" means any of the following Transfers by a Transferor Member of any Unit(s) or other Equity Security(ies) in the Company:

(i)     (A) a sale, assignment, conveyance, gift or other disposition to (I) any Controlled Entity of such Transferor Member or (II) the trustee of any Permitted Trust with respect to such Transferor Member, and (B) any subsequent sale, assignment, conveyance, gift or other disposition from such Controlled Entity or Permitted Trust to the Transferor Member that previously owned such Units or other Equity Securities;

(ii)    a sale, assignment, conveyance, gift or other disposition to one or more members of the Transferor Member's Family Group or to any Controlled Entity of one or more members of the Transferor Member's Family Group; *provided, that* no Transferor Member shall Transfer Units or other Equity Securities pursuant to this *subsection (ii)* if such Transferred Units and other Equity Securities constitute (collectively with any and all other Units and other Equity Securities previously Transferred by such Transferor Member pursuant to this *subsection (ii)*) (A) a Percentage Interest of more than ten percent (10%), or (B) twenty percent (20%) of the Units or other Equity Securities held by such Transferor Member immediately prior to such Transfer or Transfers;

(iii)   a transfer to the Company or one or more Members pursuant to the exercise of any of (A) the purchase options described in Section 11.2 hereof, (B) the purchase rights under one or more separate agreements of the Company with certain employee Members, if any, or (C) the call or put rights under Article XII of this Agreement;

(iv)    in the case of a Transferor Member which is a corporation, limited liability company or partnership, a distribution from such corporation, limited liability company or partnership to its shareholders, members or partners, as applicable;

(v)     any *bona fide* pledge by a Member other than KSCO or any Management Member made pursuant to a *bona fide* loan transaction that creates a mere security interest (*provided, however,* that upon any default by a pledgor

Member, any Transfer to the pledgee is not a Permitted Transfer and therefore shall be subject to the restrictions on Transfer set forth in <u>Article XI</u>); or

(vi)    a transfer from any Main Street Member or any Holder (or any of their respective Affiliates) to any of their respective Affiliates.

"*Permitted Trust*" means, with respect to any Transferor Member that is a natural person, any trust (a) that is held exclusively for the benefit of such Transferor Member or members of such Transferor Member's Family Group, (b) with respect to which the initial and any successor sole trustee is the Transferor Member or a member of such Transferor Member's Family Group, and (c) with respect to which the governing trust agreement requires that no Person other than the Transferor Member or a member of such Transferor Member's Family Group shall serve as trustee prior to the termination of this Agreement (unless the Transferor Member is deceased, incapacitated or otherwise not qualified to serve).

"*Person*" means any individual, partnership, limited partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, syndicate, governmental authority or other entity or organization.

"*Preemptive Rights*" has the meaning specified in <u>Section 3.5(b)</u>.

"*Pro Rata Share*" means the ratio determined by dividing the specified Fully Diluted Percentage Interest of each Member to whom a particular provision of this Agreement is stated to apply by the aggregate of the specified Fully Diluted Percentage Interests of all Members to whom that provision is stated to apply.

"*Proceeding*" has the meaning specified in <u>Section 15.3(a)</u>.

"*Profits*" and "*Losses*" means (and "*Profits*" and "*Losses,*" respectively, when used independently of each other, mean), for each Allocation Year or other period, an amount equal to the Company's taxable income or loss, respectively, for that Allocation Year or such other period, determined in accordance with Code Section 703(a) (with all items of income, gain, loss, or deduction that are required to be stated separately pursuant to Code Section 703(a)(1) to be included in taxable income or loss), with the following adjustments (without duplication):

(i)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing "*Profits*" or "*Losses*" pursuant to this definition of "*Profits*" and "*Losses*" shall be added to such taxable income or loss;

(ii)    any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing "*Profits*" or "*Losses*" under this definition, shall be

subtracted from such taxable income or loss (meaning, in the case of a loss, that the amount of the loss shall be increased);

(iii)    if the Gross Asset Value of any Company asset is adjusted pursuant to subsections (ii) or (iii) of the definition of Gross Asset Value, the amount of the adjustment shall be treated as an item of gain (if the adjustment increases the Gross Asset Value of the asset) or an item of loss (if the adjustment decreases the Gross Asset Value of the asset) from the disposition of such asset and shall be taken into account for purposes of computing *"Profits"* or *"Losses"*;

(iv)    gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value;

(v)    in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Allocation Year, computed in accordance with the definition of Depreciation;

(vi)    to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of the adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing *"Profits"* or *"Losses"*; and

(vii)    notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 5.1 or Section 5.2 shall not be taken into account in computing *"Profits"* or *"Losses"*.

The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to Section 5.1 or Section 5.2 shall be determined by applying rules analogous to those set forth in subsections (i) through (vi) above.

*"Prohibited Transfer"* has the meaning specified in Section 11.5(a).

*"Proposed Acquisition Transaction"* means any transaction or series of related transactions that would result in any of the following:

(i)    the sale of all or substantially all of the Units and other Equity Securities of the Company, with each Member receiving its Percentage Interest of the aggregate proceeds of such sale;

(ii)    the sale of all or substantially all of the assets of the Company; or

(iii)     a merger, consolidation, reorganization, recapitalization or other similar transaction with the Company that would result in the Members of the Company immediately prior to such merger, consolidation, reorganization or other similar transaction owning less than fifty percent (50%) of the equity securities or other equity interests (measured by voting power) of the surviving, resulting or acquiring entity (or of its parent if such parent owns one hundred percent (100%) of the surviving, resulting or acquiring entity); *provided, that* each Member shall receive its Percentage Interest of the aggregate proceeds, merger consideration or other consideration of such transaction.

"*Proposed Equity Securities*" has the meaning specified in Section 3.5(a).

"*Proposed Issuance*" has the meaning specified in Section 3.5(a).

"*Put Option Price*" means the greater of (i) Current Market Price and (ii) the amount which, if distributed on the date of determination with respect to such Units, would provide a return of all Capital Contributions of the Main Street Member in question plus the Required IRR, in each case for the total number of Units specified in the applicable Put Option Notice.

"*Put Objection Notice*" has the meaning specified in Section 12.2(c)(i).

"*Put Option Notice*" has the meaning specified in Section 12.2(a).

"*Putting Member*" has the meaning specified in Section 12.2(b).

"*Put Valuation Notice*" has the meaning specified in Section 12.2(b).

"*Record Holder*" means the Person in whose name a Unit is registered in the Register as of the close of business on a particular day.

"*Register*" has the meaning specified in Section 10.1.

"*Registrable Members*" has the meaning specified in Section 11.9(a).

"*Required Vote*" has the meaning specified in Section 9.8(a).

"*Required IRR*" means, with respect to any Member with respect to its Units (excluding its Warrants), as of any determination date, an amount which would result in an 8% internal rate of return on such Units as reasonably determined by the Board of Managers, which shall be calculated on a pre-tax basis and taking into account (a) such Member's Capital Contributions actually paid to the Company (or deemed to be paid pursuant to Section 3.3) by such Member with respect to such Units on or before such determination date and (b) all distributions under Article VI and Section 16.3 actually paid (or deemed to be paid pursuant to Section 6.2) by the Company to such Member in respect of such Units on or before such determination date. The Required IRR will be calculated using the XIRR function in the most recent version of Microsoft Excel (or if such program is no longer available, such other software program for calculating the

Required IRR as is reasonably determined in the discretion of the Board of Managers). For the avoidance of doubt, the Required IRR shall be calculated by treating (i) each Capital Contribution made by a holder of a Unit as an outflow on the date such Capital Contribution is actually paid to the Company, (ii) each distribution received by a holder of a Unit as an inflow on the date such distribution is actually received by such holder, and (iii) each tax distribution pursuant to Section 6.3 as received by a holder of a Unit when paid by the Company and not when the tax distribution is offset by other distributions.  For purposes of calculating the Required IRR of a transferee of a Unit, all Capital Contributions made by and distributions to its transferor (and all prior transferors) with respect to such Unit shall be deemed to have been made by or to the transferee.

"*Sale Notice*" has the meaning specified in Section 3.5(a).

"*Securities Act*" means the Securities Act of 1933, as amended, and any similar or successor federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time.  Reference to a particular section of the Securities Act shall include a reference to the comparable section, if any, of any such similar or successor federal statute.

"*Subscription Agreement*" means that certain Subscription Agreement, dated as of the Original Exeuction Date, by and among the Company and the Main Street Members.

"*Subsidiary*" means any corporation, partnership or limited liability company of which the Company from time to time owns, directly or indirectly through one or more other corporations, partnerships or limited liability companies, fifty percent (50%) or more of the outstanding capital stock or partnership or membership interests having general voting power.

"*Tag-Along Rights*" has the meaning specified in Section 11.2(d)(iii).

"*Tag-Along Units*" has the meaning specified in Section 11.2(d)(iii).

"*Tax Matters Member*" has the meaning specified in Section 14.2.

"*Taxing Authority*" means any Governmental Entity responsible for the imposition, assessment, enforcement or collection of any tax.

"*Transfer*" or "*Transferred*" means any direct or indirect change in the ownership of any Unit(s) or other Equity Security(ies) in the Company, whether made voluntarily or involuntarily by operation of law, including, but not limited to:

       (i)     a sale, assignment, conveyance, gift or other disposition (other than by operation of law or as otherwise described in clauses (ii) through (ix) below) to any Person, including but not limited to any terminating or non-terminating distribution from a Permitted Trust or from any other trust that is not a Permitted Trust (whether voluntarily or involuntarily or by operation of law);

(ii)      a transfer to the personal representative of the estate of a Member upon such Member's death, and any subsequent transfer from such personal representative to the heirs of the deceased Member under his or her will or by the laws of descent and distribution;

(iii)     a transfer to a judicially appointed personal representative as a result of the adjudication by a court of competent jurisdiction that the Transferor Member is mentally incompetent to manage his or her person or property;

(iv)      a transfer to the Transferor Member's spouse or former spouse, or heirs of such spouse or former spouse, in connection with a division of their community property in the event of a divorce involving the Transferor Member and such spouse or former spouse;

(v)       a transfer to the Transferor Member's spouse or former spouse, or heirs of such spouse or former spouse, in connection with a division of their community property upon the death of the Transferor Member or such spouse;

(vi)      a general assignment for the benefit of creditors, or any assignment to a creditor resulting from the creditor's foreclosure upon (or assignment in lieu of such foreclosure) or execution against any Lien on such Unit(s) or other Equity Security(ies);

(vii)     the filing by the Transferor Member of a voluntary bankruptcy petition;

(viii)    the entry of a judicial order granting the relief requested by the petitioner in an involuntary bankruptcy proceeding filed against the Transferor Member; or

(ix)      any Permitted Transfer.

"*Transfer Notice*" has the meaning specified in Section 11.2(a)(ii).

"*Transferor Member*" has the meaning specified in Section 11.1(a).

"*Treasury Regulations*" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations are issued, supplemented and amended from time to time.

"*Undisputed Items*" has the meaning specified in Section 12.2(c)(iii).

"*Unit Certificate*" has the meaning specified in Section 3.6.

"*Units*" means the units and other equity interests, if any, into which the Membership Interests are divided as provided in this Agreement, as set forth on Exhibit A; *provided, that* for purposes of Article X and Article XI, "Units" shall include all warrants and options to purchase Units.

"*Warrant Agreements*" means (i) that certain Warrant Agreement, dated as of the Original Effective Date, by and among the Company and the holders identified on Exhibit A thereto and (ii) that certain Warrant Agreement, dated as of the Effective Date, by and among the Company and the holders identified on Exhibit A thereto, and in each case includes any Holder's successors and assigns.

"*Warrants*" means the 2015 Warrants and the 2016 Warrants as such terms are defined in the Loan Agreement.

"*Warrant Holder*" means a Holder or a holder of a KSCO Warrant.

1.2     Construction.  Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter.   All references to "Articles", "Sections", "*subsections*" and "*clauses*" refer to articles, sections, subsections and clauses of this Agreement, unless otherwise specified.  The captions in this Agreement are for convenience only, and shall not affect the meaning or interpretation of this Agreement.  In this Agreement, "including" is used only to indicate examples, without limitation as to the indicated examples, and without limiting any generality that precedes it.

1.3     GAAP and Consolidation.   For financial reporting purposes, all Company financial statements referred to in this Agreement, and all references to the assets, liabilities, revenues, income, expenses, losses and financial position and results of operations of the Company shall be prepared, presented and determined in accordance with GAAP and, to the extent required or permitted by GAAP, on a consolidated basis for the Company and its consolidated Subsidiaries.

**ARTICLE II**
**ORGANIZATION**

2.1     Continuation.   The Company was organized as a Delaware limited liability company by the filing of the Certificate of Formation (as amended from time to time, the "**Certificate**") with the Secretary of State of the State of Delaware on January 26, 2015 under and pursuant to the Act.  The Members hereby continue the Company as a limited liability company pursuant to the Act for the purposes hereunder described.

2.2     Name.  The name of the Company is "Volusion, LLC".  All Company business shall be conducted in that name or such other names that comply with applicable Law as the Board of Managers may select from time to time.

2.3     Registered Office; Registered Agent; Principal Office in the United States; Other Offices.  The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board of Managers may designate from time to time in the manner provided by Law.  The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board of Managers may designate from time to time in the manner provided by Law.  The principal office of the Company in the United States shall be at such place as the Board of Managers may designate from time to time, which need not be in the

State of Delaware, and the Company shall maintain records there as required by the Act and shall keep the street address of such principal office at the registered office of the Company in the State of Delaware.  The Company may have such other offices as the Board of Managers may designate from time to time.

2.4     <u>Purposes and Powers</u>.  The Company is being formed to (i) engage directly in, or enter into or form any entity or any arrangement to engage indirectly in, any business activity the Board of Managers approves which a limited liability company formed under the Act lawfully may conduct and, in connection therewith, exercise all the rights and powers conferred on, and perform or comply with all obligations incurred by or imposed on, the Company in or pursuant to the agreements relating to that business activity; and (ii) do anything necessary or convenient to the conduct and promotion of the business of the Company.

The Company shall have all such powers as are necessary or appropriate to carry out the purpose of the Company, including the power to:

(a)     conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any state, territory, district or possession of the United States or in any foreign country;

(b)     acquire (by purchase, lease, contribution of property or otherwise), own, hold, operate, maintain, improve, lease, sell, convey, mortgage, transfer or dispose of any real or personal property that may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

(c)     enter into, perform and carry out contracts and leases (including contracts and leases with any Member, Manager or officer of the Company or any Affiliate of any of them) necessary, convenient or incidental to the accomplishment of the purpose of the Company;

(d)     extend, renew, terminate, modify, amend, waive, execute, acknowledge or take any other action with respect to any contracts or leases entered into by the Company;

(e)     purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, and otherwise use and deal in and with, shares or other securities or obligations of or interests in domestic or foreign corporations, associations, general or limited partnerships, trusts or limited liability companies;

(f)     borrow money and issue evidences of indebtedness, and to secure the same by Liens on the real and personal property of the Company;

(g)     lend money for any proper purpose, invest and reinvest its funds, and to take and hold real and personal property for the payment of funds so loaned or invested;

(h)     sue and be sued, complain and defend, and participate in administrative or other proceedings, in the name of the Company or otherwise, and pay, collect,

36416976

compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the Company;

(i)     appoint employees and agents of the Company, and define their duties and fix their compensation;

(j)     indemnify any Person in accordance with and subject to applicable Law and to obtain any and all types of insurance;

(k)     exercise all general powers granted under the Act; and

(l)     take all such other actions and to make, execute, acknowledge and file any and all documents or instruments related to the exercise of any of the foregoing powers or otherwise necessary, convenient or incidental to the accomplishment of the purpose of the Company.

2.5     <u>Qualification in Other Jurisdictions</u>.  The Board of Managers shall cause the Company to be qualified, formed or registered under limited liability company acts, assumed or fictitious name statutes or similar Laws in any jurisdiction in which the Company transacts business and in which the Board of Managers determines that qualification, formation or registration is necessary or appropriate.  Any officer of the Company designated by the Board of Managers shall have the authority to execute, deliver and file such certificates and other instruments (and any amendments thereto or restatements thereof) as are necessary for the Company to be qualified, formed or registered under limited liability company acts, assumed or fictitious name statutes or similar Laws in any jurisdiction in which the Company transacts business.

2.6     <u>No State-Law Partnership</u>.  The Company shall not be a partnership (including a general or limited partnership) or a joint venture, and no Member or Manager, by virtue of his status as a member or manager, respectively, of the Company,  shall be a partner or joint venturer of any other Member or Manager, for any purpose other than federal and state income tax purposes, and this Agreement shall not be construed to suggest otherwise.

2.7     <u>Term</u>.  The Company commenced upon the filing of the Certificate with the Secretary of State of the State of Delaware and shall continue in existence indefinitely or until such time as this Agreement may specify.

## ARTICLE III
## MEMBERSHIP AND MEMBERSHIP INTERESTS

3.1     <u>Admission as Members; Restatement of Original Agreement</u>.  The Members as of the Effective Date are set forth on <u>Exhibit A</u> hereto, which is hereby incorporated by reference, and each Member holds the number of Units set forth opposite such Member's name on <u>Exhibit A</u> hereto; *provided, that* each Holder shall be admitted as a Member of the Company automatically and immediately upon its exercise of the Warrants, respectively, without any further action or approval required by the Company, such Holder or any other Member. Each Person identified as a Member on <u>Exhibit A</u> that was not already a member of the Company prior to the Effective Date is hereby admitted to the Company as a member. Any Person to

whom a Membership Interest is issued by the Company after the Effective Date in accordance with the terms and conditions of this Agreement shall be admitted as a Member upon compliance with all applicable requirements of <u>Section 3.4</u>.  Any Person to whom a Membership Interest is Transferred in accordance with the terms and conditions of this Agreement shall be admitted as a Member upon compliance with the applicable requirements of <u>Article X</u> and <u>Article XI</u>.  The Members hereby amend and restate the Original Agreement, which is replaced and superseded in its entirety by this Agreement.

3.2     <u>Units of Membership Interests</u>.

(a)     The Membership Interests shall be divided into and represented by, and the Company shall have the authority to issue, a single class of Units of Membership Interests consisting initially of 100,000,000 Units (the *"Units"*) and fractions thereof. The 100,000,000 Units do not include the Units underlying the Warrants or the KSCO Warrants, which are hereby authorized to be issued upon exercise thereof as set forth in the Warrants and the KSCO Warrants, respectively.  Subject to the terms and conditions of this Agreement, the Company may also authorize and issue additional Units for such consideration and such purposes as the Board of Managers may determine from time to time.

(b)     Except as provided in <u>Section 3.5</u> of this Agreement or in a separate agreement with the Company, no Unit will entitle its holder to (i) any preemptive or preferential right to acquire or subscribe for any Units of any class or series, whether now or hereafter authorized, which at any time the Company may issue, offer for sale or sell, or (ii) any right to cumulate votes in any election of Managers.

3.3     <u>Warrants</u>.   On the Original Effective Date and on the Effective Date, the Company issued the Warrants to the Holders pursuant to the Loan Agreement.  Effective upon each Holder's exercise of a Warrant (if ever), such Holder shall be deemed to have made a Capital Contribution to the Company in exchange for Units in the amount then set forth opposite such Holder's name on <u>Exhibit A</u> hereto.

3.4     <u>Future Issuances of Equity Securities; Admission Procedures</u>.

(a)     Subject to <u>Sections 3.5</u> and <u>7.3</u> below, the Company may issue Equity Securities (in addition to the Units issued or authorized to be issued by <u>Section 3.2</u> and <u>3.3</u>) to Members or any other Persons, for any purpose, upon authorization of the Board of Managers and without the approval of the Members.  The Company may assume liabilities in connection with the issuance of Equity Securities if the Board of Managers so determines.  The Board of Managers shall determine the consideration for, and the terms and conditions of, any future issuance of Equity Securities.  In connection with any such issuance, the officers of the Company shall do all such things as they determine are necessary or appropriate, including the filing of any certificates or other documents with any Governmental Entity.

(b)     The admission of any Person as a Member upon the issuance of Equity Securities pursuant to this <u>Section 3.4</u>, or, if applicable, pursuant to any exercise or

conversion of any exercisable or convertible Equity Securities, shall be effective only when:

        (i)     if such Person is being issued incentive equity interests (which may be in the form of restricted units, incentive options or similar instruments) pursuant to the Company's Equity Incentive Plan or is converting such incentive equity interests into Equity Securities, such Person executes and delivers to the Company an appropriate document (in form reasonably satisfactory to the Company) in which it acknowledges and agrees that such Person's ownership of such Equity Securities shall be subject to, and that such Person shall comply with, all of the terms and conditions of this Agreement (other than the representations and warranties contained in Section 17.3), and (B) such Person shall not effect any Transfer of Equity Securities except in compliance with the terms and conditions of this Agreement, the Equity Incentive Plan and any other related agreements and legal documents;

        (ii)     if such Person is not being issued incentive equity interests pursuant to the Company's Equity Incentive Plan or converting any such incentive equity interests into Equity Securities, such Person executes and delivers to the Company an appropriate document (in form reasonably satisfactory to the Company) in which it acknowledges and agrees that (A) such Person's ownership of such Equity Securities shall be subject to, and that such Person shall comply with, all of the terms and conditions of this Agreement, (B) such Person shall not effect any Transfer of Equity Securities except in compliance with the terms and conditions of this Agreement, and (C) the representations and warranties contained in Section 17.3 are true and correct with respect to such Person as of the date upon which the issuance of the Equity Securities is effective; and

        (iii)     such Person's spouse, if applicable, has executed and delivered to the Company an "Addendum for Spouses" in the form attached as Exhibit B to this Agreement (or in such other form as may be approved by the Company in its sole discretion).

        (c)     Notwithstanding the foregoing, by executing and delivering this Agreement below in their capacities as "Warrant Holders", each Holder has hereby satisfied all of the conditions to their admission as a Member of the Company set forth in this Section 3.4 and elsewhere in this Agreement, such that upon issuance of any Units or other Membership Interests to any Holder in connection with an exercise of the Warrants or otherwise, (a) the applicable Holder shall be admitted to the Company as a Member automatically and immediately, without any further action or approval being required by the Company, such Holder or any other Member, and (b) the applicable Holder shall be deemed to have executed this Agreement as a Member and shall be bound by the terms and conditions of this Agreement.

3.5     <u>Preemptive Rights</u>.

(a)     <u>Sale Notice</u>.  In the event the Company proposes to undertake an issuance of Equity Securities other than an issuance of Units or other Equity Securities (i) underlying any Warrant(s) or the KSCO Warrant(s), pursuant to an exercise of such Warrant(s) or the KSCO Warrant(s), respectively, (ii) to employees of the Company or any of its Subsidiaries pursuant to any restricted unit, incentive option or other similar plan or agreement approved by the Board of Managers, (iii) in connection with any acquisition by the Company of another company (whether by asset purchase, stock purchase, merger, consolidation or any other similar transaction) that has been approved by the Board of Managers, (iv) to banks or other financial institutions, pursuant to a debt financing or similar transaction approved by the Board of Managers for other than primarily equity financing purposes, or (v) that is approved by the holders of a majority of the Equity Securities of the Company on a Fully Diluted Basis, including the approval of the Main Street Members holding a majority of the Equity Securities then held by all Main Street Members, the Company will obtain a commitment to purchase such Equity Securities and promptly give each Eligible Member written notice (the *"Sale Notice"*) of its intention to issue securities pursuant to such commitment (the *"Proposed Issuance"*) together with a copy of such commitment, which commitment shall describe (i) the number and class (and the rights, powers and preferences, if different from the then outstanding Units) of Units or other Equity Securities that the Company proposes to issue (the "*Proposed Equity Securities*"), (ii) the price and terms upon which the Company proposes to issue such Proposed Equity Securities, (iii) the identity of the purchaser or purchasers, and (iv) the number of Proposed Equity Securities that such Eligible Member is entitled to purchase, and the aggregate purchase price therefore, pursuant to their Preemptive Rights in subsection (b) below.

(b)     <u>Preemptive Rights</u>.  Each Eligible Member shall have the right, but not the obligation (the "*Preemptive Rights*"), to purchase Proposed Equity Securities, at the price and on the other terms set forth in the Sale Notice, in an amount not to exceed the total number of Proposed Equity Securities *multiplied by* a fraction, the numerator of which is equal to the Fully Diluted Percentage Interest of such electing Eligible Member, and the denominator of which is equal to the aggregate Fully Diluted Percentage Interests of all Members.

(c)     <u>Exercise Notice</u>.  Each Eligible Member will have twenty (20) days from the date of receipt of any Sale Notice to:

(i)     agree to purchase its Fully Diluted Percentage Interest or lesser number of such Proposed Equity Securities pursuant to its Preemptive Rights, for the price and upon the terms specified in the commitment, by giving written notice to the Company and stating therein its decision and the quantity of Proposed Equity Securities to be purchased; or

(ii)     decline to exercise its Preemptive Rights with respect to such Proposed Issuance.

If any Eligible Member has not responded within such twenty (20) day period, such Eligible Member shall be deemed to have elected not to purchase any Proposed Equity Securities

(d)    Closing.  If any Eligible Member exercises its Preemptive Rights, it shall promptly take all steps described in the Sale Notice to effectuate its purchase of the Proposed Equity Securities covered thereby, including, without limitation, the furnishing of information and other transfer documents customarily provided in connection with the execution of such sales, including such representations, warranties, agreements, covenants and indemnities as may be required by the terms of the Sale Notice.  All references to "sell" herein shall be deemed to include transfer, dispose of or otherwise convey in the manner in which such transfer is proposed to be made.

(e)    Subsequent Sale.  The Company will have sixty (60) days following expiration of the period provided in subsection (c) above to sell the Proposed Equity Securities as to which the Eligible Members' Preemptive Rights were not exercised, at a price and upon such other terms as are specified in the commitment and the Sale Notice. In the event the Company has not sold such Proposed Equity Securities within said 60-day period or desires to sell such Proposed Equity Securities to a purchaser not named in the commitment or on terms that differ from those described in the commitment, the Company will not thereafter issue or sell any Equity Securities without again complying with this Section 3.5.

(f)    No Forfeiture of Rights.  No failure by any Eligible Member to exercise its Preemptive Rights with respect to any Proposed Issuance shall result in the forfeiture, limitation or other adverse effect on such Eligible Member's Preemptive Rights with respect to any future issuances of Equity Securities by the Company.

(g)    Termination.  The terms and conditions of this Section 3.5 shall terminate upon, and shall not be applicable to, a bona fide, firmly underwritten public offering pursuant to a registration statement filed under the Securities Act.

3.6    Unit Certificates.    On the Company's issuance of Units to any Person, the Company may, at its option, issue certificates, in such form and signed by such officer or officers of the Company as the Board of Managers authorizes or prescribes (any such certificate being a "*Unit Certificate*"), in the name of that Person to evidence the number and class or series of Units so issued.  The Board of Managers may prescribe rules and regulations relating to the registration of the transfer and exchange of Unit Certificates and the replacement of mutilated, destroyed, lost or stolen Unit Certificates.

3.7    Non-Equity Securities.    The Company may also issue any type of non-equity security of the Company from time to time to the Members or other Persons on terms and conditions established by the Board of Managers, which securities may include nonconvertible debt obligations of the Company.  No Member shall have any Preemptive Rights with respect to any proposed issuance of such non-equity securities by the Company.

3.8    <u>Nature of Interests</u>.    Membership Interests, and Units thereof, are personal property.  No Member, in his capacity as such, shall have any rights in respect of, or interest in, specific property of the Company.

3.9    <u>Main Street Members</u>.    Notwithstanding anything in this Agreement to the contrary, any Main Street Member can exercise any and all rights and remedies related to their respective Membership Interests on an individual basis, without the corresponding exercise or consent of any other Main Street Member.  No waiver or consent of, or failure to exercise, any right or remedy related to their respective Membership Interests by any Main Street Member shall affect any right or remedy of any Main Street Member.

# ARTICLE IV
# CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

4.1    <u>Capital Contributions</u>.    The Members have made Capital Contributions in the amounts and on the dates indicated opposite their names on <u>Exhibit A</u> to this Agreement in exchange for the number of Units indicated on <u>Exhibit A</u>.

4.2    <u>Subsequent Capital Contributions</u>.    No Member shall be obligated to make any Capital Contributions other than as required by <u>Section 4.1</u> or by any separate and subsequent subscription or other agreement executed by a Member.  From time to time after the Effective Date, the Company may accept such Capital Contributions (in addition to those required by <u>Section 4.1</u>) as are authorized by the Board of Managers, in connection with the issuance of new Membership Interests or other Equity Securities or otherwise, in accordance with and as permitted by this Agreement.

4.3    <u>No Return of Capital Contributions</u>.    Except as expressly provided elsewhere in this Agreement, and except as may be separately undertaken by the Company in a written agreement signed by the Company and approved by the Board of Managers as required by <u>Section 7.3</u>, a Member shall not be entitled to the return of any of his Capital Contributions, or to be paid any interest, salary or draw in respect of his Capital Contributions or Capital Account.  An unrepaid Capital Contribution shall not be a liability of the Company or any Member.

4.4    <u>Capital Accounts</u>.    A separate capital account (collectively, the "***Capital Accounts***") shall be established and maintained for each Member.  Each Member's Capital Account shall be increased by:

(a)    the amount of money contributed by that Member to the Company;

(b)    the initial Gross Asset Value of any property (other than money) contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is deemed to have assumed or taken subject to under Section 752 of the Code);

(c)    any Profit (or items thereof) allocated to that Member pursuant to <u>Section 5.1</u>; and

(d)  any items in the nature of income or gain that are specially allocated to that Member pursuant to Section 5.2.

Each Member's Capital Account shall be decreased by:

(a)  the amount of money distributed to that Member by the Company;

(b)  the Gross Asset Value of any property (other than money) distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is deemed to have assumed or taken subject to under Section 752 of the Code);

(c)  allocations to that Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code;

(d)  any Loss (or items thereof) allocated to that Member pursuant to Section 5.1; and

(e)  any items in the nature of loss or deduction that specially allocated to that Member pursuant to Section 5.2.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations, and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  In furtherance thereof, the Members' Capital Accounts shall be maintained and adjusted as permitted by the provisions of Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations and as required by the other provisions of Sections 1.704-1(b)(2)(iv) and 1.704-1(b)(4) of the Treasury Regulations, including adjustments to reflect the allocations to the Members of Depreciation, depletion, amortization, and gain or loss as computed for book purposes rather than the allocation of the corresponding items as computed for tax purposes, as required by Section 1.704-1(b)(2)(iv)(g) of the Treasury Regulations.  Profits and Losses from the disposition of an asset shall be reflected in the Capital Accounts prior to any distributions. If, after the allocations described in Section 5.1 have been made, a Member's Capital Account attributable to the exercise by such Member of a Noncompensatory Option does not reflect such Member's relative right to share in Company capital, Company capital shall be reallocated in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(s)(3) between the existing Members and the exercising Member to the extent necessary to cause the exercising Member's Capital Account to reflect the exercising Member's right to share in Company capital under this Agreement.

4.5  Indemnity Payments.  Notwithstanding anything to the contrary in this Agreement, any indemnity payments to the Company or any indemnity payments by the Company under the Contribution Agreement or the Subscription Agreement shall be treated as Capital Contributions to the Company or distributions from the Company for federal income tax purposes, as applicable; *provided*, that such payments will not affect the Capital Account of, any other contributions to be made by, or the distributions or allocations to be made to, any Member under this Agreement.

**ARTICLE V**
**ALLOCATIONS**

5.1     <u>General Allocation Rule</u>.  After giving effect to the special allocations set forth in <u>Section 5.2</u> and after adjusting for all Capital Contributions and distributions made during the Allocation Year, Profits and Losses (or to the extent necessary, individual items of profit, income, gain, loss, or deduction) shall be allocated among the Members in a manner such that the Capital Account balance of each Member, immediately after giving effect to such allocation, is, as closely as possible (proportionately), equal to (i) the amount that would be distributed to such Member if the Company was dissolved, its affairs wound up, and its assets were sold for cash in amounts equal to their respective Gross Asset Values, all liabilities of Company were satisfied in accordance with their terms (limited, with respect to each nonrecourse liability, to the Gross Asset Values of the assets securing each such liability), and the resulting or remaining assets of Company were distributed to the Members in accordance with <u>Section 16.3</u>, minus (ii) the sum of such Member's share of Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of the Company's assets described in clause (i).

5.2     <u>Special Tax Allocations</u>. The following special allocations shall be made in the following order and priority:

(a)     <u>Minimum Gain Chargeback</u>.    Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, and notwithstanding any other provisions of this Article V, if there is a net decrease in Minimum Gain during any Allocation Year, each Member shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to that Member's share of the net decrease in Minimum Gain, determined in accordance with Section 1.704-2(g) of the Treasury Regulations.   Allocations pursuant to the previous sentence shall be made in proportion to the total of such amounts required to be allocated to each Member pursuant thereto.   The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations.   This <u>Section 5.2(a)</u> is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations, and shall be interpreted accordingly.

(b)     <u>Member Minimum Gain Chargeback</u>.  Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, and notwithstanding any other provision of this <u>Article V</u>, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Allocation Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the total of such amounts required to be allocated to each Member pursuant thereto.  The

items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations.  This <u>Section 5.2(b)</u> is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted accordingly.

(c)     <u>Qualified Income Offset</u>.  If any Member unexpectedly receives any adjustments, allocations or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of Company income and gain shall be specially allocated to that Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible; *provided* that an allocation pursuant to this <u>Section 5.2(c)</u> shall be made only if and to the extent that the Member in question would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been tentatively made without regard to this <u>Section 5.2(c)</u>.

(d)     <u>Gross Income Allocation</u>.  In the event any Member has a deficit Capital Account at the end of Allocation Year that is in excess of the sum of the amount such Member is obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be allocated items of Company income and gain in the amount of such excess as quickly as possible; *provided*, that an allocation pursuant to this <u>Section 5.2(d)</u> shall be made only if and to the extent that such Member would have a deficit in such Member's Capital Account after all other allocations provided in this <u>Article V</u> have been tentatively made as if this <u>Section 5.2(d)</u> or <u>Section 5.2(c)</u> were not a part of this Agreement.

(e)     <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions for any Allocation Year shall be specially allocated to the Members in accordance with their Percentage Interests.

(f)     <u>Member Nonrecourse Deductions</u>.  Any Member Nonrecourse Deductions for any Allocation Year shall be specially allocated to the Member or Members who bear the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable, in accordance with Section 1.704-2(i)(1) of the Treasury Regulations.

(g)     <u>Section 754 Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, under Section 1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations, to be taken into account in determining Capital Accounts, the amount of the resulting adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with the manner in which their Capital Accounts are required to be adjusted pursuant to Section 1.704-1(b)(2)(iv)(m) of the Treasury Regulations.

(h)     Stop Loss. If the amount of Losses for any taxable period that would otherwise be allocated to a Member under Section 5.1 would cause or increase an Adjusted Capital Account Deficit of such Member as of the last day of such taxable period, then a proportionate part of such Losses equal to such excess shall be allocated to the other Members, and the remainder of such Losses, if any, shall be allocated to such Member.

5.3     Other Allocation Rules.

(a)     For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Board of Managers using any permissible method under Code Section 706 and the Treasury Regulations.  Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Section 1.752-3(a)(3) of the Treasury Regulations, the Members' interests in Profits shall be determined in accordance with their Percentage Interests.

(b)     To the extent permitted by Section 1.704-2(h)(3) of the Treasury Regulations, the Members shall endeavor not to treat distributions made under Section 6.2 as having been made from the proceeds of a Nonrecourse Liability or a Member Nonrecourse Debt only to the extent that such distributions would not cause or increase an Adjusted Capital Account Deficit for any Member.

5.4     Contributed Property; Code Section 704(c); Corrective Allocations Relating to Noncompensatory Options.

(a)     The Company shall, except to the extent such item is subject to allocation pursuant to Section 5.4(b) below, allocate each item of income, gain, loss, deduction and credit, as determined for federal income tax purposes, in the same manner as such item was allocated for purposes of maintaining the Members' Capital Accounts.

(b)     In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deductions with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with the definition of Gross Asset Value) using any method selected by the Board of Managers; provided, that, with respect to any asset deemed contributed by KSCO for U.S. federal income tax purposes on the Original Effective Date, the Company shall use the "traditional method" described in Section 1.704-3(b)(1) of the Treasury Regulations.

(c)     If the Gross Asset Value of any Company asset is adjusted pursuant to subsection (ii) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross

Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder in accordance with the preceding paragraph.

(d)    <u>Noncompensatory Options</u>.   In accordance with Treasury Regulations Sections 1.704-1(b)(2)(iv)(s)(4) and 1.704-1(b)(4)(x), if Company capital is reallocated in accordance with the last sentence of <u>Section 4.4</u>, beginning with the year of reallocation and continuing until the allocations required are fully taken into account, the Company will make corrective allocations (allocations of items of gross income or gain or loss or deduction for federal income tax purposes that do not have a corresponding book allocation) to take into account the Capital Account reallocation.

(e)    Any elections or other decisions relating to such allocations shall be made by the Members in any manner that reasonably reflects the purpose and intention of this Agreement.   Allocations pursuant to this <u>Section 5.4</u> are solely for purposes of federal, state, and local taxes and shall not affect or in any way be taken into account in computing any Member's Capital Account or share of Profits, Losses, other items or distributions (other than as set forth in <u>Section 6.3</u>) pursuant to any provision of this Agreement.

5.5    <u>Intent of Allocations</u>.   The parties intend that the foregoing Capital Account allocation provisions of this <u>Article V</u> shall produce final Capital Account balances of the Members equal to the amount of liquidating distributions that are made pursuant to <u>Section 16.3</u>. To the extent that the Capital Account allocation provisions of <u>Article V</u> would fail to produce such final Capital Account balances, (i) such provisions shall be amended by the Board of Managers if and to the extent necessary to produce such result and (ii) Profits and Losses (or to the extent necessary, individual items of income, gain, loss or deduction) of the Company for prior open years shall be reallocated by the Board of Managers among the Members to the extent it is not possible to achieve such result with allocations of items of income, gain, loss or deduction for the current year and future years, as approved by the Board of Managers.   This <u>Section 5.5</u> shall control notwithstanding any reallocation or adjustment of Profits and Losses or items thereof by the Internal Revenue Service or any other taxing authority.

5.6    <u>Acknowledgement of Allocation Rules</u>.   The Members are aware of the income tax consequences of the allocations made by this <u>Article V</u>, and agree to be bound by the provisions of this <u>Article V</u> in reporting their shares of Company Profits and Losses for income tax purposes.

## ARTICLE VI
## DISTRIBUTIONS

6.1    <u>General</u>.   The Company, if the Board of Managers authorizes it to do so, may make distributions to the Members at such times and in such amounts as shall be determined by the Board of Managers.   Except as provided in <u>Section 6.3</u> in connection with required tax distributions and <u>Article XVI</u> in connection with a winding up and termination of the Company, any distributions the Company may make pursuant to this <u>Article VI</u> will be at the sole discretion of the Board of Managers, after taking into account the Company's financial position and any

contractual provisions imposed on the ability of the Company to make such distributions, and, if made, will be made as follows:

(a)     To the extent the Board of Managers determines in its discretion to make distributions from the Company's normal course operations at any time or from time to time (which, for the avoidance of doubt, means distributions other than in connection with a Liquidity Event or under Article XVI), such distributions shall be made to the Members in proportion to their respective Percentage Interests; *provided*, that no distribution shall be made pursuant to this Section 6.1(a) unless the Board of Managers first reasonably determines that if the Company were to dissolve pursuant to Section 16.1 immediately after such distribution the Company would have a sufficient amount of assets after the payment of creditors pursuant to Section 16.3(a) to make the distribution required in Section 6.1(b)(i).

(b)     To the extent the Board of Managers determines to make distributions of proceeds from a Liquidity Event, such distributions shall be made in the following order of priority (without duplication):

(i)     first, 100% to the Main Street Members (in proportion to such Main Street Members' respective Non-Warrant Percentage Interests) until each Main Street Member has received cumulative distributions pursuant to this Section 6.1(b)(i) totaling such Main Street Member's total Non-Warrant Capital Contributions; provided, that the amount of the Non-Warrant Capital Contributions shall be reduced by the cumulative amount of any indemnification payments made by the Company to the Main Street Members pursuant to the Subscription Agreement;

(ii)     second, 100% to the Members in proportion to the Members' respective Percentage Interests, excluding the Main Street Members' respective Non-Warrant Percentage Interests, until such Members have received cumulative distributions pursuant to this Section 6.1(b)(ii) totaling the product of (A) the aggregate amount distributed to the Main Street Members under Section 6.1(b)(i) multiplied by (B) a fraction, (1) the numerator of which is the sum of the Percentage Interests of the Members excluding the Main Street Members' respective Non-Warrant Percentage Interests, and (2) the denominator of which is the sum of the Main Street Members' Non-Warrant Percentage Interests; and

(iii)     thereafter, to the Members in proportion to their respective Percentage Interests.

6.2     Deemed Distributions Resulting from Sales of Units.  Notwithstanding anything to the contrary in this Agreement, if any Member (other than (i) a Main Street Member, (ii) a Member that acquired Equity Securities pursuant to the Equity Incentive Plan or (iii) subject to the limitation provided herein, KSCO) or its permitted transferees sells, exchanges or Transfers any Units (including sales of less than all its Units but excluding Transfers to permitted transferees) in a single or series of transactions (and, in the case of KSCO, that would result in KSCO's Fully Diluted Percentage Interest being 85% or less of KSCO's Fully Diluted

Percentage Interest on the Effective Date), then the net proceeds to all Members from such Transfer or Transfers shall be allocated and paid among all the Members as if the Company had received such proceeds in a sale of its assets in a Liquidity Event and distributed such proceeds among the Members pursuant to Section 6.1(b). Each Member agrees to pay to the other Members such amounts as are necessary to give effect to the immediately preceding sentence in connection with any Transfer of Units other than a Transfer by a Main Street Member, a Transfer by a Member that acquired Equity Securities pursuant to the Equity Incentive Plan, a Transfer by KSCO that would not result in KSCO's Fully Diluted Percentage Interest being 85% or less of KSCO's Fully Diluted Percentage Interest on the Effective Date, or a Permitted Transfer. Any such payment shall be treated by the Members as a reallocation of the Transfer price with respect to such Transfer for federal income tax purposes. Notwithstanding anything to the contrary in this Agreement, if the Main Street Members receive proceeds from another Member's or its permitted transferee's Transfer of Units as a result of the application of this Section 6.2 and Section 6.1(b)(i) (the "*Deemed Preferred Distributions*"), then the Transferee of such Units and such Transferred Units shall be subject to the right of the Transferor of such Units to receive distributions under Section 6.1(b)(ii) (prior to the making of any distributions to such Transferee under Section 6.1(b)(ii) or 6.1(b)(iii)) to the same extent and in the same aggregate amount that such Transferor would receive distributions under Section 6.1(b)(ii) if, instead of a Transfer of Units and the payment of Deemed Preferred Distributions to the Main Street Members, the amount of Deemed Preferred Distributions had been actually distributed by the Company. For the avoidance of doubt, each distribution made to a Main Street Member pursuant to Section 6.1(b)(i) or this Section 6.2 shall be credited toward the achievement of the cumulative distribution threshold of such Main Street Member as set forth in Section 6.1(b)(i).

6.3     Tax Distributions. If and to the extent permitted by the Loan Agreement and applicable Law, the Company shall make a quarterly (based upon quarterly federal estimated income tax payment due dates) cash distribution to each Member in proportion to their Percentage Interests in the smallest amount necessary so that the aggregate amount of distributions under Section 6.1 that each Member shall have received (after giving effect to such quarterly distribution and all other distributions from and after the Effective Date) as of the end of any Allocation Period equals such Member's Hypothetical Tax Amount. "*Hypothetical Tax Amount*" shall mean with respect to any Member and with respect to any Allocation Period, an amount equal to the product of (i) the combined maximum prevailing federal and highest state and local income tax rates for such Allocation Period applicable to an individual residing in Los Angeles, California (taking into account the deductibility of state and local taxes and the character of income and loss allocated as it effects the applicable tax rate) *times* (ii) the cumulative sum of Profits and Losses allocated for tax purposes since inception of the Company with respect to the Units of such Member (or his predecessor interest holder) pursuant to this Agreement (without regard to items allocated to a Member under Section 5.4(b) of this Agreement pursuant to the remedial allocation method designated in Section 1.704-3(d) of the Treasury Regulations). Any distribution under this Section 6.3 shall be taken into account in determining subsequent distributions under Section 6.1 and Section 16.3, and any distribution under Section 6.1 and Section 16.3 shall be treated to the extent of such amounts as satisfying the Company's obligation to make distributions under this Section 6.3, so that each Member receives the same aggregate distributions it would have received thereunder if this Section 6.3 were not contained in this Agreement. For the avoidance of doubt, it is intended that no distributions will be made pursuant to this Section 6.3 to the extent that other distributions or payments pursuant to

this Agreement are sufficient to pay the Members' respective Hypothetical Tax Amounts.  If a Warrantholder is treated as a partner of the Company under Treasury Regulations section 1.761-3(a) for U.S. federal income tax purposes with respect to a Warrant or a KSCO Warrant, as applicable, prior to the exercise of such Warrant or KSCO Warrant, then to the extent that allocations are made to such Warrantholder pursuant to Article V of this Agreement with respect to such Warrant or KSCO Warrant, as applicable, such Warrantholder shall be treated as a "Member" for purposes of this <u>Section 6.3</u> as if such Warrant or KSCO Warrant, as applicable, had been exercised and will be entitled to distributions to the extent provided by, and subject to, this <u>Section 6.3</u> (but for the avoidance of doubt, shall not be entitled to any other distributions pursuant to this Agreement) in respect of such Warrant or KSCO Warrant, as applicable, prior to its exercise of such Warrant or KSCO Warrant.

6.4    <u>Amounts Withheld</u>.  All amounts withheld or required to be withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution, or allocation to the Company or the Members and treated by the Code (whether or not withheld pursuant to the Code) or any such tax law as amounts payable by or in respect of any Member or any Person owning an interest, directly or indirectly, in such Member shall be treated as amounts distributed to the Member with respect to which such amount was withheld pursuant to this <u>Article VI</u> for all purposes under this Agreement.  The Board of Managers is authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state, local or foreign government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state, local or foreign law, and shall allocate any such amounts to the Members with respect to which such amount was withheld. Such Member shall indemnify the Company in full for the entire amount required to be withheld (and any interest, penalties and expenses associated with such payments), and to the extent distributions to such Member are not reduced, such Member, promptly upon notification of an obligation to indemnify the Company, shall make a cash payment to the Company equal to the full amount to be indemnified (and the amount paid shall not be treated as a Capital Contribution).  A Member's obligation to make payments to the Company under this <u>Section 6.4</u> shall survive the termination, dissolution, liquidation and winding up of the Company.

6.5    <u>Subordination</u>.  Notwithstanding any of the provisions of this <u>Article VI</u> to the contrary, the Company's right to declare and pay distributions, and the Members' rights to receive payments of distributions once declared, shall be subordinate in right to any and all restrictions on distributions and other obligations owed by the Company under the Loan Agreement and the other Loan Documents.

## ARTICLE VII
## MANAGEMENT BY BOARD OF MANAGERS

7.1    <u>Board of Managers</u>.  Except where any action or approval on the part of the Members or any class of Members is expressly required by this Agreement or the Act:

(a)    the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, a board of managers (the *"**Board of Managers**"*) comprised of all Persons from time to

time serving as the Managers of the Company, and by the officers of the Company elected by the Board of Managers under <u>Section 8.3</u>; and

(b)      all decisions regarding any matter set forth in this Agreement or otherwise relating to or arising out of the business of the Company shall be made by or at the direction or under the authority of the Board of Managers.

7.2      <u>No Member Management</u>.  Except as provided in <u>Section 7.3</u> or elsewhere in this Agreement, and except as may be required by the Act, (i) the Members, in their capacities as such, shall not have any right, power or authority to take part in the management, operation or control of the business or affairs of the Company and (ii) the vote, approval or consent of the Members shall not be required to authorize any actions by or on behalf of the Company.  No Members or other Persons (other than Managers or officers of the Company acting as such) shall be agents of the Company or authorized to transact business in the name of the Company or to act for or on behalf of or to bind the Company.

7.3      <u>Limitations on Board of Managers Authority</u>.  Notwithstanding the terms of <u>Section 7.1</u> and <u>Section 7.2</u>:

(a)      <u>Main Street Consent Rights</u>.  For so long as (i) any Indebtedness remains outstanding under the Loan Agreement, or (ii) the Main Street Members collectively own at least 10% of the Equity Securities of the Company on a Fully Diluted Basis (excluding the impact of any dilution resulting from any equity issued by the Company through an issuance which the Preemptive Rights in <u>Section 3.5</u> did not apply), the Board of Managers may not take any of the following actions without the approval of the Main Street Manager:

(i)      issue any Units or other Equity Securities of the Company in an amount greater than 7.5% of the Equity Securities of the Company on a Fully Diluted Basis as of the Effective Date, other than an issuance of Units or other Equity Securities pursuant to the Equity Incentive Plan;

(ii)      issue a number of Equity Securities under the Equity Incentive Plan that exceeds thirteen percent (13%) of the Equity Securities of the Company on a Fully Diluted Basis as of the Effective Date;

(iii)      redeem or repurchase any Units or other Equity Securities of the Company from a Member, except (A) from a Member other than KSCO pursuant to <u>Section 11.2(d)(i)</u> hereof or as otherwise expressly provided herein, or (B) pursuant to a right of repurchase or similar rights in connection with such Member's (other than Kevin Sproles) termination as an employee, officer, director, agent or other service provider of the Company;

(iv)      sell, lease, exchange or otherwise dispose of all or substantially all of the assets of the Company and its Subsidiaries;

(v)     merge or consolidate the Company with or into another Person, as a result of which, the Members immediately prior to such transaction own (directly or indirectly) less than 50% of the voting power of the resulting entity;

(vi)    dissolve, liquidate, or wind up the Company;

(vii)   acquire, or invest in, (A) any company (by merger, purchase of shares of such company's capital stock or otherwise), other than a subsidiary of the Company, or (B) the business or assets of any company, other than a subsidiary of the Company;

(viii)  engage in any business *except* the business in which it is engaged as of the Effective Date and businesses reasonably related thereto or constituting a reasonable extension thereof;

(ix)    except as expressly provided herein, return any Capital Contributions to any Member or pay any interest, salary or draw, in each case, in respect of such Member's Capital Contributions or Capital Account;

(x)     amend this Agreement or the Certificate in any way that would adversely affect the rights, preferences, powers (including, without limitation, allocations, distributions or voting powers) of the Main Street Members or Holders;

(xi)    cause the Company or any Subsidiary of the Company to file (A) any voluntary petition for bankruptcy of the Company or any Subsidiary of the Company, (B) a petition or an answer seeking reorganization or an arrangement with creditors, or to take advantage of any insolvency, readjustment of loan, dissolution or liquidation law or statute, or (C) an answer admitting the material allegations of a petition filed against the Company or such Subsidiary of the Company in any proceeding under any such law;

(xii)   increase the number of Managers to more than five (5);

(xiii)  increase the compensation of any Management Person; or

(xiv)   enter into any arrangement or agreement to do any of the foregoing.

(b)     <u>Matters Requiring Unanimous Approval of the Managers</u>.  The Board of Managers may not take any of the following actions without the approval of all of the Managers:

(i)     amend this Agreement or the Certificate in any way that would adversely affect the rights, preferences or powers (including, without limitation, allocations, distributions, or voting powers) of any individual Members or group of Members relative to other Members of the Company, or that would provide

additional priorities, powers or benefits to any individual Member or group of Members relative to other Members of the Company;

(ii)     authorize, declare or pay any dividend or distribution to the Members except for distributions for tax purposes in accordance with <u>Section 6.3</u> hereof;

(iii)     cause the Company to enter into any agreements or contracts requiring payments by the Company in excess of $150,000 in the aggregate with any Affiliates or related parties of a Member; *provided, that* this Agreement, the Contribution Agreement, the Subscription Agreement, the Warrant Agreements, the Loan Agreement and the other Loan Documents, and the KSCO Warrant(s), are hereby approved and do not require the approval of the Board of Managers; or

(iv)     enter into any arrangement or agreement to do any of the foregoing.

7.4     <u>Number of Managers</u>.   The number of Managers comprising the Board of Managers shall be five (5), one of whom shall be designated Chairman (the "**Chairman**"), and all of whom shall be elected by the Required Vote of the Members.

7.5     <u>Qualifications</u>.  Each Manager must be a natural Person.  A Manager need not be a Member or a resident of any particular State or other jurisdiction.

7.6     <u>Election; Term</u>.   At each annual meeting of Members, the Managers shall be elected by the vote of the Members as provided in <u>Sections 7.4</u> and <u>9.7</u>.  Each elected Manager shall serve until the next succeeding annual meeting of Members and until his successor is duly elected and qualified, or until his earlier death, resignation or removal.

7.7     <u>Vacancies</u>.  Any vacancy occurring in the Board of Managers may be filled by the affirmative vote of a majority of the remaining Managers, even if such Managers constitute less than a quorum of the Managers; *provided, however,* that any vacancy in a Manager's position held by a Manager designated by any Person or group of Persons pursuant to <u>Section 9.8(b)</u> may be filled only by the Person or group of Persons that designated the election of such Manager if such Person or group of Persons continues to hold the right to designate such Manager.  A Manager elected to fill a vacancy shall be elected for a term expiring on the date of the next succeeding annual meeting of Members.

7.8     <u>Removal</u>.  Any Manager may be removed at any time, with or without cause, by the Required Vote of the Members, except that any Manager serving at the designation of a Person or group of Persons pursuant to <u>Section 9.8(b)</u> may be removed only with the consent of that Person or group of Persons.

7.9     <u>Place of Meetings</u>.  Meetings of the Board of Managers shall be held at such places, either within or without the State of Delaware, as may be specified by the Person calling the meeting.  In the absence of specific designation, meetings of the Board of Managers shall be held at the principal office of the Company.

7.10    <u>Regular Meetings</u>.   The Board of Managers shall meet (telephonically or in person) at least four (4) times each year, on a quarterly or other periodic basis.  The Board of Managers shall meet in person at least once each year, preferably immediately following the annual meeting of the Members, at the place of such meeting, for the transaction of such business as may properly be brought before the Board of Managers.  No notice of regular meetings need be given to the Managers.  Regular meetings may also be held at such other times as shall be designated by the Board of Managers.

7.11    <u>Special Meetings</u>.  Special meetings of the Board of Managers shall be held at any time upon the call of the Chairman of the Board of Managers or the Secretary of the Company upon the written request of any Manager.  Notice of any such special meeting shall be in writing and shall be given to each Manager at least two (2) Business Days before the date of the meeting in the manner provided in <u>Section 17.4</u>.

7.12    <u>Attendance at and Notice of Meetings</u>.  Attendance at a meeting of the Board of Managers shall constitute a waiver of notice of the meeting, except where a Manager attends a meeting for the express and sole purpose of objecting to the transaction of any business at the meeting solely on the ground that the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board of Managers need be specified in the notice or waiver of notice of the meeting.

7.13    <u>Quorum of and Action by Managers</u>. A majority of the number of Managers comprising the Board of Managers shall constitute a quorum for the transaction of business at any meeting of the Board of Managers; *provided, that* at any time that one or more vacancies exist in the Board of Managers, a majority of the actual number of Managers then serving on the Board of Managers (exclusive of such vacancy(ies)) shall constitute a quorum for the transaction of business at any meeting of the Board of Managers.  Except as otherwise provided herein, the act of a majority of the Managers present at a meeting of the Board of Managers at which a quorum is present shall be the act of the Board of Managers.

7.14    <u>Unanimous Written Consent</u>.  Any action required or permitted to be taken at any regular or special meeting of the Board of Managers may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by all of the Managers then serving on the Board of Managers (excluding for this purpose any vacancies then existing in the Board of Managers).  An executed copy of any such written consent shall be inserted into the minute books of the Company.

7.15    <u>Telephonic Meetings</u>.  The Managers may hold meetings by means of conference telephone or similar communications equipment by means of which all Managers participating in the meeting can hear each other.

7.16    <u>Compensation; Reimbursement of Expenses</u>.  The Outside Managers shall be entitled to receive compensation for their services equal to the compensation, if any, paid (a) to any Managers that are members of Company management solely and exclusively in their capacity as Managers or (b) representatives of an investor in the Company *other than* KSCO.  In addition, (a) Managers shall be insured under the Directors and Officers liability insurance policy of the Company, which insurance policy of the Company shall be primary to any other insurance

covering such Outside Managers, including, without limitation, any director and officer insurance policy or other insurance policy of any Main Street Members or any of its Affiliates, and (b) the Main Street Manager and the Main Street Observer shall be entitled to prompt reimbursement of all reasonable out-of-pocket expenses incurred in the course of the performance of their duties.

7.17   <u>Committees of the Board of Managers</u>.  The Board of Managers may designate one or more committees, each of which shall be comprised of one or more Managers.  Any such committee, to the extent provided in the resolution establishing it, shall have and may exercise all of the authority of the Board of Managers; *provided, however*, that no committee shall have authority of the Board of Managers in reference to (i) amending this Agreement, (ii) filling any vacancies among the Board of Managers, (iii) authorizing the issuance of any Units or other Equity Securities, (iv) taking any action that would require the approval of all of the Managers pursuant to <u>Section 7.3(b)</u> or (v) taking any action that would require the approval of the Main Street Manager pursuant to <u>Section 7.3(a)</u>.  The Board of Managers shall have the power at any time to change the membership of, and to fill vacancies in, any committee of the Board of Managers. A majority of the number of members of any committee shall constitute a quorum for the transaction of business by the committee unless a greater number is required by a resolution adopted by the Board of Managers.  The act of the majority of the members of a committee present at any meeting at which a quorum is present shall be the act of the committee, unless the act of a greater number is required by a resolution adopted by the Board of Managers.

7.18   <u>Minutes of Meetings</u>.  All decisions and resolutions made at a meeting of the Board of Managers (or any committee thereof) shall be reported in the minutes of its meetings, which shall state the date, time and place of the meeting, the Managers present at the meeting, the resolutions put to a vote  and the results of such voting.  Written consents of the Board of Managers (and any committee thereof) and the minutes of all meetings of the Board of Managers (and any committee thereof) shall be kept at the principal office of the Company, and a copy thereof shall be provided to any Manager who so requests within ten (10) Business Days thereafter.

7.19   <u>Outside Activities of Managers; Competition</u>.  The Outside Managers shall not be required to manage the Company as their sole and exclusive function, and they may have other business interests and may engage in other activities in addition to those relating to the Company.  Such other business interests and activities may be of any nature or description, and may be engaged in independently or with others; *provided, however*, that any Outside Manager who wishes to have business interests in, or engage in, any business that competes with the Company shall (a) provide prior written notice to the Board of Managers, (b) maintain the confidentiality of any non-public information about the Company or any of its business activities, (c) not disparage the Company or any of the officers, managers, employees or agents of the Company to any other Person, and (d) not solicit any officer, employee, independent contractor, customer, supplier or vendor to cease doing business with the Company or otherwise interfere with the Company's business relationship with any such Person.  Neither the Company nor any Member shall have any right, by virtue of this Agreement or the relationship created hereby, in or to such other ventures or activities of the Outside Managers or their Affiliates, or to the income or proceeds derived therefrom, and the pursuit of such ventures, even if competitive with the business of the Company, shall not be deemed wrongful or improper.  The Outside

Managers shall have the right to take for their own account or the account of their Affiliates, or to recommend to others, any investment opportunity; *provided, that* such Outside Manager did not first become aware of such investment opportunity pursuant to his or her service on the Board of Managers.  Notwithstanding anything in this Section 7.19 to the contrary, any Outside Manager shall have the right to take for his or her own account or the account of his or her Affiliates, or to recommend to others, any investment opportunity (regardless of whether he or she first became aware of such investment opportunity pursuant to her or her service on the Board of Managers) if he or she first obtains the unanimous written consent of the other Managers.

7.20    Interested Transactions.

(a)    No contract or transaction between the Company and one or more of its Managers or officers, or between the Company and any other Person in which one or more of its Managers or officers are managers, directors or officers or have a financial interest, shall be void or voidable solely because of the Manager's or officer's interest in the contract or transaction, solely because the Manager or officer is present at or participates in the meeting of the Board of Managers or of a committee thereof which authorized the contract or transaction, or solely because such Manager's votes are counted for that purpose if otherwise permitted by applicable law, or:

(i)    the material facts as to the relationship or interest and as to the contract or transaction are disclosed or are known to the full Board of Managers and the Board of Managers or a majority of the disinterested Managers, even though the disinterested Managers are less than a quorum, approve the contract or transaction, provided that prompt written notice of such facts is given to all Members within twenty (20) days of the approval of any such action;

(ii)    the material facts as to the relationship or interest and as to the contract or transaction are disclosed or are known to the Members entitled to vote thereon, and the contract or transaction is specifically approved in good faith by disinterested Members holding a majority of the Percentage Interests then held by all of the disinterested Members; or

(iii)    the contract or transaction is fair to the Company as of the time it is authorized, approved or ratified by the Board of Managers, any committee of the Board of Managers or the Members.

(b)    Common or interested Managers may be counted in determining the presence of a quorum at a meeting of the Board of Managers or of a committee which authorized the contract or transaction.

(c)    Notwithstanding the foregoing, this Agreement, the material facts as to the relationships and interests and as to the contracts or transactions contemplated by the Contribution Agreement, the Subscription Agreement, the Warrant Agreements, the Loan Agreement and the other Loan Documents, and the KSCO Warrants, have been disclosed to and are known by all of the Members and are hereby approved by all of the

disinterested Members, such that none of such contracts or transactions shall be void or voidable because of any Manager's or officer's interest therein, or because they were approved by or do not require the approval of the Board of Managers.

7.21    Reliance by Third Parties.   Notwithstanding any other provision contained in this Agreement, no lender, purchaser or other Person shall be required to verify any representation by a Manager or officer of the Company as to the extent of the interest in the properties and assets of the Company that such Manager or officer may have, and each such lender, purchaser or other Person shall be entitled to rely exclusively on the representations of such Manager or officer as to his or her authority to enter into any financing or sale arrangements and shall be entitled to deal with such Manager or officer, without the joinder of any other Person, as if it were the sole party in interest therein, both legally and beneficially.

# ARTICLE VIII
# OFFICERS

8.1    Qualifications.   Each officer of the Company shall be a natural person.  An officer need not be a resident of the State of Delaware, a Member or a Manager.

8.2    Authority.   All officers of the Company shall have such powers and authority, subject to the direction and control of the Board of Managers, and shall perform such duties in connection with the management of the business and affairs of the Company as are provided in this Agreement, or as may be determined from time to time by resolution of the Board of Managers.  In addition, except as otherwise expressly provided herein, each officer shall have such powers and authority as would be incident to his or her office if he or she served as a comparable officer of a corporation.

8.3    Designation and Election.   The officers of the Company shall consist of one or more of the following, each of whom shall be elected by the Board of Managers.  The Board of Managers shall have the authority to elect such officers, including Chairman of the Board, President, Chief Executive Officer, Vice Presidents, Chief Financial Officer, Secretary, Treasurer and assistant officers, as it may from time to time determine.  Any two or more offices may be held by the same person.

8.4    Vacancies.   Any vacancy occurring in an office may be filled by the Board of Managers.

8.5    Removal.   Any officer of the Company may be removed by the Board of Managers whenever in its judgment the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the removed officer. Election as an officer of the Company shall not of itself create any contract rights in favor of the elected officer.

8.6    Chairman of the Board.   The Chairman of the Board, if there is one, shall preside at all meetings of the Board of Managers, and he shall be available to consult with and advise the officers of the Company with respect to the conduct of the business and affairs of the Company and shall have such other powers and duties as designated in accordance with this Agreement and as from time to time may be assigned to him by the Board of Managers.

8.7     <u>Chief Executive Officer</u>.  The Chief Executive Officer (if elected) shall be the highest ranking officer of the Company, and, under the direction and subject to the control of the Board of Managers, the Chief Executive Officer shall generally supervise and control all of the business and affairs of the Company and shall see that all orders and resolutions of the Board of Managers are carried into effect.  The Chief Executive Officer may execute and deliver any deeds, mortgages, bonds, notes, contracts or other instruments that the Board of Managers has authorized to be executed and delivered, except in cases where the execution and delivery thereof shall be expressly and exclusively delegated to another officer of the Company by the Board of Managers or this Agreement, or where the execution and delivery thereof shall be required by Law to be executed and delivered by another Person.  In general, the Chief Executive Officer shall perform all duties incident to the office of Chief Executive Officer and such other duties as may be prescribed from time to time by the Board of Managers.

8.8     <u>President; Vice Presidents; Chief Financial Officer</u>.  The President, each Vice President and the Chief Financial Officer elected by the Board of Managers shall report to the Board of Managers and the Chief Executive Officer.  Each President, Vice President and the Chief Financial Officer will perform the usual and customary duties that pertain to such office. The President shall serve in the capacities set forth above for the Chief Executive Officer if no one is filling the office of Chief Executive Officer.

8.9     <u>Secretary</u>.  It shall be the duty of the Secretary to attend all meetings of the Members and the Managers and to record correctly the proceedings of such meetings and record all votes in a minute book suitable for such purposes.  The Secretary shall give, or cause to be given, any required notice of all meetings of the Members and special meetings of the Board of Managers.  It shall also be the duty of the Secretary to maintain the Register.  The Secretary shall also attest with his signature all deeds, conveyances or other instruments requiring the seal of the Company.  The Secretary shall have full power and authority on behalf of the Company to execute any consents of shareholders, partners or members and to attend, and to act and to vote in person or by proxy at, any meetings of the shareholders, partners or members of any corporation, partnership or limited liability company in which the Company may own stock or other equity securities, and at any such meetings, the Secretary shall possess and may exercise any and all the rights and powers incident to the ownership of such securities that, as the owner thereof, the Company might have possessed and exercised if present.  The Secretary shall keep in safe custody the seal of the Company, if it has one.  Additionally, the Secretary shall also have the authority bestowed on Vice Presidents for all intents and purposes, including but not limited to, executing documents and agreements on behalf of the Company.  The Secretary shall also perform, under the direction and subject to the control of the Board of Managers, such other duties as may be assigned to him or her from time to time.

8.10     <u>Delegation of Authority</u>.  In the case of any absence of any officer of the Company or for any other reason that the Board of Managers may deem sufficient, the Board of Managers may delegate some or all of the powers or duties of such officer to any other officer for whatever period of time the Board of Managers deems appropriate.

8.11     <u>Officers</u>.  The officers of the Company as of the Effective Date are as follows:

| Name | Office |
|------|--------|
| Kevin M. Sproles | Chairman of the Board and Chief Executive Officer |
| Derek L. Willis | Secretary |
| Randon Kelly | Vice President of Finance |

# ARTICLE IX
## MEETINGS OF MEMBERS

9.1     Place of Meetings.  Meetings of Members for the election of Managers or for any other purpose shall be held at such places, either within or without the State of Delaware, as may be designated by the Board of Managers and stated in the notice of the meeting.

9.2     Annual Meeting.  Annual meetings of the Members shall be held on such date and at such time as shall be designated by the Board of Managers.  At each annual meeting the Members shall elect the Managers and transact such other business as may be properly brought before the meeting.

9.3     Special Meetings.  Special meetings of the Members may be called by the Board of Managers and shall be called by the Secretary upon the written request of the holders of twenty-five percent (25%) or more of all Units then outstanding.  Any meeting called at the request of Members shall be held at the principal offices of the Company.  Only business within the purpose or purposes described in the notice of meeting delivered to the Members in accordance with Section 9.4 may be conducted at a special meeting of Members.

9.4     Notice of Meeting.  Written or printed notice of all meetings of the Members stating the place, date and time of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) days nor more than sixty (60) days before the date of the meeting to each Member entitled to vote at the meeting.

9.5     Waiver of Notice.  Attendance of a Member at a meeting will constitute a waiver of notice of the meeting, except where such Member attends for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.  Notification of a meeting may also be waived in writing.  Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be included in the applicable notice of the meeting but not so included, if the objection is expressly made at the meeting.

9.6     Record Dates.  For the purpose of determining Members entitled to notice of, or to vote at, any meeting of Members or any adjournment thereof, the Board of Managers may fix in advance a record date, which shall not be less than ten (10) nor more than sixty (60) days before the date of the meeting.  In addition, whenever action by Members is proposed to be taken

by consent in writing without a meeting of Members, the Board of Managers may fix a record date for the purpose of determining Members entitled to consent to that action, which record date shall not precede, and shall not be more than ten (10) days after, the date upon which the resolution fixing the record date is adopted by the Board of Managers. If no record date has been fixed by the Board of Managers for the purpose of determining Members entitled to consent in writing to any action, the record date for determining Members entitled to consent to that action shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company.

9.7     Quorum.  The presence, in person or represented by proxy, of the holders of at least a majority of the issued and outstanding Units held by the Members shall constitute a quorum for the purpose of considering any matter at a meeting of the Members. If a meeting of the Members cannot be organized because a quorum is not present or represented, the Members entitled to vote at the meeting, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time until a quorum is present or represented. When a meeting is adjourned to another time or place, notice need not be given of the reconvening of the adjourned meeting if the time and place at which the meeting is to be reconvened are announced at the adjourned meeting.  At any adjourned meeting at which a quorum is present or represented, the Members may transact any business which might have been transacted at the original meeting.

9.8     Voting.

(a)     General.  The holders of the Units shall vote as a single class for the election of Managers and all other matters submitted to the Members for a vote or approval. Each Member shall be entitled to one (1) vote for each Unit held by such Member. The affirmative vote (or written consent pursuant to Section 9.11) of the holders of at least a majority of the total number of Units then outstanding and held by the Members shall be required to approve any matters on which the Members are entitled to vote (the "***Required Vote***").

(b)     Board of Managers.  Each Member hereby agrees to vote all of the Units over which such Member has voting control, and to take all other necessary or desirable actions within their control (whether in their capacity as a Member, Manager or officer of the Company or otherwise) in order to ensure that the size of the Board of Managers shall consist of no more than five (5) Managers and to cause the election as Managers of:

(i)     One (1) person designated by the Main Street Members (the "***Main Street Manager***") for so long as any Indebtedness remains outstanding under the Loan Agreement or the Main Street Members collectively own at least 10% of the Equity Securities of the Company on a Fully Diluted Basis (excluding the impact of any dilution resulting from any equity issued by the Company through an issuance which the Preemptive Rights in Section 3.5 did not apply), *provided, however*, that at the Main Street Members' sole option, the Main Street Members may elect not to designate the Main Street Manager and such Board of Managers seat not filled by the Main Street Members shall remain vacant, and the size of the Board of Managers shall consist of four (4) Managers until such time as the Main

Street Members elect to designate the Main Street Manager. The Main Street Manager shall initially be Dwayne L. Hyzak;

(ii)    One (1) person designated by Clay R. Olivier, for so long as Clay R. Olivier, together with his Family Group and Permitted Trusts, beneficially holds directly of indirectly at least 10% of the Voting Interests of the Company, who shall initially be Clay R. Olivier;

(iii)    Three (3) persons designated by KSCO (the "***KSCO Managers***"), for so long as KSCO holds at least 50% of the Voting Interests of the Company, who shall initially be Kevin M. Sproles and two vacancies;

(iv)    To the extent that the number of Managers available to be designated under subsections (i) through (ii) above become less than five (5) Managers (or, if KSCO or the Main Street Members elect not to designate all of the KSCO Managers and the Main Street Manager, that number of Managers designated by KSCO and the Main Street Members collectively), any remaining Managers shall be appointed by a vote of the holders of a majority of the then outstanding Units of the Company; and provided further that there will always be a minimum of three (3) Managers;

In addition, at the Main Street Members' sole option, for so long as any Indebtedness remains outstanding under the Loan Agreement or the Main Street Members collectively own at least 10% of the Equity Securities of the Company on a Fully Diluted Basis (excluding the impact of any dilution resulting from any equity issued by the Company through an issuance which the Preemptive Rights in Section 3.5 did not apply), the Main Street Members will have the right to designate one (1) person to exercise Board of Managers visitation rights ("***Main Street Observer***"). The Company shall (A) give the Main Street Observer notice, at the same time as furnished to the Managers, of all meetings of the Board of Managers (or any committee thereof), (ii) provide to the Main Street Observer all notices, documents and information furnished to the Managers whether at or in anticipation of a meeting, an action by written consents or otherwise, at the same time as furnished to the Managers, (iii) notify the Main Street Observer by telephone of, and permit the Main Street Observer to attend by telephone, emergency meetings of the Board of Managers (and all committees thereof), and (iv) provide the Main Street Observer copies of the minutes of all such meetings at the time such minutes are furnished to the Managers. Notwithstanding anything in this Section 9.8 to the contrary, if the Board of Managers reasonably determines in good faith that exclusion of the Main Street Observer, or withholding of the information to be provided to the Main Street Observer in connection with its observer rights, is necessary in order to (A) avoid a conflict of interest between the Company and the Main Street Observer or (B) preserve the attorney-client privilege of the Company (such determination to be based on the advice of legal counsel to the Company), then the Company shall have the right to exclude the Main Street Observer from only those portions of the meetings of the Board of Managers or the committees thereof in which such information is

discussed or withhold such information from the Main Street Observer, in each case to the extent deemed necessary by the Board of Managers or the Company's counsel and, in the case of *clause (B)*, only so long as such discussions do not include any Persons other than the Managers and counsel to the Board of Managers.   The Company agrees to notify the Main Street Observer of the Company's intention to exclude such Main Street Observer from any meeting or any portion thereof or to withhold information from such Main Street Observer. The Company shall reimburse the Main Street Observer for all reasonable out of pocket expenses incurred in connection with their rights under this <u>Section 9.8(b)(iv)</u>.

In the event that any representative designated as provided herein for any reason ceases to serve as a member of the Board of Managers during his or her term of office, the parties hereto shall cause the resulting vacancy to be filled by a representative designated as provided in this <u>Section 9.8(b)</u> by the respective person or persons entitled to designate such representative.

(c)      If any provision of this <u>Section 9.8</u> be construed to constitute the granting of proxies, such proxies shall be deemed coupled with an interest and are irrevocable for the term of this Agreement.

9.9      <u>Conduct of Meetings of Members</u>.   At each meeting of the Members, a chairman chosen by those Members entitled to approve a matter brought before the meeting, present in person or represented by proxy, shall preside and act as chairman of the meeting.   A Person whom the chairman of such meeting shall appoint shall act as secretary of such meeting and keep the minutes of the meeting.   The Board of Managers may adopt such rules and regulations as it determines are reasonably necessary or appropriate in connection with the organization and conduct of any meeting of the Members.

9.10      <u>Proxies</u>.   Each Member entitled to vote at a meeting of the Members may authorize another Person or Persons to act for him by proxy with respect to the Units owned by such Member, but no such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period.   A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an interest sufficient in law to support an irrevocable power.   A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the Units to which it relates or an interest in the Company generally.

9.11      <u>Written Consent</u>.   Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted, including the signature of any Member whose consent is specifically required for the taking of such action, if applicable.   Every written consent shall bear the date of signature of each Member that signs the consent.

9.12   Telephonic Meetings.  Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all Members participating in the meeting can hear each other, and participation in such a meeting shall constitute attendance and presence in person at that meeting.

# ARTICLE X
## TRANSFER OF INTERESTS

10.1   Register.  The Company shall maintain at its principal office a register of all Units in the Company and their Transfer (the *"Register"*).  The Register shall set forth (i) the names and addresses of each Record Holder of Units in the Company, (ii) the number of Units owned by each such Record Holder, and (iii) the date such Record Holder acquired his, her or its Units.

10.2   Record Holders.  Except as otherwise required by Law, the Company shall be entitled to recognize the exclusive right of the Record Holder of a Unit to receive distributions in respect of such a Unit and to vote as the owner of such a Unit, and shall not be bound to recognize any equitable or other claim to or interest in such a Unit on the part of any other Person, whether or not the Company has notice of the Transfer.

10.3   Assignment of Rights.  Subject to the terms and conditions of this Agreement (including Article X and Article XI), each Main Street Member shall be entitled to transfer and assign all of its rights under this Agreement (including this Section 10.3) to any of its Affiliates or partners in connection with a Transfer of Units or other Equity Securities from such Main Street Member to such Persons.

# ARTICLE XI
## RESTRICTIONS ON TRANSFER; REGISTRATION RIGHTS

11.1   Restrictions on Transfer of Units and other Equity Securities.

(a)   Restrictions on Transfer.  No Transfer of any Unit(s) or other Equity Security(ies), or any interest therein, may be made (i) if the transferring Member or group of transferring Members (the *"Transferor Member"*) has failed to provide the notices under, follow the procedures of, and Transfer such Unit(s) or other Equity Security(ies) in accordance with, the Loan Documents and this Article XI, (ii) if the Transfer has not been specifically approved by the Board of Managers, unless such Transfer is a Permitted Transfer, or (iii) if the Transfer would:  (A) violate the then applicable federal and state securities laws or the rules and regulations thereunder or the rules and regulations of any Governmental Entity having jurisdiction over that Transfer; (B) affect the Company's existence or qualification as a limited liability company under the laws of the State of Delaware; (C) result in a termination of the Company for purposes of Section 708 of the Code or any similar or successor provision of the Code; (D) require the Company to register as an investment company under the Investment Company Act of 1940; (E) require the Company or any of its Affiliates to register as an investment adviser under the Investment Advisers Act of 1940; or (F) result in the creation of any Lien that purports to give the secured party any right as a Member or create any duty to the secured party on the part of the Company or any other Member other than the delivery to the

extent subject to that Lien of distributions the Company makes to Members pursuant to this Agreement.  Except as expressly provided in this Agreement, unless approved by the Board of Managers, no Member may Transfer in any manner whatsoever all or any part of such Member's Units or other Equity Securities if, after giving effect to such Transfer, the Company would be classified as other than a partnership for U.S. federal income tax purposes.

(b)    <u>Permitted Transfers</u>.    Subject to the notice requirements set forth in <u>Section 11.2(a)(i)</u>, the covenants and restrictions set forth in <u>Section 11.2</u> shall not apply with respect to any Permitted Transfer; *provided*, *that*, (i) the restrictions contained in <u>Section 11.2</u> shall continue to be applicable to the Units and other Equity Securities after any such Permitted Transfer, and (ii) the transferees of such Units or other Equity Securities shall (to the extent not already a party hereto) have agreed in writing to be bound by the provisions of this Agreement affecting the Units or other Equity Securities so transferred.  Notwithstanding the foregoing, no Transferor Member shall avoid the provisions of this Agreement by making one or more Permitted Transfers to one or more permitted transferees and then at any time (i) disposing of, or permitting the disposition of, all or any portion of the direct or indirect equity or beneficial interest in any such permitted transferee to any Person other than a permitted transferee, (ii) directly or indirectly issuing, or permitting the issuance of, any equity or beneficial interest in any such permitted transferee to any Person other than a permitted transferee, or (iii) with respect to a Permitted Transfer to the trustee of a Permitted Trust, at any time replacing the trustee of such Permitted Trust if such successor trustee would cause such trust to cease to constitute a Permitted Trust.

11.2    <u>Options to Purchase Units Proposed to be Transferred</u>.

(a)    <u>Notification from Transferor Member</u>.

(i)    In the event that a Transferor Member proposes to make, or is subject to, a Transfer that constitutes a Permitted Transfer under this Agreement, then prior to giving effect to such Transfer, such Transferor Member shall deliver a written notice to the Company and all Eligible Members, which notice shall set forth the number of Units or other Equity Securities to be Transferred, the type of Permitted Transfer proposed to be made and the other material terms and conditions of such proposed Transfer.

(ii)    In the event a Transferor Member proposes to make, or is subject to, a Transfer of any or all of its Units and/or other Equity Securities other than pursuant to a Permitted Transfer (hereinafter, the "***Offered Units***"), then prior to giving effect to any such Transfer, such Transferor Member shall deliver a written notice to the Company and all Eligible Members (the "***Transfer Notice***").  The Transfer Notice must set forth the number of Offered Units, the type of Transfer proposed to be made and all other material terms and conditions of the proposed Transfer including, if the Transferor Member has identified a proposed purchaser or other transferee for the Offered Units, the name of the proposed transferee, the price at which the Offered Units are to be purchased (if the proposed Transfer will

be a sale), confirmation that the proposed recipient of the Offered Units has been informed of the rights and obligations provided for in this Agreement and has agreed to purchase the Offered Units in accordance with the terms of this Agreement and the proposed date of such Transfer.

(b)     Community Property Transfers on Termination of Marriage.     If the proposed Transfer is one described in *clause (iv)* of the definition of "***Transfer***", involving the Transfer to the Transferor Member's former spouse, or heirs of such former spouse, in connection with a division of their community property or other property upon divorce, and if such Transfer is not a Permitted Transfer, then the following rights and options shall apply:

(i)     First, the Transferor Member (if alive) shall have an exclusive option, exercisable at any time during a period of twenty (20) days from the date the Transfer Notice was given, to elect to purchase all or part of the Offered Units at the accumulated Capital Account value of such Offered Units (as determined in accordance with Section 11.3 below) by delivering a written election notice to such spouse or his or her estate, as applicable, within such 20-day period.  If the Transferor Member waives its option under this Section 11.2(b)(i) before this 20-day period has ended, such 20-day period shall be deemed to have ended on the date the Transferor Member's waiver is received by the Company and the other parties hereto (whether directly from the Transferor Member or by distribution thereafter).  If the Transferor Member has not responded within such 20-day period, then the Transferor Member shall be deemed to have elected not to purchase any Offered Units.

(ii)     Thereafter, in the event the Transferor Member fails to elect to purchase all of the Offered Units within such 20-day period, then the Company or its designee, for a period of fifteen (15) days after the earlier of (A) the expiration of such 20-day period, and (B) the date the Transferor Member's waiver of his option under Section 11.2(b)(i) is received by the Company and the other parties hereto,  may elect to purchase all or part of the remaining Offered Units at the accumulated Capital Account value of such Offered Units by delivering a written election notice to such spouse or estate within such 15-day period.   If the Company waives its option under this Section 11.2(b)(ii) before this 15-day period has ended, such 15-day period shall be deemed to have ended on the date the Company's waiver is received by the other parties hereto.  If the Company has not responded within such 15-day period, then the Company shall be deemed to have elected not to purchase any Offered Units.

(iii)     Thereafter, in the event that the Company fails to elect to purchase all of the remaining Offered Units within such 15-day period, each Eligible Member other than the Transferor Member, for a period of ten (10) days after the earlier of (A) the expiration of such 15-day period, and (B) the date the Company's waiver of its option under Section 11.2(b)(ii) is received by the other parties hereto, may elect to purchase the remaining Offered Units at the accumulated Capital Account value of such Offered Units in an amount up to the

number of Offered Units determined by multiplying the number of remaining Offered Units times a fraction, the numerator of which is the Fully Diluted Percentage Interest of such electing Eligible Member, and the denominator of which is the aggregate of the Fully Diluted Percentage Interests of all of the electing Eligible Members, except as otherwise mutually agreed to by the electing Eligible Members, if applicable.  Such election may be made by delivering a written election notice to such spouse or his or her estate within such 10-day period.  If any Eligible Member has not responded within such 10-day period, such Eligible Member shall be deemed to have elected not to purchase any Offered Units.  In the event that the electing Eligible Members deliver election notices with respect to a larger number of Offered Units than that number of Offered Units set forth in the Transfer Notice, the electing Eligible Members shall allocate the available Offered Units as they shall agree in writing, or in the event they do not agree, based on each electing Eligible Member's Pro Rata Share of the Offered Units being offered in the Transfer Notice.  Any remaining Offered Units not elected to be purchased by the end of such 10-day period shall be reoffered by the Transferor Member for a five-day period to the Eligible Members who have elected to purchase the Offered Units.  Such electing Eligible Members shall have the right to purchase such additional portion of the remaining Offered units in an amount up to such electing Eligible Member's Pro Rata Share of the remaining Offered Units.

(iv)    Subject to the foregoing and except as otherwise mutually agreed by the parties to such purchase, the closing of any purchase of such Offered Units shall be as soon as practicable but in no event later than forty-five (45) days following the determination of the accumulated Capital Account value of the Offered Units and shall take place at the principal office of the Company.  At the closing, such spouse or estate shall assign and deliver the Offered Units to the purchasers, together with such documents of transfer as shall be reasonably requested by the purchasers, and the purchasers shall deliver to such spouse or estate the full consideration therefore payable in cash, by wire transfer or other immediately available funds.  Any transfer or other similar taxes involved in such sale shall be paid by such spouse or estate, and such spouse or estate shall provide the purchasers with such evidence of its authority to sell hereunder and such tax lien waivers and similar instruments as the purchasers may reasonably request.  In the event all such Offered Units are not purchased by the purchasers as provided herein, then such spouse or estate shall hold such remaining Offered Units subject to this Agreement in all respects.  ***Each Member's spouse, by executing a copy of the "Addendum for Spouses" attached as*** <u>***Exhibit B***</u> ***to this Agreement, or by otherwise indicating agreement with the terms of this Agreement, agrees to sell the Offered Units to the purchasers as provided herein at the accumulated Capital Account value thereof and waives any right such spouse may otherwise have to object to such sale.***

(c)    <u>Transfers on Death, Disability or Bankruptcy</u>.  If the proposed Transfer is one described in any of *clauses (ii), (iii), (v), (vi), (vii)* or *(viii)* (but not *clause (iv)*) of the

definition of "*Transfer*", and if such Transfer is not a Permitted Transfer, then the following rights and options shall apply:

(i)        First, the Company shall have an exclusive option, exercisable at any time during a period of twenty (20) days from the date the Transfer Notice was given, to elect to purchase all or part of the Offered Units at the Fair Market Value of such Offered Units (as determined in accordance with Section 11.3 below) by delivering a written election notice to the Transferor Member or his or her personal representative or estate, as applicable, within such 20-day period.  If the Company waives its option under this Section 11.2(c)(i) before this 20-day period has ended, such 20-day period shall be deemed to have ended on the date the Company's waiver is received by the other parties hereto.  If the Company has not responded within such 20-day period, then the Company shall be deemed to have elected not to purchase any Offered Units.

(ii)        Thereafter, in the event that the Company fails to elect to purchase all of the Offered Units within such 20-day period, each Eligible Member other than the Transferor Member, for a period of ten (10) days after the earlier of (A) the expiration of such 20-day period, and (B) the date the Company's waiver of its option under Section 11.2(c)(i) is received by the other parties hereto, may elect to purchase the remaining Offered Units at the Fair Market Value of such Offered Units in an amount up to the number of Offered Units determined by multiplying the number of remaining Offered Units times a fraction, the numerator of which is the Fully Diluted Percentage Interest of such electing Eligible Member, and the denominator of which is the aggregate of the Fully Diluted Percentage Interests of all of the electing Eligible Members, except as otherwise mutually agreed by the electing Eligible Members, if applicable.  Such election may be made by delivering a written election notice to the Transferor Member or such personal representative or estate within such 10-day period.  If any Eligible Member has not responded within such 10-day period, such Eligible Member shall be deemed to have elected not to purchase any Offered Units.  In the event that the electing Eligible Members deliver election notices with respect to a larger number of Offered Units than that number of Offered Units set forth in the Transfer Notice, the electing Eligible Members shall allocate the available Offered Units as they shall agree in writing, or in the event they do not agree, based on each electing Eligible Member's Pro Rata Share of the Offered Units being offered in the Transfer Notice.  Any remaining Offered Units not elected to be purchased by the end of such 10-day period shall be reoffered by the Transferor Member for a five-day period to the Eligible Members who have elected to purchase the Offered Units.  Such electing Eligible Members shall have the right to purchase such additional portion of the remaining Offered Units in an amount up to such electing Eligible Member's Pro Rata Share of the remaining Offered Units.

(iii)        Subject to the foregoing and except as otherwise mutually agreed by the parties to such purchase, the closing of any purchase of such Offered Units shall be as soon as practicable but in no event greater than thirty (30) days after

the determination of the Fair Market Value of such Offered Units and shall take place at the principal office of the Company.  At the closing, the Transferor Member or his personal representative or estate, as applicable, shall assign and deliver such Offered Units to the purchasers, together with such documents of transfer as shall be reasonably requested by the purchasers, and the purchasers shall deliver to the Transferor Member or such personal representative or estate the full consideration therefore payable in cash, by wire transfer or other immediately available funds.  Any transfer or other similar taxes involved in such sale shall be paid by the Transferor Member or such personal representative or estate, and the Transferor Member or such personal representative or estate shall provide the purchasers with such evidence of its authority to sell hereunder and such tax lien waivers and similar instruments as the purchasers may reasonably request.  In the event all such Offered Units are not purchased by the purchasers as set forth herein, then the remaining Offered Units may then be distributed to the successors-in-interest entitled to receive the same in accordance with the terms of this Agreement; *provided, that* any such Offered Units so distributed shall be subject to this Agreement in all respects.

(d)     <u>Transfers on Sales of Units</u>.  If the proposed Transfer is one described in *clause (i)* of the definition of "Transfer", including but not limited to a sale to another Member, and if such Transfer is not a Permitted Transfer, then the following rights and options shall apply:

(i)     <u>Company Right of First Refusal</u>.  First, the Company shall have an exclusive option, exercisable at any time during a period of twenty (20) days from the date the Transfer Notice was given, to elect to purchase all or any portion of the Offered Units at the price (or at their Fair Market Value if such Transfer is a gift) and on the other terms as set forth in the Transfer Notice (which must be accompanied by the offer from such Person), by delivering a written election notice to the Transferor Member within such 20-day period.  If the Company waives its option under this <u>Section 11.2(d)(i)</u> before this 20-day period has ended, such 20-day period shall be deemed to have ended on the date the Company's waiver is received by the other parties hereto.  If the Company has not responded within such 20-day period, then the Company shall be deemed to have elected not to purchase any Offered Units.

(ii)     <u>Member Rights of First Refusal</u>.  Second, if the proposed Transfer would result in the Transfer of at least five percent (5%) of the Units of the Company on a Fully Diluted Basis, in the event that the Company fails to elect to purchase all of the Offered Units within such 20-day period, each Eligible Member other than the Transferor Member, for a period of ten (10) days after the earlier of (A) the expiration of such 20-day period, and (B) the date the Company's waiver of its option under <u>Section 11.2(d)(i)</u> is received by the other parties hereto, may elect to purchase the remaining Offered Units, at the price (or at their Fair Market Value if such Transfer is a gift) and on the other terms set forth in the Transfer Notice, in an amount up to the number of Offered Units determined by multiplying the number of remaining Offered Units times a

fraction, the numerator of which is the Fully Diluted Percentage Interest of such electing Eligible Member, and the denominator of which is the aggregate of the Fully Diluted Percentage Interests of all of the electing Eligible Members, except as otherwise mutually agreed to by the electing Eligible Members, if applicable. Such election may be made by delivering a written election notice to the Transferor Member within such 10-day period.  If any Eligible Member has not responded within such 10-day period, such Eligible Member shall be deemed to have elected not to purchase any Offered Units.  In the event that the electing Eligible Members deliver election notices with respect to a larger number of Offered Units than that number of Offered Units set forth in the Transfer Notice, the electing Eligible Members shall allocate the available Offered Units as they shall agree in writing, or in the event they do not agree, based on each electing Eligible Member's Pro Rata Share of the Offered Units being offered in the Transfer Notice.  Any remaining Offered Units not elected to be purchased by the end of such 10-day period shall be reoffered by the Transferor Member for a five-day period to the Eligible Members who have elected to purchase the Offered Units.  Such electing Eligible Members shall have the right to purchase such additional portion of the remaining Offered Units in an amount up to such electing Eligible Member's Pro Rata Share of the remaining Offered Units.

(iii)    <u>Tag-Along Rights</u>.  If the proposed Transfer would result in the Transfer of at least five percent (5%) of the Units of the Company on a Fully Diluted Basis, then, concurrently with subsections (i) and (ii) above, each Eligible Member, to the extent that it has not otherwise elected to purchase Offered Units pursuant to subsection (ii) above, shall have a right (the "***Tag-Along Rights***") to substitute Units owned by it in place of a portion of the Offered Units to be sold at the price and on the terms set forth in the Transfer Notice.  The number of Units that such Eligible Member can substitute shall be determined by multiplying the number of Offered Units by the Fully Diluted Percentage Interest of such electing Eligible Member, and rounding up any fractional number of Units by one (1) Unit.  The notice given by each electing Eligible Member shall constitute its agreement to sell the Units specified in the notice on the terms and conditions applicable to the proposed Transfer; provided, however, that in the event that there is any material change in the terms and conditions of such proposed Transfer applicable to such electing Eligible Member after it gives such notice, then, notwithstanding anything herein to the contrary, it shall have the right to withdraw from participation in the proposed Transfer with respect to all or any portion of its Units.  No exercise of the Tag-Along Rights by any Eligible Member shall limit or otherwise affect the other Eligible Members' rights to purchase Offered Units pursuant to subsection (ii) above.  As used in this <u>Section 11.2(d)</u>, "***Tag-Along Units***" shall mean and include the Units substituted by the electing Eligible Members through the exercise of their Tag-Along Rights and the remaining Units from the Offered Units after deducting the Units to be offered by the electing Eligible Members.

(iv)     <u>Co-Sale Rights</u>.

(A)     Concurrently with *subsections (i)* through *(iii)* above, if any Main Street Member has not elected to purchase Units as provided in *subsection (ii)* and has not elected to exercise its Tag-Along Rights as provided in *subsection (iii)*, and if the proposed Transfer is a Transfer by KSCO which would result in KSCO's Fully Diluted Percentage Interest being 75% or less of KSCO's Fully Diluted Percentage Interest on the Effective Date, then KSCO shall promptly give written notice (the "***Co-Sale Notice***") to the Main Street Members at least thirty (30) days prior to the closing of such Transfer.   The Co-Sale Notice shall:   (1) be accompanied by a copy of any agreement or term sheet relating to the Transfer; (2) describe in reasonable detail the proposed Transfer, including, without limitation, the name of, and the number of Units (the "***Co-Sale Units***") to be purchased by, the proposed transferee (the "***Co-Sale Purchaser***") and the purchase price of each Unit to be sold, any additional consideration, the terms and conditions of payment offered by the Co-Sale Purchaser, any other significant terms of such sale; (3) specify the date such proposed sale is expected to be consummated (the "***Co-Sale Sale Date***"); (4) specify the aggregate number of Units held of record by KSCO as of the close of business on the day immediately preceding the date of the Co-Sale Notice; and (5) confirm that the Co-Sale Purchaser has been informed of the 'co-sale rights' provided for herein and has agreed to purchase all designated Units from the electing Main Street Members in accordance with the terms hereof.

(B)     Each Main Street Member shall have the right (the "***Co-Sale Rights***"), exercisable by giving written notice to KSCO no less than ten (10) days prior to the Co-Sale Sale Date, to participate in the Transfer on the same terms and conditions as set forth in the Co-Sale Notice.   Each electing Main Street Member shall indicate in such written notice to KSCO the number of its Units (up to one hundred percent (100%) of the Co-Sale Units) it desires to sell in such sale (collectively with the Units designated for purchase by the other electing Main Street Members, the "***Designated Co-Sale Units***").

(C)     The Co-Sale Notices given by the electing Main Street Members shall constitute their agreement to sell their respective Designated Co-Sale Units on the terms and conditions applicable to the proposed Transfer; *provided, however*, that in the event that there is any material change in the terms and conditions of such proposed Transfer applicable to any electing Main Street Member after it gives such notice, then, notwithstanding anything herein to the contrary, it shall have the right to withdraw from participation in the proposed Transfer with respect to all or any portion of its Designated Co-Sale Units.

(D)     The Co-Sale Purchaser shall have the option to either (I) increase the total number of Co-Sale Units to be purchased by the Co-Sale Purchaser to accommodate the purchase of all of the Designated Co-Sale Units together with the Co-Sale Units set forth in the Co-Sale Notice, all on the same terms and conditions as set forth in the Co-Sale Notice, or (II) decline to increase the total number of Co-Sale Units to be purchased by the Co-Sale Purchaser, in which case the electing Main Street Members shall be entitled to substitute 100% of their Designated Co-Sale Units for the Co-Sale Units to be sold by KSCO, such that the number of Co-Sale Units KSCO is entitled to transfer (if any) shall be equal to the excess of the number of Co-Sale Units over the number of Designated Co-Sale Units.

(v)     Remaining Units.  If and to the extent that there are any Offered Units that (A) are not being purchased by the Company or any Eligible Member pursuant to *subsection (i)* or *(ii)*, and (B) are not being replaced in such proposed Transfer with Units substituted by the Eligible Members pursuant to *subsection (iii)* or the Main Street Members pursuant to *subsection (iv)*, then the Transferor Member(s) shall have the right to complete the Transfer of such remaining Offered Units without the participation of the Members, but only on terms and conditions that are no more favorable in any material respect to the Transferor Member(s) than as stated in the Transfer Notice or Co-Sale Notice, as applicable (and in any event, at the same purchase price), and only if such proposed Transfer occurs on a date within sixty (60) days of the proposed date of such Transfer as set forth in the Transfer Notice or Co-Sale Notice, as applicable.  If such proposed Transfer does not occur within such 60-day period, then the Offered Units that were to be subject to such proposed Transfer thereafter shall continue to be subject to all of the restrictions contained in this Agreement.

(vi)    Closing of Transfer.  The closing of any purchase of Offered Units or any sale of Co-Sale Units or Tag-Along Units by the Members shall take place at the principal office of the Company, unless otherwise agreed.  At the closing, the Members participating in such Transfer shall take all necessary steps and actions to consummate the Transfer, including (A) the delivery of the purchase price to the Transferor Member(s) by any Members who have elected to purchase Offered Units and (B) the assignment and delivery by the selling Members of any Units the selling Members have elected to sell, together with such documents of transfer as shall be reasonably requested by the purchasers and the delivery by the purchasers to the selling Members of the full consideration therefore.   Any transfer or other similar taxes involved in such sale shall be paid by the selling Members, and the selling Members shall provide the purchasers with such evidence of their authority to sell hereunder and such tax lien waivers and similar instruments as the purchasers may reasonably request.

(vii)    Drag-Along Right.

(A)    If (I) the Company or any Member receives any bona fide offer to enter into a Proposed Acquisition Transaction, (II) Members holding more than fifty percent (50%) of the outstanding Units of the Company desire to accept such offer (the "***Drag-Along Members***"), and (III) the Board of Managers has approved the Proposed Acquisition Transaction (unless the Proposed Acquisition Transaction does not require Board of Managers approval), then the Drag-Along Members shall have the right (the "***Drag-Along Right***"), exercisable by delivering written notice to the Company and the other Members including the material terms and conditions of the Proposed Acquisition Transaction (a "***Drag-Along Notice***"), to cause all of the other holders of Units and other Equity Securities to take such actions as may be necessary to consummate the Proposed Acquisition Transaction, including but not limited to (1) voting in favor of, or granting their prior written consent to, the Proposed Acquisition Transaction in their capacities as Members of the Company, (2) causing any Managers designated by such Members to vote in favor of, or grant their prior written consent to, the Proposed Acquisition Transaction, (3) selling or exchanging their Units and other Equity Securities to the proposed purchaser or acquirer in the Proposed Acquisition Transaction, and (4) taking any other actions that may be reasonably necessary or appropriate to consummate the Proposed Acquisition Transaction, all on the price and other terms set forth in the Drag-Along Notice.

(B)    Closing of Proposed Acquisition Transaction.  The closing of any Proposed Acquisition Transaction in which the Drag-Along Members have exercised their Drag-Along Right shall occur within ninety (90) days after the delivery of the Drag-Along Notice and shall take place at the principal office of the Company, unless otherwise agreed between the transferring Member(s) and the purchasers.  At closing, if required by the terms and conditions of the Proposed Acquisition Transaction, the Members shall assign and deliver their Units and other Equity Securities to the purchasers, together with such documents of transfer as shall be reasonably requested by the purchasers, and the purchasers shall deliver to the Members the full consideration therefore.   Notwithstanding the foregoing, none of the Members other than the Drag-Along Members and Members who are executive officers of the Company: (I) shall be required to make any representation or warranty in any document of transfer other than their ownership of their respective Units free and clear of all Liens, their authority to transfer their respective Units to the purchaser and the general types of representations and warranties included in Section 17.3; or (II) will be liable in any way for a breach of the purchase agreement, merger agreement or any other applicable transaction document or instrument of transfer except to the extent that such Member has breached such representations and warranties described in clause (I) above;

*provided, however*, that such liability shall not be greater than the aggregate purchase price and/or other consideration paid to such Member in connection with the Proposed Acquisition Transaction.

(viii)    <u>KSCO Covenant</u>.  KSCO covenants and agrees that, for so long as it is a Member, it will not remove or amend any transfer restrictions in the KSCO Shareholder Agreement, including Section 2, Section 3, and Section 4.6 therein, without the prior written consent of the Main Street Members, and it will not amend the KSCO Shareholder Agreement to circumvent or supersede any such provisions.

(e)    <u>Termination</u>.  The provisions of <u>Sections 11.1</u> and <u>11.2</u> shall terminate upon the Company's Initial Public Offering.

11.3    <u>Value Determination</u>.  "*Fair Market Value*" shall be determined with respect to a particular proposed Transfer in accordance with the following procedures:

(a)    <u>By Agreement</u>.  For a period of thirty (30) days following the final exercise of any option rights to purchase Offered Units at Fair Market Value pursuant to <u>Section 11.2(c)</u> or <u>Section 11.2(d)</u>, the selling party and the purchaser (or, if there is more than one purchaser, a majority of the purchasers) of the applicable Offered Units shall first endeavor to agree on the Fair Market Value of the Offered Units.

(b)    <u>By Appraisal</u>.  If an agreement as to the Fair Market Value of the Offered Units cannot be reached by the parties as provided in subsection (a) of this <u>Section 11.3</u>, then such Fair Market Value shall be determined in accordance with the procedures set forth in this subsection (b).  Initially, each party (or if there is more than one purchaser, the selling party and a majority of the purchasers) shall, within ten (10) days after the expiration of the thirty (30) day period in subsection (a) above, appoint an appraiser with experience in appraising the value of closely held businesses or agree to a single appraiser to appraise the Fair Market Value of the Offered Units.  Within thirty (30) days of appointment, each appraiser, or a single appraiser if agreed upon, shall separately investigate the Fair Market Value of the Offered Units and shall submit a notice of an appraisal of that Fair Market Value to each party.  If a single appraiser conducts the initial appraisal, the initial appraisal shall be controlling as to the Fair Market Value of the Offered Units.  If separate appraisers for each party conduct appraisals and such initial appraisals vary as to the Fair Market Value of the Offered Units by less than twenty percent (20%) of the higher appraisal, then the average of such initial appraisals shall be controlling as to the Fair Market Value of the Offered Units.  If separate appraisers for each party conduct appraisals and such initial appraisals vary as to the Fair Market Value of the Offered Units by more than twenty percent (20%) of the higher appraisal, then the appraisers, within ten (10) days of submission of the last appraisal, shall appoint a third party appraiser experienced in the valuation of closely held businesses.  In such event, the third appraiser shall, within thirty (30) days of its appointment, appraise the Fair Market Value of the Offered Units and submit notice of its appraisal to each party, and the Fair Market Value of the Offered Units as determined by the third appraiser shall be controlling.  The third party appraiser may not assign a Fair

Market Value to the Offered Units greater than the greatest value claimed by either of the other appraisers or less than the smallest value claimed by either of the other appraisers. Each party to the appraisal shall bear the costs of their own respective appointed appraisers. The cost of an agreed-upon single appraiser or a third appraiser will be shared equally by the opposing parties to the dispute. The controlling decisions of the appraisers shall be final and binding on the parties thereto with no right to appeal such decisions.

11.4    <u>Transfer Costs and Expenses</u>.  The parties to any consummated Transfer of any Unit(s) or other Equity Security(ies), and the prospective transferor of any Unit(s) or other Equity Security(ies) in an unconsummated Transfer, will pay all the costs and expenses that the Company incurs in connection with that matter.

11.5    <u>Prohibited Transfers</u>.

(a)    <u>Transaction Void</u>.  Any purported Transfer of Unit(s) or other Equity Security(ies) that violates or is otherwise not in accordance with <u>Section 11.1</u> (a "***Prohibited Transfer***") shall be null and void and of no force or effect whatsoever; *provided, however*, that, if the Company is required by law or order of a court of competent jurisdiction to recognize any Prohibited Transfer, then the Membership Interest that is Transferred (if any) shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the Transferred Membership Interest, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Membership Interest may have to the Company.  A transferee who acquires a Membership Interest by a Prohibited Transfer shall be subject to, and shall only have the rights set forth in, <u>Section 11.7</u>.

(b)    <u>Remedies</u>.  In the case of an actual, attempted or threatened Prohibited Transfer, (a) the parties engaging, attempting to engage, or threatening to engage in such Prohibited Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any of such indemnified Members may incur (including, without limitation, incremental tax liabilities, lawyers' fees and expenses) as a result of such Prohibited Transfer or attempted or threatened Prohibited Transfer and efforts to enforce the indemnity granted hereby, and (b) the Company and other Members shall, to the extent permitted by applicable Law, be entitled to (i) obtain injunctive relief, (ii) obtain a decree compelling specific performance, and/or (iii) obtain any other remedy legally allowed to them.

11.6    <u>Admission of Substituted Members</u>.

(a)    <u>General Requirements</u>.  If a transferee of any Unit(s) or other Membership Interest is admitted to the Company as a substituted Member, the transferee shall have all of the rights, powers, benefits, obligations and duties provided by this Agreement with respect to such Membership Interest in the hands of the transferor.

(b)     Admission of a Substituted Member.  Subject to the other provisions of this Article XI, a transferee of any Unit(s) or other Membership Interest who is not a Member prior to such Transfer shall be admitted to the Company as a substituted Member only upon satisfaction of each of the following conditions:

(i)     The Membership Interest with respect to which the transferee is being admitted was acquired in accordance with Section 11.1;

(ii)     The transferee becomes a party to this Agreement as a Member and executes and delivers such documents and instruments as the Company may reasonably request as may be necessary or appropriate to confirm such transferee as a Member of the Company and such transferee's agreement to be bound by the terms and conditions of this Agreement, including but not limited to an "Addendum for Spouses" in the form attached as Exhibit B to this Agreement (or in such other form as may be approved by the Company in its sole discretion), executed by such transferee's spouse, if applicable; and

(iii)     The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a substituted Member with respect to the Transferred Membership Interest.

(c)     Timing of Admission.  In the event that the transferee of a Membership Interest from a Member is admitted as a substituted Member under this Section 11.6, such transferee shall be deemed admitted to the Company as a substituted Member immediately prior to the Transfer, and such transferee shall continue the business of the Company without dissolution.

11.7     Rights of Unadmitted Members.  A Person who acquires any Unit(s) or other Membership Interest by Transfer, but who is not admitted as a substituted Member pursuant to Section 11.6, shall be entitled only to allocations and distributions with respect to such Membership Interest in accordance with this Agreement, and shall have no authority to act for or bind the Company, shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Agreement.  In the event that a transferee who acquires any Unit(s) or other Membership Interest by Transfer is not admitted as a substituted Member, the transferor shall not cease to be a Member of the Company and shall continue to be a Member until such time, if ever, as the transferee is admitted as a Member under this Agreement.

11.8     Treatment of Transferred Membership Interests.  If any Unit(s) or other Membership Interest is Transferred during any fiscal year of the Company in compliance with the provisions of this Article XI, Profits, Losses, each item thereof, and all other items attributable to the Transferred Membership Interest for such fiscal year shall be divided and allocated between the transferor and the transferee by taking into account their varying Percentage Interests during such fiscal year in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Board of Managers.  All distributions on or

before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and distributions, the Company shall recognize such Transfer not later than the end of the calendar month during which it is given notice of such Transfer; *provided, however*, that, if the Company is given notice of a Transfer at least ten (10) Business Days prior to the Transfer, then the Company shall recognize such Transfer as of the date of such Transfer; *provided, further*, that, if the Company does not receive a notice stating the date such Membership Interest was Transferred and such other information as the Board of Managers may reasonably require within thirty (30) days after the end of the fiscal year during which the Transfer occurs, then all such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company, was the owner of the Unit(s) or other Membership Interest on the last day of such fiscal year. Neither the Company nor any Manager shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 11.8, whether or not the Company or any Manager has knowledge of any Transfer of ownership of any Unit(s) or other Membership Interest.

11.9    Registration under the Securities Act.

(a)    Piggy Back Registration Rights. If the Company proposes to file a registration statement under the Securities Act covering Units or other Equity Securities of the Company, whether for the Company's own account or for the account of any Members (other than a registration statement relating to an acquisition or merger or a registration statement on Form S-4 or S-8 or subsequent similar forms or pursuant to a registration under Section 11.9(b)), it shall advise the Main Street Members (the "***Registrable Members***") by written notice at least thirty (30) days prior to the filing of such registration statement and will, upon the request of any Registrable Member (any Registrable Member availing itself of the registration rights under this Section 11.9 shall be referred to herein as a "***Participating Registrable Member***") given within fifteen (15) calendar days after the receipt of any such notice (which request shall include the number of such Units intended to be disposed of by such Participating Registrable Member), use its commercially reasonable efforts to effect the registration under the Securities Act of all such Units that the Company has been requested to so register by such Participating Registrable Member and to include in any such registration statement such information as may be required to permit a public offering of such Units. The Company is not required to include such Units in a registration statement relating to an offering of securities if the managing underwriter has advised the Company in good faith that the inclusion of such Units should be limited due to market conditions, in which case the number of Units determined by such underwriter to be the maximum number capable of being included in such registration shall be allocated as follows: (i) first, to the Units or other Equity Securities (if any) sought to be issued by the Company; (ii) second, to the Units sought to be included by the Participating Registrable Members (in proportion to their Fully Diluted Percentage Interests if necessary); and (iii) last, to the Units or other Equity Securities sought to be included by any other Members of the Company. The Company shall use its commercially reasonable efforts to keep any such registration statement current for a period of nine (9) months from the effective date of such registration statement or until such earlier date as all of the registered Units have been sold. In connection with such registration, the Participating Registrable Members will execute

and deliver such customary underwriting documents as are required by the managing underwriter as a condition to the inclusion of the Units in the registration statement; *provided, however*, that if, at any time after giving written notice of its intention to register any securities and prior to the effective date of the registration statement filed in connection with such registration, the Company shall determine for any reason not to register such securities, then the Company may, at its election, give written notice of such determination to the Participating Registrable Members and thereupon the Company shall be relieved of its obligation to register any such securities.

(b)     Demand Registration Rights.   If, at any time after an Initial Public Offering, any Registrable Member or group of Registrable Members (together, the "***Initiating Members***") gives notice (a "***Demand Notice***") to the Company that such Registrable Member(s) requests registration of all or any portion of their Units, then the Company shall, as soon as practical, but not later than ninety (90) days from the date of receipt of such notice, use its commercially reasonable efforts to effect a registration statement with the Commission to the end that such Units may be sold under the Securities Act as promptly as practical thereafter (such filing a "***Demand Registration***"); *provided, however*, that the Company shall not be obligated to effect (x) more than one registration pursuant to this Section 11.9(b) in any twelve (12) month period, and (y) a Demand Registration if the aggregate proceeds from the sale of Units by the Initiating Members, together with the holders of any other Equity Securities of the Company that are entitled and that have elected to include Units in such registration statement, propose to sell Units for aggregate proceeds (after deduction for underwriter's discounts and expenses related to the issuance) that are less than $20,000,000, and (z) a Demand Registration during the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of filing of, and ending on a date one hundred (180) days after the effective date of, a Company initiated registration; provided that the Company is actively employing in good faith commercially reasonable efforts to cause such registration statement to become effective.  The Company has the right to defer the filing of any such registration statement in order (i) to enable the Company to prepare necessary financial statements for inclusion in such registration statement, including any financial statements of any Person which has been or is expected to be acquired, (ii) that the Company not be required to disclose material nonpublic information, provided that delays of the type referred to in this clause (ii) do not exceed ninety (90) days in the aggregate, or (iii) that a filing not be made earlier than 180 days after the effective date of any other registration statement filed by the Company.  Subject to the prior sentence, if the Company is able to register such Units on a Form S-3 under the Securities Act, or subsequent similar form, in a manner which does not require inclusion of any information concerning the Company other than to incorporate by reference its filings under the Exchange Act, then the Company shall use its commercially reasonable efforts to effect such registration statement as promptly as practical but no later than within ninety (90) days.  It is a condition to the Company's obligations to file a registration statement pursuant to this Section 11.9(b) that each Participating Registrable Member provide the Company with such information as the Company may request concerning such Participating Registrable Member and its plan of distribution.  The Company shall use its commercially reasonable efforts to keep any registration statement filed pursuant to this Section 11.9(b) current and effective until the earlier of (i) six (6) months from the

effective date of the registration statement or (ii) such date as each Participating Registrable Member shall have sold all of its registered Units or shall have advised the Company that it no longer desires to sell such Units pursuant to such registration statement; *provided*, *however*, that (x) such 6-month period shall be extended for a period of time equal to the period the Participating Registrable Member refrains from selling any Units included in such registration at the request of an underwriter of Equity Securities of the Company; and (y) in the case of any registration of Units on Form S-3 which are intended to be offered on a continuous or delayed basis, such 6-month period shall be extended, if necessary, to keep the registration statement effective until all such Units are sold, *provided* that Rule 415, or any successor rule under the Securities Act, permits an offering on a continuous or delayed basis, and *provided, further* that applicable rules under the Securities Act governing the obligation to file a post-effective amendment permit, in lieu of filing a post-effective amendment which (I) includes any prospectus required by Section 10(a)(3) of the Securities Act or (II) reflects facts or events representing a material or fundamental change in the information set forth in the registration statement, the incorporation by reference of information required to be included in (I) and (II) above to be contained in periodic reports filed pursuant to Section 13 or 15(d) of the Exchange Act in the registration statement;

(c)     In addition, the Company shall, at its sole expense, use its commercially reasonable efforts to:

(i)     prepare and file with the Commission such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement for the periods required hereunder;

(ii)     furnish such number of prospectuses and other documents incident thereto, including any amendment of or supplement to the prospectus, as a Participating Registrable Member from time to time may reasonably request,

(iii)     notify each seller of Units covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading or incomplete in a light of the circumstances then existing;

(iv)     cause all such Units registered pursuant hereunder to be listed on each securities exchange on which similar securities issued by the Company are then listed;

(v)     provide a transfer agent and registrar for all Units registered pursuant hereunder and a CUSIP number for all such Units, in each case not later than the effective date of such registration statement; and

(vi)     otherwise use its commercially efforts to comply with all applicable rules and regulations of the Commission, and make generally available to its security investors, as soon as reasonably practicable, an earnings statement satisfying the provisions of Section 11(a) of the Securities Act and covering the period of at least twelve (12) months, but not more than eighteen (18) months, beginning with the first month after the effective date of such registration statement.

(d)     In connection with any underwritten offering pursuant to a registration statement filed pursuant to this Section 11.9, the Company will enter into an underwriting agreement reasonably necessary to effect the offer and sale of the Units; *provided*, *however*, that such underwriting agreement contains customary underwriting provisions; and *provided*, *further* that if the underwriter so requests the underwriting agreement will contain customary contribution provisions. In such event, the right of any Registrable Members to registration pursuant to this Section 11.9 shall be conditioned upon such Registrable Member's participation in such underwriting and the inclusion of Units of such Registrable Member in the underwriting to the extent provided herein and the execution by such Registrable Member of an underwriting agreement in customary form with the representative of the underwriter or underwriters selected by the Company.

(e)     Each Registrable Member including Units in a registration statement shall furnish to the Company such information regarding such Registrable Member and the distribution proposed by such Registrable Member as the Company may reasonably request in writing and as shall be reasonably required in connection with any registration.

(f)     The Main Street Members, collectively, shall be entitled to two (2) demand registration rights pursuant to this Section 11.9(b).

11.10   Additional Provisions Concerning Registration.  The following provisions of this Section 11.10 are applicable to any registration statement filed pursuant to Section 11.9:

(a)     Costs and Expenses.  The Company shall bear the entire cost and expense of any registration of securities initiated under Section 11.9; *provided*, *however*, that the Company shall not be required to pay for any expenses of any registration proceeding begun pursuant to Section 11.9(b) if the registration request is subsequently withdrawn at the request of the Initiating Members holding a majority of the Units requested to be included in such registration statement or because a sufficient number of Initiating Members shall have withdrawn so that the minimum offering conditions set forth in Section 11.9(b)(y) are no longer satisfied (in which case all participating Members shall bear such expenses *pro rata* among each other based on the number of Units requested to be so registered), unless the Initiating Members holding a majority of the Units agree to forfeit their right to a demand registration pursuant to Section 11.9(e).  Notwithstanding the foregoing, each Participating Registrable Member shall, however, bear the fees of its own counsel and accountants and any transfer taxes or underwriting discounts or commissions applicable to Units sold by such Registrable Member pursuant thereto.

(b)     Indemnification.  The Company shall indemnify and hold harmless any Participating Registrable Member and each underwriter, within the meaning of the Securities Act, who may purchase from or sell for such Participating Registrable Member any Units from and against any and all losses, claims, damages and liabilities (including fees and expenses of counsel, which counsel may, if such Participating Registrable Member requests, be separate from counsel for the Company) caused by (i) any untrue statement or alleged untrue statement of material fact contained in the registration statement or any post effective amendment thereto or any registration statement under the Securities Act or any prospectus included therein required to be filed or furnished by reason of Section 11.9 or any application or other filing under any state securities law, or (ii) any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading to which such Participating Registrable Member or any such underwriter or any of them may become subject under the Securities Act or other federal or state statutory law or regulation, at common law or otherwise, which indemnification includes each person, if any, who controls any such underwriter within the meaning of the Securities Act, except insofar as such losses, claims, damages or liabilities are caused by any such untrue statement or alleged untrue statement or omission or alleged omission based upon information furnished to the Company by such Participating Registrable Member, or such Participating Registrable Member's officers, directors, partners, legal counsel, accountants or a control person, or underwriter expressly for use therein and *provided*, that, the indemnity such indemnity obligations shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld).

(c)     Blue Sky.  The Company shall use its commercially reasonable efforts to qualify the registered Units for sale in such states as it is otherwise qualifying its securities for sale, or in respect of a Demand Registration, in such states as are reasonably requested by any Participating Registrable Member.  However, in no event is the Company required to submit to the jurisdiction of any state other than for the limited consent of service of process relating to the offering or subject itself to taxation in any such jurisdiction.   The Company shall also provide the Participating Registrable Members with a reasonable number of prospectuses upon request.

(d)     Withdrawal.  Neither the giving of any notice by any Registrable Member nor the making of any request for prospectuses imposes any obligation upon such Registrable Member to sell any Units but only if such Registrable Member elects, in writing, prior to the effective date of the registration statement filed in connection with such registration, not to register such Units, and if no such election shall be timely so filed, then such Registrable Member shall sell such Units in such registration on the same terms and conditions as apply to the Company.

(e)     Rule 144; Rule 144A.

(i)     From and after ninety (90) days following the effective date of the first registration under the Securities Act filed by the Company for an offering of

its securities to the general public, the Company will make and keep adequate current public information with respect to the Company available in accordance with Rule 144 under the Securities Act and file the reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the Commission thereunder and, during any period in which the Company is subject to Section 13 or 15(d) of the Exchange Act. For so long as any Member's Units are restricted securities within the meaning of Rule 144(a)(3) under the Securities Act, the Company shall furnish to such Member upon written request a written statement by the Company as to its compliance with the reporting requirements of Rule 144  and of the Securities Act and the Exchange Act, a copy of the most recent annual or quarterly report of the Company, and such other reports and documents so filed as such Member may reasonably request in availing itself of any rule or regulation of the Commission allowing a Member to sell any such securities without registration

(ii)    The Company represents and warrants that as of the Effective Date, the Units are not, and are not part of a class of securities that are, listed on a national securities exchange registered under Section 6 of the Exchange Act or quoted in an automated inter dealer quotation system.  For so long as any Member's Units are restricted securities within the meaning of Rule 144(a)(3) under the Securities Act, the Company covenants and agrees that it shall, during any period in which it is not subject to Section 13 or 15(d) of the Exchange Act, make available to any such Member of securities in connection with the sale of such Member's securities and any prospective purchaser of them from such Member, in each case upon request, if required by the Securities Act, the information specified in, and meeting the requirements of, Rule 144A(d)(4) under the Securities Act.

(f)    Contribution.  If the indemnification provided for in Section 11.10(b) from the indemnifying party is unavailable to an indemnified party hereunder in respect of any losses, claims, damages, liabilities or expenses referred to therein, then the indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages, liabilities or expenses in such proportion as is appropriate to reflect the relative fault of the indemnifying party and indemnified parties in connection with the actions which resulted in such losses, claims, damages, liabilities or expenses, as well as any other relevant equitable considerations.  The relative fault of such indemnifying party and indemnified parties shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, has been made by, or relates to information supplied by, such indemnifying party or indemnified parties, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action.  The amount paid or payable by a party as a result of the losses, claims, damages, liabilities and expenses referred to above shall be deemed to include any legal or other fees or expenses reasonably incurred by such party in connection with any investigation or proceeding.  The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 11.10(f) were determined by pro rata

allocation or by any other method of allocation that does not take into account the equitable considerations referred to in this paragraph. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(g)     Holdback and Market Stand-Off Agreements.

(i)     The Company agrees not to effect any public sale or distribution of its Equity Securities or securities convertible into or exchangeable or exercisable for any of such securities during the thirty (30) days prior to or ninety (90) days after any underwritten registration contemplated by Section 11.9 has become effective, except as part of such underwritten registration and except pursuant to registrations on Form S-8 or S-4 or any successor or similar forms thereto, and to cause each Person who purchases its Equity Securities or any securities convertible into or exchangeable or exercisable for any of such securities at any time after the Effective Date (other than in a public offering) to agree not to effect any such public sale or distribution of such securities during such period.

(ii)     Each Member agrees that it shall not, if required and reasonably requested by an underwriter of securities of the Company, except as part of such underwritten registration, sell or otherwise transfer, dispose, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale, of any of its Units for up to 180 days following the effective date of a registration statement of the Company filed under the Securities Act (or such other period as may be requested by the Company or an underwriter to accommodate regulatory restrictions on (i) the publication or other distribution of research reports and (ii) analyst recommendations and opinions, including, but not limited to, the restrictions contained in NASD Rule 2711(f)(4) or NYSE Rule 472(f)(4), or any successor provisions or amendments thereto). These provisions shall not apply to an employee benefit plan on Form S-1 or Form S-8 or similar forms or a Form S-4 or similar form. Each Member agrees to execute a market standoff agreement with said underwriters in customary form consistent with the provisions of this Section 11.10(g)(ii).

(h)     No Inconsistent Agreements. The Company has not entered into and will not enter into any agreement or similar arrangements, the performance by the Company, or the terms of which, would in any manner conflict with, restrict or be inconsistent with the performance by the Company of its obligations under this Agreement.

(i)     Limitation on Certain Restrictions. The Company shall not, and the Company shall not permit or cause any of its Subsidiaries, directly or indirectly, to create or otherwise cause or suffer to exist or become effective any restriction or encumbrance on the ability of the Company or such Subsidiary to perform and comply with their respective obligations under this Agreement.

(j)      Termination.  The provisions of this Section 11.9 shall terminate on the third anniversary of the Company's Initial Public Offering.

# ARTICLE XII
## OPTIONS ON WARRANTS AND UNITS

12.1    Call and Put Options on Warrants.

(a)      Company Call Option.  The Company shall have the option, exercisable as set forth in the Warrants, to purchase from the Holders the Warrants and/or the Units issued to the Holders pursuant to their exercise of the Warrants, on the terms specified in the Warrants.

(b)      Holder Put Option.  Each Holder shall have the option, exercisable as set forth in the Warrants, to sell to the Company, and the Company shall have the obligation to purchase from each Holder, the Warrants and/or the Units issued to the Holders pursuant to the exercise of the Warrants, on the terms specified in the Warrants.

12.2    Put Options on Units.

(a)      From and after November 23, 2020, each Main Street Member shall have the option to require the Company to purchase all of such Main Street Member's Units (excluding its Warrants) in exchange for the Put Option Price by providing written notice of the exercise of such option to the Company setting forth the number of Units to be sold (the "**Put Option Notice**").

(b)      On or before the twentieth (20th) day following the receipt of such Put Option Notice, the Company shall (i) provide the Main Street Member that provided such Put Option Notice (whether one or more, the "**Putting Member**") with a reasonably detailed copy of the Board of Manager's calculation of (A) the aggregate Capital Contributions with respect to the Units that are the subject of such Put Option Notice, (B) the Current Market Price, (C) the Required IRR, and (D) the resulting Put Option Price of such Units, including in each case all material inputs and assumptions (the "*Put Valuation Notice*"), and (ii) pay such Put Option Price to the Putting Member by wire transfer in immediately available funds to such account(s) as may be specified by the Putting Member.

(c)      *Objection and Resolution Process.*

(i)      If the Putting Member objects to the Company's determination of the Put Option Price or the Current Market Price or Required IRR relating thereto, such Putting Member may, within twenty (20) days following receipt of the Put Valuation Notice, deliver written notice to the Company of such objection, describing in reasonable detail the basis for such objection and such Putting Member's calculation of (A) the aggregate Capital Contributions with respect to the Units that are the subject of such Put Option Notice, (B) the Current Market Price, including all material inputs and assumptions, (C) the Required IRR, and (D) the resulting Put Option Price of such Units, including any items to which the

Putting Member objects with respect to the Company's calculation of the foregoing (a "**Put Objection Notice**").

(ii)     In the event the Putting Member delivers a Put Objection Notice, any items in the Put Valuation Notice that are not disputed in such Objection Notice shall be deemed to have been accepted by such Putting Member and will be final, conclusive and binding.  If a Putting Member fails to deliver a Put Objection Notice with respect to the Put Valuation Notice within such 20-day period, the Put Valuation Notice and Put Option Price contained therein shall be deemed to have been accepted by the Putting Member and will be final, conclusive and binding.  In the event a Put Objection Notice is delivered within the 20-day review period, the Company and the Putting Member shall use good faith reasonable efforts to negotiate to resolve such dispute.

(iii)     If the Company and the Putting Member, notwithstanding such good faith effort, fail to resolve all of the items set forth in the Put Objection Notice within thirty (30) days after the delivery by such Putting Member of such Put Objection Notice (or such longer period as may be agreed by the Company and the Putting Member), then any items remaining in dispute ("**Disputed Items**" and any items not so disputed, the "**Undisputed Items**") shall be submitted for resolution by the Company and the applicable Putting Member to the office of an independent nationally or regionally recognized firm specializing in security valuations that is mutually agreeable to the Company and the Putting Member (the "**Independent Arbiter**"), who, acting as experts and not arbitrators, shall resolve the Disputed Items only.  The Company and the applicable Putting Member each shall direct the Independent Arbiter to render a written determination within thirty (30) days of its retention.  The Independent Arbiter's determination shall be based solely on the Put Valuation Notice, the Put Objection Notice and supporting materials submitted therewith by the Company and the Putting Member (i.e., not on the basis of an independent review).   The determination of the Independent Arbiter shall be binding and conclusive on the parties and not subject to appeal; *provided*, *however*, that the Independent Arbiter may not make a determination of the Put Option Price in an amount greater than the larger Put Option Price determined by either the Company or the Putting Member or less than the smaller Put Option Price determined by the Company or the Putting Member.  All fees and expenses of the Independent Arbiter shall be paid by the party whose determination of the Put Option Price is further from the Independent Arbiter's determination of Put Option Price.

(iv)     The Company shall pay any additional Put Option Price in cash or immediately available funds within ten (10) days following the final determination of the Put Option Price in accordance with the procedures set forth in this Section 12.2(c).

**ARTICLE XIII**
**BOOKS, RECORDS AND INFORMATION; FISCAL YEAR**

13.1    <u>Books and Records</u>.  At all times until the dissolution and termination of the Company, the Company shall maintain separate books of account which show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the conduct of the business of the Company in accordance with this Agreement.  The Company's books of account shall be maintained on the accrual basis in accordance with GAAP, notwithstanding that Capital Accounts shall also be maintained in accordance with <u>Section 4.4</u>.

13.2    <u>Financial Statements and Tax Information</u>.    The Company will deliver each of the financial statements and other reports described below to each Member that, together with any Affiliates (and in the case of the Main Street Members, on a collective basis), owns at least 7.5% of the Equity Securities of the Company on a Fully Diluted Basis (excluding the impact of any dilution resulting from any equity issued by the Company through an issuance which the Preemptive Rights in <u>Section 3.5</u> did not apply), provided that such Member has not breached and is not in breach of its confidentiality obligations under <u>Section 17.2</u>.

(a)    <u>Year-End Reports</u>.  With respect to each fiscal year of the Company, the Company shall cause to be prepared and submitted to each Member no later than sixty (60) days after the end of such fiscal year, but in any case no later than five (5) days after prepared, the following tax information, which need not be audited:

(i)    draft copies of the Company's required federal and state annual tax reporting (including Form K-1's and supporting schedules) for such fiscal year or, if not available, estimates of the amounts to be included on the Form K-1's;

(ii)    a statement of the respective Capital Accounts of the Members and changes therein for such fiscal year.

(b)    <u>Year-End Audited Financial Statements</u>.    As soon as reasonably practicable after the end of each Fiscal Year, the Company will deliver, each in paper or electronic form, (i) the audited consolidated balance sheets of the Company and its consolidated Subsidiaries, as of the end of such Fiscal Year, and (ii) the related consolidated statements of income, Members' equity and cash flows for such Fiscal Year.  The Company will use its commercially reasonable efforts to deliver such audited financial statements to the Members within one hundred twenty (120) days after the end of each Fiscal Year.

(c)    <u>Quarterly Financial Statements</u>.  As soon as reasonably practicable and in any event within thirty (30) days after the end of each fiscal quarter, the Company will deliver, either in paper or electronic form, the internally certified unaudited consolidated balance sheet of the Company and its consolidated Subsidiaries as of the quarter then ended, and the related consolidated statements of income, Members' equity and cash flows for such quarter ended.

(d)     In connection with subsection (c) above, a certificate executed by the Chief Executive Officer, President, a Vice-President, Chief Financial Officer, Treasurer, Comptroller, Chief Accounting Officer, Chief Operating Officer or Manager of the Company certifying that such financial statements (A) were prepared in accordance with GAAP and on a basis consistent with the Company's historical financial statements and (B) present fairly, in all material respects, the consolidated financial condition and results of operations of the Company.

(e)     To the extent requested by any Member (and each of the Main Street Members hereby makes such request until they notify the Company otherwise), the Company shall cause to be prepared and timely submitted to such Member:

(i)     on or before the earlier of (A) February 28 of each calendar year or (B) five (5) days after the estimate is available (or the next Business Day, if February 28 or five (5) days after the estimate is available falls on a day that is not a Business Day), an estimate of taxable income including estimated income and loss allocations for the prior calendar year;

(ii)     no later than thirty (30) days after the last day of the first, second and third calendar quarters of each calendar year, an estimate of taxable income for the current calendar year;

(iii)     on or before the earlier of (A) February 28 of each calendar year or (B) five (5) days after available, an annual budget and business plan for the current calendar year as approved by the Board of Managers; and

(iv)     on or before January 31 of each calendar year, budgeted taxable income for the current calendar year.

(f)     The provisions of this Section 13.2 shall terminate upon the Company's Initial Public Offering.

13.3     Fiscal Year.  The fiscal year of the Company shall be the calendar year.

## ARTICLE XIV
## TAX MATTERS

14.1     Partnership for Tax Purposes.  The Members agree that it is their intention that the Company shall be treated as a partnership for purposes of United States federal income tax Laws and, to the extent permitted by Law, state and local income tax Laws.  The Members further agree not to take any position or make any election, in a tax return or otherwise, inconsistent with that intent.  In furtherance of the foregoing, the Company will file as a partnership for United States federal income tax purposes.  In addition, neither the Company, any Member, any Manager, nor any officer shall file an election to classify the Company as an association taxable as a corporation for federal tax purposes.

14.2     Tax Matters Member.  KSCO is hereby designated as the "tax matters partner" of the Company (the *"Tax Matters Member"*) for purposes of Section 6231(a)(7) of the Code and

shall have the power to manage and control, on behalf of the Company, any administrative or judicial proceeding at the Company level with the Internal Revenue Service relating to the determination of any item of Company income, gain, loss, deduction or credit for federal income tax purposes.  The Members shall take, and the Tax Matters Member is specifically authorized and directed to take, at the Company's expense, whatever steps he deems necessary or desirable to perfect such designation, including filing any forms or documents with the Internal Revenue Service and taking such other action as may from time to time be required under the Treasury Regulations.

14.3    <u>Tax Returns</u>.  All matters relating to tax returns (including amended returns) filed by the Company, including tax audits and related matters and controversies, shall be determined and conducted by the Tax Matters Member after consultation with and under the direction of the Board of Managers.  The Tax Matters Member shall prepare and file or cause to be prepared and filed at the Company's expense all tax returns (including amended returns) filed by the Company.  Copies of all federal income tax returns and all other material tax returns shall be provided to each of the Members at least thirty (30) days prior to their filing.  As promptly as practicable, and in any event in within seventy-five (75) days after the close of each taxable year, the Company shall deliver to each Member a copy of each state and federal tax return, Schedule K-1 for each Member, together with any corresponding state schedules, and other tax reports filed by the Company.

14.4    <u>Tax Elections</u>.  All elections for federal income tax purposes (and corresponding elections for state, local and foreign purposes) which are required or permitted to be made by the Company, and all material decisions with respect to the calculation of its income or loss for tax purposes, shall be made in such manner as the Tax Matters Member shall determine after consultation with the Board of Managers.

# ARTICLE XV
# LIABILITY AND INDEMNIFICATION

15.1    <u>No Liability for Company Debts; Limited Liability</u>.

(a)    The debts, liabilities and obligations of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, liabilities and obligations of the Company, for which no Member or Manager shall be liable.

(b)    Except as otherwise expressly required by Law, no Member, in its capacity as Member, shall have any liability to the Company, any other Member or the creditors of the Company in excess of the obligation of such Member to make the Capital Contributions in accordance with the provisions of this Agreement (to the extent that such Capital Contributions have not yet been made) and any other payments required to be made by such Members under the express provisions of this Agreement.

15.2    <u>Good Faith Actions; Exculpation</u>.

(a)    To the fullest extent permitted by applicable law, no Covered Person shall be liable to the Company or any Member (or any Affiliate of a Member) as a result of or in connection with any actions or omissions with respect to the Company on the part of

such Covered Person in his or its capacity as such based on any claim of breach of fiduciary duty to the extent that such Covered Person (i) conducted himself or itself in good faith and (ii) reasonably believed that his or its conduct was in the best interests of the Company except (y) for any act taken by such Covered Person purporting to bind the Company that has not been authorized pursuant to this Agreement or (z) to the extent that the liability of such Covered Person arises from the willful misconduct or gross negligence of such Covered Person.  In addition, no Covered Person shall be liable to the Company or any Member (or Affiliate of a Member) for actions taken by such Covered Person consistent with the duty of loyalty and care applicable to a member of the board of directors of a Delaware corporation.

(b)     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Manager, officer or other Person as to matters the Covered Person reasonably believes are within the professional or expert competence of such Manager, officer or other Person and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, Profits, Losses or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

(c)     To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any Member, such Covered Person acting under this Agreement shall not be liable to the Company or to any Member for its good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person, to the maximum extent permitted by applicable law.  Notwithstanding the foregoing or anything to the contrary in this Agreement, Managers that are employees or members of the management of the Company or its Subsidiaries (but not Managers that are acting on behalf of the Company solely in their capacities as Managers) shall have fiduciary duties to the Company and the Members. Non-employee Managers shall be deemed the agents of the respective constituent Members that appointed them in accordance with Section 9.8(b) and shall not be deemed an agent or subagent of the Company or the other Members and shall have no duty (fiduciary or otherwise) to the Company or the other Members to the fullest extent that the Act permits the limitation or elimination of duties to the Company.

15.3     Indemnification.

(a)     Each Covered Person who was or is made a party or is threatened to be made a party or is involved in any threatened, pending or completed action, suit or proceeding, whether formal or informal, whether of a civil, criminal, administrative or investigative nature (hereinafter a "**Proceeding**"), by reason of the fact that such Covered Person is or was a Manager, officer or employee of the Company or is or was serving as a manager, director, officer, employee or agent of any other entity at the request of the

Company, whether the basis of such proceeding is an alleged action or inaction in an official capacity or in any other capacity while serving in that official capacity, shall be indemnified and held harmless by the Company against all costs, charges, expenses, liabilities and losses, including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement (collectively, "*Indemnifiable Losses*") reasonably incurred or suffered by the Covered Person in connection therewith if with respect to the subject matter of such Proceeding the Covered Person acted in good faith and in a manner reasonably believed by such Person to be (i) in or not opposed to the best interests of the Company and, with respect to any criminal action or proceeding, such Person had no reasonable cause to believe such Person's conduct was unlawful, and (ii) within the scope of the authority conferred by this Agreement or by Law or by the consent of the Members in accordance with the provisions of this Agreement.  Such indemnification shall continue as to a Covered Person who has ceased to serve in such capacity and shall inure to the benefit of the Covered Person's successors, heirs, executors and administrators.  The Board of Managers shall make the determination (or shall appoint independent legal counsel to make the determination) as to whether or not the Covered Person and his or her actions have met the requirements set forth herein for indemnification; *provided, however,* that the Company shall indemnify any Covered Person who has been successful on the merits or otherwise in the defense of a Proceeding or any claim, issue or matter therein, against any Indemnifiable Losses incurred in connection therewith.

(b)     The Company shall pay expenses actually and reasonably incurred by a Covered Person in connection with any Proceeding in advance of its final disposition; *provided*, *however*, that the payment of such expenses incurred in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of an undertaking, by or on behalf of such Covered Person, to repay all amounts so advanced if it shall ultimately be determined that such Covered Person is not entitled to be indemnified.

(c)     If a Covered Person is entitled to payment under Section 15.3(a) and is not paid in full by the Company within thirty (30) days after a written claim has been received by the Company, such Covered Person may at any time thereafter bring suit against the Company to recover the unpaid amount of the claim and, if successful in whole or in part, the Covered Person shall be entitled to be paid also the expense of prosecuting such claim.

(d)     To the extent that any Manager, Member, officer, or employee of the Company is by reason of such position, or position with another entity at the request of the Company, a witness in any Proceeding, such Person shall be indemnified against all costs and expenses actually and reasonably incurred by such Person in connection therewith.

(e)     The Company may purchase and maintain insurance, at its expense, to protect itself and any Manager, Member, officer, or employee of the Company against any Indemnifiable Losses, whether or not the Company would have the power to indemnify such Person against such Indemnifiable Losses.

(f)     The Company may enter into agreements with any Manager, member, officer, employee or agent of the Company providing for indemnification to the fullest extent permissible under Delaware Law.

(g)     Each and every term and provision of this <u>Section 15.3</u> is separate and distinct, so that if any term or provision of this <u>Section 15.3</u> is shall be held to be invalid or unenforceable for any reason, such invalidity or unenforceability shall not affect the validity or enforceability of any other term or provision hereof.  To the extent required, any term or provision of this <u>Section 15.3</u> may be modified by a court of competent jurisdiction to preserve its validity and to provide the Covered Person with, subject to the limitations set forth in this <u>Section 15.3</u> and any agreement between the Company and the Covered Person, the broadest possible indemnification consistent with the intent hereof.

(h)     Each of the rights conferred on a Covered Person by subsections (a), (b), (c), and (d) of this <u>Section 15.3</u> and on employees or agents of the Company by <u>Section 15.3(d)</u> shall be a contractual right and any repeal or amendment of the provisions of this <u>Section 15.3</u> shall not adversely affect any right hereunder of any Person existing at the time of such repeal or amendment with respect to any act or omission occurring prior to the time of such repeal or amendment, and, further, shall not apply to any proceeding, irrespective of when the Proceeding is initiated, arising from the service of such Person prior to such repeal or amendment.

(i)     The rights conferred in this <u>Section 15.3</u> shall not be exclusive of any other rights that any Person may have or hereafter acquire under any statute, agreement, vote of Members or otherwise.

(j)     No Member shall have any obligation to contribute to the capital of the Company or otherwise provide funds to enable the Company to fund its obligations under this <u>Section 15.3</u>.

(k)     A Covered Person shall not be denied indemnification in whole or in part under this <u>Section 15.3</u> because the Covered Person had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by this Agreement.

15.4     <u>Company Responsibility for Indemnification Obligations</u>.

(a)     Notwithstanding anything to the contrary in this Agreement, the Company and the Members hereby acknowledge that a Covered Person may have rights to indemnification, advancement of expenses and/or insurance pursuant to charter documents or agreements with the employer of such Covered Person, a Member or a direct or indirect parent or brother/sister Affiliate of the Covered Person or Member (collectively, the "***Last Resort Indemnitors***").  On the other hand, a Covered Person may also have rights to indemnification, advancement of expenses and/or insurance provided by a Subsidiary of the Company or pursuant to agreements with third parties in which the Company or any Subsidiary of the foregoing has an interest (collectively, the "***First Resort Indemnitors***").  Notwithstanding anything to the contrary in this Agreement, as to

each Covered Person's rights to indemnification and advancement of expenses pursuant to this Agreement, the Company and the Members hereby agree that as between the Company and the Members:

        (i)      the First Resort Indemnitors, if any, are the indemnitors of first resort (*i.e.*, their indemnity obligations to such Covered Person are primary and any obligation of the Company to advance expenses or to provide indemnification for the Indemnifiable Losses incurred by such Covered Person are secondary), and the First Resort Indemnitors shall be obligated to indemnify such Covered Person for the full amount of all Indemnifiable Losses and expenses covered by this Article XIV, to the full extent of their indemnity obligations to the Covered Person and to the extent of the First Resort Indemnitors' assets legally available to satisfy such obligations, without regard to any rights the Covered Person may have against the Company or the Last Resort Indemnitors;

        (ii)     the Company is the indemnitor of second resort (*i.e.*, its indemnity and advancement of expense obligations to such Covered Person are secondary to the obligations of any First Resort Indemnitors, but precede any indemnity and advancement of expense obligations of any Last Resort Indemnitors), and the Company shall be liable for the full amount of all remaining Indemnifiable Losses and expenses covered by this Agreement after the application of Section 15.4(a)(i) to the full extent of its obligations under the other subsections of this Article XV and to the extent of the Company's assets legally available to satisfy such obligations, without regard to any rights such Covered Person may have against the Last Resort Indemnitors; and

        (iii)    the Last Resort Indemnitors, if any, are the indemnitors of last resort and shall be obligated to indemnify such Covered Person for any remaining Indemnifiable Losses and expenses covered by this Article XIV only after the application of Section 15.4(a)(i) and 15.4(a)(ii).

     (b)      The Company and the Members further agree that no advancement or payment by any Last Resort Indemnitors on behalf of a Covered Person with respect to any Indemnifiable Loss or expense covered by the other sections of this Article XV shall affect the foregoing and such Last Resort Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Covered Person against the Company.  The Last Resort Indemnitors, if any, are express third party beneficiaries of the terms of this Section 15.4.

## ARTICLE XVI
## DISSOLUTION, LIQUIDATION AND TERMINATION

     16.1    Dissolution.  The Company shall be dissolved and its affairs shall be wound up upon the occurrence of any of the following events:

(a)      the adoption by the Board of Managers and approval by the Required Vote of the Members of a resolution providing that the Company shall be dissolved as of the date specified therein;

(b)      the sale or other disposition of all or substantially all of the Company's assets, and the collection and distribution of all proceeds from the sale or disposition;

(c)      an event of dissolution occurs under Section 18-801(4) of the Act; or

(d)      the entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

The death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event (including any event described in Section 18-304 of the Act) that terminates the continued membership of a Member in the Company, shall not cause a dissolution of the Company.

Upon the dissolution of the Company, the Board of Managers shall promptly notify the Members of the dissolution.

16.2      Liquidation.  Upon dissolution of the Company, the Company shall continue solely for the purposes of winding-up its business and affairs as soon as reasonably practicable. Promptly after the dissolution of the Company, the Board of Managers, or if there are no Managers then serving, a Person selected by a majority of the Members, shall designate one or more Managers or other Persons (the "*Liquidating Agents*") to accomplish the winding up of the business and affairs of the Company.  Upon their designation, the Liquidating Agents shall immediately begin to wind up the affairs of the Company in accordance with the provisions of this Agreement and the Act.  In winding up the business and affairs of the Company, the Liquidating Agents may take any and all actions that they determine to be in the best interests of the Members, including any actions relating to (i) causing written notice by registered or certified mail of the Company's intention to dissolve to be mailed to each known creditor of and claimant against the Company, (ii) the payment, settlement or compromise of existing claims against the Company, (iii) the making of reasonable provisions for payment of contingent claims against the Company and (iv) the sale or disposition of the properties and assets of the Company. A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the satisfaction of claims against the Company so as to enable the Liquidating Agents to minimize the losses that may result from a liquidation.

16.3      Application of Company Assets.  In winding up the business and affairs of the Company, the assets of the Company shall be paid and distributed in the following manner and priority:

(a)      first, except to the extent otherwise permitted by law, to creditors, as their interests may appear, including Members who are creditors, in satisfaction of liabilities (other than for distributions) of the Company, whether by payment or by establishment of reserves;

(b)      thereafter, to the Members in accordance with Section 6.1(b).

The Liquidating Agents are authorized to allocate or reallocate Profits and Losses as set forth in <u>Article V</u>.

16.4    <u>Deficit Capital Accounts</u>.    Notwithstanding any other provision of this Agreement, and notwithstanding any custom or rule of law to the contrary, if any Member has a deficit balance in his Capital Account (after giving effect to all contributions, distributions and allocations for all Allocation Years, including the Allocation Year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever.

16.5    <u>Certificate of Cancellation; Termination</u>.   Upon the completion of the winding up of the business and affairs of the Company, and when all liabilities and obligations of the Company have been paid or discharged, or adequate provision has been made therefor (or, in case the property and assets of the Company are not sufficient to satisfy and discharge all of its liabilities and obligations, then when all the property and assets have been applied so far as they will go to the just and equitable payment of its liabilities and obligations) and all the remaining property and assets of the Company have been distributed to the Members in accordance with their respective rights and interests set forth in <u>Section 16.3</u>, a certificate of cancellation shall be executed on behalf of the Company by a Manager or Member designated by the Liquidating Agents, which certificate of cancellation shall comply with the requirements of the Act, and the Liquidating Agents shall cause such certificate of cancellation to be filed in the office of the Secretary of State of the State of Delaware and shall take such other actions as they may determine are necessary or appropriate to terminate the Company.

16.6    <u>Claims of the Members</u>.   The Members and former Members shall look solely to the property and assets of the Company for the return of their Capital Contributions, and if the property and assets of the Company remaining after payment of or due provision for all liabilities to creditors are insufficient to return any or all Capital Contributions, the Members and former Members shall have no recourse against the Company or any Member.

16.7    <u>Waiver of Partition</u>.    Each Member hereby waives until termination of the Company any and all rights that the Member may have to maintain an action for partition of the property and assets of the Company.

**ARTICLE XVII**
**MISCELLANEOUS**

17.1    <u>Article 8 of the Uniform Commercial Code</u>.    For so long as any Indebtedness remains outstanding under the Loan Agreement, the Company shall not, and no Member or Manager will amend this Agreement to, provide that any Units or other Equity Securities in the Company are securities governed by Article 8 of the Uniform Commercial Code, or otherwise "opt in" to Article 8 of the Uniform Commercial Code or any similar state law provisions that are or may be applicable to the Company, without the prior written consent of the Main Street Members holding a majority of the Units then held by all Main Street Members, which consent may be withheld in the Main Street Members' sole discretion.

17.2    Confidentiality.  Each Member and each Manager and the Main Street  Observer agrees that he shall not use, publish, disseminate, distribute or otherwise disclose all or any portion of the Confidential Information without the prior written approval of the Company.  If a Member, Manager or the Main Street Observer receives either a request to disclose any Confidential Information under the terms of a subpoena or order issued by a court or other governmental authority or advice of legal counsel that disclosure is required under applicable law, such Member agrees that, prior to disclosing any Confidential Information, he or she shall, unless prohibited by applicable Law, (a) promptly notify the Company of the existence and terms of, and the circumstances attendant to, such request or advice, (b) consult with the Company as to the advisability of taking legally available steps to resist or narrow any such request or to otherwise eliminate the need for such disclosure and (c) if disclosure is required, disclose only such portion of the Confidential Information as is required by applicable Law to be disclosed and cooperate with the Company to obtain a protective order or other reliable assurance that confidential treatment will be accorded to such portion of the Confidential Information as is required to be disclosed.  Notwithstanding anything in this Section 17.2 or elsewhere in this Agreement to the contrary, each Member further understands and acknowledges that the Main Street Members and the Affiliates of the Main Street Members (including, but not limited to, Main Street Capital Corporation, Main Street Capital II, LP, Main Street Mezzanine Fund, LP, Main Street Capital Partners, LLC, HMS Income Fund, Inc., and HMS Equity Holding, LLC) will have (a) certain regulatory disclosure requirements which are necessary in order to maintain compliance with the rules and regulations of the Commission and the Small Business Administration and (b) certain disclosure requirements and practices that are standard or required practices as a publicly-traded investment company, and as such each Member approves and consents to the disclosure of Confidential Information for such purposes, and nothing in this Section 17.2 shall prohibit the Main Street Members or their Affiliates from disclosing Confidential Information (A) if required by applicable law, to (i) the Commission, (ii) the Main Street Members' partners and investors, (iii) the Small Business Administration, or (iv) Small Business Administration auditors or (B) as necessary or appropriate, the Main Street Members' auditors, attorneys or accountants.

17.3    Representations and Warranties of the Members.    Each Member as of the Effective Date hereby represents and warrants and agrees as follows:

(a)    such Member has full power and authority to execute and deliver this Agreement and to carry out his obligations under this Agreement in accordance with its terms, without the consent, concurrence or joinder or any other Person (other than his spouse if the spouse has joined in the execution of this Agreement);

(b)    this Agreement constitutes a legal, valid and binding obligation of such Member, enforceable against such Member in accordance with its terms;

(c)    the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein will not constitute a breach of any term or provision of, or a default under, (i) any outstanding indenture, mortgage, loan agreement or other contract or agreement to which such Member is a party or by which such Member's properties are bound or (ii) any Law applicable to such Member or such Member's properties;

(d)      no consent, license, approval or authorization of any Governmental Entity is required on the part of such Member in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated herein;

(e)      the Units to be issued to such Member are being acquired, or will be acquired, by such Member for investment, for such Member's own account, and not with a view to, or for resale in connection with, any distribution of Units within the meaning of the Securities Act;

(f)      no Units may be sold, transferred, or otherwise disposed of without registration under the Securities Act and any applicable state securities laws, except under an exemption from those laws; *provided, that* notwithstanding such representations, the Company agrees (subject to all applicable provisions of this Agreement) to permit a sale or transfer of Units upon its obtaining satisfactory assurances that the sale or transfer may be made without registration under the Securities Act and related rules and regulations (and all applicable state securities laws and regulations), including receipt by the Company of an opinion to such effect from counsel reasonably satisfactory to the Company or compliance by the selling or transferring Member with the requirements of Rule 144(k) or Rule 144A under the Securities Act; and

(g)      such Member is an "accredited investor" within the meaning of Rule 501 under the Securities Act of 1933, as amended;

(h)      such Member has been afforded the opportunity to ask for and has received (i) all information that such Member has requested and (ii) all information that would enable such Member to evaluate the merits and risks of acquiring the Units;

(i)      such Member is aware of the risks associated with acquiring the Units and has evaluated the risks and merits involved with the acquisition of the Units; and

(j)      such Member agrees that certificates, if any, from time to time representing Units issued to such Member under this Agreement may be inscribed with the following restrictive legends:

> THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE.  SUCH UNITS MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH A REGISTRATION UNLESS THE COMPANY IS FURNISHED WITH AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY TO THE EFFECT THAT THE TRANSFER IS EXEMPT FROM REGISTRATION UNDER THOSE LAWS.

> THE SALE, ASSIGNMENT, TRANSFER, PLEDGE, ENCUMBRANCE, OR OTHER DISPOSITION OF THE UNITS EVIDENCED BY THIS CERTIFICATE, OR ANY INTEREST IN SUCH UNITS, ARE RESTRICTED

BY THE TERMS OF THE SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT BY AND AMONG THE MEMBERS OF THE COMPANY DATED EFFECTIVE AS OF NOVEMBER 23, 2016 COPIES OF WHICH WILL BE FURNISHED TO THE RECORD HOLDER OF THIS CERTIFICATE WITHOUT CHARGE UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS OR REGISTERED OFFICE.  NO SUCH SALE, ASSIGNMENT, TRANSFER, PLEDGE, ENCUMBRANCE OR OTHER DISPOSITION SHALL BE EFFECTIVE UNLESS AND UNTIL THE TERMS AND CONDITIONS OF THE AFORESAID LAWS AND SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT SHALL HAVE BEEN COMPLIED WITH IN FULL.

17.4    Notices.  All notices and other communications under or in connection with this Agreement shall be in writing and shall be given by delivery in person or by overnight courier, by registered or certified mail (return receipt requested and with postage prepaid thereon) or if delivered to the recipient in person, by courier, or by e-mail (i) in the case of notices or other communications to the Company, its principal office to the attention of the Secretary and (ii) in the case of notices or other communications to a Member, its address set forth in the Register. All notices and other communications that are addressed as provided in or pursuant to this Section 17.4 shall be deemed duly and validly given (i) if delivered in person or by overnight courier, upon delivery, (ii) if delivered by registered or certified mail (return receipt requested and with postage paid thereon), seventy two (72) hours after being placed in a depository of the United States mail and (iii) if delivered by e-mail transmission, upon transmission thereof.

17.5    Amendment.  The Board of Managers may approve any of the following actions, without the approval of the Members or any other Person, subject to any contractual restrictions elsewhere, and may modify or amend any provision of this Agreement to reflect:

(a)    a change in the name of the Company;

(b)    a change in the name of the registered agent or the location of the registered office of the Company;

(c)    a change in the location of the principal office of the Company;

(d)    the making of any Capital Contribution to the Company;

(e)    the admission to or withdrawal from the Company of any Members in accordance with the provisions of this Agreement; or

(f)    a change required by this Agreement.

Except as provided in this Section 17.5 and subject to Section 7.3(a)(x), any provision of this Agreement may otherwise be modified or amended only if such modification or amendment is adopted by the Board of Managers and approved by the Required Vote of the Members.

However, notwithstanding anything herein to the contrary, no amendment or modification shall be adopted that specifically modifies the rights, powers, preferences or privileges of any Member or group of Members in a manner that is materially adverse to such Member or group of Members relative to the other Members of the Company without the consent of such Member or group of Members.

17.6    Waiver.  Compliance with any provision of this Agreement may be waived only if such waiver is approved in writing by (a) the Board of Managers and (b) each Member entitled to the benefits thereof.  Except as expressly provided herein to the contrary, no failure to exercise any right, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege granted hereunder.

17.7    ENTIRE AGREEMENT.    THIS AGREEMENT, TOGETHER WITH THE LOAN AGREEMENT AND LOAN DOCUMENTS (AS DEFINED IN THE LOAN AGREEMENT), INCLUDING BUT NOT LIMITED TO, THE PROVISIONS RELATING TO GOVERNING LAW, CONSTITUTES THE ENTIRE UNDERSTANDINGS OF THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF AND SUPERSEDE ALL PRIOR WRITTEN OR ORAL AGREEMENTS AND UNDERSTANDINGS AND ALL CONTEMPORANEOUS ORAL AGREEMENTS AND UNDERSTANDINGS AMONG THE PARTIES OR ANY OF THEM WITH RESPECT TO THE SUBJECT MATTER HEREOF.

17.8    Parties in Interest; Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns (it being understood and agreed that, except as expressly provided herein, nothing contained in this Agreement is intended to confer any rights, benefits or remedies of any kind or character on any other Person under or by reason of this Agreement).

17.9    Severability.  If any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of that provision in every other respect, and the validity, legality and enforceability of the remaining provisions of this Agreement, shall not be in any way impaired thereby.

17.10    Specific Enforcement.  It is agreed and understood that monetary damages would not adequately compensate a Member for the breach of this Agreement by any party hereto, that this Agreement shall be specifically enforceable, and that any breach or threatened breach of this Agreement shall be the proper subject of a temporary or permanent injunction or restraining order.  Further, each of the parties hereto waives any claim or defense that there is an adequate remedy at law for any such breach or threatened breach.

17.11    Joinder of Spouses.  By executing and delivering the "Addendum for Spouses" attached as Exhibit B to this Agreement, the spouse of each Member who is a natural Person hereby joins in the execution of this Agreement to evidence the binding effect of this Agreement, and specifically Article X and Article XI, on any community property or other interest he or she may have in any Membership Interests.

17.12   Notice to Members.  By executing this Agreement, each Member acknowledges that he has actual notice of all of the provisions of this Agreement, including the restriction on the Transfer of Units and other Equity Securities set forth in Article X and Article XI.  Each Member agrees that this Agreement constitutes adequate notice of all such provisions, including any notice requirement under the Act and Chapter 8 of the Uniform Commercial Code, and each Member hereby waives any requirement that any further notice be given thereunder.

17.13   Counterparts.  This Agreement may be executed in multiple counterparts all of which taken together shall constitute one and the same agreement.  The exchange of copies of this Agreement and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether otherwise transmitted via electronic transmission), by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by a combination of such means, shall constitute effective execution and delivery of this Agreement as to the parties hereto and may be used in lieu of an original Agreement for all purposes.  Signatures of the parties hereto transmitted by facsimile or other electronic transmission shall be deemed to be original signatures for all purposes.

17.14   Counsel to the Main Street Members.  From the date hereof, counsel to the Company shall be as from time to time selected by the Board of Managers and, subject to the Texas rules of professional conduct or similar rules in any other jurisdiction, may also be or have been counsel to any Member or to any assignee or Affiliate of a Member.  Norton Rose Fulbright ("**Main Street Counsel**") has represented only the Main Street Members in connection with the negotiation and execution of this Agreement.  Each Member acknowledges that Main Street Counsel has not represented (a) the Company, or (b) any Member other than the Main Street Members.  Main Street Counsel owes no duties directly to the Company or any Member other than the Main Street Members.  Each Member further acknowledges that (a) Main Street Counsel has represented only the Main Street Members in connection with the negotiation and execution of the Subscription Agreement, the Loan Agreement, Loan Documents and the Warrant Agreements; and (b) while communications with Main Street Counsel concerning the Company and its Members may be confidential with respect to third parties, no Member has any expectation that such communications are confidential with respect to the Company or any Member.

17.15   Counsel to the Company.  Pillsbury Winthrop Shaw Pittman LLP ("**Company Counsel**"), has represented only the Company in connection with the negotiation and execution of the Original Agreement.  Each Member acknowledges that Company Counsel has not represented any Member and owes no duties directly to any Member.  Each Member further acknowledges that (a) Company Counsel has represented only the Company in connection with the negotiation and execution of the Loan Agreement, Loan Documents and the Warrant Agreements; and (b) while communications with Company Counsel concerning the Company and its Members may be confidential with respect to third parties, no Member has any expectation that such communications are confidential with respect to the Company or any Member.  Each Member is encouraged to review this Agreement with counsel of its choosing.

17.16    Authorization of Certain Transactions.   The Company shall have the power to execute, perform and deliver (and each Member hereby consents to the execution, performance and delivery of) all documents with respect to the Acquisition Transaction.

17.17    Third Party Beneficiaries.  The Company and the Members acknowledge that, for so long as any portion of the Obligation remains outstanding under the Loan Agreement, each Lender, as applicable, shall be a third-party beneficiary to this Agreement, and each Lender shall be entitled to enforce the covenants and obligations of the Company under this Agreement, subject to the terms and conditions contained herein.  Each of such Lender's rights as a third party beneficiary of this Agreement may be exercised either independently or in conjunction with the Company and any other Member (including any Main Street Member and any other Lender), and such rights shall not be prejudiced by any prior assertion or waiver of any right, claim or cause of action for damages or equitable relief or any other claim, assertion or waiver made by the Company or such other Member under this Agreement.  As third-party beneficiaries to this Agreement, each Lender shall be entitled to all of the remedies available to the Company in Section 17.10, in addition to such other remedies as may be permitted at Law or in equity.

17.18    Governing Law.  This Agreement shall be governed by the laws of the State of Delaware without regard to otherwise governing principles of conflicts of law.

*[Signatures appear on the following pages]*

IN WITNESS WHEREOF, the parties hereto have executed this Second Amended and Restated Limited Liability Company Agreement in order to evidence the adoption hereof effective as of the date first written above.

**THE COMPANY:**

**VOLUSION, LLC**
a Delaware limited liability company

By: _____

Name: Kevin M. Sproles
Title: Chief Executive Officer and President

**MEMBERS:**

**KSCO HOLDINGS, INC.**
a Texas corporation

By: _____

Name: Kevin M. Sproles
Title: Chairman of the Board


**MAIN STREET EQUITY INTERESTS, INC.**
a Delaware corporation



By: _____
Name:   Dwayne L. Hyzak
Title:    Senior Managing Director


**HMS EQUITY HOLDING, LLC**
a Delaware limited liability company

By: HMS Income Fund Inc.,
      its managing member

By: _____
Name: Alejandro Palomo
Title:   Director

IN WITNESS WHEREOF, the parties hereto have executed this Second Amended and Restated Limited Liability Company Agreement in order to evidence the adoption hereof effective as of the date first written above.

**THE COMPANY:**

**VOLUSION, LLC**
a Delaware limited liability company

By: _____
Name: Kevin M. Sproles
Title: Chief Executive Officer and President

**MEMBERS:**

**KSCO HOLDINGS, INC.**
a Texas corporation

By: _____
Name: Kevin M. Sproles
Title: Chairman of the Board

**MAIN STREET EQUITY INTERESTS, INC.**
a Delaware corporation

By: _____
Name:   Dwayne L. Hyzak
Title:   Senior Managing Director

**HMS EQUITY HOLDING, LLC**
a Delaware limited liability company

By: HMS Income Fund Inc.,
    its managing member

By: _____
Name: Alejandro Palomo
Title:  Director

IN WITNESS WHEREOF, the parties hereto have executed this Second Amended and Restated Limited Liability Company Agreement in order to evidence the adoption hereof effective as of the date first written above.

**THE COMPANY:**

**VOLUSION, LLC**
a Delaware limited liability company


By: _____
Name: Kevin M. Sproles
Title: Chief Executive Officer and President

**MEMBERS:**


**KSCO HOLDINGS, INC.**
a Texas corporation


By: _____
Name: Kevin M. Sproles
Title: Chairman of the Board


**MAIN STREET EQUITY INTERESTS, INC.**
a Delaware corporation




By: _____
Name:   Dwayne L. Hyzak
Title:    Senior Managing Director


**HMS EQUITY HOLDING, LLC**
a Delaware limited liability company
By: HMS Income Fund, Inc.,
    Its Managing Member

By: _____
Name: Alejandro Palomo
Title:   Authorized Agent

**WARRANT HOLDERS:**

**MAIN STREET CAPITAL CORPORATION**
a Maryland corporation

By: _____
Name:    Dwayne L. Hyzak
Title:    Senior Managing Director


**HMS EQUITY HOLDING, LLC**
a Delaware limited liability company

By: HMS Income Fund Inc.,
     its managing member

By: _____
Name: Alejandro Palomo
Title:  Director


**HMS INCOME FUND INC.**
a Delaware limited liability company

By: _____
Name: Alejandro Palomo
Title:  Director

**WARRANT HOLDERS:**

**MAIN STREET CAPITAL CORPORATION**
a Maryland corporation


By: _____
Name:    Dwayne L. Hyzak
Title:    Senior Managing Director


**HMS EQUITY HOLDING, LLC**
a Delaware limited liability company

By: HMS Income Fund, Inc.,
       Its Managing Member

By: _____
Name: Alejandro Palomo
Title:  Authorized Agent


**HMS INCOME FUND, INC.**
a Maryland corporation

By: _____
Name: Alejandro Palomo
Title:  Authorized Agent

**Exhibit 1**

## AMENDMENT TO SECOND AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT OF VOLUSION, LLC

The undersigned, constituting all of the Managers and a majority of the Members of Volusion, LLC, pursuant to Section 17.5 of the Second Amended and Restated Limited Liability Company Agreement of Volusion, LLC, dated November 23, 2016 (the "LLC Agreement"), hereby amend the LLC Agreement as follows:

Section 7.16 <u>Compensation; Reimbursement of Expenses</u> shall be replaced in its entirety with the following:

The Outside Managers shall be entitled to receive compensation for their services equal to the compensation, if any, paid (a) to any Managers that are members of Company management solely and exclusively in their capacity as Managers, (b) representatives of an investor in the Company *other than* KSCO, or (c) at such rates as may be approved by the Required Vote of the Members.  In addition, (a) Managers shall be insured under the Directors and Officers liability insurance policy of the Company, which insurance policy of the Company shall be primary to any other insurance covering such Outside Managers, including, without limitation, any director and officer insurance policy or other insurance policy of any Main Street Members or any of its Affiliates, and (b) the Main Street Manager and the Main Street Observer shall be entitled to prompt reimbursement of all reasonable out-of-pocket expenses incurred in the course of the performance of their duties.

Section 7.19 <u>Outside Activities of Managers; Competition</u> shall be replaced in its entirety with the following:

The Outside Managers shall not be required to manage the Company as their sole and exclusive function, and they may have other business interests and may engage in other activities in addition to those relating to the Company.  Such other business interests and activities may be of any nature or description and may be engaged in independently or with others.  Any Outside Manager who wishes to have business interests in, or engage in, any business that competes directly and in a material way with the Company shall provide prior written notice to the Board of Managers.   Neither the Company nor any Member shall have any right, by virtue of this Agreement or the relationship created hereby, in or to such other ventures or activities of the Outside Managers or their Affiliates, or to the income or proceeds derived therefrom, and the pursuit of such ventures, even if competitive with the business of the Company, shall not be deemed wrongful or improper.  The Outside Managers shall have the right to take for their own account or the account of their Affiliates, or to recommend to others, any investment opportunity; *provided, that* such Outside Manager did not first become aware of such investment pursuant to his or her service on the Board of Managers.  Notwithstanding anything in this <u>Section 7.19</u> to the contrary, any Outside Manager shall have the right to take for his or her own account or the account of his or her Affiliates, or to recommend to others, any investment opportunity (regardless of whether he or she first became aware of such investment opportunity pursuant to his or her service on the Board of Managers) if he or she first obtains the unanimous written consent of the other Managers.

Notwithstanding the foregoing, the Outside Managers shall (a) maintain the confidentiality of any non-public information about the Company or any of its business activities, (b) not defame the Company or any of the officers, managers, employees or agents of the Company to any other Person, and (c) not solicit any officer, employee, independent contractor, customer, supplier or vendor to cease doing business with the Company or otherwise interfere with the Company's business relationship with any such Person.

Section 15.2(a) <u>Good Faith Actions; Exculpation</u> shall be replaced in its entirety with the following:

(a)      To the fullest extent permitted by applicable law, no Covered Person shall be liable to the Company or any Member (or any Affiliate of a Member) as a result of or in connection with any actions or omissions with respect to the Company on the part of such Covered Person in his or its capacity as such based on any claim of breach of fiduciary duty to the extent that such Covered Person (i) conducted himself or itself in good faith and (ii) reasonably believed that his or its conduct was in the best interests of the Company except (y) for any act taken by such Covered Person purporting to bind the Company that has not been authorized pursuant to this Agreement or (z) to the extent that the liability of such Covered Person arises from the willful misconduct or gross negligence of such Covered Person.  In addition, no Covered Person shall be liable to the Company or any Member (or Affiliate of a Member) for actions taken by such Covered Person consistent with the duty of loyalty and care applicable to a member of the board of directors of a Delaware corporation.  Notwithstanding the foregoing or any other terms in this Agreement, whether express or implied, or obligation or duty at law or in equity, to the fullest extent permitted by applicable law, no Outside Manager or their Affiliates shall be liable to the Company or any Member (or any Affiliate of a Member) for any act or omission (in relation to the Company, this Agreement, any related document or any transaction contemplated hereby or thereby) taken or omitted by an Outside Manager in the belief that such act or omission is in or is not contrary to the best interests of the Company and is within the scope of authority granted to such Indemnified Person by this Agreement, provided that such act or omission does not constitute willful malfeasance or gross negligence of such Outside Manager or their Affiliates.

Section 15.2(c) <u>Good Faith Actions; Exculpation</u> shall be replaced in its entirety with the following:

(c)      To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any Member, such Covered Person acting under this Agreement shall not be liable to the Company or to any Member for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person, to the maximum extent permitted by applicable law.  Notwithstanding the foregoing or anything to the contrary in this Agreement, Managers that are employees or members of the management of the Company or its Subsidiaries (but not Managers that are acting on behalf of the Company solely in their capacities as Managers) shall have fiduciary duties to the Company

2

and the Members.  No Outside Manager shall be deemed an agent or subagent of the respective constituent Members that appointed them on account of such appointment.

A new provision entitled Section 15.3(l) <u>Indemnification of Outside Managers</u> shall be added to Section 15.3 and shall read as follows:

(l) Indemnification of Outside Managers.  To the fullest extent permitted by applicable law, in the event that any Outside Manager or its Affiliates (each an "<u>Outside Indemnified Manager</u>"), becomes involved, in any capacity, in any threatened, pending or completed action, proceeding or investigation, in connection with any matter arising out of or relating to the Company's business or affairs, the Company will periodically reimburse such Outside Indemnified Manager for its legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith, provided that such Outside Indemnified Manager shall promptly repay to the Company the amount of any such reimbursed expenses paid to such Outside Indemnified Manager if it shall ultimately be determined by a court of competent jurisdiction thorough a final order that such Outside Indemnified Manager is not entitled to be indemnified by the Company in connection with such action, proceeding or investigation as provided in the exception contained in the next succeeding sentence.  To the fullest extent permitted under the law of the State of Delaware as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment), the Company also will indemnify and hold harmless each Outside Indemnified Manager against any losses, claims, damages, liabilities, obligations, penalties, actions, judgments, suits, proceedings, costs, expenses and disbursements of any kind or nature whatsoever (collectively, "<u>Costs</u>"), to which such Outside Indemnified Manager may become subject in connection with any matter arising out of or in connection with the Company's business or affairs, except to the extent that any such Costs result solely from the willful malfeasance or gross negligence of such Outside Indemnified Manager.  If for any reason (other than the willful malfeasance or gross negligence of such Outside Indemnified Manager) the foregoing indemnification is unavailable to such Outside Indemnified Manager, or insufficient to hold it harmless, then the Company shall contribute to the amount paid or payable by such Outside Indemnified Manager as a result of such Costs in such proportion as is appropriate to reflect not only the relative benefits received by the Company on the one hand and such Outside Indemnified Manager on the other hand but also the relative fault of the Company and such Outside Indemnified Manager, as well as any relevant equitable considerations.  The reimbursement, indemnity and contribution obligations of the Company under this Section 15.3(l) shall be in addition to any liability which the Company may otherwise have to any Outside Indemnified Manager and shall be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company and any Outside Indemnified Manager.  The reimbursement, indemnity and contribution obligations of the Company under this Section 15.3(l) shall be limited to the Company's assets, and no member or manager all have any personal liability on account thereof.  Any amendment or repeal of this Section 15.3(l) shall not adversely affect any right or protection existing hereunder immediately prior to such amendment or repeal.  The foregoing provisions shall survive any termination of this Agreement.  The foregoing provisions reflect a contractual right of each Outside Indemnified Manager and any repeal or amendment of the provisions of this <u>Section 15.3(l)</u> shall not

adversely affect any right hereunder of any Outside Indemnified Manager existing at the time of such repeal or amendment with respect to any act or omission occurring prior to the time of such repeal or amendment, and, further, shall not apply to any proceeding, irrespective of when the proceeding is initiated, arising from the service of such Outside Indemnified Manager prior to such repeal or amendment.

A new provision entitled Section 15.4(c) <u>Company Responsibility for Indemnification of Outside Managers</u> shall be added to Section 15.4 and shall read as follows:

(c)     Notwithstanding the foregoing, the provisions hereof related to First Resort Indemnitors and Last Resort Indemnitors shall not be applicable to the rights of Outside Indemnified Managers to indemnification set forth in this Agreement.

All remaining provisions of the LLC Agreement remain in full force and effect.

4

## EXHIBIT B

**Troy Pike Biography**

<u>Five Hill Services</u>



Mr. Pike is a Managing Partner and executive leader at Five Hill Services. Mr. Pike is a successful private equity and operational executive with over 25 years of leadership and executive experience. He has led strategic and digital transformation initiatives across multiple industries (healthcare, pharmacy, auto retail, communications technology, distribution, chemical manufacturing, sports and entertainment, education, franchised quick service restaurants, et al) and with some of the world's leading brands.

Mr. Pike, having proven himself as a strategic advisor, responsible executive operator, and innovative team leader, is highly focused on bringing strategic clarity, analytical curiosity and rapid action to the forefront. As a private equity executive, he implemented professional investment and management practices guiding $350 million of deployed capital, $685 million of revenue and $85 million of EBITDA.

Prior to becoming the COO of a private equity firm, Mr. Pike was President & CEO of a private enterprise for eight years. Under his leadership the company doubled EBITDA, shifted sales toward digital commerce, transformed the supply chain from domestic manufacturing to global sourcing, launched two new brands, and acquired and integrated six companies. He led a successful exit for private equity investors and recapitalized the business in 2015.

Before this, Mr. Pike was the Vice President Corporate Brand Strategy and Retail Operations at Lands' End. He managed four operating units at Lands' End, with combined P&L responsibility of $375 million, opened and operated 250 new Lands' End Shops within Sears, revitalized the school uniform business, and led global brand growth initiatives.

In addition to his professional success, Mr. Pike is an Independent Board Director at Access Media Holdings and UpStream Networks which are leading providers of Internet, voice and television services engineered for multi-tenant residential properties. He joined the AMH board to stabilize and restructure the business during financial crisis. Following a UCC Article 9 Repossession, the board replaced the management team, divested assets, launched a new brand and implemented new go-to market strategies, creating terminal value for the business.

http://www.fivehillservices.com/

## EXHIBIT C

**Jeremy Rosenthal Biography**

<u>Force Ten Partners LLC</u>



Mr. Rosenthal specializes in guiding public and private companies through challenging situations by developing and implementing creative solutions in complex distressed situations. Mr. Rosenthal has significant experience guiding companies, boards, sponsors and lenders through out-of-court recapitalizations, workouts and asset sales and in-court bankruptcy solutions. Mr. Rosenthal has advised companies in many industries, including: commercial food processing, manufacturing, traditional and renewable energy, automotive, publishing, entertainment, technology, restaurant, medical, hospital, gaming, vacation and golf resorts, hotel and general real estate.

Prior to joining Force 10 Partners, Mr. Rosenthal was a partner at the international law firm Sidley Austin LLP. After practicing restructuring law for 16 years, Mr. Rosenthal embraced the challenges of guiding restructurings as a principal. As a lawyer, Mr. Rosenthal was recognized by The Best Lawyers in America for 2016, 2017 and 2018 in Bankruptcy and Reorganization Law.

Mr. Rosenthal received his J.D. from the University of California at Los Angeles (UCLA) School of Law, graduating Order of the Coif. Mr. Rosenthal received his Bachelor of Arts degree from the University of California, Berkeley.

https://www.force10partners.com/jeremy-rosenthal

**EXHIBIT D**

**Curt Lindeman Biography**

Lindeman, Esq.



Mr. Lindeman has extensive experience representing corporations and businesses of various sizes and in numerous industries. Drawing on experience gained as in-house counsel, as a member of executive management teams, as a member of Boards of Directors, and as an attorney in private practice, he has a unique perspective on the concerns and requirements of his clients.

Prior to founding Lindeman, Esq., Mr. Lindeman was most recently the Vice President, General Counsel and Corporate Secretary of U.S. Concrete, Inc., a NASDAQ traded building products company headquartered in Houston, Texas. He began his legal career in the Corporate Finance and Securities division of Shook, Hardy & Bacon, L.L.P., before serving in-house with Coral Energy, L.P. and Coach USA, Inc. He currently serves as the Chairman of the Board of Directors of Access Media Holdings, LLC, a telecommunications company headquartered in Oak Brook, IL. He previously served on the Boards of Directors of Ameritech College of Healthcare in the Salt Lake City metropolitan area, Universal Scaffolding and Equipment, LLC, a Memphis company that sources and sells scaffolding and related products, and Superior Materials Holdings, LLC, a Michigan joint venture that manufactures and delivers ready-mixed concrete and precast concrete products.

Bar Admissions
2014 - California
1998 – Texas
1997 – Missouri (inactive)

Education
1997 – J.D., University of Kansas
1993 – B.B.A., Wichita State University

http://lindemanesq.com/curt-lindeman/curt-lindeman/