# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## LAREDO DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| VOLUSION, LLC[1] | ) | Case No. 20-50082 (DRJ) |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

## REORGANIZED DEBTOR'S OBJECTION TO
## THE PROOFS OF CLAIM NOS. 16 AND 22 FILED BY BAHAR DEJBAN

**This is an objection to your claim. The objection party is asking the court to disallow the claim that you filed in this bankruptcy case. You should immediately contact the objecting party to resolve the dispute. If you do not reach an agreement, you must file a response to this objection and send a copy of your response to the objecting party within thirty (30) days after the objection was served on you. Your response must state why the objection is not valid. If you do not file a response within 30 days after the objection was served on you, your claim may be disallowed without a hearing.**

**A hearing will be conducted on this matter on April 1, 2021 at 3:00 p.m. in Courtroom 400, 4th floor, 515 Rusk, Houston, TX 77002. You may participate in the hearing either in person or by audio/video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. You will be responsible for your own long distance charges. Once connected, you will be asked to enter the conference room number. Judge Jones conference room number is 205691.**

**You may view video via GoToMeeting. To use GoToMeeting, the Court recommends that you download the free GoToMeeting application. To connect, you should enter the meeting code "JudgeJones" in the GoToMeeting app or click the link on Judge Jones home page on the Southern District of Texas website. Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of the hearing. To make your electronic appearance, go to the Southern District of Texas website and select "Bankruptcy Court" from the top menu. Select "Judges' Procedures," then "View Home Page" for Judge Jones. Under "Electronic Appearance" select "Click here to submit Electronic Appearance". Select the case name, complete the required fields and click "Submit" to complete your appearance.**

**If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within thirty (30) days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

---

[1] The Reorganized Debtor in this chapter 11 case, along with the last four digits of the Reorganized Debtor's federal tax identification number, is: Volusion, LLC (9037). The Reorganized Debtor's service address is 1835A Kramer Lane, Suite 100, Austin, TX 78758.

Volusion, LLC ("<u>Debtor</u>" and after the occurrence of the Effective Date of the Plan, the "<u>Reorganized Debtor</u>"), files this objection (this "<u>Objection</u>") to Claim No. 16 ("<u>Claim No. 16</u>"), and Claim No. 22 ("<u>Claim No. 22</u>" and together with the Claim No. 16, the "<u>Claims</u>") filed by Bahar Dejban (the "<u>Claimant</u>" or "<u>Ms. Dejban</u>") and submits the *Declaration of Timothy Stallkamp, Chief Restructuring Officer of Volusion, LLC in Support of the Debtor's Objection to the Proofs of Claim Nos. 16 and 22 filed by Bahar Dejban* (the "<u>Stallkamp Declaration</u>"), attached as **<u>Exhibit A</u>**.  In further support of this Objection, the Reorganized Debtor respectfully states as follows:

**<u>Relief Requested</u>**

1.      The Debtor seeks entry of the proposed order (the "<u>Order</u>") pursuant to § 502(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and rule 3007 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") disallowing the Claims of Ms. Dejban, filed as Proof of Claim No. 16 and Proof of Claim No. 22.  *See* **<u>Exhibit B</u>** and **<u>Exhibit C</u>**.  The Claims assert unliquidated amounts for claims that are unenforceable against the Debtor under any agreement or applicable law.  The Debtor objects to the Claims to the extent that they stem from the termination of an alleged employment contract and for amounts that exceed compensation for one year following the earlier of the Petition Date or the date of Ms. Dejban's termination.  In support of this Objection, the Debtor submits the Stallkamp Declaration, attached hereto as **<u>Exhibit A</u>**.

**<u>Jurisdiction, Venue, and Procedural Background</u>**

2.      The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  The Debtor confirms its consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Objection.

3.　　　Venue is permissible pursuant to 28 U.S.C. §§ 1408 and 1409.

4.　　　The statutory bases for the relief requested herein are §§ 105(a) and 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007, and Rules 9013-1 and 3007-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Procedural Background

5.　　　On July 27, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the Court.

6.　　　The statutory bar date for filing claims was November 30, 2020 (the "General Bar Date").　The bar date for governmental entities to file a claim is February 8, 2021 (the "Governmental Bar Date").

7.　　　On November 20, 2020, the Court entered the *Order Confirming the Debtor's Combined Plan of Reorganization and Approving on a Final Basis the Disclosure Statement of Volusion, LLC Pursuant to Chapter 11 of the Bankruptcy Code* (the "Confirmation Order") [Docket No. 128].　On January 19, 2021, the Effective Date of the Plan occurred.　*See* Docket No. 158.

8.　　　On November 30, 2020, Ms. Dejban filed her Proof of Claim No. 16 in the amount of $9,250,000.　*See* Exhibit B.

9.　　　On November 30, 2020, Ms. Dejban filed her Proof of Claim No. 22 in the amount of $9,250,000.　*See* Exhibit C.

## Summary of the Objection

10.　　　The Court should disallow the Claims pursuant to section 502(b)(1).　Ms. Dejban was not an employee of the Debtor.　Ms. Dejban was not herself even an independent contractor of the Debtor—instead, she was employed by the company (that she partially owned) that contracted with the Debtor.　Even if Ms. Dejban had standing to pursue the Claims she asserts, no

discrimination occurred.  Ms. Dejban became involved with the Debtor through an apparent act of nepotism and was placed in a position for which she was not qualified.  Further, Ms. Dejban's loyalty to the Debtor as a client was impaired and breached.  Ms. Dejban's relationship with the Debtor was terminated with good cause and without a discriminatory basis.

**Factual Background**

11.     Bardia Dejban ("Mr. Dejban") was originally hired as Chief Information Officer in 2015 and began work in that role in February 2016; he became the Debtor's Chief Executive Officer ("CEO") in August 2019.  Sometime after his employment, Mr. Dejban cut a sweetheart deal for his twin sister, Ms. Dejban and her husband, the CEO's brother-in-law.  On behalf of the Debtor, Mr. Dejban signed an Independent Contractor Agreement ("Independent Contractor Agreement") with DK Strategic Solutions, LLC ("DK").  The Independent Contractor Agreement expressly provided that "[i]t is the express intention of the parties that [DK] is an independent contractor.  Nothing in this Agreement shall in any way be construed to constitute Contractor as an agent, employee, or representative of [Volusion], but [DK] shall perform the Services hereunder as an independent contractor."  A copy of the Independent Contractor Agreement is attached hereto as **Exhibit D**.

12.     DK is a company partially owned by Ms. Dejban.  DK contracted to provide two different types of services.  First, DK, with Ms. Dejban as "owner," agreed to "render to the Company . . . General Counsel Services . . . as requested by Company's CEO and/or Founder."  Second, DK agreed to provide negotiation and management services, and Ms. Dejban's husband Shawn Khorrami ("Mr. Khorrami") would allegedly perform such services.  Under Exhibit A to the Independent Contractor Agreement (general counsel services), DK was paid a monthly fee of $30,000, and under Exhibit B to the Independent Contractor Agreement (management services), DK was paid a monthly fee of $30,000 (which was eventually increased to $35,000).

13.     Ms. Dejban resides in and is licensed to practice law in California.  To the best of Debtor's knowledge, Ms. Dejban's experience as a lawyer is limited to personal injury work, and in particular, personal injury work with her husband's former firm.  Ms. Dejban had no experience performing general counsel services for a company, much less a tech services company like the Debtor.  Ms. Dejban was not familiar with Debtor's business or industry.  Ms. Dejban was unqualified to provide general counsel services on behalf of the Debtor and should have never been retained by the Debtor indirectly through DK.

14.     Mr. Khorrami is Ms. Dejban's husband.  Mr. Khorrami was a California lawyer who was disbarred in 2016.  Like Ms. Dejban, Mr. Khorrami had no prior experience in the Debtor's business.  Regardless, Ms. Dejban, either ignorant of or in disregard to her fiduciary duties to the Debtor, signed the Independent Contractor Agreement on behalf of DK so that Mr. Khorrami would be a paid consultant to the CEO (Ms. Dejban's twin brother).

15.     Ms. Dejban had an inherent conflict of interest as a result of the DK arrangement with Debtor.  Ms. Dejban's personal interest that her husband receive $30,000 a month for vague management services was a fundamental conflict of interest that Ms. Dejban could not overcome (as well as the fact that she answered to and reported to her twin brother).

16.     With respect to Ms. Dejban's own interest and family relationships, Rule 1.7 of the California Rules of Professional Conduct addresses the issue when a lawyer's own interests create a conflict:

> A lawyer shall not, without informed written consent from each affected client and compliance with paragraph (d), represent a client if there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships **with a third person**, or **by the lawyer's own interests**.  Rule 1.7 of the Model Rules of Professional Conduct provides that except as provided in paragraph (b)[2], a lawyer shall not represent a client if the

---

[2] (b) states "Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if: (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent

representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person *or by a personal interest of the lawyer*."[3] (emphasis added)

17.     From the moment she signed the DK Independent Contractor Agreement as "owner," Ms. Dejban created an inherent conflict of interest so that her role as a fiduciary took a back seat to her personal interest and the relationship among her, Mr. Khorrami and the CEO.

18.     For the reasons discussed in the objection to Bardia Dejban's proofs of claim[4] (which are hereby incorporated by reference), filed contemporaneously herewith, on July 27, 2020, the Board terminated the employment of Mr. Dejban and terminated the independent contractor engagements of DK, Ms. Dejban, Dejban Law, and Mr. Khorrami.  The Board also terminated any other contractor engagements of DK as well as the engagement of California law firm Geragos & Geragos and law firm Spencer Fane, and it terminated Kevin Sproles' position as well.

19.     The Board's decision with respect to Ms. Dejban and her law firm Dejban Law was threefold.  First, Ms. Dejban was unqualified to render general counsel services.  Second, Ms. Dejban's loyalty laid with her brother and her husband, and not the Debtor.  Third, the Board desired to undo Mr. Dejban's misdeeds, including entering into independent contractor agreements with family members to serve Mr. Dejban and not the Debtor.

---

representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4) each affected client gives informed consent, confirmed in writing."

[3] Tex. Rules Disciplinary P.R. 1.06 comment 5 states that the "lawyer's own interests should not be permitted to have adverse effect on representation of a client.  If the probity of a lawyer's own conduct in a transaction is in question, it may be difficult for the lawyer to give a client detached advice. A lawyer should not allow related business interests to affect representation, for example, by referring clients to an enterprise in which the lawyer has an undisclosed interest."

[4] *See* the *Reorganized Debtor's Objection to the Proofs of Claim Nos. 15 and 23 Filed by Bardia Dejban.*

<u>**Objection**</u>

**A.     The Claims are Unenforceable Against the Debtor Under any Agreement or Applicable Law.**

20.     Under section 502(b)(1), the court "shall determine the amount of such claim…as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—such claim is unenforceable against the debtor and the property of the debtor…" 11 U.S.C. § 502(b)(1).

21.     As set forth in Bankruptcy Rule 3001(f), a properly executed and filed proof of claim constitutes *prima facie* evidence of the validity and the amount of the claim under § 502(a) of the Bankruptcy Code.  *See, e.g.*, *In re Jack Kline Co., Inc.*, 440 B.R. 712, 742 (Bankr. S.D. Tex. 2010).   A proof of claim loses the presumption of *prima facie* validity under Bankruptcy Rule 3001(f) if an objecting party refutes at least one of the allegations that are essential to the claim's legal sufficiency.  *See In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988). Once such an allegation is refuted, the burden reverts to the claimant to prove the validity of its claim by a preponderance of the evidence.  *See id.*  Despite this shifting burden during the claim objection process, "the ultimate burden of proof always lies with the claimant."  *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000)).

22.     The Claims stem from the Debtor's termination of the independent contractor relationship it had with Ms. Dejban's company, DK.  The Claims assert unliquidated claims alleging national origin discrimination, sex discrimination, and retaliation under Title VII of the Civil Rights Act of 1984 ("<u>Title VII</u>") and California's Fair Employment and Housing Act ("<u>FEHA</u>") and disability discrimination under the Americans with Disabilities Act ("<u>ADA</u>").  The

Claims are not enforceable against the Debtor under any agreement or applicable law and should be disallowed under section 502(b)(1).

23.     Ms. Dejban cannot meet her burden to establish liability on any of these allegations. First and foremost, Ms. Dejban's relationship with the Debtor was, at most, that of an independent contractor, not an employee.  None of the statutes under which Ms. Dejban seeks relief apply to independent contractors.  Even if Ms. Dejban were an employee of Debtor, her Claims must fail because she is unable to present evidence capable of satisfying the elements required to establish a prima facie case of discrimination or retaliation under Title VII, the FEHA, or the ADA.  Debtor has shown that it had legitimate, non-discriminatory, non-retaliatory reasons for terminating its independent contractor relationship with Ms. Dejban's company (DK).  Primarily, the reconstituted Board determined that Ms. Dejban was unqualified to render general counsel services and Ms. Dejban's loyalty laid with her brother and husband, and not the Debtor.  The reconstituted Board desired to undo Mr. Dejban's improper actions as CEO of Debtor, such as entering into independent contractor agreements with family members to serve Mr. Dejban and not the Debtor. Ms. Dejban is unable to present evidence capable of showing that the legitimate, non-discriminatory, non-retaliatory reasons for which the Debtor terminated its relationship with her were a pretext for discrimination or retaliation in violation of Title VII,  the FEHA or the ADA.

**B.      Ms. Dejban's Status as an Independent Contractor Bars all of Her Claims.**

24.     Ms. Dejban's relationship with Debtor was, *at most,* that of an independent contractor (and solely based on the DK engagement and not any other arrangement directly with the Debtor).  Ms. Dejban was never an employee.  And, even if she somehow qualified as an independent contractor of the Debtor, none of the statutes under which she seeks relief apply to independent contractors.  *See  Diggs v. Harris Hospital-Methodist, Inc*., 847 F.2d 270, 272 (5th Cir. 1988) (Title VII's protections do not apply to independent contractors); *Bloom v. Bexar*

*County, Tex.*, 130 F.3d 722, 724 (5th Cir. 1997) (Title I of the ADA does not apply to independent contractors); *Talley v. County of Fresno*, 51 Cal. App. 5th 1060, 1071 (2020) (Plaintiff's claims require him to prove he is an employee within the meaning of the FEHA).

25.     To determine whether a person is an employee or independent contractor for purposes of Title VII and the ADA, courts apply the hybrid economic realities/common law control test.  *See Muhammad v. Dallas Cnty. Cmty. Supervision & Corr. Dept.*, 479 F.3d 377, 382 (5th Cir. 2007); *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 227 (5th Cir. 2015) (citing *Deal v. State Farm Cnty. Mut. Ins. Co. of Texas*, 5 F.3d 117, 118-19 (5th Cir. 1993)). "The most important component of this test is '[t]he right to control the employee's conduct,'" "'focus[ing] on whether the employer has the right' to hire, fire, supervise, and set the work schedule of the employee." *Id.* (quoting *Deal v. State Farm Cty. Mut. Ins. Co. of Tex.*, 5 F.3d 117, 119 (5th Cir. 1993)). The economic realities component evaluates whether the alleged employer "paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment." *Id.*  The test requires that the worker "as a matter of economic reality, be dependent on the business to which they render service." *Juino v. Livingston Par. Fire Dist.* No. 5, 717 F.3d 431, 435 (5th Cir. 2013) (citing *Diggs v. Harris Hosp.-Methodist, Inc.*, 847 F.2d 270, 272 n.3 (5th Cir. 1988)).

26.     Courts also look at whether the parties intended that the individual be an employee or independent contractor, as expressed in written agreements or contracts. *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440 (2003); *see also Haskett v. Percheron*, LLC, CV G-14-257, 2016 WL 1054396, at *4 (S.D. Tex. Mar. 9, 2016), (considering the worker's ability to render their services to others in finding that there was no employer-employee relationship); *see also Broussard v. L.H. Bossier, Inc.*, 789 F.2d 1158, 1160 (5th Cir. 1986) (noting the workers were

not employees based on several facts, including that they were responsible for their operating costs, license fees, and taxes and that their pay was much higher than that of company workers).

27.     In order to determine whether a person is an employee or independent contractor for purposes of the FEHA, courts look to traditional common law principles of agency and respondeat superior. *Patterson v. Domino's Pizza*, LLC, 333 P.3d 723, 734 (Cal. 4th Dist. 2014). In FEHA cases, "courts consider the totality of the circumstances bearing on the nature of the work relationship of the parties, with an emphasis on the extent to which the defendant controls the plaintiff's performance of employment duties." *Rhodes v. Sutter Health*, 949 F. Supp. 2d 997, 1003 (E.D. Cal. 2013).  Other factors to be taken into account include "payment of salary or other employment benefits and Social Security taxes, the ownership of the equipment necessary to performance of the job, the location where the work is performed, the obligation of the defendant to train the employee, the authority of the defendant to hire, transfer, promote, discipline or discharge the employee, the authority to establish work schedules and assignments, the defendant's discretion to determine the amount of compensation earned by the employee, the skill required of the work performed and the extent to which it is done under the direction of a supervisor, whether the work is part of the defendant's regular business operations, the skill required in the particular occupation, the duration of the relationship of the parties, and the duration of the plaintiff's employment. *Id.* (quoting *Vernon v. State*, 116 Cal. App. 4th 114, 124 (2004)).

28.     Of these factors, the extent of the defendant's right to control the means and manner of the workers' performance is the most important. *Vernon*, 116 Cal. App. 4th at 126. "'A finding of the right to control employment requires . . . a comprehensive and immediate level of "day-to-day" authority over employment decisions.'" *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 682 (9th Cir. 2009) (quoting *Vernon*, 116 Cal. App. 4th at 127-28).  In the case of *Irish v Magnussen*

*Home Furnishings, Inc*., 786 F. App'x 687, 687 (9th Cir. 2019), the court ruled that the plaintiff was an independent contractor as a matter of law because he "set his own schedule, paid himself out of his company's funds, owned most of the equipment he used, was permitted to work for other employers at the same time he worked for [the company], and was never issued W-2 tax forms." The court held that, taken together, these facts show that the plaintiff  was an independent contractor.  *Id.*

29.     At the most, Ms. Dejban performed services for Debtor as an independent contractor, not an employee.  Ms. Dejban is a lawyer licensed to practice in the State of California.  She owns her own law firm, Dejban Law.  According to Dejban Law's own website, the firm markets its services nationwide.  As an example, the Dejban Law website currently states on its home page:

> The Firm
>
> Dejban Law is California law firm that helps clients nationwide who have been wronged due to the negligence or intentional acts of others.
>
> Our firm provides services to clients in numerous fields and practice areas including personal injury, product liability, employment, dangerous drugs and devices, food contamination, civil rights, consumer protection and numerous others.
>
> Get in touch with us to set up a consultation, or use the contact form at the bottom of this page to enquire whether our services are right for you.[5]

30.     In addition to her law firm, Ms. Dejban owns DK.  Ms. Dejban signed the Independent Contractor Agreement as "owner" of DK in which she agreed to "render to the Company . . . General Counsel Services . . . as requested by Company's CEO and/or Founder."  Ms. Dejban performed services for the Debtor under and pursuant to the terms of the DK Independent Contractor Agreement.  The Debtor did not pay any salary or compensation of any

---

[5] *See* http://www.dejbanlaw.com/.

kind to Ms. Dejban.  It likewise paid no health insurance or any other benefits to Ms. Dejban that it provided to its actual employees.  Rather, the Debtor paid DK for services under the Independent Contractor Agreement.  The Debtor did not issue a W-2 to Ms. Dejban.  The Debtor did not issue a 1099 to Ms. Dejban.  Rather, the Debtor issued an 1099 to DK for payments made under the Independent Contractor Agreement.  Ms. Dejban is a practicing lawyer with her own law firm that markets her services to the public at large.  The Debtor did not have the right to control Ms. Dejban's conduct, nor did it control her work schedule.  There was no "comprehensive and immediate level of "day-to-day" authority over employment decisions" as required to show right of control under the FEHA. *See Doe I*., 572 F.3d 677 at 682.  The Debtor did not pay Ms. Dejban's operating costs, license fees, or taxes.  The Debtor did not have any obligation to train Ms. Dejban and did not in fact train her.  The practice of law is a highly skilled profession and Ms. Dejban did not work under the direction of a supervisor.  The practice of law is not part of the Debtor's regular business operations.  Taken together, all of these facts establish as a matter of law that Ms. Dejban was not an employee of the Debtor under any of the statutes that form the basis for her Claims.  As such, all of her Claims must be dismissed pursuant to section 502(b)(1).

## C.    Ms. Dejban Cannot Establish National Origin Discrimination.[6]

31.    Ms. Dejban claims that the Debtor terminated her employment because of her national origin in violation of Title VII and the FEHA.  Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Under FEHA, it is an unlawful employment practice

---

[6] Debtor maintains that Ms. Dejban was no more than an independent contractor and that all of her Claims must fail on that ground alone.  However, alternatively and in an abundance of caution, even if Ms. Dejban were considered an employee, her Claims would still fail.  By making these arguments, Debtor is not waiving its assertion that Ms. Dejban was nothing more than an independent contractor and is not admitting that she was its employee.

for an employer, because of the national origin of any person to discriminate against the person in compensation or in terms, conditions, or privileges of employment. Cal. Gov. Code § 12940(a). The analysis of claims under the FEHA is identical to that applied to claims brought under Title VII. *See Metoyer v. Chassman*, 504 F.3d 919, 941 (9th Cir. 2007).

32.     When a claimant relies only on circumstantial evidence in an attempt to prove her discrimination claim, courts utilize the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  "Under this framework, the plaintiff must first create a presumption of discrimination by making out a prima facie case of discrimination." *Laxton v. Gap, Inc*., 333 F.3d 572, 578 (5th Cir. 2003) (internal citations omitted).  If the plaintiff can establish a prima facie case, "the burden of production shifts to the employer, who must offer an alternative nondiscriminatory explanation for the adverse employment action." *Lee v. Kansas City S. Ry. Co*., 574 F.3d 253, 259 (5th Cir. 2009).  To meet its intermediary burden, an employer only needs to set out its reason for the adverse employment action through admissible evidence. *See Turner v. Kan. City S. Ry. Co*., 675 F.3d 887, 900 (5th Cir. 2012).  If the employer produces any evidence 'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action,' then the employer has satisfied its burden of production." *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995) (quoting *Hicks*, 509 U.S. at 507); *see EEOC v. Texas Bus Lines*, 923 F. Supp. 965, 970 (S.D. Tex. 1996).  If the defendant sustains its burden of production, "the presumption raised by the plaintiff's prima facie case essentially disappears, and the plaintiff is left with the ultimate burden which has never left [her]:  that of proving that the defendant intentionally discriminated against [her]." *Tanik v. Southern Methodist Univ.*, 116 F.3d 775, 776 (5th Cir.), *cert. denied*, 522 U.S. 1015 (1997).  If the defendant can articulate such a nondiscriminatory reason, the burden then shifts back to the plaintiff who must show at "a new

13

level of specificity" that the explanation is merely a pretext for discrimination. *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 639 (5th Cir. 1985), abrogated on other grounds by *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 513 (1993). In the alternative, the plaintiff may show "that the employer's reason, while true, is not the only reason for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (quoting *Rachid v. Jack In The Box, Inc*., 376 F.3d 305, 312 (5th Cir. 2004)).

33.     Ms. Dejban cannot establish a prima facie case of national origin discrimination. To sustain her national origin discrimination claim, Ms. Dejban must first establish a prima facie case by showing: (1) she is a member of a protected class, (2) she was qualified for the position at issue, (3) she was the subject of an adverse employment action, and (4) she was replaced by someone outside the protected class or she was treated less favorably than similarly situated employees who were not of her protected class under nearly identical circumstances. *Lee*, 574 F.3d at 259; *Okoye v. Univ. of Tex. Houston Health Sci. Ctr*., 245 F.3d 507, 513 (5th Cir. 2001).

34.     Ms. Dejban cannot establish the second or fourth elements of her prima facie case. With regard to the second element, Ms. Dejban was not qualified to provide general counsel services on behalf of the Debtor. Ms. Dejban resides in and is licensed to practice law in California, while the Debtor is located in Texas. To the best of Debtor's knowledge, Ms. Dejban's experience as a lawyer is limited to personal injury work. Ms. Dejban had no experience performing general counsel services for a technology company. Ms. Dejban was not familiar with Debtor's business or industry. With regard to the fourth element, Debtor has not replaced Ms. Dejban. She cannot show that she was replaced by someone outside her protected class. Further, Ms. Dejban cannot identify any similarly situated employee who was not of Iranian

descent and was treated more favorably.  Therefore, Ms. Dejban must proceed under the disparate treatment clause of the fourth prong.

35.     Ms. Dejban cannot establish disparate treatment.  Ms. Dejban's comparison of herself to other employees is limited to vague, broad, general and conclusory contentions that employees of Iranian descent (she and her twin brother) were treated worse than employees not of Iranian descent.  Ms. Dejban has not and cannot demonstrate that she was treated less favorably than other similarly-situated employees who were outside of her protected classes.  The similarly situated analysis requires Ms. Dejban to show that the Debtor gave preferential treatment to a coworker who was not of Iranian descent under nearly identical circumstances. *See Okoye*, 245 F.3d at 514.  This coworker, known as a comparator, must hold the "same job" or hold the same job responsibilities as Ms. Dejban;  must "share [ ] the same supervisor" or have his "employment status determined by the same person" as Ms. Dejban; and must have a history of "violations" or "infringements" similar to those of Ms. Dejban. *Alkhawaldeh v. Dow Chemical Co*., 851 F.3d 422, 426 (5th Cir. 2017); *Turner v. Kan. City S. Ry. Co*., 675 F.3d 887, 893 (5th Cir. 2012) (quoting *Lee*, 574 F.3d at 260).  Employees with "different work responsibilities . . . are not similarly situated." *Lee*, 574 F.3d at 259.  The services that Ms. Dejban performed for Debtor through her company (DK) were unique.  There were no employees of the Debtor who performed the same services or had the same responsibilities as Ms. Dejban, nor were there any employees who the Debtor retained who had a history of violations and infringements similar to Ms. Dejban.  Therefore, Ms. Dejban cannot show that she was similarly situated to any employee of the Debtor and fails to meet her prima facie burden.  The facts do not support Ms. Dejban's contention that the Debtor targeted employees of Iranian descent for termination.  Ms. Dejban and her twin brother were not the only employees and contractors terminated by the Debtor's reconstituted Board.  In

connection with the restructuring and organizational realignment of Debtor, since July 27, 2020,

the reconstituted Board terminated a total of 23 employees.  To Debtor's knowledge, 22 of the 23

terminated employees were *not* of Iranian descent.  The reconstituted Board also terminated the

independent contractor agreements that Debtor had with another California law firm, Geragos &

Geragos as well as with law firm Spencer Fane.  It is clear that the Debtor was not targeting Iranian-

born employees or contractors for termination.

36.     Even if Ms. Dejban could establish a prima facie case of discriminatory termination

because of her national origin, Ms. Dejban's national origin discrimination claim still must fail

because the Debtor terminated the DK Independent Contractor Agreement for legitimate,

nondiscriminatory reasons—namely, because (i) the reconstituted Board determined that Ms.

Dejban was unqualified to render general counsel services, (ii) Ms. Dejban's loyalty laid with her

brother and husband and not the Debtor, and (iii) the reconstituted Board desired to undo Mr.

Dejban's improper actions as CEO, such as entering into independent contractor agreements with

family members to serve Mr. Dejban and not the Debtor. *See Faruki v. Parsons, S.I.P.*, 123 F.3d

315, 320  (5th Cir. 1997) (recognizing poor job performance as a legitimate, non-discriminatory

reason for termination of employment); *see also Ihsan v. Weatherford U.S., LP*, No. H-17-2546,

2019 U.S. Dist. LEXIS 85199, at *21 (S.D. Tex. May 21, 2019) (plaintiff's failure to meet the

expectations for his position is a legitimate, non-discriminatory reason for terminating plaintiff's

employment); *Farrar & Ball, LLP v. Hudson*, No. H-16-3341, 2018 U.S. Dist. LEXIS 39495, at

*11-12 (S.D. Tex. Mar. 12, 2018) (holding company satisfied its burden to articulate a legitimate,

non-discriminatory reason for the decision to terminate employee based on company's "perception

that [Employee] had a bad attitude and was communicating her negativity to other [Company]

employees"); *Mick v. Big Sur Waterbeds*, No. A-06-CA-115 LY, 2006 U.S. Dist. LEXIS 117285,

at *13-15 (W.D. Tex. Dec. 18, 2006) (holding Defendant's proffered reasons that "Plaintiff's poor attitude and poor relationships with his peers and supervisors in the year he worked" with Defendant were legitimate, non-discriminatory reasons for Plaintiff's termination); *Wolf v. Tex. A&M Univ. Sys.*, No. H-09-0643, 2010 U.S. Dist. LEXIS 46428, at *11 (S.D. Tex. May 12, 2010) (holding defendant satisfied its burden to articulate a legitimate, non-discriminatory reason for plaintiff's termination on the basis plaintiff's "attitude and demeanor caused [defendant] to lose confidence in her ability to" satisfactorily perform her job).

37.     Ms. Dejban cannot show that the Debtor's reasons for terminating its contractual relationship with her (through its termination of the DK contract) are pretextual, meaning false or unworthy of belief. *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002) (defining pretext).   Whether Ms. Dejban disputes the facts that led to the termination of her contractual relationship with Debtor is irrelevant. The reconstituted Board's decision to do so was motivated by its reasonable belief that keeping its contractual relationship with Ms. Dejban was not in the Debtor's best interests.

38.     In her Claims, Ms. Dejban makes it clear that she disagreed with the Debtor's assessment of her performance.   However, disagreeing with an employer's negative performance assessment is insufficient to show pretext. *Shackelford v. Deloitte & Touche LLP*, 190 F.3d 398, 409 (5th Cir. 1999) ("the real issue is 'whether [the employer's] perception of [the employee's] performance, accurate or not, was the real reason for [his or] her termination.").   The Fifth Circuit and other courts, have consistently held that such an inquiry into whether an employer's termination decision was correct is irrelevant to an employee's discrimination claim. *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("[E]vidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind

an adverse employment decision. Management does not have to make proper decisions, only non-discriminatory ones."); *Little v. Republic Ref. Co*., 924 F.2d 93, 97 (5th Cir. 1991) ("The existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification."); *Jones v. Overnite Transport Co*., 212 F. App'x 268, 275 (5th Cir. 2006) ("Title VII does not protect an employee against unfair employment decisions; instead, it protects against" discriminatory decisions.); *Mayberry v. Vought Aircraft Co*., 55 F.3d 1086, 1091 (5th Cir. 1995) ("The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive."); *Little v. Rep. Refining Co*., 924 F.2d 93, 97 (5th Cir. 1991) ("Even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason. We do not try in court the validity of good faith beliefs as to an employee's competence. Motive is the issue…[A] dispute in the evidence concerning…job performance does not provide a sufficient basis for a reasonable factfinder to infer that [the] proffered justification is unworthy of credence."). Ms. Dejban may believe that the contractual relationship with DK was terminated for illegal reasons; however, her subjective beliefs are not relevant. The Fifth Circuit "has consistently held that an employee's subjective belief of discrimination alone is not sufficient to warrant judicial relief." *Byers v. Dallas Morning News, Inc*., 209 F.3d 419, 427 (5th Cir. 2000) (refusing to rely upon a plaintiff's subjective belief as to discriminatory intent).

D.     **Ms. Dejban Cannot Establish Retaliation.**

39.     Ms. Dejban asserts illegal retaliation because of her sex (pregnancy) in violation of Title VII and the FEHA. To establish her retaliation claim, Ms. Dejban must first establish a prima facie retaliation case by proving: (1) she engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal connection existed between the protected conduct and adverse

18

employment action. *Shackleford*, 190 F.3d at 408.  If Ms. Dejban establishes a prima facie case of retaliation, the same burden shifting analysis applicable to her Title VII/FEHA discrimination claim applies.  *See Id*.

  40. Ms. Dejban cannot establish the first or third elements of her prima facie retaliation case.  Ms. Dejban did not engage in a protected activity, which is required to state a prima facie case of retaliation.  A "protected activity" under Title VII includes:  (1) opposition to any practice rendered unlawful by Title VII; and (2) participation in an investigation, proceeding, or hearing under Title VII or making a charge, testifying, or assisting in such activity.  *Douglas v. DynMcDermott Petroleum Operations Co*., 144 F.3d 364, 372-73 (5th Cir. 1998).  Ms. Dejban did not oppose any practice rendered unlawful by Title VII or participate in an investigation, proceeding or hearing or make a charge, testify or assist in such activity prior to her termination of employment.  To the extent Ms. Dejban may have generally complained about her treatment by the Debtor, such complaints are not considered protected activity.  *See Harris-Childs v. Medco Health Solutions, Inc*., 169 F. App'x 913, 916 (5th Cir. 2006) (affirming summary judgment on retaliation claim where plaintiff never "specifically complained of racial or sexual harassment, only harassment").  With regard to the third element of Ms. Dejban's prima facie retaliation case, even assuming that she did engage in protected conduct, she cannot show a causal connection between any such protected conduct and termination of her contractual relationship with the Debtor.  Finally, the Debtor terminated its contractual relationship with Ms. Dejban for legitimate, non-discriminatory, non-retaliatory reasons and Ms. Dejban cannot show that the Debtor's articulated reasons for the termination are pretextual.  Therefore, Ms. Dejban's retaliation claims must fail as a matter of law.

**E.      Ms. Dejban Cannot Establish that She Was Terminated Because of Her Pregnancy.**

41.      Ms. Dejban claims that the Debtor terminated her employment because of her sex (pregnancy) in violation of Title VII and the FEHA.  Title VII makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e-2(a)(1).   The Pregnancy Discrimination Act ("PDA") clarifies that "because of sex" includes "because of or on the basis of pregnancy, childbirth, or other related medical conditions," and requires that "women affected by pregnancy, child-birth, or other related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k).   Similarly, the FEHA prohibits an employer from discriminating against a person in compensation or in the terms, conditions, or privileges of employment because of sex or gender. Cal. Gov't Code § 12940(a).   A claim under the PDA is analyzed like Title VII discrimination claims in general. *Urbano v. Continental Airlines*, Inc, 138 F.3d 204, 206 (5th Cir 1998).   First, the plaintiff must establish a prima facie case of discrimination by showing: (1) she was a member of a protected class, (2) she was qualified for the position she lost, (3) she suffered an adverse employment action, and (4) that others similarly situated outside of the protected class were more favorably treated. *Id.* (citing, *McDonnell Douglas Corp v. Green,* 411 U.S. 792, 802 (1973)).

42.      For the same reasons set forth above as to why Ms. Dejban cannot establish a prima facie case of national origin discrimination, Ms. Dejban cannot establish her prima facie case of pregnancy discrimination.  Ms. Dejban was not qualified to provide the services that DK had contracted her to provide.  Also, she cannot show that others similarly situated outside of her protected class were more favorably treated.  Additionally, the Debtor terminated its contractual relationship with Ms. Dejban for legitimate, non-discriminatory, non-retaliatory reasons.

20

Ms. Dejban cannot show that the Debtor's articulated reasons for terminating its contractual relationships with her are pretextual.  Therefore, Ms. Dejban's claim that she was terminated because of her pregnancy must fail as a matter of law.

**F.     Ms. Dejban Cannot Establish that Debtor Failed to Accommodate her Pregnancy in Violation of the Title VII or the FEHA.**

43.     Ms. Dejban alleges that Debtor "refused" to accommodate her pregnancy in violation of law.  Under Title VII, a plaintiff claiming pregnancy discrimination for a failure to accommodate must show: (1) that she belongs to the protected class, (2) that she sought accommodation, (2) that the employer did not accommodate her, and (4) that the employer did accommodate others similar in their ability or inability to work. *Young v. UPS*, 135 S. Ct. 1338, 1354 (2015) (internal quotation marks omitted).  The FEHA makes it unlawful "for an employer to refuse to provide reasonable accommodation for an employee for a condition related to pregnancy, childbirth, or a related medical condition, if she so requests, with the advice of her healthcare provider." Cal. Gov't Code § 12945(a)(3)(A).  To state a pregnancy discrimination claim for failure to accommodate under FEHA, a plaintiff must show that: (1) her employer refused a reasonable accommodation (2) for a pregnancy-related condition (3) requested by an employee affected by pregnancy (4) with the advice of her health care provider. *See Mayfield v. Trevors Store, Inc*., No. C-04-1483 MHP, 2004 WL 2806175, at *5 (N.D. Cal. Dec. 6, 2004); *see also Graves v. Pau Hana Group, LLC*, No. 2:13-CV-01278-JAM, 2013 WL 6000986, at *6 (E.D. Cal. Nov. 12, 2013).

44.     Ms. Dejban's claim for failure to accommodate under Title VII fails because she did not seek an accommodation and the Debtor did not refuse to provide her with an accommodation.  This claim also fails because Ms. Dejban has presented no evidence or even alleged that the Debtor did accommodate others similar to her in their ability or inability to work.

45.     Ms. Dejban's claim for failure to accommodate under the FEHA likewise fails because Ms. Dejban did not request any accommodation related to her pregnancy and the Debtor did not refuse any reasonable accommodation for a pregnancy-related condition.  Further, Ms. Dejban has not alleged and cannot show that she sought an accommodation at the advice of her health care provider.  Ms. Dejban's claims for failure to accommodate her pregnancy fail as a matter of law.

**G.     Ms. Dejban's Claims for Discrimination under the ADA Fail as a Matter of Law.**

46.     Without providing any evidence or supporting facts, Ms. Dejban alleges in a general and conclusory fashion that Debtor regarded her pregnancy as a disability and asserts a claim for discrimination under the Americans with Disabilities Act.  The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to ... discharge ...." 42 U.S.C. § 12112(a).  The same burden shifting framework that applies to Title VII cases applies to claims of discrimination under the ADA. *Cannon v. Jacobs Field Servs., N.A. Inc.*, 813 F.3d 586, 590 (5th Cir. 2016).  In order to make out a *prima facie* showing under the *McDonnell Douglas* framework for the claim that she was discriminated against because the Debtor regarded her as disabled, Ms. Dejban must show that: (1) she was regarded as disabled (as described in 42 U.S.C. § 12102(3)); (2) she was qualified for the job; and (3) she was subject to an adverse employment decision on account of the perception of disability. *Cannon v. Jacobs Field Servs., N.A. Inc.*, 813 F.3d 586, 590 (5th Cir. 2016); 42 U.S.C. § 12102(1).  An individual meets the requirements of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under the ADA because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.  42 U.S.C. § 12102(3).  Ms. Dejban cannot establish any of the elements of her prima facie case.  The Debtor did not regard her as disabled and Ms. Dejban has not

22

presented and cannot present any evidence showing that the Debtor regarded her as disabled.  Also, she was not qualified to provide general counsel services for Debtor.  Finally, Ms. Dejban cannot show that her contractual relationship with the Debtor was terminated because of a perception that her pregnancy was a disability.

47.    A discrimination claim under the ADA is subject to the same burden shifting analysis as a Title VII claim. *LHC Grp.*, 773 F.3d at 702 (citing *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (citations and internal quotation marks omitted).  As set forth above, the Debtor terminated its contractual relationship with Ms. Dejban for legitimate, non-discriminatory, non-retaliatory reasons and Ms. Dejban cannot show that the Debtor's articulated reasons for terminating its contractual relationship with her are pretextual.   Therefore, Ms. Dejban's claims under the ADA must fail as a matter of law.

**H.      The Claim Are Duplicates.**

48.    The Claims are substantively duplicative of each other.  As set forth herein, the Debtor is not liable on the Claims and the Court should disallow both of the Claims for the reasons set forth herein.

49.    In addition, given the false nature of the basis of the Claims asserted, the Debtor requests recovery of attorneys' fees and costs associated with this Objection.

WHEREFORE, the Debtor respectfully requests that the Court enter the Order filed with this Objection granting the relief requested in this Objection, including awarding attorneys' fees and costs, and granting such other and further relief as is appropriate under the circumstances.

Respectfully submitted,

/s/ *Jennifer F. Wertz*

Matthew D. Cavenaugh (State Bar No. 24062656)
Jennifer F. Wertz (State Bar No. 24072822)
**JACKSON WALKER LLP**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
Email: jwertz@jw.com

**COUNSEL FOR THE REORGANIZED
DEBTOR**

**<u>Certificate of Service</u>**

I certify that on February 26, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and via regular upon the following:

Hal Keith Gillespie
Attorney for Bahar Dejban
3403 Gaston Avenue
Dallas, TX 75246

/s/ *Jennifer F. Wertz*

Jennifer F. Wertz

## <u>Exhibit A</u>

**Stallkamp Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VOLUSION, LLC[1] | ) Case No. 20-50082 (DRJ) |
| | ) |
| Debtor. | ) |
| | ) |

**DECLARATION OF TIMOTHY STALLKAMP**
**IN SUPPORT OF REORGANIZED DEBTOR'S OBJECTION TO THE**
**PROOFS OF CLAIM NOS. 16 AND 22 FILED BY BAHAR DEJBAN**

I, Timothy Stallkamp, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of the Debtor and have served in this position since June 24, 2020.

2.      I am generally familiar with the Debtor's operations, financing arrangements, business affairs, and books and records that reflect, among other things, the Debtor's liabilities and the amount thereof owed to its creditors as of the Petition Date.  I read the *Reorganized Debtor's Objection to the Proofs of Claim Nos. 16 and 22 Filed by Bahar Dejban* (the "Objection"), filed contemporaneously herewith.[2]

3.      To the best of my knowledge, information, and belief, the assertions made in the Objection are accurate.  As such, I believe that the disallowance of the Claims on the terms set forth in the Objection is appropriate.

4.      The failure to disallow the Claims could result in the Claimant receiving an improper recovery on account of the Claims, to the detriment of the Debtor's other, similarly

---

[1]  The Reorganized Debtor in this chapter 11 case, along with the last four digits of the Reorganized Debtor's federal tax identification number, is:  Volusion, LLC (9037).  The Reorganized Debtor's service address is 1835A Kramer Lane, Suite 100, Austin, TX 78758.

[2]  Capitalized but undefined terms herein shall have the same meaning ascribed to them as in the Objection.

situated creditors, and could delay the administration of the Debtor's estate.   Accordingly, the disallowance of the Claims as requested in the Objection is appropriate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing declaration are true and correct to the best of my knowledge, information and belief.

Dated:  February 26, 2021               By: *Timothy Stallkamp*

_____

Timothy Stallkamp
Chief Restructuring Officer
Volusion, LLC

2

**<u>Exhibit B</u>**

**Proof of Claim No. 16**

| Fill in this information to identify the case: | |
| --- | --- |
| Debtor 1 | Volusion, LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Southern District of Texas |
| Case number | 20-50082 (DRJ) |

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1: Identify the Claim

**1. Who is the current creditor?**

Bahar Dejban

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor  NA

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Hal K. Gillespie
Name
4803 Gaston Ave.
Number      Street
Dallas, Texas 75246
City                     State          ZIP Code

Contact phone  (214) 415-7911

Contact email  hkg@gillespiesanford.com

Where should payments to the creditor be sent? (if different)

Name
Number      Street
City                     State          ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ — _ _ _ _ — _ _ _ _ — _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

| | |
|---|---|
| 7. How much is the claim? | $_____9,250,000. Does this amount include interest or other charges?<br>☐ No<br>☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>Unlawful discrimination, retaliation and termination. |

| | |
|---|---|
| 9. Is all or part of the claim secured? | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>Nature of property:<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>Basis for perfection: _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>Value of property: $_____<br>Amount of the claim that is secured: $_____<br>Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>Amount necessary to cure any default as of the date of the petition: $_____<br><br>Annual Interest Rate (when case was filed) _____%<br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| 10. Is this claim based on a lease? | ☑ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition. $_____ |

| | |
|---|---|
| 11. Is this claim subject to a right of setoff? | ☑ No<br>☐ Yes. Identify the property: _____ |

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

Amount entitled to priority

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

$_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

$_____

☑ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

$_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

$_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

$_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.

$_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

The person completing this claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date ___11/30/2020___
MM / DD / YYYY

Signature _____

Print the name of the person who is completing and signing this claim:

| | |
|---|---|
| Name | Hal Keith Gillespie |
| | First name          Middle name          Last name |
| Title | Attorney for Bahar Dejban |
| Company | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 3403 Gaston Avenue |
| | Number          Street |
| | Dallas, Texas 75246 |
| | City          State          ZIP Code |
| Contact phone | (214) 415-7911          Email hkg@gillespiesanford.com |

---

| Print | Save As... | Add Attachment | Reset |
|---|---|---|---|

Official Form 410                    **Proof of Claim**                    page 3

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | |

## California Fair Employment and Housing Act
### State or local Agency, if any
and EEOC

| Name (indicate Mr., Ms., Mrs.) | Cell Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Ms. Bahar Dejban** | **(818) 517-3244** | **1979** |

| Street Address | City, State and ZIP Code |
|---|---|
| **16061 Royal Oak Drive, Encino CA 91436** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **Volusion, LLC** | **About 170** | **972-371-5200** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1835-A Kramer Lane, Suite 100, Austin, TX 78758** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☒ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: **June 23, 2020**   Latest: **July 27, 2020**

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

See Attachment A hereto.

---

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – When necessary for State and Local Agency Requirements

I declare under penalty of perjury that the above is true and correct.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

| November 30, 2020 | |
|---|---|
| Date | Charging Party Signature |

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

## Attachment A

### I.     Personal Harm

I am a female citizen of the United States and currently 41 years old. I was born in Tehran, Iran in 1979. My first name, Bahar, is a uniquely Iranian name. My highest level of formal education is a law degree from Loyola Law School, which I obtained in 2005.

## VOLUSION BACKGROUND

On January 29, 2015, Main Street Capital Corporation ("Main Street") announced it had recently led a new portfolio investment totaling $45.0 million of invested capital in Volusion, LLC ("Volusion"), with Main Street funding $31.5 million of the investment. The proceeds of the investment were used to provide capital to fund Volusion's near-term growth opportunities. Main Street's investment in Volusion included a combination of first-lien, senior secured term debt with equity warrant participation and a direct equity investment. In addition, Main Street and its co-investor provided Volusion a commitment for up to $10.0 million of additional capital to support its future growth opportunities and have the ability to fund additional capital in the future if needed to continue to support Volusion's growth. The press release for this transaction stated, "Main Street's investment supports Volusion's current management team, which retained majority equity ownership of the company."

## AT VOLUSION I WAS AN EMPLOYEE,
## NOT AN INDEPENDENT CONTRACTOR

I was General Counsel for Volusion, LLC ("Volusion"). I worked at Volusion as a lawyer, as its General Counsel. I was hired as the General Counsel of Volusion in March 2019. My hiring as General Counsel was approved by Volusion's Board of Managers, which at the time included Kevin Sproles (the founder and then the CEO and Dwayne Hyzak). I was a full-time employee, not an independent contractor. While I served as General Counsel of Volusion, Volusion had control of me. Volusion had the right to hire me, fire me, supervise me, and set my schedule. Also, in terms of economic realities, I was an employee and not a mere independent contractor as follows:

1. The kind of work I did as a lawyer, as General Counsel for Volusion, was typically done under the supervision of the COO and the CEO – as with my predecessor who was a full time salaried employee of Volusion. For the duration of my employment, I had a standing meeting with either the CEO or COO on Fridays at 11am CST to update on my work, provide advice and obtain approval. See #8 for list of work I was doing.

2. As General Counsel and c-suite employee, I was required to and possessed a high level of skill in my job with Volusion.

2

    a.  I was hired as a general counsel, requiring me to oversee and tend to matters in various areas of law.

    b.  I was also assigned various projects at the managerial level, and was brought into various arenas that are not typically general counsel work by multiple departments (See #8)

3.  While working for Volusion, Volusion – my employer – furnished the equipment I used and my place of work.

    a.  Volusion furnished all equipment and local office, including my private office;

    b.  The equipment furnished included, but was not limited to, the following:
        i.  A laptop and supporting equipment;
       ii.  A Volusion email address and signature line;
      iii.  A direct phone number at Volusion's headquarters which rang at my private office at that location;
      iv.  Access to Volusion's Google Drive
       v.  Access to Slack -- a communication app that was used at Volusion for people to communicate quickly and easily with each other. Slack allows the user to create groups, different channels, make phone calls and share documents.
      vi.  I was added to the same email/Slack channels that other employees were on such as All Hands, SM Beats, and HR emails. All Hands were company wide meetings where employees and leadership met to discuss company matters. SM Beats were similar. Bottom line -- these were company gatherings where all employees attended and I was also included in these.

4.  I was employed at Volusion from March 2019 until July 27, 2020.

5.  I was paid a monthly salary. My pay was not tethered to any project or time limitation. I was given work and responsibility as needed and was paid the same salary whether I put in 40, 60, or 80 hours per week.

6.      I was terminated abruptly by email on July 27, 2020 effective at 9:15 a.m. CST by the new CEO, Troy Pike, who was a member of the Board of Managers as of June 9, 2020. The letter from Mr. Pike falsely states, "The Board of Managers of Volusion, LLC ("Volusion") understands that you have been providing services to Volusion through an independent contractor relationship." During the time that Pike (along with the other two new members of the Board of Managers, Jeremy Rosenthal and Curt Lindeman) were over me at Volusion, I only talked to them once – a long phone call on June 23, 2020. During that phone call, these guys asked about getting a copy of my contract and kept referring to me as outside counsel. I kept correcting them and saying I was full time general counsel for Volusion. They referred to my pay as a retainer and I clarified that and said that I was paid a salary the same way that the previous GC was paid a salary, at the end of each month for work that I did for the previous month. Mr. Pike sent two termination letters on July 27, 2020, as a transparent effort to call me an independent contractor. He sent one termination letter to DK Strategic Solutions LLC and a second letter to Bahar Dejban. He sent these as

3

attachments to an email sent at 6:04 p.m. on July 27, 2020, addressed "Dear Bahar," worded to try
to make it sound like I had not been an employee of Volusion. Mr. Pike's email said:

> Thank you for your service to Volusion, LLC. Please find the attached letter (sic)
> which confirms the board's decision to sever its relationship with Dejban Law and
> DK Strategic Solutions. Please call me with any questions that you may have.

I was an at-will employee of Volusion, having no employment contract between myself and
Volusion. There was a Independent Contractor Agreement between Volusion and DK Strategic
Solutions, LLC signed by Bardia Dejban as COO of Volusion and by me on behalf of DK Strategic
Solutions, LLC on March 15, 2019.

7.      I was entitled to whatever annual leave any other Volusion employee was entitled to. Every
leader at Volusion was provided with the option for unlimited paid time off. Only non-exempt
(hourly) employees would fill in timecards and time-off requests to reflect in pay checks. I was
gone for 2 weeks in August 2019 and Volusion still paid me my full monthly salary.  I was a full-
time employee and team member.

8.      My work was an integral part of the business of my employer, Volusion:  My work at
Volusion included but was not limited to:

        a. Reviewing, drafting and negotiating all contracts with vendors, customers, partners, and
all other third parties.

        b. Dealing with and managing all customer, vendor, partner and employee disputes.

        c.  Managing and coordinating compliance requirements for the company including
Privacy, Data and ADA.

        d. Handling trademark and patent work.

        e. Handling/managing most legal claims. I handled and disposed of most matters in-house.
Those few I could not handle with internal resources, I would would submit to insurance and/or
outside counsel if applicable.  At the time of my termination I was managing the security breach
that had occurred in October of 2019.   This included micro-managing the messaging and
communication that was going on publicly and to our customers, both by Volusion's internal
resources and coordinating with outside PR contractors.  This also included communicating with
insurance, working with outside counsel, and managing a multimillion dollar class action that had
been filed against Volusion.

        f.  Working with the sales department on the implementation price changes, contract
alterations, and various customer offerings.

        g. Working with the accounting department on whether we need to dispute or pay certain
invoices, as well as managing certain vendor contracts.

        h.  Working with the Billing department closely regarding any questions/concerns
customers had with charges, managing responses, and dealing with billing/contractual disputes.

4

i. Working with the Partner department on contract terms with our partners.

j. Working with the marketing department on appropriate marketing methods that do not violate any anti-spam regulations, as well as addressing potential PR issues.

k. Being generally available to all employees via email and/or phone and Slack for any questions and/or concerns they have.

l. Assisting People and Culture with HR issues. At the time of my termination I was in the process of reviewing and updating the Employee Handbook for 2021. Prior to that I had assisted with updating our policies as they relate to Covid.

m. Updating Volusion's online Terms of Service and Privacy Policies. I had recently updated those due to changes from CCPA as well as new Partner Program that we had initiated in approximately April of 2020.

n. I had standing weekly meetings with either the COO or the CEO (every Friday at 11am CST) to provide an update on all of the above.

9.      The intention of the parties with respect to my status at Volusion was that I perform as an employee, notwithstanding the independent contractor agreement between Volusion and DK Strategic Solutions, LLC.  Volusion intended to replace its former GC – who was a full time employee, when it hired me. I was personally approved by Volusion's Board of Managers to serve in this role.  The role and expectations did not change from the previous GC to me. The job was, and continued to be, one of a full-time employee.  Volusion believed – even at my termination – that I was an employee. Volusion sent a termination letter to me personally terminating my employment. They separately sent a letter to DK Strategic terminating that contract.

## NEW LEADERS COME TO VOLUSION AND FIRE ME ALMOST IMMEDIATELY DUE TO MY PREGNANCY AND IRANIAN DESCENT

By May 2020, my twin brother, Volusion's CEO Bardia Dejban, had completely turned around Volusion's performance.  By that time Volusion was for the first time in 4 years running a positive EBITDA, and we had focused it for maximizing revenue from its legacy product.  We were on course to launch Volusion's new product. Under Bardia Dejban's leadership, Volusion's cash reserves had increased from about $4 million to nearly $8 million.  As of this date, Volusion had about 170 employees.  Of these employees, only two, myself and CEO Bardia Dejban, were of Iranian descent.  We were both were born in Iran.  I became the General Counsel of Volusion in March 2019, when Bardia Dejban was the company's COO.

On June 9, 2020, Main Street's CEO, Dwayne Hyzak, notified Bardia Dejban along with Mr. Kein Sproles, Mr. Randon Kelly, and the Corporate Secretary of Volusion that it had changed the Board of Managers ("the Board") for Volusion and that the Board now was made up of Troy Pike, Jeremy Rosenthal, and Curt Lindeman.  All three of these are Caucasian males, born in the United States.

5

In June 2020 I learned that the three new members of the Board of Managers were three men: Curt Lindeman, Jeremy Rosenthal and Troy Pike. Until that point, my performance for Volusion had been excellent, I had received very positive feedback about my performance and I had no performance issues. In fact, due at least in part to my performance, I had increasingly been given greater management duties as outlined above. I initially reported to the CEO (and Founder) of Volusion, Kevin Sproles and the COO of Volusion, my twin brother, Bardia Dejban. After Bardia Dejban became the CEO of Volusion, I reported to him directly.

After the new Board of Managers and CRO Tim Stallkamp arrived at Volusion, these four Caucasian born-in-the-United States males treated all the Volusion employees born in Iran badly, while treating born-in-the-United States employees of Volusion well. The New Leaders implemented a discriminatory double standard. While Pike, Rosenthal, Lindeman and Stallkamp (collectively the "New Leaders") were demanding, unreasonable, condescending, abrupt and rude toward me and the other Iranian born employee of Volusion, my brother, Bardia Dejban, the New Leaders treated the other Volusion leaders (non-Iranian born) politely and with deference. The remaining leadership at Volusion (non-Iranian born) were able to put off requests from the New Leaders for days and weeks. They could literally say, "I won't have time to talk until next week" and the response, time and again was "no problem. When next week." The demands on Bardia Dejban and me by the New Leaders, were abrupt, unreasonable and pretextual. The New Leaders made a deliberate effort to manufacture a false "reason" for termination so they could assert falsely that Bardia and I were "disengaged and disobedient officers." Although the New Leaders did not give me a reason for terminating me when they fired me by mail, "being disengaged and disobedient" is the false and pretextual reason that Volusion offered in its Disclosure Statement in Bankruptcy Court in the matter called In re Volusion, LLC, Chapter 11, Case No. 20-50082 (DRJ), in the United States Bankruptcy Court for the Southern District of Texas, Laredo Division.

From the time the New Leaders arrived at Volusion until my termination by letter on July 27, 2020, I was engaged, obedient and cooperative with the New Leaders, despite the fact that one or more of them often treated me in an arbitrary, demanding, inconsistent and disrespectful manner. Volusion engaged in a **pattern or practice** of retaliation and interference, not only punishing and firing Bardia Dejban for his protected efforts to care for my nephews, his young sons, but also retaliating against and firing me due to my pregnancy soon after it learned that I was pregnant.

Shortly after learning of the Board change, I informed the new members of the Board of Managers that I was pregnant and that I was experiencing complications from my pregnancy. They reacted negatively, regarded my pregnancy as a disability, refused to accommodate my pregnancy, and then they fired me due to my pregnancy and due to the fact that I was born in Iran. My brother and I were the only Iranian born employees of Volusion and the new Board cleaned house - firing us both by letter at the same moment - on July 27, 2020, effective at 9:15 a.m. Volusion used a pretext to cover up their discriminatory actions, falsely claiming that my brother and I were "disengaged and disobedient officers." Volusion replaced me with a non-pregnant male General Counsel.

6

## The New Leaders Begin to Set Up Bardia Dejban For Termination

The day after Bardia Dejban's first board meeting with the New Leaders, on Tuesday, June 16, 2020 at 9:35 PM, Jeremy Rosenthal sent Bardia Dejban an email with voluminous requests that would normally take weeks, and provided a deadline of next day Friday, by 2 PM CST. **This was a set up.** First, this began a pattern by the New Leaders of building a paper trail that they were seeking documents and trying to show they were not getting sufficient cooperation, despite prompt and diligent efforts by both Bardia Dejban and me. Second, the whole feverish document search was part of a pretext. Prior to Main Street inserting its handpicked board (Pike, Rosenthal and Lineman) and its CRO -- Stallkamp, not only was Main Street (through Main Street's CEO, no less) a board member, but Volusion's leaders had held multiple talks with Main Street and provided them with virtually all of the information that the New Leaders pressed to receive as if an emergency.

For the New Leaders to suddenly claim that they were in dire need of information and documents and that it had none in its possession after being interviewed and handpicked by Main Street, and presumably after they themselves considered the position they were being offered is incredible. They would have to claim that Main Street provided them with none of the information in its possession and that they never sought any in accepting positions as the top managers of Volusion. Their pretense that they took their positions without being provided with or seeking any information or documents which were in the direct possession of their employer (Main Street) defies credulity. Further, even assuming that the New Leaders were in need of anything and that there was some huge urgency to obtain it, they could obtain the information from their boss -- Main Street -- and not declare an emergency that would override the efforts of the existing leaders of Volusion to run the company. The argument that these New Leaders walked onto their jobs sight unseen as the chief managers of a company in such dire straits that it was on the verge of bankruptcy is absurd.

Bardia Dejban replied to Rosenthal the next day before his 2 PM deadline. In the first reply by Bardia Dejban, he let them know he was taking my son to the doctor for an emergency, he had a severe ear infection and fever, and told Jeremy that he would reply as soon as he was back. Bardia Dejban's 9:18 AM email on June 17, 2020 said to Rosenthal:

Jeremy:

**Taking my son to the doctor, he has a severe ear infection.** I'll reply to your email immediately after I return.

Sincerely,

Bardia

(Emphasis added.)

7

Bardia Dejban's next email to Rosenthal was also ahead of his 2 pm deadline. CEO Dejban sent his email at 11:18 AM. It was an earnest attempt to cooperate and to work fast and also to remind the New Leaders of his sons' health issues and needs. CEO Dejban let them know that he was not allowing enough time to turnaround requests under normal circumstances, and that he was going through extraordinary circumstances. Historically, the information Rosenthal requested would take an 8-week process to turnaround. CEO Dejban reiterated his family responsibilities, to his boys, aged 2 and 7. Bardia Dejban's email to Rosenthal said:

Jeremy:

As CEO, I need to balance operating the company as well as fulfilling these requests. I'm a very hands on leader, which is part of the reason I was elevated to CEO. I take great care to be involved in and shape each part of the organization to assure that it is heading for success.

Regardless, in just 24 hours, I've now met with all parties requesting meetings and begun preparing next steps. Based on our meetings, I felt like we are being collaborative and communicating openly, something foundational to our <u>culture code</u>.

While I am giving you and Tim my highest priority, there are other business items that I cannot merely ignore. **I'm moving as fast as physically possible to compile information and populate drives.** I'll be able to create a Google Drive for the Board and begin populating the requested information by the end of business today. I'm targeting to have all requested information by the end of this week, possibly Friday AM in preparation for our meeting on Monday.

I would appreciate the opportunity to correct the record in regards to Conway Mackenzie. I did not report that the information was readily available, I let Tim know our form NDA was readily available and that we would begin our PCI procedure, which starts with a background check. This is something we have never bypassed as a PCI compliant organization. All contractors that have access to the information he is requesting must go through this process. Is your instruction that we bypass this security process? My concern is that doing so may jeopardize our compliance status while only saving a few days. Candidly, historical board members at Volusion have also gone through this background check.

Given that he had not specified a length of time, and had shortly before the call sent me his document requests, Tim seemed amenable to the 30 minute meeting. **On the items Tim requested, I just wanted to give some background. It took us over 8 weeks to deliver that information to Raymond James last year during our process. During that time, I was the person responsible for aggregating a significant majority of that information, and can do so efficiently. While I'll work to expedite this process, it is likely going to be in**

**batches over the next 4 weeks.** Also, Tim never requested to have unfettered access to anyone from leadership. Considering the above miscommunication, I will endeavor a better job of documenting future communications so as to avoid further miscommunication.

As I informed you during our meeting, based on the way Volusion has operated historically, I firmly believe that introducing and/or creating direct reports for Tim, or any of this structure by the management team at Volusion at this time will be incredibly disruptive, and will lead to a catastrophic deterioration in key metrics and hinder rock completion for the organization. This is the reason I asked to be allowed to think through how best to achieve this. I've been thinking through how to do this, and when, in an appropriate way. This will also personally tie me up with questions and uncertainties of the future of the organization, potentially leading to even further disruption and missed performance. This should be an area we dig into on Monday.

In general, **a majority of the management team is very focused and is taking on some additional roles, all part of the plan to rebuild the organization from within in preparation for our go-to-market with VOLT. There is an incredible new energy within the organization, but this is also an incredibly time consuming process for me, as CEO, to ramp up, cast vision and provide clear direction for each management team member, as well as establishing processes (EOS) as our guiding light to success for the organization.** As you stated, we want to all make Volusion successful. I ask a little of your indulgence considering my years of being immersed in this company, its business, and building its culture. **I'm taking your requests seriously and making them my top priority, while also balancing above. I also have to assure that this process does not interfere with my responsibilities to my two boys, aged 2 and 6.**

Sincerely,

Bardia

(Emphasis added.)

On June 18, 2020 Troy Pike texted Bardia Dejban at 6:48 PM, saying, "Please call me this evening if possible. If not possible, please let me know." CEO Dejban was still caring for his son with a severe ear infection. With COVID, Bardia's 2-year old's daycare was closed, so this became a huge challenge for his family, trying to provide different levels of care for a sick 7-year-old and demanding 2-year-old, combined with COVID and their underlying health conditions (severe asthma, food allergies). Bardia Dejban replied that evening: "With the kids. I can call you at 8 AM tomorrow."

9

Pike replied with pressure and a veiled threat: "My normal response would be yes, of course. But it is clear to me now that you aren't grasping how critical time is for you right now." CEO Dejban called Pike at 8 AM the next morning. He did not accept Bardia's call.

Then Pike sent CEO Dejban another text, making it sound like he failed to call him. Pike's text said: "Awaiting your call."

CEO Dejban called him again. He answered and was abusive. Pike told Bardia on the phone call: "Either you don't understand the gravity of the situation or you don't care." He also told Bardia, "There's a new sheriff in town."

This kind of talk was part of Pike's pattern and it was prompted by his national origin discrimination and his negative reaction to Bardia's efforts to care for the health of his family. Pike would pretend to be friendly then he would tell Bardia that he needed to do something right away or else. In that early phone call the morning of June 19, 2020, Pike asked Bardia to introduce Tim Stallkamp and Wayne Scott. Baradia did what he asked, and Bardia's response to Pike at 8:24 AM confirms that and notes his threat to Bardia:

> Troy:
> I committed to introducing Tim and Wayne, and I did. You rejected my call today.
> I don't understand why you have to threaten me?
>
> Sincerely, Bardia

On June 19, 2020, the New Leaders passed a "Unanimous Written Consent of the Board of Managers of Volusion, LLC," a document that was directly retaliatory to the efforts of Bardia Dejban to care for his sons' health issues during the pandemic – it severely limited his abilities to perform his job as CEO. Pike's email essentially admitted this retaliation. Pikes" June 19, 2020 (4:35:01 PM) email stated: "your insufficient level of responsiveness and execution on board directives causes the board great concern."

### The New Leaders' Campaign Against Me

On June 19, 2020, the New Leaders began a campaign against me. One of the New Leaders, Curt Lindeman, wrote to me, misstating my role (calling me "outside general counsel" when I was full time and not an "outside" General Counsel of Volusion). Lindeman's email (of 8:59 AM) said:

> I am one of the members of the Board of Managers of Volusion (the other 2 are copied on this email). The Board asked David Snyder (also copied), with Jackson Walker (company counsel), to contact you. **I understand that you are operating as the full-time outside general counsel of Volusion.** We really need you to at least touch base with David this morning (preferably within the hour) so we can start to understand the legal issues currently facing the company.

> If there are significant legal issues that would prevent such a call this morning, we obviously need to know asap.

> I look forward to working with you.

(Emphasis added.)

I responded to Lindeman on June 19, 2020 (at noon), referring to David Snyder as "David" as follows:

> I emailed David for available times. **Unfortunately, I have personal medical issues to tend to as I am pregnant**. David is welcome to contact me directly. I will endeavor to connect with him at the first possible time.

> Thank you for your consideration. I too look forward to working with you.

(Emphasis added.)

The New Leaders viewed the news that I was pregnant negatively and with hostility. None of the New Leaders ever congratulated me on my pregnancy, asked me about accommodations I would need or might need, or even asked me how far along I was in my pregnancy. This would have been the first step in a discussion about accommodations. In fact, none of the New Leaders ever mentioned my pregnancy except in a dismissive way that suggested that being pregnant was inconvenient and the same as not being pregnant but facing COVID issues with the rest of the population. Lindeman said he could "understand and sympathize with family obligations" and dismissed my pregnancy (and Bardia's son's health issues) by saying, "We are all trying to juggle family obligations during this strange time." Later he made a similar statement to CEO Bardia Dejban in a meeting when Bardia talked about the medical issues facing his sons that he was trying to handle. Lindeman said to Bardia, "We're all in the same boat."

On July 8, 2020 (at 4:44 PM) , Lindeman wrote a condescending, critical, and dismissive email to Bardia and me. Lindeman's email stated:

> I can understand and sympathize with family obligations. **We are all trying to juggle family obligations with work during this strange time.** However, these delays by both you and Bahar for weeks are not acceptable. If these requests were made of me as a GC, I could send out the documents within minutes from anywhere there is a cell signal.

> If you can't do it, please direct people on your team to send me the documents today.

11

I had not delayed anything for weeks.  I promptly responded, objecting to Lindeman's email and pointing out my pregnancy and the fact that I had been experiencing complications and difficulties with her pregnancy over the past weeks.  My email of July 8, 2020 (at 5:39 PM) told Lindeman:

> Curt,
>
> **I do not appreciate your misrepresentations.**  This is the <u>first</u> request I have received for contracts with major vendors or engagement letters with law firms. I was asked for a list of law firms that are or have recently been engaged. And I provided that to you last week.
>
> **I also informed you in our conference call that I do not have access to employment agreements, and nevertheless, you requested those from me.**
>
> **Finally, I have been working full time for Volusion, and as I have told you, I am pregnant and have experienced some complications and difficulties with my pregnancy over the past weeks.** Regardless, I have continued to respond to all of Tim's requests, including providing him with complete access to a drive of intellectual property material along with corresponding engagement letters last night.
>
> I can get you the retainer agreements for lawyers I have engaged, other than the patent lawyer which you now already have as of last night. I will have to search for agreements with lawyers that were engaged prior to my employment but that are still doing work for Volusion.
>
> I take my job as General Counsel of Volusion VERY seriously and would appreciate it if you wouldn't misstate things and conflate your previous role as GC with the work I am doing. We have different jobs and obviously different styles. I have and will continue to timely respond to all requests while managing my other duties.

(Emphasis added.)  I copied all the New Leaders on this email.

None of the New Leaders responded with any effort to accommodate my pregnancy and its complications.  Volusion's response, much like – "Oh, you're pregnant – thanks for that information – you're fired – we will replace you with a non-pregnant man" -- very shortly thereafter, was to fire me without providing me any reason and without prior warning on July 27, 2020.

### Bardia's Written Notice to the New Leaders of FMLA/ FFRCA Needs

On July 8, 2020  CEO Dejban put the New Leaders on written notice that he was taking time to care for his sons and that they suffered from "medical conditions that are directly

impacted by COVID-19 and Stage 5" (referring to the shutdown that caused serious issues with obtaining essential food for Bardia's sons that would not trigger severe allergic reactions). At 7:04 PM on July 8, 2020 Bardia sent this email to all 4 of the New Leaders:

> Curt, Troy, Jeremy and Tim:
>
> Replying to an email Tim had sent while I was on PTO.
>
> **Just getting back from my son's doctors appointment. Earlier today, Austin confirmed Stage 5 approaching within the next couple days if not tonight.** I am spending the remainder of the week working on Q3 priorities with the executive team, and **taking care of my family in preparation for Stage 5. As I mentioned before, my children have medical conditions that are directly impacted by COVID-19 and Stage 5.**
>
> Let's schedule a meeting by video for Monday, July 13th? I can free up any block of time that works for you. If we have time, I would also like to cover our VOLT go-to-market plans, including Q3 revenue stability, which I'm also finalizing.
>
> Sincerely,
>
> Bardia

(Emphasis added.)

None of the New Leaders responded with any effort to accommodate Bardia's FMLA/ FFRCA needs (instead, they responded with hostility). Jeremy Rosenthal's email to Bardia at 8:34 PM on July 8, 2020 deliberately missed the point – that Bardia's sons were especially impacted by COVID-19. Rosenthal glibly said, "Please stay safe. We understand that with Covid this is a very challenging time." Generally, the emails from the New Leaders treated Bardia's efforts to take care of his family as an inconvenience and/or as a lack of cooperation. Volusion's ultimate response, very shortly thereafter, was to fire CEO Dejban, as it fired me, without providing any reason and without prior warning on July 27, 2020.

On July 13, 2020 via Bardia's 7:55 AM email, Bardia put the New Leaders on further written notice of his FMLA/ FFRCA needs. Bardia sent them this email letter:

> Curt, Jeremy, Troy, Tim:
>
> Wanted to get this to you first thing this AM. I mentioned Friday that I would be working over the weekend on various initiatives. As you know, Volusion measures success based on our 5+1. If you look at our financials and board materials, we have been targeting and exceeding EBITDA margin goals since Q4 2019; with Net Income posted in May for first time in over a year. Additionally,

we have brought revenue green shoots online for partner and ecosystem lines, all part of the plan we had laid out late last year. While it's been great to see our plan working, we still have immediate revenue stabilization initiatives targeting ~$500k additional revenue through Q4. But our largest revenue driver will be VOLT GTM.

There are also key elements of the revenue stability plan and our VOLT GTM that need to be detailed. The management team feels that we are on the right path and results are already validating that belief. Our CFO had mentioned to Tim that he would have models by July 24th, which I've attempted to help accelerate. We are also finalizing June numbers this week. Once I receive all of those pieces of information, I'll need to incorporate them into the board presentation as well as implement into the overall organizational plans.

**At the same time I need to bring to your attention that my time this week will be diverted to speaking with several members of the leadership team in an effort to ameliorate some of the damage and reduce the anxiety that has occurred by the recent events. Of particular concern is the effect that Tim's communications have had on the management team. He has not only injected derogatory information, which is frankly unnecessary, but also has shared a board resolution document. To put it simply, they are now uncertain of the future of Volusion and their own commitment to what has been a less than clear and mixed message. This has significantly impacted the work environment, including directly impacting Q3 rocks.** The team as you must know, are critical members of the organization who were contacted against my advice and counsel.

Finally, it has been brought to my attention that legal representatives of various entities will be having a discussion tomorrow at 4 CST. I feel caught in the middle of this, but more importantly, need to have some understanding of what is going on so I can effectively perform my duties and continue the turnaround. Truthfully, I am also separately troubled by the fact that the board, two members of which are attorneys, along with their counsel wish to have a meeting with me and insisting that I appear without counsel. I am extremely uncomfortable with the legal maneuvering and factions, and must admit that I am completely out of my element. It is crucial that I focus on my job to keep moving Volusion to increased profitability and growth, and leave the legal matters to the experts, at least until I have better clarity.

**Personally, as I have mentioned, COVID-19 continues to cause extreme uncertainty and anxiety for my family, especially given my young sons' health issues.** Also as I wrote Friday, Austin will be moved back to a Stage 5. Given all of these considerations combined with COVID-related family issues, I am asking that you move our meeting to the end-of-the month. In the meantime I

will speak with Tim as scheduled this morning who I'm sure will report back on our conversation.

Sincerely,

Bardia

(Emphasis added.)

None of the New Leaders responded with any effort to accommodate Bardia's FMLA/FFRCA needs. Emails from the New Leaders treated Bardia's efforts to take care of his family as an inconvenience and as a lack of cooperation. Volusion's ultimate response, very shortly thereafter, was to fire Bardia and me without providing any reason and without prior warning on July 27, 2020.

### The New Leaders Terminate Bardia and Me
### And Try To Cover Up Bardia's National Origin

On July 17, 2020, Bardia Dejban attended another Board meeting. Nothing was said at that meeting to alert him to the fact that the New Leaders were about to fire him, Kevin Sproles and me and to put Volusion in bankruptcy, despite the fact that Volusion was doing well as a business and did not need to take bankruptcy to avoid foreclosure.

On July 23, 2020 at 1:46 PM, Stallkamp emailed me about patent attorneys. At 2:21 PM, Bardia emailed the New Leaders about the Board Meeting agenda for the board meeting that would take place later in the day. Bardia's email to them said:

Troy, Jeremy, Curt:

The agenda for today's call will be to focus on Q2 2020 preliminary 5+1 impact.
If we have time, I'd also like to discuss VOLT.

I'm also attaching/responding to the the following requests:

Volusion feature matrix (attached)

Market penetration in Apparel category

_    23% of our customers are in this segment today

-    $2m-50m GMV apparel merchants in U.S. is ~1,237

-    We have 200 today (16% market penetration)

Sincerely, Bardia

Troy Pike emailed back to Bardia in response five minutes later without any hint that anything was afoot. Pike's 2:26 PM email said:

> Thank you, Bardia. We should also reserve five minutes to discuss the
> forbearance agreement and its objectives.
> Best,
> Troy

Pike's reference to the forbearance agreement related to the agreement Main Street, Volusion's lender, had made that it would not seek to foreclose on the loan due to default on payment obligations by Volusion. Despite this agreement, Tim Stallkamp (CRO) told Bardia shortly before the Board meeting that he needed someone to wire over $800,000 to Main Street as a peace offering. He also said the Board gave him authority to sign the agreement but not to wire the funds. Bardia asked why we had to pay anything to Main Street since Volusion had a forbearance back in April. Stallkamp said it was different now that the new Board was here. Bardia told him he would need to follow up with Kevin Sproles, the founder since Bardia did not have bank account access. Tim told Bardia that Main Street would take action against Volusion if it did not do so by end of week. That made no sense in light of the forbearance agreement, and Stallkamp's suggestion that Bardia wire this money was a transparent effort to set up Bardia with a pretext to justify termination.

What Stallkamp was saying to Bardia before the July 23 Board meeting was a transparent attempt to set up Bardia as a pretext for firing him to cover up unlawful reasons. This was obvious for several reasons. First, Bardia had no rights over bank accounts. Second, the Board's resolutions made Stallkamp the boss of finance and the direct boss of Volusion's Director of Finance. Third, as Stallkamp knew, under the Board's resolutions, Bardia was not authorized to spend more than $25,000. Fourth, if Main Street was going to foreclose on its loan, it would not have gone through the time and expense of putting the New Leaders in place. If that was the plan, Main Street would have just foreclosed. It would just send Volusion a letter saying send us a specific amount of money, or we're going to foreclose. It had not done so. Fifth, as an officer of Volusion, Bardia had had an obligation to protect the company and the majority shareholder, and Volusion had a forbearance with Main Street.

The Board meeting on Thursday, July 23, 2020 lasted less than 35 minutes. Stallkamp and his assistant joined this Board call as well. Bardia had let them know that he would taking PTO (Paid Time Off) on Friday, to help with his boys' medical issues. They said nothing positive and seemed unhappy about this development, like they were tired of dealing with this inconvenience.

At the Board meeting of July 23, none of the New Leaders mentioned anything about Volusion filing for bankruptcy. They did not mention that they were considering firing me. They did not mention they were considering firing the Founder, Kevin Sproles. They did not mention that they were considering firing CEO Bardia Dejban or that this would be his last work day as an employee of Volusion.

16

At the July 23 Board meeting, Bardia went through the details he had proposed in the agenda he had sent them before the meeting. The Board started by asking if they should discuss the payment to Main Street first, and Bardia recommended moving along with the agenda he had proposed. The Board seemed disinterested in any topics Bardia discussed, then the Board switched topics and asked Bardia to wire the money to Mainstreet Capital. Bardia told them he did not want to be put in the middle of Main Street and the founder (Kevin Sproles) and that he would need to talk with Kevin to understand where that all stood. Jeremy Rosenthal and Curt Lindeman asked Bardia, "as the highest-ranking officer, you can't wire this payment?" Bardia told them that he would follow-up after he had a chance to speak with the founder (who had bank account access) because Bardia didn't want to get in the middle of legal challenges between the founder and Main Street. The last thing Troy Pike said was at the Board meeting was, "Gentlemen, the three of us should discuss what is going to happen Monday when Main Street doesn't receive their payment." Jeremy Rosenthal closed the meeting by saying "Thanks for your time Bardia."

At 5:53 pm, I responded to Stallkamp's email – all in a normal, business-like way.

I got no communication from any of the New Leaders after the Thursday, June 23, 2020 Board meeting.

### The New Leaders Terminate Bardia and Me
### And Try To Cover Up Our National Origin and Because of My Pregnancy

On July 27, 2020, Troy Pike notified Bardia that he was fired by email. His email enclosed a termination letter. It did not provide a reason for termination.

Troy Pike also notified me on July 27, 2020 by email that I was fired. He did so in a way that was calculated to try to make it appear that I was not an employee, but merely an independent contractor – which is false. First, by electronic mail Pike sent a message to "DK Strategic Solutions LLC" that falsely stated, "The Board of Managers of Volusion, LLC ("Volusion") understands that you have been providing services to Volusion through an independent contractor relationship." I had specifically confirmed to the New Leaders that I was a full time employee, the General Counsel, and not "outside counsel." Then Pike's letter said:

This letter serves as notice that your contractual, and any other relationship you have with Volusion, ended effective as of 9:15 a.m. Central Standard Time on July 27, 2020 (the "Termination Time"). After the Termination Time, you will no longer be entitled to any further compensation or benefits from Volusion and are no longer authorized to act on behalf of Volusion or represent yourself to be an agent of Volusion. Also, you are no longer authorized to access any Volusion systems or accounts, including but not limited to email systems, voicemail systems, document management systems and financial accounts.

Knowing that Volusion had not been dealing with "DK Strategic Solutions LLC," but with me, Pike simultaneously sent a letter to me, "Bahar Dejban." Pike's letter contained the same false independent contractor sentence and the other information about "notice that your

contractual, and any other relationship you have with Volusion, ended effective as of 9:15 a.m. Central Standard Time on July 27, 2020" as his letter to DK Strategic Solutions LLC. None of the New Leaders, and nobody on behalf of Volusion called me or contacted me otherwise about my termination. Volusion did not provide a reason for terminating me.

The New Leaders promptly took actions and made statements that show the termination decision was motivated by my pregnancy and by hostility to the national origin of two of the three people (Bardia Dejban and me) that it fired in "leadership changes" it connected to its filing for bankruptcy the same day that it fired Bardia Dejban, Kevin Sproles, and me.

First, on information and belief, Volusion selected a non-pregnant male, David Snyder, to replace me as General Counsel.

Second, to make it seem like nothing was "wrong" at Volusion, the Company published information about its Chapter 11 bankruptcy filing under the heading "Frequently Asked Questions." Voluson's "answers" did not hint that the "reason" for firing Bardia Dejban or me was that it was facing "disengaged and disobedient officers." I have a distinctly Iranian name – Bahar Dejban. Volusion did not mention it in its "answers." Nor did it mention that it had fired Volusion's General Counsel. Volusion falsely stated that to get bankruptcy protection in place for Volusion,

> we made some difficult, but necessary and immediate leadership changes. **Effective July 27, Kevin Sproles and Bardia Dejban are no longer with the company.** We know this may have a personal impact on some of you with long-standing relationships, as well as to our tight-knit organization overall. **Kevin and Bardia have been important leaders at Volusion and we are tremendously thankful for their significant contributions.** While they are no longer formally a part of Volusion, the belief in the company, **the importance of the culture and the mission they inspired will remain.** Our goal is to honor what they helped to create by making sure the restructuring process is successful and Volusion can thrive going forward.

(Emphasis added.)

As for the "reason" for the bankruptcy and its timing, Volusion's "answers" stated: "The company has matured debt and has not been able to make repayment terms." The "answers" did not assert the reason was insufficient collaboration or cooperation from any of existing management or that it was faced with "disengaged and disobedient officers."

Third, at about the same time, Volusion took a deliberate action (when coupled with its act of hiding my name as it fired me) to hide my Iranian national origin from the public. When Bardia became CEO of Volusion, the company posted a letter from Bardia on its blog, for the viewing world's information. The title of the letter was "Day One – New CEO / Volusion." Page 1 of that letter contained this:

18



Dear Founders, Partners and Employees:

As I take this new role of CEO, I look back at the past three years and am thankful for the opportunity to work with so many of you directly. Today is an exciting and humbling day for me, and even though I've been a part of all the amazing changes at Volusion these past few years, it feels very much like a brand new day. Like all of you, I have a choice in what I do, and choosing Volusion to be a part of my future has very much been shaped by my past as well as my passion for entrepreneurship. These values are shared not only with our founder, Kevin, but also reJected by everything we do as an organization.

**I came to the United States in 1979 to escape turbulent times from Iran and grew up in Southern California.** I come from a hardworking family with the grit to launch and grow their own businesses. I've launched my own successful companies, brought hundreds of products to market, and have helped other founders and entrepreneurs do the same. I'm a devoted technologist with a diverse product and engineering background and have solid business experience (including failures). More importantly, I have a deep understanding of the needs of our thousands of customers and take great pride in helping them succeed. I currently live in Austin, Texas with my wife of eight years, two boys and 15-year old Jack Russell Terrier.

(Emphasis added.)

During Bardia's tenure with Volusion since he began in January 2016, when an employee left Volusion, Volusion left their articles and content live on its digital footprint, most often times under their name. This was Volusion's way of honoring them and showing off the talent and culture of the company. **Within a week or two of Bardia's firing, Volusion removed his "Day One" letter from its website.**

Shortly after firing the company's only Iranian-born employees, Bardia Dejban and me on July 27, 2019, and announcing to the world that its "immediate and necessary leadership change" including Kevin Sproles no longer being with the company, Volusion rehired Sproles. So, its leadership changes eliminated only Iranian-born company employees.

Then Volusion falsely stated to the public the reason Bardia, and implicitly I, were fired. In its public bankruptcy filing of November 2, 2020, signed by Troy Pike as, Interim Chief Executive Officer, Volusion stated:

> Despite the restructuring efforts of the Debtor, **the reconstituted Board and CRO did not receive sufficient collaboration or cooperation from certain members of then (pre-petition) existing management**. It became increasingly more difficult for the Board to fulfill its duties and take the steps necessary to maintain the value of the Debtor. The Debtor was **faced with disengaged and disobedient officers** and Secured Lenders who had already exercised remedies with regards to its matured loan facility. As a result, **the Debtor filed this Chapter 11 Case to prevent a foreclosure from occurring** and to effectuate a restructuring, which will leave the Debtor's balance sheet strong and allow the Debtor to effectively address its matured loan facility and prevent further exercise of remedies by the Secured Lenders.

(Emphasis added.).

Mr. Pike's statements in the November 2, 2020 filing are false. With the forbearance agreement in place, filing for bankruptcy when Volusion did was not necessary to prevent foreclosure. The "disengaged and disobedient" reference to Bardia is contrary to Volusion's "answers" shortly after firing him and is a lie Volusion is telling as a pretext for firing Bardia Dejban and me because of our national origin, because of my inconvenient and aggravating (to the New Leaders) pregnancy, and because of Bardia's inconvenient and aggravating (to the New Leaders) efforts to care for the serious medical issues of his young sons during the COVID-19 pandemic.

## DISCRIMINATION STATEMENT

I believe I have been discriminated against and terminated by Volusion because of my national origin and my pregnancy (which Volusion regarded as a diability) in violation of Title VII of the Civil Rights Act of 1964, the California Fair Employment and Housing Act ("CFEHA"), Government Code Section 12900, *et seq.*, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.* as amended,

My name is Bahar Dejban, my date of birth is 1979, and my address is 16061 Royal Oak Drive, Encino, CA 91436, in the United States of America. I declare under penalty of perjury that the foregoing is true and correct.

20

Executed in Los Angeles County, State of California, on the 30th day of November 2020.

Bahar Dejban

## Damage Calculation for Bahar Dejban

| Bahar Dejban's birth year | 1979 |
|---|---|
| Date of Termination | July 27, 2020 |
| Age on Termination Date | 41 |
| Date of EEOC Charge / California Fair Employment and Housing Act Complaint (FEHA) | Not filed yet due to automatic stay |
| Date of Age 72 Retirement | 2051 |
| Annual Base Salary | $360,000 |
| Estimated trial date | January 27, 2023 |
| Years from termination date until trial | 2.5 years |
| Years from estimated trial date until retirement in 2051 | 28 years |
| Damages calculation (see calculations and explanation on page 2): | $9,250,000 |

DAMAGE CALCULATION – BAHAR DEJBAN – November 30, 2020                                    2

| I. | | **ECONOMIC LOSSES** | **$2,750,000** |
|---|---|---|---|
| | A. | Back Pay and Benefits: | $650,000[1] |
| | B. | Present Value[2] of Front Pay and Benefits: | $2,100,000[3] |
| II. | | **PUNITIVE DAMAGES (FEHA):** | **$5,000,000** |
| III. | | **COMPENSATORY DAMAGES (FEHA):** | **1,000,000** |
| IV. | | **ATTORNEY'S FEES & COSTS:** | **$500,000** |

**TOTAL DAMAGE ESTIMATE:**                              **$9,250,000**

---

[1] $360,000 x 2.5 = $900,000 minus mitigation estimate (2.5 x $100,000 = $250,000) = $650,000.

[2] Discounted to present value by means of the net discount method.

[3] $360,000 x 10.00 years = $3,600,000, minus mitigation estimate ($150,000 x 10.00 years = $1,500,000) = $2,100,000.

**<u>Exhibit C</u>**

**Proof of Claim No. 22**

<table>
<tr><td colspan="2">

**Fill in this information to identify the case:**

Debtor 1    Volusion, LLC

Debtor 2 (Spouse, if filing)

United States Bankruptcy Court for the:   Southern District of Texas

Case number   20-50082 (DRJ)

</td></tr>
</table>

United States Courts
Southern District of Texas
FILED

*November 30, 2020*

David J. Bradley, Clerk of Court

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| | | |
| --- | --- | --- |
| 1. | **Who is the current creditor?** | Bahar Dejban <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor   NA |
| 2. | **Has this claim been acquired from someone else?** | ☑ No <br> ☐ Yes. From whom? _____ |
| 3. | **Where should notices and payments to the creditor be sent?** <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> Hal K. Gillespie <br> Name <br> 4803 Gaston Ave. <br> Number     Street <br> Dallas, Texas 75246 <br> City     State     ZIP Code <br> Contact phone   (214) 415-7911 <br> Contact email   hkg@gillespiesanford.com <br><br> Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br> _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _    **Where should payments to the creditor be sent?** (if different) <br><br> Name <br><br> Number     Street <br><br> City     State     ZIP Code <br> Contact phone _____ <br> Contact email _____ |
| 4. | **Does this claim amend one already filed?** | ☑ No <br> ☐ Yes. Claim number on court claims registry (if known) _____    Filed on ___/___/___ <br>                                            MM / DD / YYYY |
| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No <br> ☐ Yes. Who made the earlier filing? _____ |

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |
| 7. **How much is the claim?** | $_____ 9,250,000 . **Does this amount include interest or other charges?**<br>☐ No<br>☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>Unlawful discrimination, retaliation and termination. |
| 9. **Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:** $_____<br>**Amount of the claim that is secured:** $_____<br>**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:** $_____<br><br>**Annual Interest Rate** (when case was filed)_____%<br>☐ Fixed<br>☐ Variable |
| 10. **Is this claim based on a lease?** | ☑ No<br>☐ Yes. Amount necessary to cure any default as of the date of the petition. $_____ |
| 11. **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

| | | |
|---|---|---|
| **12.** Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No | |
| | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☑ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   11/30/2020
                          MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| | |
|---|---|
| Name | Hal Keith Gillespie |
| | First name          Middle name                    Last name |
| Title | Attorney for Bahar Dejban |
| Company | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 3403 Gaston Avenue |
| | Number          Street |
| | Dallas, Texas 75246 |
| | City                          State          ZIP Code |
| Contact phone | (214) 415-7911          Email hkg@gillespiesanford.com |

Print          Save As...          Add Attachment          Reset

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | |

**California Fair Employment and Housing Act** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Cell Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Bahar Dejban** | **(818) 517-3244** | **1979** |

| Street Address | City, State and ZIP Code |
|---|---|
| **16061 Royal Oak Drive, Encino CA 91436** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **Volusion, LLC** | **About 170** | **972-371-5200** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1835-A Kramer Lane, Suite 100, Austin, TX 78758** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☒ NATIONAL ORIGIN
☒ RETALIATION ☐ AGE ☒ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: **June 23, 2020**   Latest: **July 27, 2020**

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

See Attachment A hereto.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **November 30, 2020**     *Charging Party Signature* <br> Date | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act
Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | |

**Texas Workforce Commission Civil Rights Division**     and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

_____    _____
Date                  *Charging Party Signature*

NOTARY – *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
*(month, day, year)*

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so <u>within 15 days</u> of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

1

**Attachment A**

## I.    **Personal Harm**

I am a female citizen of the United States and currently 41 years old. I was born in Tehran, Iran in 1979. My first name, Bahar, is a uniquely Iranian name. My highest level of formal education is a law degree from Loyola Law School, which I obtained in 2005.

### VOLUSION BACKGROUND

On January 29, 2015, Main Street Capital Corporation ("Main Street") announced it had recently led a new portfolio investment totaling $45.0 million of invested capital in Volusion, LLC ("Volusion"), with Main Street funding $31.5 million of the investment. The proceeds of the investment were used to provide capital to fund Volusion's near-term growth opportunities. Main Street's investment in Volusion included a combination of first-lien, senior secured term debt with equity warrant participation and a direct equity investment. In addition, Main Street and its co-investor provided Volusion a commitment for up to $10.0 million of additional capital to support its future growth opportunities and have the ability to fund additional capital in the future if needed to continue to support Volusion's growth. The press release for this transaction stated, "Main Street's investment supports Volusion's current management team, which retained majority equity ownership of the company."

### AT VOLUSION I WAS AN EMPLOYEE,
### NOT AN INDEPENDENT CONTRACTOR

I was General Counsel for Volusion, LLC ("Volusion"). I worked at Volusion as a lawyer, as its General Counsel. I was hired as the General Counsel of Volusion in March 2019. My hiring as General Counsel was approved by Volusion's Board of Managers, which at the time included Kevin Sproles (the founder and then the CEO and Dwayne Hyzak). I was a full-time employee, not an independent contractor. While I served as General Counsel of Volusion, Volusion had control of me. Volusion had the right to hire me, fire me, supervise me, and set my schedule. Also, in terms of economic realities, I was an employee and not a mere independent contractor as follows:

1. The kind of work I did as a lawyer, as General Counsel for Volusion, was typically done under the supervision of the COO and the CEO – as with my predecessor who was a full time salaried employee of Volusion. For the duration of my employment, I had a standing meeting with either the CEO or COO on Fridays at 11am CST to update on my work, provide advice and obtain approval. See #8 for list of work I was doing.

2. As General Counsel and c-suite employee, I was required to and possessed a high level of skill in my job with Volusion.

2

    a.  I was hired as a general counsel, requiring me to oversee and tend to matters in various areas of law.

    b.  I was also assigned various projects at the managerial level, and was brought into various arenas that are not typically general counsel work by multiple departments (See #8)

3.  While working for Volusion, Volusion – my employer – furnished the equipment I used and my place of work.

    a.  Volusion furnished all equipment and local office, including my private office;

    b.  The equipment furnished included, but was not limited to, the following:
        i.  A laptop and supporting equipment;
        ii.  A Volusion email address and signature line;
        iii.  A direct phone number at Volusion's headquarters which rang at my private office at that location;
        iv.  Access to Volusion's Google Drive
        v.  Access to Slack -- a communication app that was used at Volusion for people to communicate quickly and easily with each other. Slack allows the user to create groups, different channels, make phone calls and share documents.
        vi.  I was added to the same email/Slack channels that other employees were on such as All Hands, SM Beats, and HR emails. All Hands were company wide meetings where employees and leadership met to discuss company matters. SM Beats were similar. Bottom line -- these were company gatherings where all employees attended and I was also included in these.

4.  I was employed at Volusion from March 2019 until July 27, 2020.

5.  I was paid a monthly salary.  My pay was not tethered to any project or time limitation.  I was given work and responsibility as needed and was paid the same salary whether I put in 40, 60, or 80 hours per week.

6.        I was terminated abruptly by email on July 27, 2020 effective at 9:15 a.m. CST by the new CEO, Troy Pike, who was a member of the Board of Managers as of  June 9, 2020.  The letter from Mr. Pike falsely states, "The Board of Managers of Volusion, LLC ("Volusion") understands that you have been providing services to Volusion through an independent contractor relationship." During the time that Pike (along with the other two new members of the Board of Managers, Jeremy Rosenthal and Curt Lindeman) were over me at Volusion, I only talked to them once – a long phone call on June 23, 2020.  During that phone call, these guys asked about getting a copy of my contract and kept referring to me as outside counsel.  I kept correcting them and saying I was full time general counsel for Volusion. They referred to my pay as a retainer and I clarified that and said that I was paid a salary the same way that the previous GC was paid a salary, at the end of each month for work that I did for the previous month.  Mr. Pike sent two termination letters on July 27, 2020, as a transparent effort to call me an independent contractor.  He sent one termination letter to DK Strategic Solutions LLC and a second letter to Bahar Dejban.  He sent these as

attachments to an email sent at 6:04 p.m. on July 27, 2020, addressed "Dear Bahar," worded to try to make it sound like I had not been an employee of Volusion. Mr. Pike's email said:

> Thank you for your service to Volusion, LLC. Please find the attached letter (sic) which confirms the board's decision to sever its relationship with Dejban Law and DK Strategic Solutions. Please call me with any questions that you may have.

I was an at-will employee of Volusion, having no employment contract between myself and Volusion. There was a Independent Contractor Agreement between Volusion and DK Strategic Solutions, LLC signed by Bardia Dejban as COO of Volusion and by me on behalf of DK Strategic Solutions, LLC on March 15, 2019.

7.      I was entitled to whatever annual leave any other Volusion employee was entitled to. Every leader at Volusion was provided with the option for unlimited paid time off. Only non-exempt (hourly) employees would fill in timecards and time-off requests to reflect in pay checks. I was gone for 2 weeks in August 2019 and Volusion still paid me my full monthly salary.  I was a full-time employee and team member.

8.      My work was an integral part of the business of my employer, Volusion:  My work at Volusion included but was not limited to:

a. Reviewing, drafting and negotiating all contracts with vendors, customers, partners, and all other third parties.

b. Dealing with and managing all customer, vendor, partner and employee disputes.

c.  Managing and coordinating compliance requirements for the company including Privacy, Data and ADA.

d. Handling trademark and patent work.

e. Handling/managing most legal claims.  I handled and disposed of most matters in-house. Those few I could not handle with internal resources, I would would submit to insurance and/or outside counsel if applicable.  At the time of my termination I was managing the security breach that had occurred in October of 2019.  This included micro-managing the messaging and communication that was going on publicly and to our customers, both by Volusion's internal resources and coordinating with outside PR contractors.  This also included communicating with insurance, working with outside counsel, and managing a multimillion dollar class action that had been filed against Volusion.

f.  Working with the sales department on the implementation price changes, contract alterations, and various customer offerings.

g.  Working with the accounting department on whether we need to dispute or pay certain invoices, as well as managing certain vendor contracts.

h.  Working with the Billing department closely regarding any questions/concerns customers had with charges, managing responses, and dealing with billing/contractual disputes.

4

     i. Working with the Partner department on contract terms with our partners.

     j. Working with the marketing department on appropriate marketing methods that do not violate any anti-spam regulations, as well as addressing potential PR issues.

     k. Being generally available to all employees via email and/or phone and Slack for any questions and/or concerns they have.

     l. Assisting People and Culture with HR issues. At the time of my termination I was in the process of reviewing and updating the Employee Handbook for 2021. Prior to that I had assisted with updating our policies as they relate to Covid.

     m. Updating Volusion's online Terms of Service and Privacy Policies. I had recently updated those due to changes from CCPA as well as new Partner Program that we had initiated in approximately April of 2020.

     n. I had standing weekly meetings with either the COO or the CEO (every Friday at 11am CST) to provide an update on all of the above.

9.     The intention of the parties with respect to my status at Volusion was that I perform as an employee, notwithstanding the independent contractor agreement between Volusion and DK Strategic Solutions, LLC. Volusion intended to replace its former GC – who was a full time employee, when it hired me. I was personally approved by Volusion's Board of Managers to serve in this role. The role and expectations did not change from the previous GC to me. The job was, and continued to be, one of a full-time employee. Volusion believed – even at my termination – that I was an employee. Volusion sent a termination letter to me personally terminating my employment. They separately sent a letter to DK Strategic terminating that contract.

### NEW LEADERS COME TO VOLUSION AND FIRE ME ALMOST IMMEDIATELY DUE TO MY PREGNANCY AND IRANIAN DESCENT

     By May 2020, my twin brother, Volusion's CEO Bardia Dejban, had completely turned around Volusion's performance. By that time Volusion was for the first time in 4 years running a positive EBITDA, and we had focused it for maximizing revenue from its legacy product. We were on course to launch Volusion's new product. Under Bardia Dejban's leadership, Volusion's cash reserves had increased from about $4 million to nearly $8 million. As of this date, Volusion had about 170 employees. Of these employees, only two, myself and CEO Bardia Dejban, were of Iranian descent. We were both were born in Iran. I became the General Counsel of Volusion in March 2019, when Bardia Dejban was the company's COO.

     On June 9, 2020, Main Street's CEO, Dwayne Hyzak, notified Bardia Dejban along with Mr. Kein Sproles, Mr. Randon Kelly, and the Corporate Secretary of Volusion that it had changed the Board of Managers ("the Board") for Volusion and that the Board now was made up of Troy Pike, Jeremy Rosenthal, and Curt Lindeman. All three of these are Caucasian males, born in the United States.

Case 2:5-0a0s-5e0 20-003500i8n2 D Dooceummenetn t4 691 1/3004/a2h0 o TnX SBD b NytD 0T2X/2S6 o/2n1 0 1P/2ag6e/ 29 0 fP 2a6ge 9 of 26

5

In June 2020 I learned that the three new members of the Board of Managers were three men: Curt Lindeman, Jeremy Rosenthal and Troy Pike. Until that point, my performance for Volusion had been excellent, I had received very positive feedback about my performance and I had no performance issues. In fact, due at least in part to my performance, I had increasingly been given greater management duties as outlined above. I initially reported to the CEO (and Founder) of Volusion, Kevin Sproles and the COO of Volusion, my twin brother, Bardia Dejban. After Bardia Dejban became the CEO of Volusion, I reported to him directly.

After the new Board of Managers and CRO Tim Stallkamp arrived at Volusion, these four Caucasian born-in-the-United States males treated all the Volusion employees born in Iran badly, while treating born-in-the-United States employees of Volusion well. The New Leaders implemented a discriminatory double standard. While Pike, Rosenthal, Lindeman and Stallkamp (collectively the "New Leaders") were demanding, unreasonable, condescending, abrupt and rude toward me and the other Iranian born employee of Volusion, my brother, Bardia Dejban, the New Leaders treated the other Volusion leaders (non-Iranian born) politely and with deference. The remaining leadership at Volusion (non-Iranian born) were able to put off requests from the New Leaders for days and weeks. They could literally say, "I won't have time to talk until next week" and the response, time and again was "no problem. When next week." The demands on Bardia Dejban and me by the New Leaders, were abrupt, unreasonable and pretextual. The New Leaders made a deliberate effort to manufacture a false "reason" for termination so they could assert falsely that Bardia and I were "disengaged and disobedient officers." Although the New Leaders did not give me a reason for terminating me when they fired me by mail, "being disengaged and disobedient" is the false and pretextual reason that Volusion offered in its Disclosure Statement in Bankruptcy Court in the matter called In re Volusion, LLC, Chapter 11, Case No. 20-50082 (DRJ), in the United States Bankruptcy Court for the Southern District of Texas, Laredo Division.

From the time the New Leaders arrived at Volusion until my termination by letter on July 27, 2020, I was engaged, obedient and cooperative with the New Leaders, despite the fact that one or more of them often treated me in an arbitrary, demanding, inconsistent and disrespectful manner. Volusion engaged in a **pattern or practice** of retaliation and interference, not only punishing and firing Bardia Dejban for his protected efforts to care for my nephews, his young sons, but also retaliating against and firing me due to my pregnancy soon after it learned that I was pregnant.

Shortly after learning of the Board change, I informed the new members of the Board of Managers that I was pregnant and that I was experiencing complications from my pregnancy. They reacted negatively, regarded my pregnancy as a disability, refused to accommodate my pregnancy, and then they fired me due to my pregnancy and due to the fact that I was born in Iran. My brother and I were the only Iranian born employees of Volusion and the new Board cleaned house - firing us both by letter at the same moment - on July 27, 2020, effective at 9:15 a.m. Volusion used a pretext to cover up their discriminatory actions, falsely claiming that my brother and I were "disengaged and disobedient officers." Volusion replaced me with a non-pregnant male General Counsel.

6

### The New Leaders Begin to Set Up Bardia Dejban For Termination

The day after Bardia Dejban's first board meeting with the New Leaders, on Tuesday, June 16, 2020 at 9:35 PM, Jeremy Rosenthal sent Bardia Dejban an email with voluminous requests that would normally take weeks, and provided a deadline of next day Friday, by 2 PM CST. **This was a set up.** First, this began a pattern by the New Leaders of building a paper trail that they were seeking documents and trying to show they were not getting sufficient cooperation, despite prompt and diligent efforts by both Bardia Dejban and me. Second, the whole feverish document search was part of a pretext. Prior to Main Street inserting its handpicked board (Pike, Rosenthal and Lineman) and its CRO -- Stallkamp, not only was Main Street (through Main Street's CEO, no less) a board member, but Volusion's leaders had held multiple talks with Main Street and provided them with virtually all of the information that the New Leaders pressed to receive as if an emergency.

For the New Leaders to suddenly claim that they were in dire need of information and documents and that it had none in its possession after being interviewed and handpicked by Main Street, and presumably after they themselves considered the position they were being offered is incredible. They would have to claim that Main Street provided them with none of the information in its possession and that they never sought any in accepting positions as the top managers of Volusion. Their pretense that they took their positions without being provided with or seeking any information or documents which were in the direct possession of their employer (Main Street) defies credulity. Further, even assuming that the New Leaders were in need of anything and that there was some huge urgency to obtain it, they could obtain the information from their boss -- Main Street – and not declare an emergency that would override the efforts of the existing leaders of Volusion to run the company. The argument that these New Leaders walked onto their jobs sight unseen as the chief managers of a company in such dire straits that it was on the verge of bankruptcy is absurd.

Bardia Dejban replied to Rosenthal the next day before his 2 PM deadline. In the first reply by Bardia Dejban, he let them know he was taking my son to the doctor for an emergency, he had a severe ear infection and fever, and told Jeremy that he would reply as soon as he was back. Bardia Dejban's 9:18 AM email on June 17, 2020 said to Rosenthal:

Jeremy:

**Taking my son to the doctor, he has a severe ear infection.** I'll reply to your email immediately after I return.

Sincerely,

Bardia

(Emphasis added.)

Bardia Dejban's next email to Rosenthal was also ahead of his 2 pm deadline. CEO Dejban sent his email at 11:18 AM. It was an earnest attempt to cooperate and to work fast and also to remind the New Leaders of his sons' health issues and needs. CEO Dejban let them know that he was not allowing enough time to turnaround requests under normal circumstances, and that he was going through extraordinary circumstances. Historically, the information Rosenthal requested would take an 8-week process to turnaround. CEO Dejban reiterated his family responsibilities, to his boys, aged 2 and 7. Bardia Dejban's email to Rosenthal said:

Jeremy:

As CEO, I need to balance operating the company as well as fulfilling these requests. I'm a very hands on leader, which is part of the reason I was elevated to CEO. I take great care to be involved in and shape each part of the organization to assure that it is heading for success.

Regardless, in just 24 hours, I've now met with all parties requesting meetings and begun preparing next steps. Based on our meetings, I felt like we are being collaborative and communicating openly, something foundational to our <u>culture code</u>.

While I am giving you and Tim my highest priority, there are other business items that I cannot merely ignore. **I'm moving as fast as physically possible to compile information and populate drives.** I'll be able to create a Google Drive for the Board and begin populating the requested information by the end of business today. I'm targeting to have all requested information by the end of this week, possibly Friday AM in preparation for our meeting on Monday.

I would appreciate the opportunity to correct the record in regards to Conway Mackenzie. I did not report that the information was readily available, I let Tim know our form NDA was readily available and that we would begin our PCI procedure, which starts with a background check. This is something we have never bypassed as a PCI compliant organization. All contractors that have access to the information he is requesting must go through this process. Is your instruction that we bypass this security process? My concern is that doing so may jeopardize our compliance status while only saving a few days. Candidly, historical board members at Volusion have also gone through this background check.

Given that he had not specified a length of time, and had shortly before the call sent me his document requests, Tim seemed amenable to the 30 minute meeting. **On the items Tim requested, I just wanted to give some background. It took us over 8 weeks to deliver that information to Raymond James last year during our process. During that time, I was the person responsible for aggregating a significant majority of that information, and can do so efficiently. While I'll work to expedite this process, it is likely going to be in**

8

**batches over the next 4 weeks.** Also, Tim never requested to have unfettered access to anyone from leadership. Considering the above miscommunication, I will endeavor a better job of documenting future communications so as to avoid further miscommunication.

As I informed you during our meeting, based on the way Volusion has operated historically, I firmly believe that introducing and/or creating direct reports for Tim, or any of this structure by the management team at Volusion at this time will be incredibly disruptive, and will lead to a catastrophic deterioration in key metrics and hinder rock completion for the organization. This is the reason I asked to be allowed to think through how best to achieve this. I've been thinking through how to do this, and when, in an appropriate way. This will also personally tie me up with questions and uncertainties of the future of the organization, potentially leading to even further disruption and missed performance. This should be an area we dig into on Monday.

In general, **a majority of the management team is very focused and is taking on some additional roles, all part of the plan to rebuild the organization from within in preparation for our go-to-market with VOLT. There is an incredible new energy within the organization, but this is also an incredibly time consuming process for me, as CEO, to ramp up, cast vision and provide clear direction for each management team member, as well as establishing processes (EOS) as our guiding light to success for the organization.** As you stated, we want to all make Volusion successful. I ask a little of your indulgence considering my years of being immersed in this company, its business, and building its culture. **I'm taking your requests seriously and making them my top priority, while also balancing above. I also have to assure that this process does not interfere with my responsibilities to my two boys, aged 2 and 6.**

Sincerely,

Bardia

(Emphasis added.)

On June 18, 2020 Troy Pike texted Bardia Dejban at 6:48 PM, saying, "Please call me this evening if possible. If not possible, please let me know." CEO Dejban was still caring for his son with a severe ear infection. With COVID, Bardia's 2-year old's daycare was closed, so this became a huge challenge for his family, trying to provide different levels of care for a sick 7-year-old and demanding 2-year-old, combined with COVID and their underlying health conditions (severe asthma, food allergies). Bardia Dejban replied that evening: "With the kids. I can call you at 8 AM tomorrow."

Pike replied with pressure and a veiled threat: "My normal response would be yes, of course. But it is clear to me now that you aren't grasping how critical time is for you right now." CEO Dejban called Pike at 8 AM the next morning. He did not accept Bardia's call.

Then Pike sent CEO Dejban another text, making it sound like he failed to call him. Pike's text said: "Awaiting your call."

CEO Dejban called him again. He answered and was abusive. Pike told Bardia on the phone call: "Either you don't understand the gravity of the situation or you don't care." He also told Bardia, "There's a new sheriff in town."

This kind of talk was part of Pike's pattern and it was prompted by his national origin discrimination and his negative reaction to Bardia's efforts to care for the health of his family. Pike would pretend to be friendly then he would tell Bardia that he needed to do something right away or else. In that early phone call the morning of June 19, 2020, Pike asked Bardia to introduce Tim Stallkamp and Wayne Scott. Baradia did what he asked, and Bardia's response to Pike at 8:24 AM confirms that and notes his threat to Bardia:

> Troy:
> I committed to introducing Tim and Wayne, and I did. You rejected my call today.
> I don't understand why you have to threaten me?
>
> Sincerely, Bardia

On June 19, 2020, the New Leaders passed a "Unanimous Written Consent of the Board of Managers of Volusion, LLC," a document that was directly retaliatory to the efforts of Bardia Dejban to care for his sons' health issues during the pandemic – it severely limited his abilities to perform his job as CEO. Pike's email essentially admitted this retaliation. Pikes" June 19, 2020 (4:35:01 PM) email stated: "your insufficient level of responsiveness and execution on board directives causes the board great concern."

### The New Leaders' Campaign Against Me

On June 19, 2020, the New Leaders began a campaign against me. One of the New Leaders, Curt Lindeman, wrote to me, misstating my role (calling me "outside general counsel" when I was full time and not an "outside" General Counsel of Volusion). Lindeman's email (of 8:59 AM) said:

> I am one of the members of the Board of Managers of Volusion (the other 2 are copied on this email). The Board asked David Snyder (also copied), with Jackson Walker (company counsel), to contact you. **I understand that you are operating as the full-time outside general counsel of Volusion.** We really need you to at least touch base with David this morning (preferably within the hour) so we can start to understand the legal issues currently facing the company.

If there are significant legal issues that would prevent such a call this morning, we obviously need to know asap.

I look forward to working with you.

(Emphasis added.)

I responded to Lindeman on June 19, 2020 (at noon), referring to David Snyder as "David" as follows:

I emailed David for available times. **Unfortunately, I have personal medical issues to tend to as I am pregnant**. David is welcome to contact me directly. I will endeavor to connect with him at the first possible time.

Thank you for your consideration. I too look forward to working with you.

(Emphasis added.)

The New Leaders viewed the news that I was pregnant negatively and with hostility. None of the New Leaders ever congratulated me on my pregnancy, asked me about accommodations I would need or might need, or even asked me how far along I was in my pregnancy. This would have been the first step in a discussion about accommodations. In fact, none of the New Leaders ever mentioned my pregnancy except in a dismissive way that suggested that being pregnant was inconvenient and the same as not being pregnant but facing COVID issues with the rest of the population. Lindeman said he could "understand and sympathize with family obligations" and dismissed my pregnancy (and Bardia's son's health issues) by saying, "We are all trying to juggle family obligations during this strange time." Later he made a similar statement to CEO Bardia Dejban in a meeting when Bardia talked about the medical issues facing his sons that he was trying to handle. Lindeman said to Bardia, "We're all in the same boat."

On July 8, 2020 (at 4:44 PM) , Lindeman wrote a condescending, critical, and dismissive email to Bardia and me. Lindeman's email stated:

I can understand and sympathize with family obligations. **We are all trying to juggle family obligations with work during this strange time.** However, these delays by both you and Bahar for weeks are not acceptable. If these requests were made of me as a GC, I could send out the documents within minutes from anywhere there is a cell signal.

If you can't do it, please direct people on your team to send me the documents today.

I had not delayed anything for weeks.  I promptly responded, objecting to Lindeman's
email and pointing out my pregnancy and the fact that I had been experiencing complications
and difficulties with her pregnancy over the past weeks.  My email of July 8, 2020 (at 5:39 PM)
told Lindeman:

Curt,

**I do not appreciate your misrepresentations.**  This is the <u>first</u> request I have
received for contracts with major vendors or engagement letters with law firms. I
was asked for a list of law firms that are or have recently been engaged. And I
provided that to you last week.

**I also informed you in our conference call that I do not have access to
employment agreements, and nevertheless, you requested those from me.**

**Finally, I have been working full time for Volusion, and as I have told you, I
am pregnant and have experienced some complications and difficulties with
my pregnancy over the past weeks.** Regardless, I have continued to respond to
all of Tim's requests, including providing him with complete access to a drive of
intellectual property material along with corresponding engagement letters last
night.

I can get you the retainer agreements for lawyers I have engaged, other than the
patent lawyer which you now already have as of last night. I will have to search
for agreements with lawyers that were engaged prior to my employment but that
are still doing work for Volusion.

I take my job as General Counsel of Volusion VERY seriously and would
appreciate it if you wouldn't misstate things and conflate your previous role as GC
with the work I am doing. We have different jobs and obviously different styles. I
have and will continue to timely respond to all requests while managing my other
duties.

(Emphasis added.)  I copied all the New Leaders on this email.

None of the New Leaders responded with any effort to accommodate my
pregnancy and its complications.  Volusion's response, much like – "Oh, you're pregnant
– thanks for that information – you're fired – we will replace you with a non-pregnant
man" -- very shortly thereafter, was to fire me without providing me any reason and
without prior warning on July 27, 2020.

### Bardia's Written Notice to the New Leaders of FMLA/ FFRCA Needs

On July 8, 2020  CEO Dejban put the New Leaders on written notice that he was taking
time to care for his sons and that they suffered from "medical conditions that are directly

impacted by COVID-19 and Stage 5" (referring to the shutdown that caused serious issues with obtaining essential food for Bardia's sons that would not trigger severe allergic reactions). At 7:04 PM on July 8, 2020 Bardia sent this email to all 4 of the New Leaders:

> Curt, Troy, Jeremy and Tim:
>
> Replying to an email Tim had sent while I was on PTO.
>
> **Just getting back from my son's doctors appointment. Earlier today, Austin confirmed Stage 5 approaching within the next couple days if not tonight.** I am spending the remainder of the week working on Q3 priorities with the executive team, and **taking care of my family in preparation for Stage 5. As I mentioned before, my children have medical conditions that are directly impacted by COVID-19 and Stage 5.**
>
> Let's schedule a meeting by video for Monday, July 13th? I can free up any block of time that works for you. If we have time, I would also like to cover our VOLT go-to-market plans, including Q3 revenue stability, which I'm also finalizing.
>
> Sincerely,
>
> Bardia

(Emphasis added.)

None of the New Leaders responded with any effort to accommodate Bardia's FMLA/ FFRCA needs (instead, they responded with hostility). Jeremy Rosenthal's email to Bardia at 8:34 PM on July 8, 2020 deliberately missed the point – that Bardia's sons were especially impacted by COVID-19. Rosenthal glibly said, "Please stay safe. We understand that with Covid this is a very challenging time." Generally, the emails from the New Leaders treated Bardia's efforts to take care of his family as an inconvenience and/or as a lack of cooperation. Volusion's ultimate response, very shortly thereafter, was to fire CEO Dejban, as it fired me, without providing any reason and without prior warning on July 27, 2020.

On July 13, 2020 via Bardia's 7:55 AM email, Bardia put the New Leaders on further written notice of his FMLA/ FFRCA needs. Bardia sent them this email letter:

> Curt, Jeremy, Troy, Tim:
>
> Wanted to get this to you first thing this AM. I mentioned Friday that I would be working over the weekend on various initiatives. As you know, Volusion measures success based on our 5+1. If you look at our financials and board materials, we have been targeting and exceeding EBITDA margin goals since Q4 2019; with Net Income posted in May for first time in over a year. Additionally,

we have brought revenue green shoots online for partner and ecosystem lines, all part of the plan we had laid out late last year. While it's been great to see our plan working, we still have immediate revenue stabilization initiatives targeting ~$500k additional revenue through Q4. But our largest revenue driver will be VOLT GTM.

There are also key elements of the revenue stability plan and our VOLT GTM that need to be detailed. The management team feels that we are on the right path and results are already validating that belief. Our CFO had mentioned to Tim that he would have models by July 24th, which I've attempted to help accelerate. We are also finalizing June numbers this week. Once I receive all of those pieces of information, I'll need to incorporate them into the board presentation as well as implement into the overall organizational plans.

**At the same time I need to bring to your attention that my time this week will be diverted to speaking with several members of the leadership team in an effort to ameliorate some of the damage and reduce the anxiety that has occurred by the recent events. Of particular concern is the effect that Tim's communications have had on the management team. He has not only injected derogatory information, which is frankly unnecessary, but also has shared a board resolution document. To put it simply, they are now uncertain of the future of Volusion and their own commitment to what has been a less than clear and mixed message. This has significantly impacted the work environment, including directly impacting Q3 rocks.** The team as you must know, are critical members of the organization who were contacted against my advice and counsel.

Finally, it has been brought to my attention that legal representatives of various entities will be having a discussion tomorrow at 4 CST. I feel caught in the middle of this, but more importantly, need to have some understanding of what is going on so I can effectively perform my duties and continue the turnaround. Truthfully, I am also separately troubled by the fact that the board, two members of which are attorneys, along with their counsel wish to have a meeting with me and insisting that I appear without counsel. I am extremely uncomfortable with the legal maneuvering and factions, and must admit that I am completely out of my element. It is crucial that I focus on my job to keep moving Volusion to increased profitability and growth, and leave the legal matters to the experts, at least until I have better clarity.

**Personally, as I have mentioned, COVID-19 continues to cause extreme uncertainty and anxiety for my family, especially given my young sons' health issues.** Also as I wrote Friday, Austin will be moved back to a Stage 5. Given all of these considerations combined with COVID-related family issues, I am asking that you move our meeting to the end-of-the month. In the meantime I

14

will speak with Tim as scheduled this morning who I'm sure will report back on our conversation.

Sincerely,

Bardia

(Emphasis added.)

None of the New Leaders responded with any effort to accommodate Bardia's FMLA/ FFRCA needs.  Emails from the New Leaders treated Bardia's efforts to take care of his family as an inconvenience and as a lack of cooperation. Volusion's ultimate response, very shortly thereafter, was to fire Bardia and me without providing any reason and without prior warning on July 27, 2020.

### The New Leaders Terminate Bardia and Me
### And Try To Cover Up Bardia's National Origin

On July 17, 2020, Bardia Dejban attended another Board meeting.  Nothing was said at that meeting to alert him to the fact that the New Leaders were about to fire him, Kevin Sproles and me and to put Volusion in bankruptcy, despite the fact that Volusion was doing well as a business and did not need to take bankruptcy to avoid foreclosure.

On July 23, 2020 at 1:46 PM, Stallkamp emailed me about patent attorneys.  At 2:21 PM, Bardia emailed the New Leaders about the Board Meeting agenda for the board meeting that would take place later in the day.  Bardia's email to them said:

Troy, Jeremy, Curt:

The agenda for today's call will be to focus on Q2 2020 preliminary 5+1 impact.
If we have time, I'd also like to discuss VOLT.

I'm also attaching/responding to the the following requests:

Volusion feature matrix (attached)

Market penetration in Apparel category

_      23% of our customers are in this segment today

-      $2m-50m GMV apparel merchants in U.S. is ~1,237

-      We have 200 today (16% market penetration)

Sincerely, Bardia

Troy Pike emailed back to Bardia in response five minutes later without any hint that anything was afoot. Pike's 2:26 PM email said:

> Thank you, Bardia. We should also reserve five minutes to discuss the
> forbearance agreement and its objectives.
> Best,
> Troy

Pike's reference to the forbearance agreement related to the agreement Main Street, Volusion's lender, had made that it would not seek to foreclose on the loan due to default on payment obligations by Volusion. Despite this agreement, Tim Stallkamp (CRO) told Bardia shortly before the Board meeting that he needed someone to wire over $800,000 to Main Street as a peace offering. He also said the Board gave him authority to sign the agreement but not to wire the funds. Bardia asked why we had to pay anything to Main Street since Volusion had a forbearance back in April. Stallkamp said it was different now that the new Board was here. Bardia told him he would need to follow up with Kevin Sproles, the founder since Bardia did not have bank account access. Tim told Bardia that Main Street would take action against Volusion if it did not do so by end of week. That made no sense in light of the forbearance agreement, and Stallkamp's suggestion that Bardia wire this money was a transparent effort to set up Bardia with a pretext to justify termination.

What Stallkamp was saying to Bardia before the July 23 Board meeting was a transparent attempt to set up Bardia as a pretext for firing him to cover up unlawful reasons. This was obvious for several reasons. First, Bardia had no rights over bank accounts. Second, the Board's resolutions made Stallkamp the boss of finance and the direct boss of Volusion's Director of Finance. Third, as Stallkamp knew, under the Board's resolutions, Bardia was not authorized to spend more than $25,000. Fourth, if Main Street was going to foreclose on its loan, it would not have gone through the time and expense of putting the New Leaders in place. If that was the plan, Main Street would have just foreclosed. It would just send Volusion a letter saying send us a specific amount of money, or we're going to foreclose. It had not done so. Fifth, as an officer of Volusion, Bardia had had an obligation to protect the company and the majority shareholder, and Volusion had a forbearance with Main Street.

The Board meeting on Thursday, July 23, 2020 lasted less than 35 minutes. Stallkamp and his assistant joined this Board call as well. Bardia had let them know that he would taking PTO (Paid Time Off) on Friday, to help with his boys' medical issues. They said nothing positive and seemed unhappy about this development, like they were tired of dealing with this inconvenience.

At the Board meeting of July 23, none of the New Leaders mentioned anything about Volusion filing for bankruptcy. They did not mention that they were considering firing me. They did not mention they were considering firing the Founder, Kevin Sproles. They did not mention that they were considering firing CEO Bardia Dejban or that this would be his last work day as an employee of Volusion.

At the July 23 Board meeting, Bardia went through the details he had proposed in the agenda he had sent them before the meeting. The Board started by asking if they should discuss the payment to Main Street first, and Bardia recommended moving along with the agenda he had proposed. The Board seemed disinterested in any topics Bardia discussed, then the Board switched topics and asked Bardia to wire the money to Mainstreet Capital. Bardia told them he did not want to be put in the middle of Main Street and the founder (Kevin Sproles) and that he would need to talk with Kevin to understand where that all stood. Jeremy Rosenthal and Curt Lindeman asked Bardia, "as the highest-ranking officer, you can't wire this payment?" Bardia told them that he would follow-up after he had a chance to speak with the founder (who had bank account access) because Bardia didn't want to get in the middle of legal challenges between the founder and Main Street. The last thing Troy Pike said was at the Board meeting was, "Gentlemen, the three of us should discuss what is going to happen Monday when Main Street doesn't receive their payment." Jeremy Rosenthal closed the meeting by saying "Thanks for your time Bardia."

At 5:53 pm, I responded to Stallkamp's email – all in a normal, business-like way.

I got no communication from any of the New Leaders after the Thursday, June 23, 2020 Board meeting.

### The New Leaders Terminate Bardia and Me
### And Try To Cover Up Our National Origin and Because of My Pregnancy

On July 27, 2020, Troy Pike notified Bardia that he was fired by email. His email enclosed a termination letter. It did not provide a reason for termination.

Troy Pike also notified me on July 27, 2020 by email that I was fired. He did so in a way that was calculated to try to make it appear that I was not an employee, but merely an independent contractor – which is false. First, by electronic mail Pike sent a message to "DK Strategic Solutions LLC" that falsely stated, "The Board of Managers of Volusion, LLC ("Volusion") understands that you have been providing services to Volusion through an independent contractor relationship." I had specifically confirmed to the New Leaders that I was a full time employee, the General Counsel, and not "outside counsel." Then Pike's letter said:

This letter serves as notice that your contractual, and any other relationship you have with Volusion, ended effective as of 9:15 a.m. Central Standard Time on July 27, 2020 (the "Termination Time"). After the Termination Time, you will no longer be entitled to any further compensation or benefits from Volusion and are no longer authorized to act on behalf of Volusion or represent yourself to be an agent of Volusion. Also, you are no longer authorized to access any Volusion systems or accounts, including but not limited to email systems, voicemail systems, document management systems and financial accounts.

Knowing that Volusion had not been dealing with "DK Strategic Solutions LLC," but with me, Pike simultaneously sent a letter to me, "Bahar Dejban." Pike's letter contained the same false independent contractor sentence and the other information about "notice that your

contractual, and any other relationship you have with Volusion, ended effective as of 9:15 a.m. Central Standard Time on July 27, 2020" as his letter to DK Strategic Solutions LLC. None of the New Leaders, and nobody on behalf of Volusion called me or contacted me otherwise about my termination. Volusion did not provide a reason for terminating me.

The New Leaders promptly took actions and made statements that show the termination decision was motivated by my pregnancy and by hostility to the national origin of two of the three people (Bardia Dejban and me) that it fired in "leadership changes" it connected to its filing for bankruptcy the same day that it fired Bardia Dejban, Kevin Sproles, and me.

First, on information and belief, Volusion selected a non-pregnant male, David Snyder, to replace me as General Counsel.

Second, to make it seem like nothing was "wrong" at Volusion, the Company published information about its Chapter 11 bankruptcy filing under the heading "Frequently Asked Questions." Voluson's "answers" did not hint that the "reason" for firing Bardia Dejban or me was that it was facing "disengaged and disobedient officers." I have a distinctly Iranian name – Bahar Dejban. Volusion did not mention it in its "answers." Nor did it mention that it had fired Volusion's General Counsel. Volusion falsely stated that to get bankruptcy protection in place for Volusion,

> we made some difficult, but necessary and immediate leadership changes.
> **Effective July 27, Kevin Sproles and Bardia Dejban are no longer with the company**. We know this may have a personal impact on some of you with long-standing relationships, as well as to our tight-knit organization overall. **Kevin and Bardia have been important leaders at Volusion and we are tremendously thankful for their significant contributions.** While they are no longer formally a part of Volusion, the belief in the company, **the importance of the culture and the mission they inspired will remain.** Our goal is to honor what they helped to create by making sure the restructuring process is successful and Volusion can thrive going forward.

(Emphasis added.)

As for the "reason" for the bankruptcy and its timing, Volusion's "answers" stated: "The company has matured debt and has not been able to make repayment terms." The "answers" did not assert the reason was insufficient collaboration or cooperation from any of existing management or that it was faced with "disengaged and disobedient officers."

Third, at about the same time, Volusion took a deliberate action (when coupled with its act of hiding my name as it fired me) to hide my Iranian national origin from the public. When Bardia became CEO of Volusion, the company posted a letter from Bardia on its blog, for the viewing world's information. The title of the letter was "Day One – New CEO / Volusion." Page 1 of that letter contained this:

18



Dear Founders, Partners and Employees:

As I take this new role of CEO, I look back at the past three years and am thankful for the opportunity to work with so many of you directly. Today is an exciting and humbling day for me, and even though I've been a part of all the amazing changes at Volusion these past few years, it feels very much like a brand new day. Like all of you, I have a choice in what I do, and choosing Volusion to be a part of my future has very much been shaped by my past as well as my passion for entrepreneurship. These values are shared not only with our founder, Kevin, but also reJected by everything we do as an organization.

**I came to the United States in 1979 to escape turbulent times from Iran and grew up in Southern California.** I come from a hardworking family with the grit to launch and grow their own businesses. I've launched my own successful companies, brought hundreds of products to market, and have helped other founders and entrepreneurs do the same. I'm a devoted technologist with a diverse product and engineering background and have solid business experience (including failures). More importantly, I have a deep understanding of the needs of our thousands of customers and take great pride in helping them succeed. I currently live in Austin, Texas with my wife of eight years, two boys and 15-year old Jack Russell Terrier.

(Emphasis added.)

During Bardia's tenure with Volusion since he began in January 2016, when an employee left Volusion, Volusion left their articles and content live on its digital footprint, most often times under their name. This was Volusion's way of honoring them and showing off the talent and culture of the company. **Within a week or two of Bardia's firing, Volusion removed his "Day One" letter from its website.**

Shortly after firing the company's only Iranian-born employees, Bardia Dejban and me on July 27, 2019, and announcing to the world that its "immediate and necessary leadership change" including Kevin Sproles no longer being with the company, Volusion rehired Sproles. So, its leadership changes eliminated only Iranian-born company employees.

Then Volusion falsely stated to the public the reason Bardia, and implicitly I, were fired. In its public bankruptcy filing of November 2, 2020, signed by Troy Pike as, Interim Chief Executive Officer, Volusion stated:

> Despite the restructuring efforts of the Debtor, **the reconstituted Board and CRO did not receive sufficient collaboration or cooperation from certain members of then (pre-petition) existing management**. It became increasingly more difficult for the Board to fulfill its duties and take the steps necessary to maintain the value of the Debtor. The Debtor was **faced with disengaged and disobedient officers** and Secured Lenders who had already exercised remedies with regards to its matured loan facility. As a result, **the Debtor filed this Chapter 11 Case to prevent a foreclosure from occurring** and to effectuate a restructuring, which will leave the Debtor's balance sheet strong and allow the Debtor to effectively address its matured loan facility and prevent further exercise of remedies by the Secured Lenders.

(Emphasis added.).

Mr. Pike's statements in the November 2, 2020 filing are false. With the forbearance agreement in place, filing for bankruptcy when Volusion did was not necessary to prevent foreclosure. The "disengaged and disobedient" reference to Bardia is contrary to Volusion's "answers" shortly after firing him and is a lie Volusion is telling as a pretext for firing Bardia Dejban and me because of our national origin, because of my inconvenient and aggravating (to the New Leaders) pregnancy, and because of Bardia's inconvenient and aggravating (to the New Leaders) efforts to care for the serious medical issues of his young sons during the COVID-19 pandemic.

## DISCRIMINATION STATEMENT

I believe I have been discriminated against and terminated by Volusion because of my national origin and my pregnancy (which Volusion regarded as a diability) in violation of Title VII of the Civil Rights Act of 1964, the California Fair Employment and Housing Act ("CFEHA"), Government Code Section 12900, *et seq.*, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, *et seq.* as amended,

My name is Bahar Dejban, my date of birth is 1979, and my address is 16061 Royal Oak Drive, Encino, CA 91436, in the United States of America. I declare under penalty of perjury that the foregoing is true and correct.

20

Executed in Los Angeles County, State of California, on the 30th day of November 2020.

Bahar Dejban

## Exhibit D

**Independent Contractor Agreement**



## INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement (the "Agreement") shall replace all previous agreements, including the Independent Contractor Agreement (the "Prior Agreement") made and entered into as of the 14th day of March, 2019 and the Addendum to Independent Contractor Agreement (the "Addendum") made and entered into as of the 30th day of May, 2019 by and between **Volusion, LLC**, a Delaware limited liability company ("Company"), and **DK Strategic Solutions, LLC**, a Delaware limited liability company ("Contractor").  The Company desires to retain Contractor as an independent contractor to perform consulting services for Company and Contractor is willing to perform such services, on terms set forth more fully below.  In consideration of the mutual promises contained herein, the parties agree as follows:

### 1. <u>SERVICES AND COMPENSATION</u>

This Agreement shall amend and alter the Prior Agreement and Addendum in order to retain the following Services:

(a)     Contractor agrees to perform for Company the services ("Services") described in Exhibits A and B attached hereto.

(b)     Company agrees to pay Contractor the compensation set forth in Exhibit A and B for the performance of the Services.

### 2. <u>CONFIDENTIALITY</u>

(a)  <u>Definition</u>.  "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customers, customer lists, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed by Company either directly or indirectly in writing, orally or by drawings or inspection of parts or equipment.

(b)  <u>Non-Use and Non-Disclosure</u>.  Contractor will not, during or subsequent to the term of this Agreement, use Company's Confidential Information for any purpose whatsoever other than the performance of the Services on behalf of Company or disclose Company's Confidential Information to any third party.  It is understood that said Confidential Information shall remain the sole property of Company.  Contractor further agrees to take all reasonable precautions to prevent any unauthorized disclosure of such Confidential Information including, but not limited to, having each employee of Contractor, if any, with access to any Confidential Information, execute a nondisclosure agreement containing provisions in Company's favor identical to Section 1 of this Agreement.  Confidential

1

Information does not include information which: (i) is known to Contractor at the time of disclosure to Contractor by Company as evidenced by written records of Contractor; (ii) has become publicly known and made generally available through no wrongful act of Contractor; or (iii) has been rightfully received by Contractor from a third party who is authorized to make such disclosure. Without Company's prior written approval, Contractor will not directly or indirectly disclose to anyone the existence of this Agreement or the fact that Contractor has this arrangement with Company.

(c)  <u>Third Party Confidential Information</u>.  Contractor recognizes that Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes.  Contractor agrees that Contractor owes Company and such third parties, during the term of this Agreement and thereafter, a duty to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out the Services for Company consistent with Company's agreement with such third party.

(d)  <u>Other Contractor Confidential Information</u>.  Contractor agrees that Contractor will not, during the term of this Agreement, improperly use or disclose any proprietary information or trade secrets of any third party with which Contractor has an agreement or duty to keep in confidence information acquired by Contractor, if any, and that Contractor will not bring onto the premises of Company any unpublished document or proprietary information belonging to such party unless consented to in writing by such party.  Contractor will indemnify Company and hold it harmless from and against all claims, liabilities, damages and expenses, including reasonable attorneys fees and costs of suit, arising out of or in connection with any alleged or actual violation or misappropriation of a third party's rights resulting in whole or in part from Company's use of the work product of Contractor under this Agreement.

(e)  <u>Return of Materials</u>.  Upon the termination of this Agreement, or upon Company's earlier request, Contractor will deliver to Company all of Company's property or Confidential Information that Contractor may have in Contractor's possession or control.

3.  **<u>OWNERSHIP</u>**

(a)  <u>Assignment</u>.  Contractor agrees that all copyrightable material, notes, records, drawings, designs, inventions, improvements, developments, discoveries and trade secrets (collectively, "Work Product") conceived, discovered, developed or reduced to practice by Contractor, solely or in collaboration with others, during the term of this Agreement which relate in any manner to the business of the Company that Contractor may be directed to undertake, investigate or experiment with, or which Contractor may become associated with in work, investigation or experimentation in Company's line of business in performing the Services hereunder, are the sole property of Company.  Contractor further agrees to assign (or cause to be assigned) and does hereby assign fully to Company all Work Product and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. Contractor hereby waives any and all moral rights.

2

(b)  <u>Further Assurances</u>.  Contractor agrees to assist the Company, or its designee, at Company's expense, in every proper way to secure Company's rights in the Work Product and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to Company, its successors, assigns and nominees the sole and exclusive right, title and interest in and to such Work Product, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.  Contractor further agrees that Contractor's obligation to execute or cause to be executed, when it is in Contractor's power to do so, any such instrument or papers shall continue after the termination of this Agreement.

(c)  <u>Pre-Existing Materials</u>.  Contractor agrees that if in the course of performing the Services, Contractor incorporates into any Work Product developed hereunder any invention, improvement, development, concept, discovery or other proprietary information owned by Contractor or in which Contractor has an interest: (i) Contractor shall inform Company, in writing before incorporating such invention, improvement, development, concept, discovery or other proprietary information into any Work Product; and (ii) Company is hereby granted and shall have a nonexclusive, royalty-free, perpetual, irrevocable, worldwide license to use, perform, display, make, reproduce, make derivative works, import, sell, offer for sale, license, distribute, and otherwise dispose of such invention, improvement, development, concept, discovery or other proprietary information as part of or in connection with such Work Product, with the right to license such rights to others.  Contractor shall not incorporate any invention, improvement, development, concept, discovery or other proprietary information owned by any third party into any Invention without Company's prior written permission.

## 4.  **WARRANTIES**

(a)  <u>Contractor Warranty</u>.  Contractor shall perform the obligations described herein in a good and workmanlike manner with due diligence and in full compliance with the terms and conditions of this Agreement and all mutually agreed to specifications, statements of work, and acceptance criteria. Contractor, at its expense, shall use reasonable efforts to correct any Services or Work Product performed by or delivered by Contractor that do not conform to the foregoing warranty.

(b)  <u>Further Warranties.</u> Contractor further warrants that: (i) the Work Product is or will be original to Contractor; (ii) Contractor has not previously granted and will not grant any rights in the Work Product to any third party that are inconsistent with the rights granted to Company herein; (iii) each of Contractor's employees, consultants, contractors, partners, or agents who has been or will be involved in the performance of the Services has or will have signed an agreement with Contractor conveying all proprietary and intellectual property rights in or relating to the Work Product to Contractor and agreeing to maintain in confidence all trade secrets and non-Contractor proprietary information embodied in the Work Product or acquired while performing the Services or having access to Work Product; (iv) all Work Product, and the intended uses thereof, shall be free of any third party claims with respect to intellectual property or other proprietary rights and shall be free of any third

3

party liens, encumbrances, security interests, or any similar restrictions; (v) unless provided by Company, Contractor will provide all necessary personnel, facilities, and materials to facilitate efficient and effective completion of the Services; (vi) Contractor will exert Contractor's best efforts to use a repeatable and proven process to design, develop, test, deliver, and document the Work Product, or any part thereof; and (vii) Contractor has full power and authority to enter into this Agreement, to carry out its obligations under this Agreement and to grant the rights granted to Company hereunder.

(c)  <u>Warranty Indemnity</u>.  Contractor shall indemnify and hold Company harmless from and against any claims, damages, or liabilities resulting from Contractor's breach of the foregoing warranties.

## 5.  CONFLICTING OBLIGATIONS

(a)  Contractor certifies that Contractor has no outstanding agreement or obligation that is in conflict with any of the provisions of this Agreement, or that would preclude Contractor from complying with the provisions hereof, and further certifies that Contractor will not enter into any such conflicting agreement during the term of this Agreement.

(b)  In view of Contractor's access to Company's trade secrets and proprietary know-how, Contractor further agrees that Contractor will not, without Company's prior written consent, design identical or substantially similar designs as any that may be developed in connection with this Agreement for any third party during the term of this Agreement and for a period of twelve (12) months after the termination of this Agreement. Contractor acknowledges that the obligations in this Section 5 are ancillary to Contractor's nondisclosure obligations under Section 1.

## 6.  REPORTS

Contractor agrees that he will from time to time during the term of this Agreement or any extension thereof keep Company advised as to Contractor's progress in performing the Services hereunder and that Contractor will, as requested by Company, prepare written reports with respect thereto.  It is understood that the time required in the preparation of such written reports shall be considered time devoted to the performance of Contractor's Services.

## 7.  TERM AND TERMINATION

(a)  <u>Term</u>.  This Agreement will commence on the date first written above and will continue until the earlier of: (i) final completion of the Services; or (ii) termination as provided below.

(b)  <u>Termination</u>.  Company may terminate this Agreement upon giving seven (7) days prior written notice thereof to Contractor. Company may terminate this Agreement immediately and without prior

4

notice if Contractor refuses to or is unable to perform the Services or is in breach of any material provision of this Agreement.

(c)  Survival.  Upon termination of this Agreement pursuant to Section 7(a) or (b), all rights and duties of the parties toward each other shall cease except:

(i)     that Company shall be obliged to pay, within thirty (30) days of the effective date of termination, all amounts owing to Contractor for Services completed and accepted by Company prior to the termination date and related expenses, if any, in accordance with the provisions of Section Error! Reference source not found.; and

(ii)     Sections 1 (Confidentiality), 2 (Ownership), 4 (Warranties), 5 (Conflicting Obligations), 8 (Independent Contractor), and 11 (Arbitration and Equitable Relief) shall survive termination of this Agreement.

## 8.  ASSIGNMENT

Neither this Agreement nor any right hereunder or interest herein may be assigned or transferred by Contractor without the express written consent of Company.  Company may assign this Agreement in its discretion.

## 9.  INDEPENDENT CONTRACTOR

(a)  Nature of Relationship.  It is the express intention of the parties that Contractor is an independent contractor.  Nothing in this Agreement shall in any way be construed to constitute Contractor as an agent, employee or representative of Company, but Contractor shall perform the Services hereunder as an independent contractor.  Contractor agrees to furnish (or reimburse the Company for) all tools and materials necessary to accomplish this contract, and shall incur all expenses associated with performance, except as expressly provided on Exhibit A of this Agreement. Contractor acknowledges and agrees that Contractor is obligated to report as income all compensation received by Contractor pursuant to this Agreement, and Contractor agrees to and acknowledges the obligation to pay all self-employment and other taxes thereon.

(b)  Independent Contractor Indemnification.  Contractor agrees to indemnify and hold harmless Company and its directors, officers and employees from and against all taxes, losses, damages, liabilities, costs and expenses, including attorneys' fees and other legal expenses, arising directly or indirectly from or in connection with: (i) any negligent, reckless or intentionally wrongful act of Contractor or Contractor's assistants, employees or agents; (ii) a determination by a court or agency that Contractor is not an independent contractor; (iii) any breach by Contractor or Contractor's assistants, employees or agents of any of the covenants contained in this Agreement; (iv) any failure of Contractor to perform the Services in accordance with all applicable laws, rules and regulations; or (v) any violation or claimed violation of a third party's rights resulting in whole or in part from Company's

INDEPENDENT CONTRACTOR AGREEMENT
VOLUSION, LLC CONFIDENTIAL

use of the work product of Contractor under this Agreement.

10.   **BENEFITS**

Contractor acknowledges and agrees and it is the intent of the parties hereto that neither Contractor nor any employees or contractors of Contractor receive any Company-sponsored benefits from Company either as a consultant or employee.  Such benefits include, but are not limited to, paid vacation, sick leave, medical insurance, and 401(k) participation.  If Contractor is reclassified by a state or federal agency or court as an employee, Contractor will become a reclassified employee and will receive no benefits except those mandated by state or federal law, even if by the terms of Company's benefit plans in effect at the time of such reclassification Contractor would otherwise be eligible for such benefits.

11.   **ARBITRATION AND EQUITABLE RELIEF**

(a)  <u>Disputes</u>.  Except as provided in Section 11(d), Company and Contractor agree that any dispute or controversy arising out of, relating to or in connection with the interpretation, validity, construction, performance, breach or termination of this Agreement shall be settled by binding arbitration to be held in Travis County, Texas, in accordance with the rules then in effect of the American Arbitration Association.  The arbitrator may grant injunctions or other relief in such dispute or controversy.  The decision of the arbitrator shall be final, conclusive and binding on the parties to the arbitration.   Judgment may be entered on the arbitrator's decision in any court of competent jurisdiction.

(b)  <u>Consent to Personal Jurisdiction</u>.  The arbitrator(s) shall apply Texas law to the merits of any dispute or claim, without reference to conflicts of law rules.  Contractor hereby consents to the personal jurisdiction of the state and federal courts located in Travis County, Texas for any action or proceeding arising from or relating to this Agreement or relating to any arbitration in which the parties are participants.

(c)  <u>Costs</u>.  Company and Contractor shall each pay one-half of the costs and expenses of such arbitration, and each shall separately pay its counsel fees and expenses unless otherwise required by law.

(d)  <u>Equitable Relief</u>.  The parties may apply to any court of competent jurisdiction for a temporary restraining order, preliminary injunction, or other interim or conservatory relief, as necessary, without breach of this arbitration agreement and without abridgment of the powers of the arbitrator.

(e)  <u>Acknowledgment</u>.  CONTRACTOR HAS READ AND UNDERSTANDS SECTION 11, WHICH DISCUSSES ARBITRATION.   CONTRACTOR UNDERSTANDS THAT BY SIGNING THIS AGREEMENT, CONTRACTOR AGREES TO SUBMIT ANY CLAIMS ARISING OUT OF, RELATING TO, OR IN CONNECTION WITH THIS AGREEMENT, OR THE INTERPRETATION, VALIDITY, CONSTRUCTION, PERFORMANCE, BREACH OR TERMINATION THEREOF, TO BINDING

6

ARBITRATION, EXCEPT AS PROVIDED IN SECTION 11(d), AND THAT THIS ARBITRATION CLAUSE CONSTITUTES A WAIVER OF CONTRACTOR'S RIGHT TO A JURY TRIAL AND RELATES TO THE RESOLUTION OF ALL DISPUTES RELATING TO ALL ASPECTS OF THE RELATIONSHIP BETWEEN THE PARTIES.

## 12.  NON-SOLICITATION

For a period of two (2) years after the termination or expiration of this Agreement, Contractor shall not solicit any Company customer to sell any product or service similar to or relating to the Services provided hereunder, without the prior written consent of Company.

## 13.  GOVERNING LAW

This Agreement shall be governed by the internal substantive laws, but not the choice of law rules, of the State of Texas.

## 14.  ENTIRE AGREEMENT

This Agreement is the entire agreement of the parties and supersedes any prior agreements between them, whether written or oral, with respect to the subject matter hereof.  No waiver, alteration, or modification of any of the provisions of this Agreement shall be binding unless in writing and signed by Contractor and a duly authorized representative of Company.

## 15.  ATTORNEY'S FEES

In any court action at law or equity which is brought by one of the parties to enforce or interpret the provisions of this Agreement, the prevailing party will be entitled to reasonable attorney's fees, in addition to any other relief to which that party may be entitled.

## 16.  SEVERABILITY

The invalidity or unenforceability of any provision of this Agreement, or any terms thereof, shall not affect the validity of this Agreement as a whole, which shall at all times remain in full force and effect.

## 17.  NOTICES

Any notice shall be addressed to the party being notified at the address set forth in this Agreement or such other address as either party may notify the other of and shall be deemed given upon delivery if personally delivered or transmitted via facsimile or reliable overnight carrier (with tracking capability),

7

or forty-eight (48) hours after being deposited in the United States mail, postage prepaid, registered or certified mail, return receipt requested.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**Company:**

**VOLUSION, LLC**

By: _[signature]_

Print Name: Bardia Dejban

Title:      Chief Executive Officer

Date:      October 1, 2019

Address:   1835-A Kramer Lane, Suite 100

Austin, Texas 78758

**Contractor:**

**DK Strategic Solutions, LLC**

_[signature]_

Print Name: Bahar Dejban

Address: 16061 Royal Oak Rd.

Encino, California, 91436

8

## EXHIBIT A

## SERVICES AND COMPENSATION

1.    **Contact.**  Contractor's principal Company contact:

(a) **Name**:  Bahar Dejban

(b) **Title**:  Owner

2.    **Services**.  Contractor will render to the Company the following General Counsel Services:

(a)  Advising the Board of Managers, the Executive Team, and the staff of Company on any and all matters concerning Company on which the CEO and/or Founder authorize, and obtaining and submitting formal legal opinions whenever requested to do so, especially in the areas of Contracts and agreements; personnel, labor and employment; and environment.

(b)  At the discretion of Company's CEO and/or Founder, to provide a principal or representative to attend meetings of the Board of Managers, and if so appointed, will serve as corporate secretary, including drafting and distributing minutes to the Board of Managers for approval, and keeping the corporate minute books.

(c)  Review, editing, and management of new and active contracts, as requested by Company's CEO and/or Founder, including providing opinions and recommendations therefor.

(d)  Review and renewal of insurance policies, as requested by Company's CEO and/or Founder, including providing opinions and recommendations therefor.

(e)  Management of Company's trademark and patent applications, as requested by Company's CEO and/or Founder.

(f)  Management of Company's litigation matters, as requested by Company's CEO and/or Founder.

(g) Management of DMCA and third party trademark claims related to Company's hosting of third party content.

(h)  Review, editing, and management of policies and procedures, as requested by Company's CEO and/or Founder.

(i) Management of Company's compliance with applicable data security and privacy laws and regulations, including the General Data Protection Regulation ("GDPR") and the EU Privacy Shield.

9

3.      **<u>Compensation</u>**.  Contractor will receive the following compensation for the Services:

(a)  **Payment**: $30,000 per month as flat rate for services, only. Contractor shall also to be reimbursed for normal and necessary expenses including, but not limited to, travel and lodging, postage and shipping, supplies, meals, and such other expenses as approved by Company and/or its CEO and/or Founder.

(b)  **Records**: Contractor agrees to provide accurate and complete records regarding the performance of all Services for the Company.

10

INDEPENDENT CONTRACTOR AGREEMENT
VOLUSION, LLC CONFIDENTIAL

## EXHIBIT B

## SERVICES AND COMPENSATION

1.    **Contact.**  Contractor's principal Company contact:

(a) **Name**: Bahar Dejban

(b) **Title**: Owner

2.    **Services**.  Contractor will render to the Company the following Services:

(a) To review, manage and/or perform, and/or assist in the successful management, negotiation and execution of one or more transactions related to all matters related to any transaction involving Main Street Capital Corporation ("Main Street"), and HMS Income Fund, Inc. ("HMS");

(b) To assist Company in managing, overseeing, and supervising corporate development for Company, including, but not limited to:

(i) To assist Company in the planning, development, and implementation of strategies to identify and evaluate financing sources for Company, including, but not limited to sources that will either directly or indirectly provide investment capital, provide new financing or replace existing financing;

(ii) To assist Company in planning, and evaluating Company's debt load, including advising Company on adding, altering, and/or rearranging its current capital structure, and assist in the determination of an appropriate capital and debt structure;

(iii) To assist Company in negotiating with its current investors, creditors, and other holders of securities, in order to allow for the procurement and implementation of new capital either through investment or debt or any other form;

(iii) To assist Company in planning, developing, and implementing to completion the procurement of capital, including assisting Company in structuring the capital;

(iv) To assist Company in identifying, contacting, and negotiating with potential investors and/or lenders.

(c) To manage and/or oversee and/or supervise and/or direct the partner and/or partner marketing department at Company, including, but not limited to:

(i) Planning, developing, and executing of various marketing and sales strategies;

(ii) Planning, developing, implementing and overseeing all marketing and advertising campaigns;

11

INDEPENDENT CONTRACTOR AGREEMENT
VOLUSION, LLC CONFIDENTIAL

(iii) Planning, developing, and implementing sales strategies and plans as necessary;

(iv)  Liaising with public relations teams to align objectives, including, but not limited to planning, and implementing messaging across channels and to targeted audiences to assure sales and marketing objectives;

(v)  Growing, training, and developing the in-house marketing and sales teams;

(vi) Conducting market research and staying abreast of competitor positioning; and budget management.

3.      **Compensation**.  In consideration, Contractor will receive the following compensation for the Services:

(a) **Payment**:

  (1) $30,000 per month as flat rate for services, only.

  (2) a Transaction Fee equal to the sum of twenty five percent (25%) of the total Transaction Savings associated with any transaction with Main Street and/or HMS and/or any other person or entity to which Company is financially obligated.  Transaction Savings as mentioned herein shall refer to specific transactions that result in the reduction of Company's obligations to any vendor/creditor/contractor whether by way of investment, capital , debt or loan.   The non-refundable fee provided to Contractor under Exhibit B of  the Independent Contractor Agreement  will be credited towards any Transaction fee earned under this section.

  (3) a Transaction Fee equal to the sum of one and one-half percent (1.5%) of the Financing Value of any Transaction. Financing Value as mentioned herein shall refer to the total capital procured under section 2(b).

Contractor shall also to be reimbursed for normal and necessary expenses including, but not limited to, travel and lodging, postage and shipping, supplies, meals, and such other expenses as approved by Company and/or its CEO and/or Founder.

(b) **Records**: Contractor agrees to provide accurate and complete records regarding the performance of all Services for the Company.

INDEPENDENT CONTRACTOR AGREEMENT
VOLUSION, LLC CONFIDENTIAL