## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## LAREDO DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| VOLUSION, LLC[1] | ) | Case No. 20-50082 (DRJ) |
|  | ) |  |
| Reorganized Debtor. | ) |  |
|  | ) |  |

## REORGANIZED DEBTOR'S OBJECTION TO THE
## PROOFS OF CLAIM NOS. 15, 20, AND 23 FILED BY BARDIA DEJBAN

**This is an objection to your claim. The objection party is asking the court to disallow the claim that you filed in this bankruptcy case. You should immediately contact the objecting party to resolve the dispute. If you do not reach an agreement, you must file a response to this objection and send a copy of your response to the objecting party within thirty (30) days after the objection was served on you. Your response must state why the objection is not valid. If you do not file a response within 30 days after the objection was served on you, your claim may be disallowed without a hearing.**

**A hearing will be conducted on this matter on April 1, 2021 at 3:00 p.m. in Courtroom 400, 4th floor, 515 Rusk, Houston, TX 77002. You may participate in the hearing either in person or by audio/video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. You will be responsible for your own long distance charges. Once connected, you will be asked to enter the conference room number. Judge Jones conference room number is 205691**

**You may view video via GoToMeeting. To use GoToMeeting, the Court recommends that you download the free GoToMeeting application. To connect, you should enter the meeting code "JudgeJones" in the GoToMeeting app or click the link on Judge Jones home page on the Southern District of Texas website. Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of the hearing. To make your electronic appearance, go to the Southern District of Texas website and select "Bankruptcy Court" from the top menu. Select "Judges' Procedures," then "View Home Page" for Judge Jones. Under "Electronic Appearance" select "Click here to submit Electronic Appearance". Select the case name, complete the required fields and click "Submit" to complete your appearance.**

**If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within thirty (30) days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

---

[1] The Reorganized Debtor in this chapter 11 case, along with the last four digits of the Reorganized Debtor's federal tax identification number, is:  Volusion, LLC (9037).  The Reorganized Debtor's service address is 1835A Kramer Lane, Suite 100, Austin, TX 78758.

Volusion, LLC (the "<u>Debtor</u>" and after the occurrence of the Effective Date of the Plan, the "<u>Reorganized Debtor</u>") files this objection (this "<u>Objection</u>") to Claim No. 15 ("<u>Claim No. 15</u>"), Claim No. 20 ("<u>Claim No. 20</u>"), and Claim No. 23 ("<u>Claim No. 23</u>" and together with the Claim No. 15, the "<u>Claims</u>")[2] filed by Bardia Dejban (the "<u>Claimant</u>" or "<u>Mr. Dejban</u>") and submits the *Declaration of Timothy Stallkamp, Chief Restructuring Officer of Volusion, LLC in Support of the Debtor's Objection to the Proofs of Claim Nos. 15, 20, and 23 filed by Bardia Dejban* (the "<u>Stallkamp Declaration</u>"), attached as **Exhibit A**.  In further support of this Objection, the Reorganized Debtor respectfully states as follows:

**Relief Requested**

1.      The Debtor seeks entry of the proposed order (the "<u>Order</u>") pursuant to § 502(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and rule 3007 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") disallowing the Claims of the Claimant, identified as Proof of Claim No. 15, Proof of Claim No. 20, and Proof of Claim No. 23. **Exhibit B**, **Exhibit C**, and **Exhibit D**.  The Claims assert unliquidated amounts for claims that are unenforceable against the Debtor under any agreement or applicable law.  The Debtor objects to the Claims to the extent they stem from the termination of an employment contract and for amounts that exceed compensation for one year following the earlier of the Petition Date or the date of Mr. Dejban's termination.  In support of this Objection, the Debtor submits the Stallkamp Declaration, attached hereto as **Exhibit A**.

**Jurisdiction, Venue, and Procedural Background**

2.      The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  The Debtor confirms

---

[2] Copies of the Claims are attached hereto as **Exhibit B**, **Exhibit C**, and **Exhibit D**.

its consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Objection.

3.      Venue is permissible pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are §§ 105(a) and 502(b) of the Bankruptcy Code, Bankruptcy Rule 3007, and Rules 9013-1 and 3007-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Procedural Background

5.      On July 27, 2020 (the "Petition Date"), the Debtor filed a voluntary petition (the "Petition") for relief under chapter 11 of the United States Bankruptcy Code in the Court.

6.      The statutory bar date for filing claims was November 30, 2020 (the "General Bar Date").  The bar date for governmental entities to file a claim is February 8, 2021 (the "Governmental Bar Date").

7.      On November 20, 2020, the Court entered the *Order Confirming the Debtor's Combined Plan of Reorganization and Approving on a Final Basis the Disclosure Statement of Volusion, LLC Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 128].  On January 19, 2021, the Effective Date of the Plan occurred. *See* Docket No. 158.

8.      On November 30, 2020, Mr. Dejban filed his Proof of Claim No. 15 in the amount of $11,875,000.  *See* **Exhibit B**.

9.      On November 30, 2020, Mr. Dejban filed his Proof of Claim No. 20 in the amount of $11,875,000.  *See* **Exhibit C**.

10.     On November 30, 2020, Mr. Dejban filed his Proof of Claim No. 23 in the amount of $11,875,000.  *See* **Exhibit D**.

3

## Factual Background

11.     Mr. Dejban's Claims have nothing to do with alleged discrimination.  Instead, they are sour grapes by an underperforming, uncooperative, insubordinate, and disloyal former Chief Executive Officer of the Debtor ("CEO").[3]

12.     Under Mr. Dejban's watch, the Debtor struggled in the marketplace well before the pandemic due to a failed M&A process to sell the company.  The failure of the M&A sale process was in large part due to the poor financial performance of the Debtor in the year leading up to the hoped for M&A transaction.  Under Mr. Dejban's watch, family members were engaged as independent contractors to represent the Debtor, providing no apparent value to the company.  In addition, the Debtor defaulted on its primary Loan with Main Street Capital Corporation ("Main Street") and failed to engage meaningfully with such lender.  At Mr. Dejban's direction, certain senior executives of the Debtor, including Mr. Dejban, attempted to frustrate the actions and oversight of the reconstituted Board.  And finally, under Mr. Dejban's direction, the Debtor refused to fund its obligations under the initial forbearance agreement with Main Street (the "Initial Forbearance Agreement"), which resulted in its Chapter 11 filing.

13.     Mr. Dejban was originally hired as Chief Information Officer in 2015 and began work in that role in February 2016; he became the Debtor's CEO in August 2019.  As CEO, Mr. Dejban signed on behalf of the Debtor an Independent Contractor Agreement ("Independent Contractor Agreement") with DK Strategic Solutions, LLC ("DK").  DK is a company partially owned by Mr. Dejban's sister Bahar Dejban ("Ms. Dejban").[4]  DK was to provide two different types of services.  First, DK, with Ms. Dejban as "owner," agreed to "render to the Company . . .

---

[3] The Reorganized Debtor holds claims against Mr. Dejban that were articulated and reserved in the confirmed plan.

[4] Contemporaneously herewith, the Reorganized Debtor is filing an objection to claims filed in this case by Ms. Dejban.

General Counsel Services . . . as requested by Company's CEO and/or Founder."  Second, DK agreed that Shawn Khorrami ("Mr. Khorrami") would provide negotiator and partner strategy services as an independent contractor.  Ms. Dejban resides in and is licensed to practice law in California.  Mr. Khorrami is Mr. Dejban's brother-in-law and Ms. Dejban's husband.  Mr. Khorrami was formerly an attorney licensed to practice law in California.[5]

14.     On November 23, 2016, the Debtor signed an Amended and Restated Loan Agreement (the "Loan") with Main Street as lender.

15.     For much of 2018 and 2019, the Debtor sought a buyer for the company. Unfortunately, this M&A effort failed and the Debtor found itself in financial dire straits.  On October 21, 2019, Main Street sent the Debtor a Notice of Default under the terms of the Loan. The Debtor's records are replete with communications from Main Street to, *inter alia,* Mr. Dejban, requesting that the obligations to Main Street be addressed, and that the Debtor provide Main Street with certain financial information.  These communications both pre-dated and post-dated the Notice of Default.  To the Debtor's knowledge, these communications were ignored by Mr. Dejban and Mr. Khorrami, to the Debtor's likely detriment.[6]

16.     On November 6, 2019, Main Street emailed its concern to Mr. Dejban about the Debtor's performance and ability to generate additional operating capital and to fund the capital needs associated with the Loan maturing in January 2020.  Main Street suggested that Mr. Dejban hire a restructuring consultant as soon as possible to advise the Debtor.

17.     As he did with any communications from Main Street, Mr. Dejban immediately forwarded Main Street's email to his brother-in-law/independent contractor/disbarred California

---

[5] Mr. Khorrami was disbarred in 2016.

[6] These communications are not detailed herein but the Debtor anticipates presenting them as evidence at trial on this Objection.

lawyer, Shawn Khorrami. Mr. Khorrami responded: "We need to hire an outside CFO as a compromise measure to meet their demand. That CFO has to have some very specific traits. ***It needs to be someone who will report to us and who is careful about the numbers they are producing***." (emphasis added)

18.    Mr. Dejban then informed Main Street that "[a]fter interviewing several CFO/CRO individuals and firms, especially those which you recommended, in addition to the new direction which Todd[7] shared with me, it has become even more clear to me that we need someone to handle the day-to-day of matters. ***That person is going to be Shawn***." (emphasis added) So instead of hiring a restructuring consultant, Mr. Dejban informed Main Street that Mr. Khorrami would be handling day-to-day matters. Nothing in Mr. Khorrami's prior work experience qualified him to act as CFO/CRO of the Debtor.

19.    In January 2020, the Loan matured and the Debtor was in continued default.

20.    In addition to being uncooperative about hiring a restructuring consultant and relying on his brother-in-law for advice, Mr. Dejban refused to provide timely information to Main Street. On February 18, 2020, after Main Street's third request for the Debtor's December financials, the Debtor's VP of Finance emailed Mr. Dejban, "[n]ot sure what the communication plan is for Main Street but I am inclined toward a response that Shawn will be in touch ***vs. maintaining radio silence***." (emphasis added)

21.    On June 9, 2020, Main Street sent another Notice of Default for failure to pay interest in the absence of a forbearance agreement. In addition, the original Board was reconstituted with three new independent managers.[8] On June 19, 2020, reservations of authority

---

[7]       Todd was a prior Main Street employee.

[8]       A detailed description of the facts precipitating the appointment of the reconstituted Board members and the filing of the Chapter 11 Case are set forth in the (A) *Debtor's Emergency Motion for Authority to Use Cash Collateral and Granting Adequate Protection to Prepetition Secured Parties* [*see* Docket No. 4] and (B) *Debtor's Motion for*

were enacted requiring Board approval before the implementation of certain matters. On June 24, 2020, Timothy B. Stallkamp of Conway MacKenzie Management Services, LLC was appointed as the Debtor's Chief Restructuring Officer ("CRO"). Additional reservations of authority were enacted requiring Board approval before implementation of certain additional matters.

22.     The reconstituted Board repeatedly sought effective and collaborative communication with Mr. Dejban. Mr. Dejban, on the other hand, communicated that he thought the appointment of the CRO was "ridiculous." Mr. Dejban did not merely fail to cooperate with the reconstituted Board and the CRO. He actively resisted.

23.     Without the Board's knowledge, Mr. Dejban retained two different law firms, Spencer Fane and Geragos & Geragos, purportedly on behalf of the Debtor to thwart the reconstituted Board. Mr. Dejban caused the Debtor to send these firms each a six-figure retainer.

24.     On July 22, 2020, and following discussions and negotiations concerning same, Main Street and the Debtor executed the Initial Forbearance Agreement. The Initial Forbearance Agreement would have provided the Debtor with valuable relief and time to continue to work through its obligations with Main Street. As a condition to the forbearance, an interest payment in the total amount of $563,266.47 was required to be made by the Debtor. Despite being expressly told to make such interest payment, Mr. Dejban refused to do so, which resulted in the nullification of the Initial Forbearance Agreement.

25.     On July 27, 2020, the reconstituted Board determined "that to ensure the appropriate functioning and decision-making in respect of company assets and operations during

_____

*Entry of Order (i) Authorizing the Appointment of Independent Managers Effective as of the Petition Date; (ii) Directing the Debtor to Maintain the Independent Managers; (iii) Authorizing the Payment of Manager Fees; and (iv) Authorizing the Debtor's Performance of its Obligations to Each of the Independent Managers Pursuant to the Company Agreement* [*see* Docket No. 5].

the restructuring of the company . . . it is in the best interest of the company to terminate the engagement of (i) Bahar Dejban and Dejban Law, General Counsel of the Company ("Dejban Law"), (ii) Shawn Khorrami, counsel, negotiator and partner strategy for the Company, and (iii) any other contractor engagements of DK Strategic Solutions LLC (such terminations, the "Independent Contractor Terminations")." On that same day, the Board also terminated the representation of Geragos & Geragos, and it terminated Kevin Sproles' position as well.

26.     In addition to the July 27, 2020 terminations, in November 2020, the Debtor went through an organizational realignment, which further reduced the Debtor's headcount by 21 employees.

<u>Objection</u>

**A.      The Claims are Unenforceable Against the Debtor Under any Agreement or Applicable Law.**

27.     Section 502(b)(1) of the Bankruptcy Code provides that the court "shall determine the amount of such claim…as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—such claim is unenforceable against the debtor and the property of the debtor…" 11 U.S.C. § 502(b)(1).

28.     As set forth in Bankruptcy Rule 3001(f), a properly executed and filed proof of claim constitutes *prima facie* evidence of the validity and the amount of the claim under § 502(a) of the Bankruptcy Code. *See, e.g.*, *In re Jack Kline Co., Inc.*, 440 B.R. 712, 742 (Bankr. S.D. Tex. 2010). A proof of claim loses the presumption of *prima facie* validity under Bankruptcy Rule 3001(f) if an objecting party refutes at least one of the allegations that are essential to the claim's legal sufficiency. *See In re Fidelity Holding Co., Ltd*., 837 F.2d 696, 698 (5th Cir. 1988). Once such an allegation is refuted, the burden reverts to the claimant to prove the validity of its claim by a preponderance of the evidence. *See id.* Despite this shifting burden during the claim

8

objection process, "the ultimate burden of proof always lies with the claimant." *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000)).

29.     The Claims stem from the Debtor's termination of Mr. Dejban's employment.  The Claims are not enforceable against the Debtor under any agreement or applicable law.  The Claims assert unliquidated claims alleging national origin discrimination and retaliation under Title VII of the Civil Rights Act of 1984 ("Title VII") and the Texas Commission on Human Rights Act ("TCHRA"), unlawful interference and retaliation under the Family and Medical Leave Act ("FMLA") and unlawful interference and retaliation under the Families First Coronavirus Response Act ("FFCRA").

30.     Mr. Dejban cannot meet his burden to establish liability on any of these allegations. Specifically, Mr. Dejban is unable to present evidence capable of satisfying the elements required to establish (i) a prima facie case of discrimination or retaliation under Title VII or the TCHRA, (ii) a violation of the FMLA, or (iii) a violation of the FFCRA.  Also, the Debtor has shown, and will prove at trial, that it had legitimate, non-discriminatory, non-retaliatory reasons for terminating Mr. Dejban's employment.

31.     As CEO of the Debtor, Mr. Dejban was:

- Underperforming:
  - As evidenced by the failed M&A sale process and the Debtor's financial condition;

- Uncooperative:
  - As evidenced by his failure to cooperate with the reconstituted Board;

- Insubordinate:
  - As evidenced by his refusal to make the interest payment under the Initial Forbearance Agreement as instructed by the reconstituted Board and failure to disclose material agreements that he had caused the Debtor to enter into;

- In breach of his fiduciary duties:
  - As evidenced by the unreasonable and extraordinary expenditures and waste of company assets;

- Disloyal:
  - As evidenced by his engagement of unqualified family members as independent contractors of the Debtor.

Mr. Dejban is unable to present evidence capable of showing that the legitimate, non-discriminatory, non-retaliatory reasons for which the Debtor terminated his employment were a pretext for discrimination or retaliation in violation of Title VII, the TCHRA, the FMLA or the FFCRA.

**B.      Mr. Dejban Cannot Establish National Origin Discrimination.**

32.      Mr. Dejban claims that the Debtor terminated his employment because of his national origin in violation of Title VII and the TCHRA.  Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  The analysis of claims under the TCHRA is identical to that applied to claims brought under Title VII. *See Weaver v. Basic Energy Servs. L.P.,* No. MO-13-CV-022, 2014 U.S. Dist. LEXIS 200646, at *23 (W.D. Tex. Jan. 8, 2014).

33.      Where a claimant relies only on circumstantial evidence in an attempt to prove his discrimination claim, the Court utilizes the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  "Under this framework, the plaintiff must first create a presumption of discrimination by making out a prima facie case of discrimination." *Laxton v. Gap, Inc*., 333 F.3d 572, 578 (5th Cir. 2003) (internal citations omitted).  If the plaintiff can establish a prima facie case, "the burden of production shifts to the employer, who must offer an alternative nondiscriminatory explanation for the adverse employment action." *Lee v. Kansas City S. Ry. Co*.,

574 F.3d 253, 259 (5th Cir. 2009).  To meet its intermediary burden, an employer only needs to set out its reason for the adverse employment action through admissible evidence. *See Turner v. Kan. City S. Ry. Co.*, 675 F.3d 887, 900 (5th Cir. 2012).  If the employer produces any evidence 'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action,' then the employer has satisfied its burden of production." *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995) (quoting *Hicks*, 509 U.S. at 507); *see EEOC v. Texas Bus Lines*, 923 F. Supp. 965, 970 (S.D. Tex. 1996).  If the defendant sustains its burden of production, "the presumption raised by the plaintiff's prima facie case essentially disappears, and the plaintiff is left with the ultimate burden which has never left [her]: that of proving that the defendant intentionally discriminated against [her]." *Tanik v. Southern Methodist Univ.*, 116 F.3d 775, 776 (5th Cir.), *cert. denied*, 522 U.S. 1015 (1997).  If the defendant can articulate such a nondiscriminatory reason, the burden then shifts back to the plaintiff who must show at "a new level of specificity" that the explanation is merely a pretext for discrimination. *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 639 (5th Cir. 1985), abrogated on other grounds by *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 513 (1993).  In the alternative, the plaintiff may show "that the employer's reason, while true, is not the only reason for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (quoting *Rachid v. Jack In The Box, Inc*., 376 F.3d 305, 312 (5th Cir. 2004)).

34.     Mr. Dejban cannot establish a prima facie case of national origin discrimination. To sustain his national origin discrimination claim, Mr. Dejban must first establish a prima facie case by showing (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was replaced by someone

outside the protected class or he was treated less favorably than similarly situated employees who were not of his protected class under nearly identical circumstances. *Lee*, 574 F.3d at 259; *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 513 (5th Cir. 2001).

35.     Mr. Dejban cannot establish the fourth element of his prima facie case.  Mr. Dejban was not replaced by someone outside his protected class, nor can he identify any similarly situated employee who was not of Iranian descent and was treated more favorably.  Troy Pike ("Mr. Pike"), a member of the reconstituted Board, became the Debtor's interim CEO.  Debtor has not yet found a permanent replacement to fill the CEO position.  Mr. Pike is not in the same protected class as Mr. Dejban.  However, the fact that Mr. Pike is Mr. Dejban's temporary, rather than permanent replacement, is relevant for purposes of the fourth prong analysis of Mr. Dejban's prima facie case. *See Mercer v. Capitol Mgmt. & Realty*, 242 F. App'x 162, 163 (5th Cir. 2007) (affirming district court grant of summary judgment on the basis that plaintiff failed to prove her prima facie case by offering no proof to rebut the employer's assertion that the person replacing her was not her permanent replacement, but only an interim holder of that position).  A district court in the Southern District of Texas granted summary judgment against a plaintiff who failed to meet his prima facie burden where the person who ultimately permanently replaced plaintiff was of the same race, despite the interim replacement being outside the protected class. *Ashagre v. Southland Corp.*, 546 F. Supp. 1214, 1219-20 (S.D. Tex. 1982).  Because the relevant inquiry looks at the permanent, not interim replacement, and Debtor has not yet hired a permanent replacement, Mr. Dejban must proceed under the disparate treatment clause of the fourth prong.

36.     Mr. Dejban cannot establish disparate treatment.  Mr. Dejban's comparison of himself to other employees is limited to vague, broad, general and conclusory contentions that employees of Iranian descent (he and his twin sister) were treated worse than employees not of

12

Iranian descent.  Mr. Dejban has not and cannot demonstrate that he was treated less favorably than other similarly-situated employees who were outside of his protected classes.  The similarly situated analysis requires Mr. Dejban to show that the Debtor gave preferential treatment to a coworker who was not of Iranian descent under nearly identical circumstances. *See Okoye*, 245 F.3d at 514.  This coworker, known as a comparator, must hold the "same job" or hold the same job responsibilities as Mr. Dejban; must "share [ ] the same supervisor" or have his "employment status determined by the same person" as Mr. Dejban; and must have a history of "violations" or "infringements" similar to those of Mr. Dejban.  *Alkhawaldeh v. Dow Chemical Co*., 851 F.3d 422, 426 (5th Cir. 2017); *Turner v. Kan. City S. Ry. Co*., 675 F.3d 887, 893 (5th Cir. 2012) (quoting Lee, 574 F.3d at 260).  Employees with "different work responsibilities . . . are not similarly situated." *Lee*, 574 F.3d at 259.  Mr. Dejban was the Debtor's one and only Chief Executive Officer at the time of his termination.  As such he had unique job responsibilities.  There were no other employees of the Debtor who held the same job or had the same responsibilities as Mr. Dejban, nor were there any employees who the Debtor retained who had a history of violations and infringements similar to Mr. Dejban.  Therefore, Mr. Dejban cannot show that he was similarly situated to any other employee of the Debtor and fails to meet his prima facie burden.  Additionally, the facts do not support Mr. Dejban's contention that the Debtor targeted employees of Iranian descent for termination.  Mr. Dejban and his sister were not the only employees and contractors terminated by Debtor's reconstituted Board.   In connection with the restructuring and organizational realignment of Debtor, since July 27, 2020, the reconstituted Board terminated a total of 23 employees.  To Debtor's knowledge, 22 of the 23 terminated employees were *not* of Iranian descent.  The numbers speak for themselves.  The Debtor was not targeting Iranian born employees for termination.

37.    Even if Mr. Dejban could establish a prima facie case of discriminatory termination because of his national origin, Mr. Dejban's national origin discrimination claim still must fail because the Debtor terminated Mr. Dejban for legitimate, nondiscriminatory reasons.  More specifically, Mr. Dejban was terminated because the Debtor determined that he was an underperforming (as evidenced by the failed M&A sale process), uncooperative (as evidenced by Mr. Dejban's failure to cooperate with the reconstituted Board), insubordinate (as evidenced by Mr. Dejban's refusal to make the interest payment under the Initial Forbearance Agreement and failure to disclosure material agreements he had caused the Debtor to enter into) and disloyal (as evidenced by Mr. Dejban's engagement of family members as independent contractors of the Debtor, including for positions for which they were not qualified) CEO of the Debtor.  *See Faruki v. Parsons, S.I.P.*, 123 F.3d 315, 320  (5th Cir. 1997) (recognizing poor job performance as a legitimate, non-discriminatory reason for termination of employment)*; see also Ihsan v. Weatherford U.S., LP*, No. H-17-2546, 2019 U.S. Dist. LEXIS 85199, at *21 (S.D. Tex. May 21, 2019) (plaintiff's failure to meet the expectations for his position is a legitimate, non-discriminatory reason for terminating plaintiff's employment); *Farrar & Ball, LLP v. Hudson,* No. H-16-3341, 2018 U.S. Dist. LEXIS 39495, at *11-12 (S.D. Tex. Mar. 12, 2018) (holding Company satisfied its burden to articulate a legitimate, non-discriminatory reason for the decision to terminate employee based on Company's "perception that [Employee] had a bad attitude and was communicating her negativity to other [Company] employees"); *Wolf v. Tex. A&M Univ. Sys.,* No. H-09-0643, 2010 U.S. Dist. LEXIS 46428, at *11 (S.D. Tex. May 12, 2010) (holding Defendant satisfied its burden to articulate a legitimate, non-discriminatory reason for Plaintiff's termination on the basis that Plaintiff's "attitude and demeanor caused [Defendant] to lose confidence in her ability to" satisfactorily perform her job).

38.     Mr. Dejban cannot show that the Debtor's reasons for discharging him are pretextual, meaning false or unworthy of belief. *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002) (defining pretext).  Whether or not Mr. Dejban disputes the facts that led to his discharge, the Debtor's decision to terminate him was motivated by its reasonable belief that Mr. Dejban's actions and continued employment were not in the Debtor's best interests.  In his Claims, Mr. Dejban makes it clear that he disagreed with the Debtor's assessment of his performance. However, disagreeing with an employer's negative performance assessment is insufficient to show pretext. *Shackelford v. Deloitte & Touche LLP*, 190 F.3d 398, 409 (5th Cir. 1999) ("the real issue is 'whether [the employer's] perception of [the employee's] performance, accurate or not, was the real reason for [his or] her termination.").  The Fifth Circuit Court of Appeals and other courts consistently hold that an inquiry into whether an employer's termination decision was correct is irrelevant to an employee's discrimination claim. *Bryant v. Compass Group USA Inc.,* 413 F.3d 471, 478 (5th Cir. 2005) ("[E]vidence that the employer's investigation merely came to an incorrect conclusion does not establish a racial motivation behind an adverse employment decision. Management does not have to make proper decisions, only non-discriminatory ones."); *Little v. Republic Ref. Co.,* 924 F.2d 93, 97 (5th Cir. 1991) ("The existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification."); *Jones v. Overnite Transport Co*., 212 F. App'x 268, 275 (5th Cir. 2006) ("Title VII does not protect an employee against unfair employment decisions; instead, it protects against" discriminatory decisions.); *Little v. Rep. Refining Co.,* 924 F.2d 93, 97 (5th Cir. 1991) ("Even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason. We do not try in court the validity of good faith beliefs as to an

employee's competence. Motive is the issue…[A] dispute in the evidence concerning…job performance does not provide a sufficient basis for a reasonable factfinder to infer that [the] proffered justification is unworthy of credence."). Mr. Dejban may believe that he was terminated for illegal reasons; however, his subjective beliefs are not relevant. The Fifth Circuit "has consistently held that an employee's subjective belief of discrimination alone is not sufficient to warrant judicial relief." *Byers v. Dallas Morning News, Inc.,* 209 F.3d 419, 427 (5th Cir. 2000) (refusing to rely upon a plaintiff's subjective belief as to discriminatory intent).

**C.     Mr. Dejban Cannot Establish Retaliation Under Title VII or the TCHRA.**

39.     Mr. Dejban asserts illegal retaliatory termination in violation of Title VII and the TCHRA. To establish his retaliation claim, Mr. Dejban must first establish a prima facie retaliation case by proving: (1) he engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal connection existed between the protected conduct and adverse employment action. *Shackleford*, 190 F.3d at 408. If Mr. Dejban establishes a prima facie case of retaliation, the same burden shifting analysis applicable to his Title VII/TCHRA discrimination claim applies. *See id.*

40.     Mr. Dejban cannot establish the first or third elements of his prima facie retaliation case. Mr. Dejban did not engage in protected activity, required to state a prima facie case of Title VII retaliation. A "protected activity" under Title VII includes: (1) opposition to any practice rendered unlawful by Title VII; and (2) participation in an investigation, proceeding, or hearing under Title VII or making a charge, testifying, or assisting in such activity. *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 372-73 (5th Cir. 1998). Mr. Dejban did not oppose any practice rendered unlawful by Title VII prior to his termination of employment. To the extent Mr. Dejban may have generally complained about his treatment by the Debtor, such complaints are not considered protected activity. *See Harris-Childs v. Medco Health Solutions, Inc.,* 169 F. App'x 913, 916 (5th Cir. 2006) (affirming summary judgment on retaliation claim

16

where plaintiff never "specifically complained of racial or sexual harassment, only harassment"). With regard to the third element of Mr. Dejban's prima facie retaliation case, assuming that he did engage in protected conduct, he cannot show a causal connection between any such protected conduct and his discharge. Finally, as set forth above, the Debtor terminated Mr. Dejban's employment for legitimate, non-discriminatory, non-retaliatory reasons. Mr. Dejban cannot show that the Debtor's articulated reasons for his termination are pretextual. Therefore, Mr. Dejban's retaliation claims must fail as a matter of law.

**D.      Mr. Dejban Cannot Establish that the Debtor Interfered with His FMLA Rights.**

41.      The FMLA provides, in relevant part, that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" provided by the FMLA. 29 U.S.C. 2615(a)(1).  To succeed on an FMLA interference claim, an employee must prove that his employer interfered with, denied, or restrained his exercise of FMLA rights, and that the interference actually resulted in prejudice or harm. *Bryant v. Tex. Dep't of Aging & Disability Servs*., 781 F.3d 764, 770 (5th Cir. 2015).

42.      To establish a prima facie case of FMLA interference, a plaintiff must show that (1) he was an eligible employee, (2) defendant-employer was an employer subject to the FMLA's requirements, (3) he was entitled to leave, (4) he gave proper notice of his intention to take FMLA leave, and (5) defendant-employer denied him the benefits to which he was entitled under the FMLA. *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017).

43.      If a plaintiff establishes a prima facie case of interference, the burden shifts to defendant-employer to articulate a legitimate, nondiscriminatory, nonretaliatory reason for the adverse employment action taken. *See Hagan v. Echostar Satellite, L.L.C*., 529 F.3d 617, 624 (5th Cir. 2008).  If defendant-employer meets this production obligation, the burden shifts back to the plaintiff to show "by a preponderance of the evidence that the reasoning presented by [the

defendant-employer] is [pretextual]." *Mauder v. Metro. Transit. Auth. of Harris Cty.*, 446 F.3d 574, 583 (5th Cir. 2006).

44.     Mr. Dejban states that his FMLA and FFCRA claims are based on his efforts to care for the serious medical issues (food allergies and asthma) of his young sons during the COVID-19 pandemic.  Mr. Dejban has not and cannot establish the fourth and fifth elements of his prima facie case of FMLA interference.  Mr. Dejban did not request FMLA leave nor did he give notice of any intention to take FMLA leave.  The Debtor did not deny Mr. Dejban any benefits to which he was entitled under the FMLA.  The Debtor also points out that Mr. Dejban has not produced any evidence to show (nor has he even asserted) that he was an eligible employee under the FMLA, that the Debtor was an employer subject to the FMLA's requirements, or that he was entitled to leave under the FMLA.

45.     Finally, to the extent Mr. Dejban intends to claim that his discharge is somehow tied to his FMLA interference claim, the Debtor terminated Mr. Dejban's employment for legitimate, non-discriminatory, non-retaliatory reasons.  Mr. Dejban cannot show that the Debtor's articulated reasons for his termination are pretextual.  Therefore, Mr. Dejban's FMLA interference claim must fail as a matter of law.

**E.      Mr. Dejban Cannot Establish that the Debtor Retaliated Against Him in Violation of the FMLA.**

46.     The FMLA makes it unlawful for an employer to discharge or retaliate in any other manner against an individual for opposing the employer's unlawful FMLA practices. 29 U.S.C. § 2615(a)(2). To prevail on an FMLA retaliation claim, a plaintiff must first demonstrate a prima facie case of retaliation by showing that (1) he engaged in protected activity, i.e., requesting or taking FMLA-qualifying leave, (2) an adverse employment action occurred, and (3) that the plaintiff was treated less favorably than an employee who had not requested FMLA leave or the

adverse employment decision was made because the plaintiff took FMLA leave. *Mauder*, 446 F.3d at 583. The third element requires the employee to show "there is a causal link" between the FMLA-protected activity and the adverse action. *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005).

47.     Once the complaining party establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Id.* Thereafter, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the reasoning presented by the defendant is a pretext for retaliation. *Id.*  Unlike an interference claim, an FMLA retaliation claim requires a plaintiff to show discriminatory intent. *Cuellar*, 731 F. 3d at 349-50.

48.     Mr. Dejban cannot show that he engaged in protected activity.  He did not request or take FMLA-qualifying leave.  Also, even if Mr. Dejban had requested or taken FMLA leave, he cannot show that he was treated less favorably than an employee who had not requested FMLA leave or that the termination decision was made because he requested FMLA leave.  The Debtor terminated Mr. Dejban's employment for legitimate, non-discriminatory, non-retaliatory reasons. Mr. Dejban cannot show that the Debtor's articulated reasons for his termination are pretextual. Therefore, Mr. Dejban's FMLA retaliation claim must fail as a matter of law.

**F.     Mr. Dejban Cannot Establish that the Debtor Violated his Rights under the FFRCA.**

49.     Mr. Dejban's Claims do not specify which FFCRA acts the Debtor is alleged to have violated.  The FFCRA contains two acts that provide for employee paid leaves of absence: the Emergency Paid Sick Leave Act ("EPSLA") and the Emergency Family and Medical Leave Expansion Act ("EFMLEA").  Thus, the Debtor assumes that Mr. Dejban is claiming that it violated the EPSLA and EFMLEA sections of the FFCRA and addresses these two acts.

19

50.     An employer is prohibited from discharging, disciplining, or discriminating against any employee because such employee took paid sick leave under the EPSLA.  Likewise, an employer is prohibited from discharging, disciplining, or discriminating against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to the EPSLA, or has testified or is about to testify in any such proceeding. 29 C.F.R. § 826.150 (2020).  Mr. Dejban did not request or take paid sick leave under the EPSLA.  Likewise, Mr. Dejban did not file any complaint under or related to the EPSLA or testify in any such proceeding prior to his termination of employment from the Debtor.

51.     The prohibitions against interference with the exercise of rights, discrimination, and interference with proceedings or inquiries described in the FMLA, 29 U.S.C. 2615, apply to employers with respect to eligible employees taking, or attempting to take, leave under the EFMLEA.  29 CFR § 826.151 (2020).  For the same reasons set forth above with respect to Mr. Dejban's FMLA claim, he cannot prevail on a claim under the EFMLEA.  For the reasons set forth herein, Mr. Dejban's claims under the FFCRA fail as a matter of law.

**G.     The Claims Should be Disallowed Because They Seek Excess Compensation Pursuant to Section 502(b)(7).**

52.     Section 502(b)(7) of the Bankruptcy Code caps payments to terminated employees upon objection to the claim.  It provides that the Court:

> Shall determine the amount of a claim as of the date of the filing of the petition date and shall allow such claim, except to the extent that—
>
> (7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, ***such claim exceeds***—
>
> > (A)     the compensation provided by such contract, ***without acceleration, for one year following the earlier*** of –
> >
> > > (i)     the date of the filing of the petition; or

(ii)    the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

(B)    any unpaid compensation due under such contract, without acceleration, on the earlier of such dates.

53.    Various courts have held that section 502(b)(7) was designed to limit the claims of former employees and limits potential payouts thereunder. *See Woods v. 21st Century Oncology Holdings, Inc. (In re 21st Century Oncology Holdings, Inc.,* 965 F. 3d 196, 200 (2nd Cir. 2020).

54.    In the Claims, Mr. Dejban alleges he is owed $11,875,000. *See* Exhibits B & C. In the attachment to the Claims, Mr. Dejban asserts that amount consists of:

| | |
|---|---|
| $4,355,000 | Alleged "Back Pay and Benefits"<br>-Mr. Dejban alleges $592,000 in annual base salary and $350,000 in "estimated value of annual stock, bonus incentive plan, health insurance, vacation, and sick leave," for a total of $942,000 to which he applies a 2.5 multiplier to arrive at $2,3500,000, deducts "mitigation estimate" in the amount of $250,000, and then adds "minimum additional lost compensation of $2,250,000" to arrive at $4,355,000. |
| $6,920,000 | Alleged "Present Value of Front Pay and Benefits"<br>-Mr. Dejban states that he has "discounted to present value by means of the net discount method." He multiplied the $942,000 figure from above by 10 years for a total of $9,420,000, and then deducted a "mitigation estimate of $2,500,000," to arrive at $6,920,000. |
| $100,000 | Alleged "Exemplary Damages & Punitive Damages Under Title VII and TCHRA (Capped)" |
| $500,000 | Alleged "Attorneys' Fees & Costs" |
| $11,875,000 | Total Alleged Claim |

As demonstrated above, the Claims center mostly around Mr. Dejban's claims to unpaid compensation—he claims a total of $11,275,000 in compensation and "benefits." On the face of the Claims themselves, these amounts exceed the cap set forth in section 502(b)(7) as they exceed compensation beyond one year following July 27, 2020 (the date of Mr. Dejban's termination and

the Petition Date), without acceleration.  In addition, even without regard to section 502(b)(7), Mr. Dejban's use of multipliers to the compensation-based components of the Claims, is wholly improper and based in no obligation of the Debtor.  Moreover, no back pay was even due to Mr. Dejban as of the Petition Date.  Accordingly, the Claims should be disallowed in their entirety.

## H.    The Claims Are Duplicates.

55.    The Claims are substantively duplicative of each other.  As set forth herein, the Debtor is not liable on the Claims and the Court should disallow both of the Claims for the reasons set forth herein.

56.    In addition, given the false nature of the basis of the Claims asserted, the Debtor requests recovery of attorneys' fees and costs associated with this Objection.

WHEREFORE, the Reorganized Debtor respectfully requests that the Court enter the Order filed with this Objection granting the relief requested in this Objection and granting such other and further relief, including awarding attorneys' fees and costs, as is appropriate under the circumstances.

February 26, 2021

/s/ *Jennifer F. Wertz*

Matthew D. Cavenaugh (State Bar No. 24062656)
Jennifer F. Wertz (State Bar No. 24072822)
**JACKSON WALKER LLP**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
Email: jwertz@jw.com

**COUNSEL FOR THE REORGANIZED DEBTOR**

## <u>Certificate of Service</u>

I certify that on February 26, 2021 I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and via regular upon the following:

Hal Keith Gillespie
Attorney for Bardia Dejban
3403 Gaston Avenue
Dallas, TX 75246

/s/ *Jennifer F. Wertz*
Jennifer F. Wertz

**<u>Exhibit A</u>**

**Stallkamp Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VOLUSION, LLC[1] | ) Case No. 20-50082 (DRJ) |
| | ) |
| Debtor. | ) |
| | ) |

**DECLARATION OF TIMOTHY STALLKAMP**
**IN SUPPORT OF REORGANIZED DEBTOR'S OBJECTION TO THE**
**PROOFS OF CLAIM NOS. 15, 20, AND 23 FILED BY BARDIA DEJBAN**

I, Timothy Stallkamp, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of the Reorganized Debtor and have served in this position since June 24, 2020.

2.      I am generally familiar with the Debtor's operations, financing arrangements, business affairs, and books and records that reflect, among other things, the Debtor's liabilities and the amount thereof owed to its creditors as of the Petition Date.  I read the *Reorganized Debtor's Objection to the Proofs of Claim Nos. 15, 20, and 23 filed by Bardia Dejban* (the "Objection").[2]

3.      To the best of my knowledge, information, and belief, the assertions made in the Objection are accurate.  I believe that the disallowance of the Claims on the terms set forth in the Objection is appropriate.

4.      The failure to disallow the Claims could result in the Claimant receiving an improper recovery on account of the Claims, to the detriment of the Debtor's other, similarly

---

[1]  The Reorganized Debtor in this chapter 11 case, along with the last four digits of the Reorganized Debtor's federal tax identification number, is:  Volusion, LLC (9037).  The Reorganized Debtor's service address is 1835A Kramer Lane, Suite 100, Austin, TX 78758.

[2]  Capitalized but undefined terms herein shall have the same meaning ascribed to them as in the Objection.

situated creditors, and could delay the administration of the Debtor's estate.  Accordingly, the disallowance of the Claims as requested in the Objection is appropriate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing declaration are true and correct to the best of my knowledge, information and belief.


Dated:  February 26, 2021                    By: _Timothy Stallkamp_____
                                                  Timothy Stallkamp
                                                  Chief Restructuring Officer
                                                  Volusion, LLC

**<u>Exhibit B</u>**

**Proof of Claim No. 15**

**Fill in this information to identify the case:**

Debtor 1    Volusion, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Southern District of Texas

Case number   20-50082 (DRJ)

---

## Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

---

### Part 1: Identify the Claim

| | |
|---|---|
| **1. Who is the current creditor?** | Bardia Dejban<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor   NA |
| **2. Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? _____ |

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Hal K. Gillespie
Name
4803 Gaston Ave.
Number   Street
Dallas, Texas 75246
City    State    ZIP Code

Contact phone   (214) 415-7911

Contact email   hkg@gillespiesanford.com

Where should payments to the creditor be sent? (if different)

Name

Number   Street

City    State    ZIP Code

Contact phone

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

| | |
|---|---|
| **4. Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____<br>                                             MM / DD / YYYY |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

---

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____

**7. How much is the claim?**

$ _____11,875,000___. Does this amount include interest or other charges?

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Unlawful discrimination, retaliation and termination.

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

Nature of property:

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

Basis for perfection:

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____

Amount of the claim that is secured: $_____

Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $_____

Annual Interest Rate (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition. $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

Official Form 410         Proof of Claim         page 2

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No

☑ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
$_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).
$_____

☑ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).
$        10,000

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).
$_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).
$_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.
$_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  11/30/2020
MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| | |
|---|---|
| Name | Hal Keith Gillespie |
| | First name    Middle name    Last name |
| Title | Attorney for Bardia Dejban |
| Company | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 3403 Gaston Avenue |
| | Number    Street |
| | Dallas, Texas 75246 |
| | City    State    ZIP Code |
| Contact phone | (214) 415-7911    Email hkg@gillespiesanford.com |

| Print | Save As... | Add Attachment | Reset |
|---|---|---|---|

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| **Texas Workforce Commission Civil Rights Division** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Cell Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Bardia Dejban** | **(818) 929-6818** | **1979** |

| Street Address | City, State and ZIP Code |
|---|---|
| **2907 Dover Pl, Austin, TX 78757** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **Volusion, LLC** | **About 170** | **(800) 646-3517** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1835-A Kramer Lane, Suite 100, Austin, TX 78758** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | **(800) 646-3517** |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☒ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| **June 8, 2020** | **July 27, 2020** |

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

See Attachment A hereto.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

| November 29, 2020 | *[signature]* |
|---|---|
| Date | Charging Party Signature |

## Attachment A

### I.     Personal Harm

I am a male citizen of the United States and currently 41 years old.  I was born in Tehran, Iran in 1979.  My first name, Bardia, is a uniquely Iranian name.  My highest level of formal education is an MBA degree from Pepperdine University, which I obtained in 2012.

On January 29, 2015, Main Street Capital Corporation ("Main Street") announced it had recently led a new portfolio investment totaling $45.0 million of invested capital in Volusion, LLC ("Volusion"), with Main Street funding $31.5 million of the investment.  The proceeds of the investment were used to provide capital to fund Volusion's near-term growth opportunities.  Main Street's investment in Volusion included a combination of first-lien, senior secured term debt with equity warrant participation and a direct equity investment.  In addition, Main Street and its co-investor provided Volusion a commitment for up to $10.0 million of additional capital to support its future growth opportunities and have the ability to fund additional capital in the future if needed to continue to support Volusion's growth. The press release for this transaction stated, "Main Street's investment supports Volusion's current management team, which retained majority equity ownership of the company."

I received an offer letter dated December 23, 2015 from Volusion for the position of Chief Information Officer (CIO), with a start date of January 25, 2016.  I signed the offer letter to accept the position on December 28, 2015.  At the time the CEO of Volusion  was Kevin Sproles, who was the founder of the company.

My performance for Volusion was always outstanding.  Also, my results for Volusion were outstanding.  I started my employment with Volusion in February 2016.  Mr. Sproles changed my job title to Chief of Staff a week before I started.

- Volusion paid me a relocation payment of $10,000 on February 11, 2016.

- Volusion paid me a signing bonus of $250,000 and a performance bonus of $13,984.52 on May 5, 2016.

- Volusion paid me a performance bonus of $23,211.54 on July 14, 2016.

I held the Chief of Staff position until October 2016, when I was promoted to Chief Technology Officer (CTO).   Mr. Sproles made the promotion decision.

On November 30, 2018 I was promoted to the position of Chief Operating Officer (COO).  Mr. Sproles made this promotion decision.

On January 15, 2019, all the members of the Board of Managers (the "Board") of Volusion adopted several resolutions. Pursuant to the resolutions Volusion approved a Transaction Incentive Retention Bonus Plan and designated me as a participant in the Plan. Under the Plan, I was awarded 1,534,956 units, with an exercise price of $0.69000, with a vesting commencement date of November 2, 2018 and a special vesting schedule. The next highest award to an existing employee went to Randon Kelly, with 345,000 units. My award was recognition of outstanding contributions to the company.

On August 19, 2019 Volusion announced my promotion to the position of CEO. This promotion was the decision of Mr. Sproles, with approval of Volusion's Board of Directors. Volusion announced that Sproles would stay on with the company "to guide produce and technology innovation."

• Volusion paid me a performance bonus of $75,000 on August 22, 2019.

By May 2020, I had completely turned around Volusion's performance. By that time Volusion was for the first time in 4 years running a positive EBITDA, and we had focused it for maximizing revenue from its legacy product. We were on course to launch Volusion's new product. Under my leadership, Volusion's cash reserves had increased from about $4 million to over $8 million. As of this date, Volusion had about 170 employees. Of these employees, only two, myself and the General Counsel of the company, Bahar Dejban, were of Iranian descent. Bahar Dejban, my twin sister, and I were born in Iran. Bahar Dejban became the General Counsel of Volusion in March 2019, when I was the company's COO. Until that time, I was unaware of any discrimination against employees born in Iran at Volusion.

On June 9, 2020, Main Street's COO, Dwayne Hyzak, notified me the CEO of Volusion, along with Mr. Kevin Sproles, Mr. Randon Kelly, and the Corporate Secretary of Volusion that it had changed the Board of Managers ("the Board") for Volusion and that the Board now was made up of Troy Pike, Jeremy Rosenthal, and Curt Lindeman. All three of these are Caucasian males, born in the United States.

After the new Board of Managers and CRO Tim Stallkamp arrived on the scene at Volusion, these four Caucasian born-in-the-United States males treated all the Volusion employees born in Iran badly, while treating born-in-the-United States employees of Volusion well. The New Leaders implemented a discriminatory double standard. While Pike, Rosenthal, Lindeman and Stallkamp (collectively the "New Leaders") were demanding, unreasonable, condescending, abrupt and rude toward me and the other Iranian born employee of Volusion, my sister, Bahar Dejban (Volusion's General Counsel), the New Leaders treated the other Volusion leaders (non-Iranian born) politely and with deference. The remaining leadership at Volusion (non-Iranian born) were able to put off requests from the New Leaders for days and weeks. They could literally say, "I won't have time to talk until next week" and the response, time and again was "no problem. When next week." The demands on Bahar Dejban and me by the New Leaders, were abrupt, unreasonable and pretextual. The New Leaders made a deliberate effort to manufacture a false "reason" for termination so they could assert falsely that Bardia and Bahar Dejban were "disengaged and disobedient officers." Although the New Leaders did not give me a reason for

3

terminating me when they fired me by mail, "being disengaged and disobedient" is the false and pretextual reason that Volusion offered in its Disclosure Statement in Bankruptcy Court in the matter called In re Volusion, LLC, Chapter 11, Case No. 20-50082 (DRJ), in the United States Bankruptcy Court for the Southern District of Texas, Laredo Division.

Stallkamp's email to me of Thursday, June 11, 2020 at 8:49 AM stated:

By way of introduction, I have recently been retained as a senior advisor to assist the newly constituted Board and Volusion. I wanted to reach out to see if there would be the ability to connect in person today (or at least by phone if in person is not practical.) I have plans to be in Austin through mid-day tomorrow and can be flexible as to location, etc. My cell # is below – looking forward to meeting/speaking with you.

From that time until my termination by letter on July 27, 2020, I was engaged, obedient and cooperative with the New Leaders, despite the fact that one or more of them often treated me in an arbitrary, demanding, inconsistent and disrespectful manner. This mistreatment came at the time of the COVID-19 pandemic, and the New Leaders interfered with my ability to care for my two young sons with serious health issues that I advised them of orally and in writing. The New Leaders and Volusion discriminated against me, retaliated against me, and ultimately terminated me because of my efforts to exercise rights under the FMLA and the Family First Coronavirus Response Act (FFRCA) as well as my Iranian national origin. Volusion deliberately attempted to create a pretext for firing me, so it could assert that it fired me for being disengaged and disobedient.

At the same time, Volusion treated my lawful and protected efforts to care for young sons with serious (life threatening) medical issues – severe asthma and allergies – during the pandemic as foot dragging, delay, and insubordination. Volusion engaged in a **pattern or practice** of retaliation and interference, not only punishing and firing me for my protected efforts to care for my young sons, but also retaliating against and firing another Volusion employee, Bahar Dejban, due to her pregnancy when it learned of her pregnancy.

My first Board Meeting (the first with the New Leaders) began at noon on Monday, June 15, 2020. I called into the meeting. I told them when the meeting started that I still had family and personal things still going on and didn't realize video was mandatory. Historically, Volusion's board calls were phone with screen share optional. Jeremy Rosenthal said that next time we would do video and he made it sound mandatory.

Jeremy Rosenthal asked about my 818 phone number, and if I was bi-coastal. Then there was some casual talk about the weather. Troy Pike was late for the meeting. Jeremy Rosenthal talked about his cases.

When Troy Pike came onto the call, we started the meeting. Jeremy Rosenthal introduced himself as restructuring professional.

Troy Pike introduced himself as operating side guy, formerly a CEO.

Curt Lindeman introduced himself as a straddler between Jeremy and Troy, and then went on to talk about how he had been important at some firm then moved to securities law.

I introduced myself as a technologist, SAAS, SMB, involved in entrepreneurship. I explained how I met Kevin Sproles and how I was there to fix the company. I told them I was Persian and came to the USA in 1979. When I told them that I was from Iran, the reaction was negative silence. I told them I was married, that I had two young sons, that after meeting Kevin Sproles we moved to Austin, and that I have family in California. At the end of the call, I let them know that my family and especially my sons needed extra care during this trying time. (From that point on, every time I mentioned needing time off for my kids, the New Leaders increased their requests to me and due dates, making sure the due dates were not doable. When I mentioned my family health issues along with COVID-related topics that impacted my abilities, they would deliver punitive board resolutions within 48 hours. When our General Counsel, Bahar Dejban, told them she was pregnant, they told her that a general counsel should drop anything she was doing to fulfill a board request in minutes.)

Jeremy Rosenthal said he relished the opportunity to work with me, to support me.

I provided an overview of the organization, what the key challenges were and are today.

The New Leaders asked for more information along the way: Google Drive with org chart, L10 meetings, etc. I went over Volusion, metrics, revenue, cash in bank, etc.

Troy Pike went on to make assumptions that customers were negatively impacted by COVID. I advised him that our customers were seeing phenomenal online growth due to COVID and their challenges were supply-chain related and not online sales.

The New Leaders asked about Joseph Essas and whether we had board meetings since March, when Main Street resigned from the board.

Rosenthal continued to ask more on this topic, and whether or not major board decisions were made in the May board meeting. He asked if Main Street was invited to the May board meeting, and I reminded him that they resigned.

They went on to ask about Kevin Sproles and how "critical" he was to the organization.

I painted Kevin in a very positive light and as instrumental to Volusion.

Troy Pike asked about the last merger and acquisition process. We called it Velocity internally.

Late in the call, I reminded the New Leaders that I had family matters to tend to and only had 15 mins left. I let them know that Velocity was the way to get liquidity for Main Street. I told them that we selected Raymond James because they pitched producing a full-sale value of $120 million or higher. I went through the details of that process, and how it failed because it was over-marketed, and we never got an offer. I let them know Raymond James elected to bow out of the contract because the situation got tense with them, due to not producing.

Jeremy Rosenthal said he wanted to have a meet and greet with management to make sure I was in a position to work with Tim Stallkamp and the document requests. They then told me that Stallkamp was the priority, among all their requests. (The New Leaders turned this around later and said everything they request is the priority.) The New Leaders then reiterated the need to meet with management immediately. They wanted to set up a next meeting. I told them I had family matters that started every afternoon, and that I would need to meet earlier than 2 CST. **I told them that I had challenging family matters, alluding to COVID-19 and telling them that I had two young sons, both with serious health issues.** I told the New Leaders that I was committed to getting them what they needed and working well with them.

### The New Leaders Begin to Set Me Up For Termination

The day after my first board meeting with the New Leaders, on Tuesday, June 16, 2020 at 9:35 PM, Jeremy Rosenthal sent me an email with voluminous requests that would normally take weeks, and provided a deadline of next day Friday, by 2 PM CST. **This was a set up.** First, this began a pattern by the New Leaders of building a paper trail that they were seeking documents and trying to show they were not getting sufficient cooperation, despite prompt and diligent efforts by both Bahar Dejban and me. Second, the whole feverish document search was part of a pretext. Prior to Main Street inserting its handpicked board (Pike, Rosenthal and Lineman) and its CRO -- Stallkamp, not only was Main Street (through Main Street's CEO, no less) a board member, but Volusion's leaders had held multiple talks with Main Street and provided them with virtually all of the information that the New Leaders pressed to receive as if an emergency.

For the New Leaders to suddenly claim that they were in dire need of information and documents and that it had none in its possession after being interviewed and handpicked by Main Street, and presumably after they themselves considered the position they were being offered is incredible. They would have to claim that Main Street provided them with none of the information in its possession and that they never sought any in accepting positions as the top managers of Volusion. Their pretense that they took their positions without being provided with or seeking any information or documents which were in the direct possession of their employer (Main Street) defies credulity. Further, even assuming that the New Leaders were in need of anything and that there was some huge urgency to obtain it, they could obtain the information from their boss -- Main Street – and not declare an emergency that would override the efforts of the existing leaders of Volusion to run the company. The argument that these New Leaders walked onto their jobs sight unseen as the chief managers of a company in such dire straits that it was on the verge of bankruptcy is absurd.

I replied to Rosenthal the next day before his 2 PM deadline. In my first reply I let them know I was taking my son to the doctor for an emergency, he had a severe ear infection and fever, and told Jeremy I would reply as soon as I was back. My 9:18 AM email on June 17, 2020 said to Rosenthal:

> Jeremy:
>
> **Taking my son to the doctor, he has a severe ear infection.** I'll reply to your email immediately after I return.
>
> Sincerely,
>
> Bardia

(Emphasis added.)

My next email to Rosenthal was also ahead of his 2 pm deadline. I sent my email at 11:18 AM. It was an earnest attempt to cooperate and to work fast and also to remind the New Leaders of my sons' health issues and needs. I let them know that he was not allowing enough time to turnaround requests under normal circumstances, and that I was going through extraordinary circumstances. Historically, the information Rosenthal requested would take an 8-week process to turnaround. I reiterated my family responsibilities, to my boys, aged 2 and 7. My email to Rosenthal said:

> Jeremy:
>
> As CEO, I need to balance operating the company as well as fulfilling these requests. I'm a very hands on leader, which is part of the reason I was elevated to CEO. I take great care to be involved in and shape each part of the organization to assure that it is heading for success.
>
> Regardless, in just 24 hours, I've now met with all parties requesting meetings and begun preparing next steps. Based on our meetings, I felt like we are being collaborative and communicating openly, something foundational to our culture code.
>
> While I am giving you and Tim my highest priority, there are other business items that I cannot merely ignore. **I'm moving as fast as physically possible to compile information and populate drives.** I'll be able to create a Google Drive for the Board and begin populating the requested information by the end of business today. I'm targeting to have all requested information by the end of this week, possibly Friday AM in preparation for our meeting on Monday.

I would appreciate the opportunity to correct the record in regards to Conway Mackenzie. I did not report that the information was readily available, I let Tim know our form NDA was readily available and that we would begin our PCI procedure, which starts with a background check. This is something we have never bypassed as a PCI compliant organization. All contractors that have access to the information he is requesting must go through this process. Is your instruction that we bypass this security process? My concern is that doing so may jeopardize our compliance status while only saving a few days. Candidly, historical board members at Volusion have also gone through this background check.

Given that he had not specified a length of time, and had shortly before the call sent me his document requests, Tim seemed amenable to the 30 minute meeting. **On the items Tim requested, I just wanted to give some background. It took us over 8 weeks to deliver that information to Raymond James last year during our process. During that time, I was the person responsible for aggregating a significant majority of that information, and can do so efficiently. While I'll work to expedite this process, it is likely going to be in batches over the next 4 weeks.** Also, Tim never requested to have unfettered access to anyone from leadership. Considering the above miscommunication, I will endeavor a better job of documenting future communications so as to avoid further miscommunication.

As I informed you during our meeting, based on the way Volusion has operated historically, I firmly believe that introducing and/or creating direct reports for Tim, or any of this structure by the management team at Volusion at this time will be incredibly disruptive, and will lead to a catastrophic deterioration in key metrics and hinder rock completion for the organization. This is the reason I asked to be allowed to think through how best to achieve this. I've been thinking through how to do this, and when, in an appropriate way. This will also personally tie me up with questions and uncertainties of the future of the organization, potentially leading to even further disruption and missed performance. This should be an area we dig into on Monday.

In general, **a majority of the management team is very focused and is taking on some additional roles, all part of the plan to rebuild the organization from within in preparation for our go-to-market with VOLT. There is an incredible new energy within the organization, but this is also an incredibly time consuming process for me, as CEO, to ramp up, cast vision and provide clear direction for each management team member, as well as establishing processes (EOS) as our guiding light to success for the organization.** As you stated, we want to all make Volusion successful. I ask a little of your indulgence considering my years of being immersed in this company, its business, and building its culture. **I'm taking your requests seriously and making them my top priority, while also balancing above. I also have to assure that this**

**process does not interfere with my responsibilities to my two boys, aged 2 and 6.**

Sincerely,

Bardia

(Emphasis added.)

On June 18, 2020 Troy Pike texted me at 6:48 PM, saying, "Please call me this evening if possible. If not possible, please let me know." I was still caring for my son with a severe ear infection. With COVID, my 2-year old's daycare was closed, so this became a huge challenge for us, trying to provide different levels of care for a sick 7-year-old and demanding 2-year-old, combined with COVID and their underlying health conditions (severe asthma, food allergies). I replied that evening: "With the kids. I can call you at 8 AM tomorrow."

Pike replied with pressure and a veiled threat: "My normal response would be yes, of course. But it is clear to me now that you aren't grasping how critical time is for you right now." I called Pike at 8 AM the next morning. He did not accept my call.

Then Pike sent me another text, making it sound like I failed to call him. Pike's text said: "Awaiting your call."

I called him again. He answered and was abusive. Pike told me on the phone call: "Either you don't understand the gravity of the situation or you don't care." He also told me, "There's a new sheriff in town."

This kind of talk was part of Pike's pattern and it was prompted by his national origin discrimination and his negative reaction to my efforts to care for the health of my family. Pike would pretend to be friendly then he would tell me I needed to do something right away or else. In that early phone call the morning of June 19, 2020, Pike asked me to introduce Tim Stallkamp and Wayne Scott. I did what he asked, and my response to Pike at 8:24 AM confirms that and notes his threat to me:

> Troy:
> I committed to introducing Tim and Wayne, and I did. You rejected my call today.
> I don't understand why you have to threaten me?
>
> Sincerely, Bardia

On June 19, 2020, the New Leaders passed a "Unanimous Written Consent of the Board of Managers of Volusion, LLC," a document that was directly retaliatory to my efforts to care for my sons' health issues during the pandemic – it severely limited my abilities to perform my job as CEO. Pike's email essentially admitted this retaliation. Pikes' June 19, 2020 (4:35:01 PM)

email stated: "your insufficient level of responsiveness and execution on board directives causes the board great concern."

## The New Leaders' Campaign Against Bahar Dejban

On June 19, 2020, the New Leaders began a campaign against Bahar Dejban, the General Counsel of Volusion. One of the New Leaders, Curt Lindeman, wrote to Bahar Dejban, misstating her role (calling her "outside general counsel" when she was full time, but not "outside" General Counsel of Volusion). Lindeman's email (of 8:59 AM) said:

> I am one of the members of the Board of Managers of Volusion (the other 2 are copied on this email). The Board asked David Snyder (also copied), with Jackson Walker (company counsel), to contact you. **I understand that you are operating as the full-time outside general counsel of Volusion.** We really need you to at least touch base with David this morning (preferably within the hour) so we can start to understand the legal issues currently facing the company.
>
> If there are significant legal issues that would prevent such a call this morning, we obviously need to know asap.
>
> I look forward to working with you.

(Emphasis added.)

Bahar Dejban responded to Lindeman on June 19, 2020 (at noon), referring to David Snyder as "David" as follows:

> I emailed David for available times. **Unfortunately, I have personal medical issues to tend to as I am pregnant.** David is welcome to contact me directly. I will endeavor to connect with him at the first possible time.
>
> Thank you for your consideration. I too look forward to working with you.

(Emphasis added.)

The New Leaders viewed the news that Bahar Dejban was pregnant negatively and with hostility. None of the New Leaders ever congratulated Bahar on her pregnancy, asked her about accommodations she would need, or even asked her how far along she was – the first step in a discussion about accommodations. In fact, none of the New Leaders ever mentioned her pregnancy except in a dismissive way that suggested that being pregnant was inconvenient and the same as not being pregnant but facing COVID issues with the rest of the population. Lindeman said he could "understand and sympathize with family obligations" and dismissed her pregnancy (and my son's health issues) by saying, "We are all trying to juggle family obligations during this strange time." Later he made a similar statement to me in a meeting when I talked about the

medical issues facing my sons that I was trying to handle – he said to me, "We're all in the same boat." We were not.

On July 8, 2020 (at 4:44 PM) , Lindeman wrote a condescending, critical, and dismissive email to Bahar and me. Lindeman's email stated:

> I can understand and sympathize with family obligations. **We are all trying to juggle family obligations with work during this strange time.** However, these delays by both you and Bahar for weeks are not acceptable. If these requests were made of me as a GC, I could send out the documents within minutes from anywhere there is a cell signal.
>
> If you can't do it, please direct people on your team to send me the documents today.

Bahar Dejban promptly responded, objecting to Lindeman's email and pointing out her pregnancy and the fact that she had been experiencing complications and difficulties with her pregnancy over the past weeks. Bahar Dejban's email of July 8, 2020 (at 5:39 PM) told Lindeman:

> Curt,
>
> **I do not appreciate your misrepresentations.** This is the <u>first</u> request I have received for contracts with major vendors or engagement letters with law firms. I was asked for a list of law firms that are or have recently been engaged. And I provided that to you last week.
>
> **I also informed you in our conference call that I do not have access to employment agreements, and nevertheless, you requested those from me.**
>
> **Finally, I have been working full time for Volusion, and as I have told you, I am pregnant and have experienced some complications and difficulties with my pregnancy over the past weeks.** Regardless, I have continued to respond to all of Tim's requests, including providing him with complete access to a drive of intellectual property material along with corresponding engagement letters last night.
>
> I can get you the retainer agreements for lawyers I have engaged, other than the patent lawyer which you now already have as of last night. I will have to search for agreements with lawyers that were engaged prior to my employment but that are still doing work for Volusion.
>
> I take my job as General Counsel of Volusion VERY seriously and would appreciate it if you wouldn't misstate things and conflate your previous role as GC with the work I am doing. We have different jobs and obviously different styles. I

have and will continue to timely respond to all requests while managing my other duties.

(Emphasis added.)  Bahar Dejban copied all the New Leaders on this email.

None of the New Leaders responded with any effort to accommodate the pregnancy and complications of Bahar Dejban.  Volusion's response, much like – "Oh, you're pregnant – thanks for that information – you're fired – we will replace you with a non-pregnant man" -- very shortly thereafter, was to fire Bahar Dejban without stating any reason and without prior warning on July 27, 2020.

### My Written Notice to the New Leaders of FMLA/ FFRCA Needs

On July 8, 2020  I put the New Leaders on written notice that I was taking time to care for my sons and that they suffered from "medical conditions that are directly impacted by COVID-19 and Stage 5" (referring to the shutdown that caused serious issues with obtaining essential food  for my sons that would not trigger severe allergic reactions).  At 7:04 PM on July 8, 2020 I sent this email to all 4 of the New Leaders:

Curt, Troy, Jeremy and Tim:

Replying to an email Tim had sent while I was on PTO.

**Just getting back from my son's doctors appointment. Earlier today, Austin confirmed Stage 5 approaching within the next couple days if not tonight.** I am spending the remainder of the week working on Q3 priorities with the executive team, and **taking care of my family in preparation for Stage 5. As I mentioned before, my children have medical conditions that are directly impacted by COVID-19 and Stage 5.**

Let's schedule a meeting by video for Monday, July 13th? I can free up any block of time that works for you. If we have time, I would also like to cover our VOLT go-to-market plans, including Q3 revenue stability, which I'm also finalizing.

Sincerely,

Bardia

(Emphasis added.)

None of the New Leaders responded with any effort to accommodate my FMLA/ FFRCA needs (instead, they responded with hostility).  Jeremy Rosenthal's email to me at 8:34 PM on July 8, 2020 deliberately missed the point – that my sons were especially impacted by COVID-19.  Rosenthal glibly said, "Please stay safe.  We understand that with Covid this is a very challenging time."  Generally, the emails from the New Leaders

12

treated my efforts to take care of my family as an inconvenience and/or as a lack of cooperation. Volusion's ultimate response, very shortly thereafter, was to fire me without stating any reason and without prior warning on July 27, 2020.

On July 13, 2020 via my 7:55 AM email, I put the New Leaders on further written notice of my FMLA/ FFRCA needs. I sent them this email letter:

Curt, Jeremy, Troy, Tim:

Wanted to get this to you first thing this AM. I mentioned Friday that I would be working over the weekend on various initiatives. As you know, Volusion measures success based on our 5+1. If you look at our financials and board materials, we have been targeting and exceeding EBITDA margin goals since Q4 2019; with Net Income posted in May for first time in over a year. Additionally, we have brought revenue green shoots online for partner and ecosystem lines, all part of the plan we had laid out late last year. While it's been great to see our plan working, we still have immediate revenue stabilization initiatives targeting ~$500k additional revenue through Q4. But our largest revenue driver will be VOLT GTM.

There are also key elements of the revenue stability plan and our VOLT GTM that need to be detailed. The management team feels that we are on the right path and results are already validating that belief. Our CFO had mentioned to Tim that he would have models by July 24th, which I've attempted to help accelerate. We are also finalizing June numbers this week. Once I receive all of those pieces of information, I'll need to incorporate them into the board presentation as well as implement into the overall organizational plans.

**At the same time I need to bring to your attention that my time this week will be diverted to speaking with several members of the leadership team in an effort to ameliorate some of the damage and reduce the anxiety that has occurred by the recent events. Of particular concern is the effect that Tim's communications have had on the management team. He has not only injected derogatory information, which is frankly unnecessary, but also has shared a board resolution document. To put it simply, they are now uncertain of the future of Volusion and their own commitment to what has been a less than clear and mixed message. This has significantly impacted the work environment, including directly impacting Q3 rocks.** The team as you must know, are critical members of the organization who were contacted against my advice and counsel.

Finally, it has been brought to my attention that legal representatives of various entities will be having a discussion tomorrow at 4 CST. I feel caught in the middle of this, but more importantly, need to have some understanding of what is going on so I can effectively perform my duties and continue the turnaround. Truthfully,

13

I am also separately troubled by the fact that the board, two members of which are attorneys, along with their counsel wish to have a meeting with me and insisting that I appear without counsel. I am extremely uncomfortable with the legal maneuvering and factions, and must admit that I am completely out of my element. It is crucial that I focus on my job to keep moving Volusion to increased profitability and growth, and leave the legal matters to the experts, at least until I have better clarity.

**Personally, as I have mentioned, COVID-19 continues to cause extreme uncertainty and anxiety for my family, especially given my young sons' health issues.** Also as I wrote Friday, Austin will be moved back to a Stage 5. Given all of these considerations combined with COVID-related family issues, I am asking that you move our meeting to the end-of-the month. In the meantime I will speak with Tim as scheduled this morning who I'm sure will report back on our conversation.

Sincerely,

Bardia

(Emphasis added.)

None of the New Leaders responded with any effort to accommodate my FMLA/ FFRCA needs. Emails from the New Leaders treated my efforts to take care of my family as an inconvenience and as a lack of cooperation. Volusion's ultimate response, very shortly thereafter, was to fire me without stating any reason and without prior warning on July 27, 2020.

### The New Leaders Terminate Bahar and Me For Unlawful Reasons And Try To Cover Up My National Origin

On July 17, 2020, I attended another Board meeting. Nothing was said at that meeting to alert me to the fact that the New Leaders were about to fire the General Counsel, Kevin Sproles and me and to put Volusion in bankruptcy, despite the fact that Volusion was doing well as a business and did not need to take bankruptcy to avoid foreclosure.

On July 23, 2020 at 1:46 PM, Stallkamp emailed Bahar Dejban about patent attorneys. At 2:21 PM, I emailed the New Leaders about the Board Meeting agenda for the board meeting that would take place later in the day. My email to them said:

Troy, Jeremy, Curt:

The agenda for today's call will be to focus on Q2 2020 preliminary 5+1 impact. If we have time, I'd also like to discuss VOLT.

I'm also attaching/responding to the following requests:

14

Volusion feature matrix (attached)

Market penetration in Apparel category

   _      23% of our customers are in this segment today

   -      $2m-50m GMV apparel merchants in U.S. is ~1,237

   -      We have 200 today (16% market penetration)

Sincerely, Bardia

    Troy Pike emailed in response five minutes later without any hint that anything was afoot. Pike's 2:26 PM email said:

> Thank you, Bardia. We should also reserve five minutes to discuss the
> forbearance agreement and its objectives.
> Best,
> Troy

    Pike's reference to the forbearance agreement related to the agreement Main Street, Volusion's lender, had made that it would not seek to foreclose on the loan due to default on payment obligations by Volusion. Despite this agreement, Tim Stallkamp (CRO) told me shortly before the Board meeting that he needed someone to wire over $800,000 to Main Street as a peace offering. He also said the Board gave him authority to sign the agreement but not to wire the funds. I asked why we had to pay anything to Main Street since we had a forbearance back in April. Stallkamp said it was different now that the new Board was here. I told him I would need to follow up with Kevin Sproles, the founder since I did not have bank account access. Tim told me Main Street would take action against Volusion if we did not do so by end of week. That made no sense in light of the forbearance agreement, and Stallkamp's suggestion that I wire this money was a transparent effort to set me up.

    What Stallkamp was saying to me before the July 23 Board meeting was a transparent attempt to set me up as a pretext for firing me. This was obvious to me for several reasons. First, I had no rights over bank accounts. Second, the Board's resolutions made Stallkamp the boss of finance and the direct boss of Volusion's Director of Finance. Third, as Stallkamp knew, under the Board's resolutions, I was not authorized to spend more than $25,000. Fourth, if Main Street was going to foreclose on its loan, it would not have gone through the time and expense of putting the New Leaders in place. If that was the plan, Main Street would have just foreclosed. It would just send us a letter saying send us a specific amount of money, or we're going to foreclose. It had not done so. And fifth, as an officer of Volusion, I had had an obligation to protect the company and the majority shareholder, and as far as I was concerned, we had a forbearance with Main Street.

15

The Board meeting on Thursday, July 23, 2020 lasted less than 35 minutes. Stallkamp and his assistant joined this Board call as well. I had let them know that I would taking PTO (Paid Time Off) on Friday, to help with my boys' medical issues. They said nothing positive and seemed unhappy about this development, like they were tired of dealing with this inconvenience.

At the Board meeting of July 23, none of the New Leaders mentioned anything about Volusion filing for bankruptcy. They did not mention that they were considering firing Bahar Dejban, the General Counsel. They did not mention they were considering firing the Founder, Kevin Sproles. They did not mention that they were considering firing me or that this would be my last work day as an employee of Volusion.

I went through the details I had proposed in the agenda I had sent them before the meeting. The Board started by asking if we should discuss the payment to Main Street first, and I recommended moving along with the agenda I had proposed. The Board seemed disinterested in any topics I discussed, then the Board switched topics and asked me to wire the money to Mainstreet Capital. I told them I did not want to be put in the middle of Main Street and the founder (Kevin Sproles) and that I would need to talk with Kevin to understand where that all stood. Jeremy Rosenthal and Curt Lindeman asked me, "as the highest-ranking officer, you can't wire this payment?" I told them that I would follow-up after I had a chance to speak with the founder (who had bank account access) because I didn't want to get in the middle of legal challenges between the founder and Main Street. The last thing Troy Pike said was at the Board meeting was, "Gentlemen, the three of us should discuss what is going to happen Monday when Main Street doesn't receive their payment." Jeremy Rosenthal closed the meeting by saying "Thanks for your time Bardia."

At 5:53 pm, Bahar Dejban responded to Stallkamp's email – all in a normal, business-like way.

I got no communication from any of the New Leaders after the Thursday, June 23, 2020 Board meeting that had lasted 35 minutes. I took Friday, June 24, 2020 as a PTO day off to help with my boys, as I had told them I would do. Even when taking PTO, I checked emails. I started work early on Monday, July 27, 2020.

Troy Pike notified me I was fired by email. He called me in the afternoon on July 27, 2020. Pike left a voice message that said, "Hello Bardia, this is Troy Pike and I'm calling on behalf of Volusion's Board of Directors. I need to speak with you today uh very importantly on a matter regarding your employment with Volusion. I'll follow this directly with an email as well, but I'd appreciate you calling me back immediately." Then he left me his phone number. We did not talk on the phone that day. His email enclosed my termination letter. It did not provide a reason for termination. Pike's termination letter to me included this:

This letter follows up on my call to you earlier today. Your employment and any other relationship you have with Volusion, LLC ("Volusion") ended effective as of 9:15 a.m. Central Standard Time on July 27, 2020 (the "Termination Time").

16

>After the Termination Time, you will no longer be entitled to any further
>compensation or benefits from Volusion and are no longer authorized to act on
>behalf of Volusion or represent yourself to be an employee or agent of Volusion.
>Also, you are no longer authorized to access any Volusion systems or accounts,
>including but not limited to email systems, voicemail systems, document
>management systems and financial accounts.

Also on July 27, 2020, and without prior consultation, counseling, or warning, the New
Leaders fired Bahar Dejban by letter from Pike, effective as of 9:15 a.m. Central
Standard Time on July 27, 2020.

The New Leaders promptly took actions and made statements that show the termination
decision was motivated by hostility to the national origin of two of the three people (Bahar
Dejban and me) that it fired in "leadership changes" it connected to its filing for bankruptcy the
same day that it fired Bahar Dejban, Kevin Sproles, and me.

First, to make it seem like nothing was "wrong" at Volusion, the Company published
information about its Chapter 11 bankruptcy filing under the heading "Frequently Asked
Questions." Volusion's "answers" did not hint that the "reason" for firing Bahar Dejban or me
was that it was facing "disengaged and disobedient officers." Instead, Volusion falsely stated
that to get bankruptcy protection in place for Volusion,

>we made some difficult, but necessary and immediate leadership changes.
>**Effective July 27, Kevin Sproles and Bardia Dejban are no longer with the
>company.** We know this may have a personal impact on some of you with long-
>standing relationships, as well as to our tight-knit organization overall. **Kevin
>and Bardia have been important leaders at Volusion and we are
>tremendously thankful for their significant contributions.** While they are no
>longer formally a part of Volusion, the belief in the company, **the importance of
>the culture and the mission they inspired will remain.** Our goal is to honor
>what they helped to create by making sure the restructuring process is successful
>and Volusion can thrive going forward.

(Emphasis added.)

As for the "reason" for the bankruptcy and its timing, Volusion's "answers" stated: "The
company has matured debt and has not been able to make repayment terms." The "answers" did
not assert the reason was insufficient collaboration or cooperation from any of existing
management or that it was faced with "disengaged and disobedient officers."

At about the same time, Volusion took a deliberate action to hide my Iranian national
origin from the public. When I became CEO of Volusion, the company posted a letter from me
on its blog, for the viewing world's information. The title of the letter was "Day One – New
CEO / Volusion." Page 1 of that letter contained this:



Dear Founders, Partners and Employees:

As I take this new role of CEO, I look back at the past three years and am thankful for the opportunity to work with so many of you directly. Today is an exciting and humbling day for me, and even though I've been a part of all the amazing changes at Volusion these past few years, it feels very much like a brand new day. Like all of you, I have a choice in what I do, and choosing Volusion to be a part of my future has very much been shaped by my past as well as my passion for entrepreneurship. These values are shared not only with our founder, Kevin, but also reJected by everything we do as an organization.

**I came to the United States in 1979 to escape turbulent times from Iran and grew up in Southern California.** I come from a hardworking family with the grit to launch and grow their own businesses. I've launched my own successful companies, brought hundreds of products to market, and have helped other founders and entrepreneurs do the same. I'm a devoted technologist with a diverse product and engineering background and have solid business experience (including failures). More importantly, I have a deep understanding of the needs of our thousands of customers and take great pride in helping them succeed. I currently live in Austin, Texas with my wife of eight years, two boys and 15-year old Jack Russell Terrier.

(Emphasis added.)

During my tenure with Volusion since I began in January 2016, when an employee left Volusion, we left their articles and content live on our digital footprint, most often times under their name. This was our way of honoring them and showing off the talent and culture of the company. **Within a week or two of my firing, Volusion removed my "Day One" letter from its website.**

18

Shortly after firing the company's only Iranian-born employees, Bahar Dejban and me on July 27, 2019, and announcing to the world that its "immediate and necessary leadership change" including Kevin Sproles no longer being with the company, Volusion rehired Sproles. So, its leadership changes eliminated only Iranian-born company employees.

Then Volusion lied to the public about the reason I was fired. In its public bankruptcy filing of November 2, 2020, signed by Troy Pike as Interim Chief Executive Officer, Volusion stated:

> Despite the restructuring efforts of the Debtor, **the reconstituted Board and CRO did not receive sufficient collaboration or cooperation from certain members of then (pre-petition) existing management**. It became increasingly more difficult for the Board to fulfill its duties and take the steps necessary to maintain the value of the Debtor. The Debtor was **faced with disengaged and disobedient officers** and Secured Lenders who had already exercised remedies with regards to its matured loan facility. As a result, **the Debtor filed this Chapter 11 Case to prevent a foreclosure from occurring** and to effectuate a restructuring, which will leave the Debtor's balance sheet strong and allow the Debtor to effectively address its matured loan facility and prevent further exercise of remedies by the Secured Lenders.

(Emphasis added.).

Mr. Pike's statements in the November 2, 2020 filing are false. With the forbearance agreement in place, filing for bankruptcy when Volusion did was not necessary to prevent foreclosure. The "disengaged and disobedient" reference to me is contrary to Volusion's "answers" shortly after firing me and is a lie Volusion is telling as a pretext for firing Bahar Dejban and me because of our national origin, because of Bahar Dejban's inconvenient and aggravating (to the New Leaders) pregnancy, and because of my inconvenient and aggravating (to the New Leaders) efforts to care for the serious medical issues of my young sons during the COVID-19 pandemic.

## DISCRIMINATION STATEMENT

I believe I have been discriminated against and terminated by Volusion because of my national origin in violation of Title VII of the Civil Rights Act of 1964 and the Texas Commission on Human Rights Act, TEX. LABOR CODE, § 21.001 *et seq.* and because of my efforts to care for the serious medical issues of my young sons during the COVID-19 pandemic, in violation of the Family Medical Leave Act (FMLA) and the Family First Coronavirus Response Act (FFRCA).

My name is Bardia Dejban, my date of birth is 1979, and my address is 2907 Dover Pl, Austin, Texas 78757, in the United States of America. I declare under penalty of perjury that the foregoing is true and correct.

19

Executed in Travis County, State of Texas, on the 29th day of November 2020.

_____
Bardia Dejban

## Damage Calculation for Bardia Dejban

| | |
|---|---|
| **Bardia Dejban's birth year** | **1979** |
| **Date of Termination** | **July 27, 2020** |
| **Age on Termination Date** | **41** |
| **Date of EEOC/TWC Charge** | **Not filed yet due to automatic stay** |
| **Date of Age 72 Retirement** | **2051** |
| **Annual Compensation:** | **$592,000: Annual Base Salary**<br>**$350,000: Estimated value of annual stock, bonus incentive plan, health insurance, vacation, and sick leave**<br>**TOTAL: $942,000** |
| **Additional Compensation** | **The higher of either a minimum $2.25 million board approved cash bonus or value of 3,069,912 stock options.** |
| **Estimated trial date** | **January 27, 2023** |
| **Years from termination date until trial** | **2.5 years** |
| **Years from estimated trial date until retirement in 2051** | **28 years** |
| **Damages calculation (see calculations and explanation on page 2):** | **$11,875,000** |

| I.   | **ECONOMIC LOSSES** | | **$11,275,000** |
|------|------|------|------|
|      | A.   | Back Pay and Benefits: | $4,355,000[1] |
|      | B.   | Present Value[2] of Front Pay and Benefits: | $6,920,000[3] |
| II.  | **EXEMPLARY DAMAGES & PUNITIVE DAMAGES UNDER TITLE VII AND TCHRA (CAPPED)** | | **$100,000** |
| III. | **ATTORNEY'S FEES & COSTS:** | | **$500,000** |

---

**TOTAL DAMAGE ESTIMATE:**                    **$11,875,000**

---

[1] $942,000 x 2.5 = $2,355,000 minus mitigation estimate (1 x $250,000 = $250,000) = $2,105,000, plus minimum additional lost compensation of $2,250,000 = $4,355,000

[2] Discounted to present value by means of the net discount method.

[3] $942,000 x 10.00 years = $9,420,000, minus mitigation estimate ($250,000 x 10.00 years = $2,500,000) = $6,920,000

**Exhibit C**

**Proof of Claim No. 20**

United States Courts
Southern District of Texas
FILED

*November 30, 2020*
.........
David J. Bradley, Clerk of Court

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Volusion, LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Southern District of Texas |
| Case number | 20-50082 (DRJ) |

## Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

## Part 1: Identify the Claim

**1. Who is the current creditor?**

Bardia Dejban

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor  NA

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Hal K. Gillespie
Name
4803 Gaston Ave.
Number     Street
Dallas, Texas 75246
City               State          ZIP Code

Contact phone  (214) 415-7911

Contact email  hkg@gillespiesanford.com

Where should payments to the creditor be sent? (if different)

Name
Number     Street
City               State          ZIP Code

Contact phone _____
Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
         MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

---

**7. How much is the claim?**

$_____ 11,875,000 . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Unlawful discrimination, retaliation and termination.

---

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

---

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition. $_____

---

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☐ No | **Amount entitled to priority** |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ Yes. *Check one:* | |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☑ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____10,000 |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   11/30/2020
                  MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Hal Keith Gillespie | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Attorney for Bardia Dejban | | |
| Company | | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 3403 Gaston Avenue | | |
| | Number          Street | | |
| | Dallas, Texas 75246 | | |
| | City | State | ZIP Code |
| Contact phone | (214) 415-7911 | Email | hkg@gillespiesanford.com |

| Print | Save As... | Add Attachment | | Reset |
|---|---|---|---|---|

Official Form 410          Proof of Claim          page 3

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | |

**Texas Workforce Commission Civil Rights Division** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Cell Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Bardia Dejban** | **(818) 929-6818** | **1979** |

| Street Address | City, State and ZIP Code |
|---|---|
| **2907 Dover Pl, Austin, TX 78757** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **Volusion, LLC** | **About 170** | **(800) 646-3517** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1835-A Kramer Lane, Suite 100, Austin, TX 78758** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | **(800) 646-3517** |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☒ NATIONAL ORIGIN
☒ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: **June 8, 2020**   Latest: **July 27, 2020**

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

See Attachment A hereto.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

| November 29, 2020 | |
|---|---|
| Date | Charging Party Signature |

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To:

| | |
|---|---|
| ☐ | FEPA |
| ☒ | EEOC |

Agency(ies) Charge No(s):

**Texas Workforce Commission Civil Rights Division**   and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

_____    _____
*Date*                                    *Charging Party Signature*

NOTARY – *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
*(month, day, year)*

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1.   **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2.   **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3.   **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4.   **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws).  Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination.  This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions.  A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5.   **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of.  Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed.  Charges may be clarified or amplified later by amendment.  It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA.  Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements.  You will be told which agency will handle your charge.  When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter.  Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so <u>within 15 days</u> of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge.  Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

**Attachment A**

### I.     Personal Harm

I am a male citizen of the United States and currently 41 years old.  I was born in Tehran, Iran in 1979.  My first name, Bardia, is a uniquely Iranian name.  My highest level of formal education is an MBA degree from Pepperdine University, which I obtained in 2012.

On January 29, 2015, Main Street Capital Corporation ("Main Street") announced it had recently led a new portfolio investment totaling $45.0 million of invested capital in Volusion, LLC ("Volusion"), with Main Street funding $31.5 million of the investment.  The proceeds of the investment were used to provide capital to fund Volusion's near-term growth opportunities.  Main Street's investment in Volusion included a combination of first-lien, senior secured term debt with equity warrant participation and a direct equity investment.  In addition, Main Street and its co-investor provided Volusion a commitment for up to $10.0 million of additional capital to support its future growth opportunities and have the ability to fund additional capital in the future if needed to continue to support Volusion's growth. The press release for this transaction stated, "Main Street's investment supports Volusion's current management team, which retained majority equity ownership of the company."

I received an offer letter dated December 23, 2015 from Volusion for the position of Chief Information Officer (CIO), with a start date of January 25, 2016.  I signed the offer letter to accept the position on December 28, 2015.  At the time the CEO of Volusion  was Kevin Sproles, who was the founder of the company.

My performance for Volusion was always outstanding.  Also, my results for Volusion were outstanding.  I started my employment with Volusion in February 2016.  Mr. Sproles changed my job title to Chief of Staff a week before I started.

•       Volusion paid me a relocation payment of $10,000 on February 11, 2016.

•       Volusion paid me a signing bonus of $250,000 and a performance bonus of $13,984.52 on May 5, 2016.

•       Volusion paid me a performance bonus of $23,211.54 on July 14, 2016.

I held the Chief of Staff position until October 2016, when I was promoted to Chief Technology Officer (CTO).   Mr. Sproles made the promotion decision.

On November 30, 2018 I was promoted to the position of Chief Operating Officer (COO). Mr. Sproles made this promotion decision.

2

On January 15, 2019, all the members of the Board of Managers (the "Board") of Volusion adopted several resolutions. Pursuant to the resolutions Volusion approved a Transaction Incentive Retention Bonus Plan and designated me as a participant in the Plan. Under the Plan, I was awarded 1,534,956 units, with an exercise price of $0.69000, with a vesting commencement date of November 2, 2018 and a special vesting schedule. The next highest award to an existing employee went to Randon Kelly, with 345,000 units. My award was recognition of outstanding contributions to the company.

On August 19, 2019 Volusion announced my promotion to the position of CEO. This promotion was the decision of Mr. Sproles, with approval of Volusion's Board of Directors. Volusion announced that Sproles would stay on with the company "to guide produce and technology innovation."

• Volusion paid me a performance bonus of $75,000 on August 22, 2019.

By May 2020, I had completely turned around Volusion's performance. By that time Volusion was for the first time in 4 years running a positive EBITDA, and we had focused it for maximizing revenue from its legacy product. We were on course to launch Volusion's new product. Under my leadership, Volusion's cash reserves had increased from about $4 million to over $8 million. As of this date, Volusion had about 170 employees. Of these employees, only two, myself and the General Counsel of the company, Bahar Dejban, were of Iranian descent. Bahar Dejban, my twin sister, and I were born in Iran. Bahar Dejban became the General Counsel of Volusion in March 2019, when I was the company's COO. Until that time, I was unaware of any discrimination against employees born in Iran at Volusion.

On June 9, 2020, Main Street's COO, Dwayne Hyzak, notified me the CEO of Volusion, along with Mr. Kevin Sproles, Mr. Randon Kelly, and the Corporate Secretary of Volusion that it had changed the Board of Managers ("the Board") for Volusion and that the Board now was made up of Troy Pike, Jeremy Rosenthal, and Curt Lindeman. All three of these are Caucasian males, born in the United States.

After the new Board of Managers and CRO Tim Stallkamp arrived on the scene at Volusion, these four Caucasian born-in-the-United States males treated all the Volusion employees born in Iran badly, while treating born-in-the-United States employees of Volusion well. The New Leaders implemented a discriminatory double standard. While Pike, Rosenthal, Lindeman and Stallkamp (collectively the "New Leaders") were demanding, unreasonable, condescending, abrupt and rude toward me and the other Iranian born employee of Volusion, my sister, Bahar Dejban (Volusion's General Counsel), the New Leaders treated the other Volusion leaders (non-Iranian born) politely and with deference. The remaining leadership at Volusion (non-Iranian born) were able to put off requests from the New Leaders for days and weeks. They could literally say, "I won't have time to talk until next week" and the response, time and again was "no problem. When next week." The demands on Bahar Dejban and me by the New Leaders, were abrupt, unreasonable and pretextual. The New Leaders made a deliberate effort to manufacture a false "reason" for termination so they could assert falsely that Bardia and Bahar Dejban were "disengaged and disobedient officers." Although the New Leaders did not give me a reason for

3

terminating me when they fired me by mail, "being disengaged and disobedient" is the false and pretextual reason that Volusion offered in its Disclosure Statement in Bankruptcy Court in the matter called In re Volusion, LLC, Chapter 11, Case No. 20-50082 (DRJ), in the United States Bankruptcy Court for the Southern District of Texas, Laredo Division.

Stallkamp's email to me of Thursday, June 11, 2020 at 8:49 AM stated:

By way of introduction, I have recently been retained as a senior advisor to assist the newly constituted Board and Volusion. I wanted to reach out to see if there would be the ability to connect in person today (or at least by phone if in person is not practical.) I have plans to be in Austin through mid-day tomorrow and can be flexible as to location, etc. My cell # is below – looking forward to meeting/speaking with you.

From that time until my termination by letter on July 27, 2020, I was engaged, obedient and cooperative with the New Leaders, despite the fact that one or more of them often treated me in an arbitrary, demanding, inconsistent and disrespectful manner. This mistreatment came at the time of the COVID-19 pandemic, and the New Leaders interfered with my ability to care for my two young sons with serious health issues that I advised them of orally and in writing. The New Leaders and Volusion discriminated against me, retaliated against me, and ultimately terminated me because of my efforts to exercise rights under the FMLA and the Family First Coronavirus Response Act (FFRCA) as well as my Iranian national origin. Volusion deliberately attempted to create a pretext for firing me, so it could assert that it fired me for being disengaged and disobedient.

At the same time, Volusion treated my lawful and protected efforts to care for young sons with serious (life threatening) medical issues – severe asthma and allergies – during the pandemic as foot dragging, delay, and insubordination. Volusion engaged in a **pattern or practice** of retaliation and interference, not only punishing and firing me for my protected efforts to care for my young sons, but also retaliating against and firing another Volusion employee, Bahar Dejban, due to her pregnancy when it learned of her pregnancy.

My first Board Meeting (the first with the New Leaders) began at noon on Monday, June 15, 2020. I called into the meeting. I told them when the meeting started that I still had family and personal things still going on and didn't realize video was mandatory. Historically, Volusion's board calls were phone with screen share optional. Jeremy Rosenthal said that next time we would do video and he made it sound mandatory.

Jeremy Rosenthal asked about my 818 phone number, and if I was bi-coastal. Then there was some casual talk about the weather. Troy Pike was late for the meeting. Jeremy Rosenthal talked about his cases.

4

When Troy Pike came onto the call, we started the meeting. Jeremy Rosenthal introduced himself as restructuring professional.

Troy Pike introduced himself as operating side guy, formerly a CEO.

Curt Lindeman introduced himself as a straddler between Jeremy and Troy, and then went on to talk about how he had been important at some firm then moved to securities law.

I introduced myself as a technologist, SAAS, SMB, involved in entrepreneurship.  I explained how I met Kevin Sproles and how I was there to fix the company. I told them I was Persian and came to the USA in 1979. When I told them that I was from Iran, the reaction was negative silence.  I told them I was married, that I had two young sons, that after meeting Kevin Sproles we moved to Austin, and that I have family in California.  At the end of the call, I let them know that my family and especially my sons needed extra care during this trying time. (From that point on, every time I mentioned needing time off for my kids, the New Leaders increased their requests to me and due dates, making sure the due dates were not doable.  When I mentioned my family health issues along with COVID-related topics that impacted my abilities, they would deliver punitive board resolutions within 48 hours.  When our General Counsel, Bahar Dejban, told them she was pregnant, they told her that a general counsel should drop anything she was doing to fulfill a board request in minutes.)

Jeremy Rosenthal said he relished the opportunity to work with me, to support me.

I provided an overview of the organization, what the key challenges were and are today.

The New Leaders asked for more information along the way: Google Drive with org chart, L10 meetings, etc.  I went over Volusion, metrics, revenue, cash in bank, etc.

Troy Pike went on to make assumptions that customers were negatively impacted by COVID.  I advised him that our customers were seeing phenomenal online growth due to COVID and their challenges were supply-chain related and not online sales.

The New Leaders asked about Joseph Essas and whether we had board meetings since March, when Main Street resigned from the board.

Rosenthal continued to ask more on this topic, and whether or not major board decisions were made in the May board meeting. He asked if Main Street was invited to the May board meeting, and I reminded him that they resigned.

They went on to ask about Kevin Sproles and how "critical" he was to the organization.

I painted Kevin in a very positive light and as instrumental to Volusion.

Troy Pike asked about the last merger and acquisition process.  We called it Velocity internally.

Late in the call, I reminded the New Leaders that I had family matters to tend to and only had 15 mins left. I let them know that Velocity was the way to get liquidity for Main Street. I told them that we selected Raymond James because they pitched producing a full-sale value of $120 million or higher. I went through the details of that process, and how it failed because it was over-marketed, and we never got an offer. I let them know Raymond James elected to bow out of the contract because the situation got tense with them, due to not producing.

Jeremy Rosenthal said he wanted to have a meet and greet with management to make sure I was in a position to work with Tim Stallkamp and the document requests. They then told me that Stallkamp was the priority, among all their requests. (The New Leaders turned this around later and said everything they request is the priority.) The New Leaders then reiterated the need to meet with management immediately. They wanted to set up a next meeting. I told them I had family matters that started every afternoon, and that I would need to meet earlier than 2 CST. **I told them that I had challenging family matters, alluding to COVID-19 and telling them that I had two young sons, both with serious health issues.** I told the New Leaders that I was committed to getting them what they needed and working well with them.

### The New Leaders Begin to Set Me Up For Termination

The day after my first board meeting with the New Leaders, on Tuesday, June 16, 2020 at 9:35 PM, Jeremy Rosenthal sent me an email with voluminous requests that would normally take weeks, and provided a deadline of next day Friday, by 2 PM CST. **This was a set up.** First, this began a pattern by the New Leaders of building a paper trail that they were seeking documents and trying to show they were not getting sufficient cooperation, despite prompt and diligent efforts by both Bahar Dejban and me. Second, the whole feverish document search was part of a pretext. Prior to Main Street inserting its handpicked board (Pike, Rosenthal and Lineman) and its CRO -- Stallkamp, not only was Main Street (through Main Street's CEO, no less) a board member, but Volusion's leaders had held multiple talks with Main Street and provided them with virtually all of the information that the New Leaders pressed to receive as if an emergency.

For the New Leaders to suddenly claim that they were in dire need of information and documents and that it had none in its possession after being interviewed and handpicked by Main Street, and presumably after they themselves considered the position they were being offered is incredible. They would have to claim that Main Street provided them with none of the information in its possession and that they never sought any in accepting positions as the top managers of Volusion. Their pretense that they took their positions without being provided with or seeking any information or documents which were in the direct possession of their employer (Main Street) defies credulity. Further, even assuming that the New Leaders were in need of anything and that there was some huge urgency to obtain it, they could obtain the information from their boss -- Main Street – and not declare an emergency that would override the efforts of the existing leaders of Volusion to run the company. The argument that these New Leaders walked onto their jobs sight unseen as the chief managers of a company in such dire straits that it was on the verge of bankruptcy is absurd.

I replied to Rosenthal the next day before his 2 PM deadline. In my first reply I let them know I was taking my son to the doctor for an emergency, he had a severe ear infection and fever, and told Jeremy I would reply as soon as I was back. My 9:18 AM email on June 17, 2020 said to Rosenthal:

Jeremy:

**Taking my son to the doctor, he has a severe ear infection.** I'll reply to your email immediately after I return.

Sincerely,

Bardia

(Emphasis added.)

My next email to Rosenthal was also ahead of his 2 pm deadline. I sent my email at 11:18 AM. It was an earnest attempt to cooperate and to work fast and also to remind the New Leaders of my sons' health issues and needs. I let them know that he was not allowing enough time to turnaround requests under normal circumstances, and that I was going through extraordinary circumstances. Historically, the information Rosenthal requested would take an 8-week process to turnaround. I reiterated my family responsibilities, to my boys, aged 2 and 7. My email to Rosenthal said:

Jeremy:

As CEO, I need to balance operating the company as well as fulfilling these requests. I'm a very hands on leader, which is part of the reason I was elevated to CEO. I take great care to be involved in and shape each part of the organization to assure that it is heading for success.

Regardless, in just 24 hours, I've now met with all parties requesting meetings and begun preparing next steps. Based on our meetings, I felt like we are being collaborative and communicating openly, something foundational to our culture code.

While I am giving you and Tim my highest priority, there are other business items that I cannot merely ignore. **I'm moving as fast as physically possible to compile information and populate drives.** I'll be able to create a Google Drive for the Board and begin populating the requested information by the end of business today. I'm targeting to have all requested information by the end of this week, possibly Friday AM in preparation for our meeting on Monday.

I would appreciate the opportunity to correct the record in regards to Conway Mackenzie. I did not report that the information was readily available, I let Tim know our form NDA was readily available and that we would begin our PCI procedure, which starts with a background check. This is something we have never bypassed as a PCI compliant organization. All contractors that have access to the information he is requesting must go through this process. Is your instruction that we bypass this security process? My concern is that doing so may jeopardize our compliance status while only saving a few days. Candidly, historical board members at Volusion have also gone through this background check.

Given that he had not specified a length of time, and had shortly before the call sent me his document requests, Tim seemed amenable to the 30 minute meeting. **On the items Tim requested, I just wanted to give some background. It took us over 8 weeks to deliver that information to Raymond James last year during our process. During that time, I was the person responsible for aggregating a significant majority of that information, and can do so efficiently. While I'll work to expedite this process, it is likely going to be in batches over the next 4 weeks.** Also, Tim never requested to have unfettered access to anyone from leadership. Considering the above miscommunication, I will endeavor a better job of documenting future communications so as to avoid further miscommunication.

As I informed you during our meeting, based on the way Volusion has operated historically, I firmly believe that introducing and/or creating direct reports for Tim, or any of this structure by the management team at Volusion at this time will be incredibly disruptive, and will lead to a catastrophic deterioration in key metrics and hinder rock completion for the organization. This is the reason I asked to be allowed to think through how best to achieve this. I've been thinking through how to do this, and when, in an appropriate way. This will also personally tie me up with questions and uncertainties of the future of the organization, potentially leading to even further disruption and missed performance. This should be an area we dig into on Monday.

In general, **a majority of the management team is very focused and is taking on some additional roles, all part of the plan to rebuild the organization from within in preparation for our go-to-market with VOLT. There is an incredible new energy within the organization, but this is also an incredibly time consuming process for me, as CEO, to ramp up, cast vision and provide clear direction for each management team member, as well as establishing processes (EOS) as our guiding light to success for the organization.** As you stated, we want to all make Volusion successful. I ask a little of your indulgence considering my years of being immersed in this company, its business, and building its culture. **I'm taking your requests seriously and making them my top priority, while also balancing above. I also have to assure that this**

8

**process does not interfere with my responsibilities to my two boys, aged 2
and 6.**

Sincerely,

Bardia

(Emphasis added.)

On June 18, 2020 Troy Pike texted me at 6:48 PM, saying, "Please call me this evening if
possible.  If not possible, please let me know."  I was still caring for my son with a severe ear
infection. With COVID, my 2-year old's daycare was closed, so this became a huge challenge
for us, trying to provide different levels of care for a sick 7-year-old and demanding 2-year-old,
combined with COVID and their underlying health conditions (severe asthma, food allergies). I
replied that evening: "With the kids.  I can call you at 8 AM tomorrow."

Pike replied with pressure and a veiled threat: "My normal response would be yes, of
course.  But it is clear to me now that you aren't grasping how critical time is for you right now."
I called Pike at 8 AM the next morning.  He did not accept my call.

Then Pike sent me another text, making it sound like I failed to call him.  Pike's text said:
"Awaiting your call."

I called him again.  He answered and was abusive.  Pike told me on the phone call:
"Either you don't understand the gravity of the situation or you don't care." He also told me,
"There's a new sheriff in town."

This kind of talk was part of Pike's pattern and it was prompted by his national origin
discrimination and his negative reaction to my efforts to care for the health of my family.  Pike
would pretend to be friendly then he would tell me I needed to do something right away or else.
In that early phone call the morning of June 19, 2020, Pike asked me to introduce Tim Stallkamp
and Wayne Scott.  I did what he asked, and my response to Pike at 8:24 AM confirms that and
notes his threat to me:

Troy:
I committed to introducing Tim and Wayne, and I did. You rejected my call
today.
I don't understand why you have to threaten me?

Sincerely, Bardia

On June 19, 2020, the New Leaders passed a "Unanimous Written Consent of the Board
of Managers of Volusion, LLC," a document that was directly retaliatory to my efforts to care for
my sons' health issues during the pandemic – it severely limited my abilities to perform my job
as CEO.  Pike's email essentially admitted this retaliation.  Pikes' June 19, 2020 (4:35:01 PM)

email stated: "your insufficient level of responsiveness and execution on board directives causes the board great concern."

### The New Leaders' Campaign Against Bahar Dejban

On June 19, 2020, the New Leaders began a campaign against Bahar Dejban, the General Counsel of Volusion. One of the New Leaders, Curt Lindeman, wrote to Bahar Dejban, misstating her role (calling her "outside general counsel" when she was full time, but not "outside" General Counsel of Volusion). Lindeman's email (of 8:59 AM) said:

> I am one of the members of the Board of Managers of Volusion (the other 2 are copied on this email). The Board asked David Snyder (also copied), with Jackson Walker (company counsel), to contact you. **I understand that you are operating as the full-time outside general counsel of Volusion.** We really need you to at least touch base with David this morning (preferably within the hour) so we can start to understand the legal issues currently facing the company.
>
> If there are significant legal issues that would prevent such a call this morning, we obviously need to know asap.
>
> I look forward to working with you.

(Emphasis added.)

Bahar Dejban responded to Lindeman on June 19, 2020 (at noon), referring to David Snyder as "David" as follows:

> I emailed David for available times. **Unfortunately, I have personal medical issues to tend to as I am pregnant**. David is welcome to contact me directly. I will endeavor to connect with him at the first possible time.
>
> Thank you for your consideration. I too look forward to working with you.

(Emphasis added.)

The New Leaders viewed the news that Bahar Dejban was pregnant negatively and with hostility. None of the New Leaders ever congratulated Bahar on her pregnancy, asked her about accommodations she would need, or even asked her how far along she was – the first step in a discussion about accommodations. In fact, none of the New Leaders ever mentioned her pregnancy except in a dismissive way that suggested that being pregnant was inconvenient and the same as not being pregnant but facing COVID issues with the rest of the population. Lindeman said he could "understand and sympathize with family obligations" and dismissed her pregnancy (and my son's health issues) by saying, "We are all trying to juggle family obligations during this strange time." Later he made a similar statement to me in a meeting when I talked about the

medical issues facing my sons that I was trying to handle – he said to me, "We're all in the same boat." We were not.

On July 8, 2020 (at 4:44 PM) , Lindeman wrote a condescending, critical, and dismissive email to Bahar and me. Lindeman's email stated:

> I can understand and sympathize with family obligations. **We are all trying to juggle family obligations with work during this strange time.** However, these delays by both you and Bahar for weeks are not acceptable. If these requests were made of me as a GC, I could send out the documents within minutes from anywhere there is a cell signal.
>
> If you can't do it, please direct people on your team to send me the documents today.

Bahar Dejban promptly responded, objecting to Lindeman's email and pointing out her pregnancy and the fact that she had been experiencing complications and difficulties with her pregnancy over the past weeks. Bahar Dejban's email of July 8, 2020 (at 5:39 PM) told Lindeman:

> Curt,
>
> **I do not appreciate your misrepresentations.** This is the first request I have received for contracts with major vendors or engagement letters with law firms. I was asked for a list of law firms that are or have recently been engaged. And I provided that to you last week.
>
> **I also informed you in our conference call that I do not have access to employment agreements, and nevertheless, you requested those from me.**
>
> **Finally, I have been working full time for Volusion, and as I have told you, I am pregnant and have experienced some complications and difficulties with my pregnancy over the past weeks.** Regardless, I have continued to respond to all of Tim's requests, including providing him with complete access to a drive of intellectual property material along with corresponding engagement letters last night.
>
> I can get you the retainer agreements for lawyers I have engaged, other than the patent lawyer which you now already have as of last night. I will have to search for agreements with lawyers that were engaged prior to my employment but that are still doing work for Volusion.
>
> I take my job as General Counsel of Volusion VERY seriously and would appreciate it if you wouldn't misstate things and conflate your previous role as GC with the work I am doing. We have different jobs and obviously different styles. I

have and will continue to timely respond to all requests while managing my other duties.

(Emphasis added.)  Bahar Dejban copied all the New Leaders on this email.

None of the New Leaders responded with any effort to accommodate the pregnancy and complications of Bahar Dejban.  Volusion's response, much like – "Oh, you're pregnant – thanks for that information – you're fired – we will replace you with a non-pregnant man" -- very shortly thereafter, was to fire Bahar Dejban without stating any reason and without prior warning on July 27, 2020.

### My Written Notice to the New Leaders of FMLA/ FFRCA Needs

On July 8, 2020  I put the New Leaders on written notice that I was taking time to care for my sons and that they suffered from "medical conditions that are directly impacted by COVID-19 and Stage 5" (referring to the shutdown that caused serious issues with obtaining essential food  for my sons that would not trigger severe allergic reactions).  At 7:04 PM on July 8, 2020 I sent this email to all 4 of the New Leaders:

Curt, Troy, Jeremy and Tim:

Replying to an email Tim had sent while I was on PTO.

**Just getting back from my son's doctors appointment. Earlier today, Austin confirmed Stage 5 approaching within the next couple days if not tonight.** I am spending the remainder of the week working on Q3 priorities with the executive team, and **taking care of my family in preparation for Stage 5. As I mentioned before, my children have medical conditions that are directly impacted by COVID-19 and Stage 5.**

Let's schedule a meeting by video for Monday, July 13th? I can free up any block of time that works for you. If we have time, I would also like to cover our VOLT go-to-market plans, including Q3 revenue stability, which I'm also finalizing.

Sincerely,

Bardia

(Emphasis added.)

None of the New Leaders responded with any effort to accommodate my FMLA/ FFRCA needs (instead, they responded with hostility).  Jeremy Rosenthal's email to me at 8:34 PM on July 8, 2020 deliberately missed the point – that my sons were especially impacted by COVID-19.  Rosenthal glibly said, "Please stay safe.  We understand that with Covid this is a very challenging time."  Generally, the emails from the New Leaders

treated my efforts to take care of my family as an inconvenience and/or as a lack of cooperation. Volusion's ultimate response, very shortly thereafter, was to fire me without stating any reason and without prior warning on July 27, 2020.

On July 13, 2020 via my 7:55 AM email, I put the New Leaders on further written notice of my FMLA/ FFRCA needs. I sent them this email letter:

Curt, Jeremy, Troy, Tim:

Wanted to get this to you first thing this AM. I mentioned Friday that I would be working over the weekend on various initiatives. As you know, Volusion measures success based on our 5+1. If you look at our financials and board materials, we have been targeting and exceeding EBITDA margin goals since Q4 2019; with Net Income posted in May for first time in over a year. Additionally, we have brought revenue green shoots online for partner and ecosystem lines, all part of the plan we had laid out late last year. While it's been great to see our plan working, we still have immediate revenue stabilization initiatives targeting ~$500k additional revenue through Q4. But our largest revenue driver will be VOLT GTM.

There are also key elements of the revenue stability plan and our VOLT GTM that need to be detailed. The management team feels that we are on the right path and results are already validating that belief. Our CFO had mentioned to Tim that he would have models by July 24th, which I've attempted to help accelerate. We are also finalizing June numbers this week. Once I receive all of those pieces of information, I'll need to incorporate them into the board presentation as well as implement into the overall organizational plans.

**At the same time I need to bring to your attention that my time this week will be diverted to speaking with several members of the leadership team in an effort to ameliorate some of the damage and reduce the anxiety that has occurred by the recent events. Of particular concern is the effect that Tim's communications have had on the management team. He has not only injected derogatory information, which is frankly unnecessary, but also has shared a board resolution document. To put it simply, they are now uncertain of the future of Volusion and their own commitment to what has been a less than clear and mixed message. This has significantly impacted the work environment, including directly impacting Q3 rocks.** The team as you must know, are critical members of the organization who were contacted against my advice and counsel.

Finally, it has been brought to my attention that legal representatives of various entities will be having a discussion tomorrow at 4 CST. I feel caught in the middle of this, but more importantly, need to have some understanding of what is going on so I can effectively perform my duties and continue the turnaround. Truthfully,

13

I am also separately troubled by the fact that the board, two members of which are attorneys, along with their counsel wish to have a meeting with me and insisting that I appear without counsel. I am extremely uncomfortable with the legal maneuvering and factions, and must admit that I am completely out of my element. It is crucial that I focus on my job to keep moving Volusion to increased profitability and growth, and leave the legal matters to the experts, at least until I have better clarity.

**Personally, as I have mentioned, COVID-19 continues to cause extreme uncertainty and anxiety for my family, especially given my young sons' health issues.** Also as I wrote Friday, Austin will be moved back to a Stage 5. Given all of these considerations combined with COVID-related family issues, I am asking that you move our meeting to the end-of-the month. In the meantime I will speak with Tim as scheduled this morning who I'm sure will report back on our conversation.

Sincerely,

Bardia

(Emphasis added.)

None of the New Leaders responded with any effort to accommodate my FMLA/ FFRCA needs. Emails from the New Leaders treated my efforts to take care of my family as an inconvenience and as a lack of cooperation. Volusion's ultimate response, very shortly thereafter, was to fire me without stating any reason and without prior warning on July 27, 2020.

### The New Leaders Terminate Bahar and Me For Unlawful Reasons And Try To Cover Up My National Origin

On July 17, 2020, I attended another Board meeting. Nothing was said at that meeting to alert me to the fact that the New Leaders were about to fire the General Counsel, Kevin Sproles and me and to put Volusion in bankruptcy, despite the fact that Volusion was doing well as a business and did not need to take bankruptcy to avoid foreclosure.

On July 23, 2020 at 1:46 PM, Stallkamp emailed Bahar Dejban about patent attorneys. At 2:21 PM, I emailed the New Leaders about the Board Meeting agenda for the board meeting that would take place later in the day. My email to them said:

Troy, Jeremy, Curt:

The agenda for today's call will be to focus on Q2 2020 preliminary 5+1 impact. If we have time, I'd also like to discuss VOLT.

I'm also attaching/responding to the following requests:

14

Volusion feature matrix (attached)

Market penetration in Apparel category

_    23% of our customers are in this segment today

-    $2m-50m GMV apparel merchants in U.S. is ~1,237

-    We have 200 today (16% market penetration)

Sincerely, Bardia

Troy Pike emailed in response five minutes later without any hint that anything was afoot. Pike's 2:26 PM email said:

Thank you, Bardia. We should also reserve five minutes to discuss the forbearance agreement and its objectives.
Best,
Troy

Pike's reference to the forbearance agreement related to the agreement Main Street, Volusion's lender, had made that it would not seek to foreclose on the loan due to default on payment obligations by Volusion. Despite this agreement, Tim Stallkamp (CRO) told me shortly before the Board meeting that he needed someone to wire over $800,000 to Main Street as a peace offering. He also said the Board gave him authority to sign the agreement but not to wire the funds. I asked why we had to pay anything to Main Street since we had a forbearance back in April. Stallkamp said it was different now that the new Board was here. I told him I would need to follow up with Kevin Sproles, the founder since I did not have bank account access. Tim told me Main Street would take action against Volusion if we did not do so by end of week. That made no sense in light of the forbearance agreement, and Stallkamp's suggestion that I wire this money was a transparent effort to set me up.

What Stallkamp was saying to me before the July 23 Board meeting was a transparent attempt to set me up as a pretext for firing me. This was obvious to me for several reasons. First, I had no rights over bank accounts. Second, the Board's resolutions made Stallkamp the boss of finance and the direct boss of Volusion's Director of Finance. Third, as Stallkamp knew, under the Board's resolutions, I was not authorized to spend more than $25,000. Fourth, if Main Street was going to foreclose on its loan, it would not have gone through the time and expense of putting the New Leaders in place. If that was the plan, Main Street would have just foreclosed. It would just send us a letter saying send us a specific amount of money, or we're going to foreclose. It had not done so. And fifth, as an officer of Volusion, I had had an obligation to protect the company and the majority shareholder, and as far as I was concerned, we had a forbearance with Main Street.

The Board meeting on Thursday, July 23, 2020 lasted less than 35 minutes. Stallkamp and his assistant joined this Board call as well. I had let them know that I would taking PTO (Paid Time Off) on Friday, to help with my boys' medical issues. They said nothing positive and seemed unhappy about this development, like they were tired of dealing with this inconvenience.

At the Board meeting of July 23, none of the New Leaders mentioned anything about Volusion filing for bankruptcy. They did not mention that they were considering firing Bahar Dejban, the General Counsel. They did not mention they were considering firing the Founder, Kevin Sproles. They did not mention that they were considering firing me or that this would be my last work day as an employee of Volusion.

I went through the details I had proposed in the agenda I had sent them before the meeting. The Board started by asking if we should discuss the payment to Main Street first, and I recommended moving along with the agenda I had proposed. The Board seemed disinterested in any topics I discussed, then the Board switched topics and asked me to wire the money to Mainstreet Capital. I told them I did not want to be put in the middle of Main Street and the founder (Kevin Sproles) and that I would need to talk with Kevin to understand where that all stood. Jeremy Rosenthal and Curt Lindeman asked me, "as the highest-ranking officer, you can't wire this payment?" I told them that I would follow-up after I had a chance to speak with the founder (who had bank account access) because I didn't want to get in the middle of legal challenges between the founder and Main Street. The last thing Troy Pike said was at the Board meeting was, "Gentlemen, the three of us should discuss what is going to happen Monday when Main Street doesn't receive their payment." Jeremy Rosenthal closed the meeting by saying "Thanks for your time Bardia."

At 5:53 pm, Bahar Dejban responded to Stallkamp's email – all in a normal, business-like way.

I got no communication from any of the New Leaders after the Thursday, June 23, 2020 Board meeting that had lasted 35 minutes. I took Friday, June 24, 2020 as a PTO day off to help with my boys, as I had told them I would do. Even when taking PTO, I checked emails. I started work early on Monday, July 27, 2020.

Troy Pike notified me I was fired by email. He called me in the afternoon on July 27, 2020. Pike left a voice message that said, "Hello Bardia, this is Troy Pike and I'm calling on behalf of Volusion's Board of Directors. I need to speak with you today uh very importantly on a matter regarding your employment with Volusion. I'll follow this directly with an email as well, but I'd appreciate you calling me back immediately." Then he left me his phone number. We did not talk on the phone that day. His email enclosed my termination letter. It did not provide a reason for termination. Pike's termination letter to me included this:

This letter follows up on my call to you earlier today. Your employment and any other relationship you have with Volusion, LLC ("Volusion") ended effective as of 9:15 a.m. Central Standard Time on July 27, 2020 (the "Termination Time").

16

> After the Termination Time, you will no longer be entitled to any further compensation or benefits from Volusion and are no longer authorized to act on behalf of Volusion or represent yourself to be an employee or agent of Volusion. Also, you are no longer authorized to access any Volusion systems or accounts, including but not limited to email systems, voicemail systems, document management systems and financial accounts.

Also on July 27, 2020, and without prior consultation, counseling, or warning, the New Leaders fired Bahar Dejban by letter from Pike, effective as of 9:15 a.m. Central Standard Time on July 27, 2020.

The New Leaders promptly took actions and made statements that show the termination decision was motivated by hostility to the national origin of two of the three people (Bahar Dejban and me) that it fired in "leadership changes" it connected to its filing for bankruptcy the same day that it fired Bahar Dejban, Kevin Sproles, and me.

First, to make it seem like nothing was "wrong" at Volusion, the Company published information about its Chapter 11 bankruptcy filing under the heading "Frequently Asked Questions." Volusion's "answers" did not hint that the "reason" for firing Bahar Dejban or me was that it was facing "disengaged and disobedient officers." Instead, Volusion falsely stated that to get bankruptcy protection in place for Volusion,

> we made some difficult, but necessary and immediate leadership changes. **Effective July 27, Kevin Sproles and Bardia Dejban are no longer with the company**. We know this may have a personal impact on some of you with long-standing relationships, as well as to our tight-knit organization overall. **Kevin and Bardia have been important leaders at Volusion and we are tremendously thankful for their significant contributions.** While they are no longer formally a part of Volusion, the belief in the company, **the importance of the culture and the mission they inspired will remain.** Our goal is to honor what they helped to create by making sure the restructuring process is successful and Volusion can thrive going forward.

(Emphasis added.)

As for the "reason" for the bankruptcy and its timing, Volusion's "answers" stated: "The company has matured debt and has not been able to make repayment terms." The "answers" did not assert the reason was insufficient collaboration or cooperation from any of existing management or that it was faced with "disengaged and disobedient officers."

At about the same time, Volusion took a deliberate action to hide my Iranian national origin from the public. When I became CEO of Volusion, the company posted a letter from me on its blog, for the viewing world's information. The title of the letter was "Day One – New CEO / Volusion." Page 1 of that letter contained this:



Dear Founders, Partners and Employees:

As I take this new role of CEO, I look back at the past three years and am thankful for the opportunity to work with so many of you directly. Today is an exciting and humbling day for me, and even though I've been a part of all the amazing changes at Volusion these past few years, it feels very much like a brand new day. Like all of you, I have a choice in what I do, and choosing Volusion to be a part of my future has very much been shaped by my past as well as my passion for entrepreneurship. These values are shared not only with our founder, Kevin, but also reJected by everything we do as an organization.

**I came to the United States in 1979 to escape turbulent times from Iran and grew up in Southern California.** I come from a hardworking family with the grit to launch and grow their own businesses. I've launched my own successful companies, brought hundreds of products to market, and have helped other founders and entrepreneurs do the same. I'm a devoted technologist with a diverse product and engineering background and have solid business experience (including failures). More importantly, I have a deep understanding of the needs of our thousands of customers and take great pride in helping them succeed. I currently live in Austin, Texas with my wife of eight years, two boys and 15-year old Jack Russell Terrier.

(Emphasis added.)

During my tenure with Volusion since I began in January 2016, when an employee left Volusion, we left their articles and content live on our digital footprint, most often times under their name. This was our way of honoring them and showing off the talent and culture of the company. **Within a week or two of my firing, Volusion removed my "Day One" letter from its website.**

Shortly after firing the company's only Iranian-born employees, Bahar Dejban and me on July 27, 2019, and announcing to the world that its "immediate and necessary leadership change" including Kevin Sproles no longer being with the company, Volusion rehired Sproles. So, its leadership changes eliminated only Iranian-born company employees.

Then Volusion lied to the public about the reason I was fired. In its public bankruptcy filing of November 2, 2020, signed by Troy Pike as Interim Chief Executive Officer, Volusion stated:

> Despite the restructuring efforts of the Debtor, **the reconstituted Board and CRO did not receive sufficient collaboration or cooperation from certain members of then (pre-petition) existing management**. It became increasingly more difficult for the Board to fulfill its duties and take the steps necessary to maintain the value of the Debtor. The Debtor was **faced with disengaged and disobedient officers** and Secured Lenders who had already exercised remedies with regards to its matured loan facility. As a result, **the Debtor filed this Chapter 11 Case to prevent a foreclosure from occurring** and to effectuate a restructuring, which will leave the Debtor's balance sheet strong and allow the Debtor to effectively address its matured loan facility and prevent further exercise of remedies by the Secured Lenders.

(Emphasis added.).

Mr. Pike's statements in the November 2, 2020 filing are false. With the forbearance agreement in place, filing for bankruptcy when Volusion did was not necessary to prevent foreclosure. The "disengaged and disobedient" reference to me is contrary to Volusion's "answers" shortly after firing me and is a lie Volusion is telling as a pretext for firing Bahar Dejban and me because of our national origin, because of Bahar Dejban's inconvenient and aggravating (to the New Leaders) pregnancy, and because of my inconvenient and aggravating (to the New Leaders) efforts to care for the serious medical issues of my young sons during the COVID-19 pandemic.

## DISCRIMINATION STATEMENT

I believe I have been discriminated against and terminated by Volusion because of my national origin in violation of Title VII of the Civil Rights Act of 1964 and the Texas Commission on Human Rights Act, TEX. LABOR CODE, § 21.001 *et seq.* and because of my efforts to care for the serious medical issues of my young sons during the COVID-19 pandemic, in violation of the Family Medical Leave Act (FMLA) and the Family First Coronavirus Response Act (FFRCA).

My name is Bardia Dejban, my date of birth is 1979, and my address is 2907 Dover Pl, Austin, Texas 78757, in the United States of America. I declare under penalty of perjury that the foregoing is true and correct.

19

Executed in Travis County, State of Texas, on the 29th day of November 2020.

Bardia Dejban

**<u>Exhibit D</u>**

**Proof of Claim No. 23**

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Volusion, LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Southern District of Texas |
| Case number | 20-50082 (DRJ) |

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

| | | |
|---|---|---|
| 1. | Who is the current creditor? | Bardia Dejban |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor NA |

| | | |
|---|---|---|
| 2. | Has this claim been acquired from someone else? | ☑ No<br>☐ Yes. From whom? |

| | | | |
|---|---|---|---|
| 3. | Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?<br><br>Hal K. Gillespie<br>Name<br>4803 Gaston Ave.<br>Number        Street<br>Dallas, Texas 75246<br>City            State            ZIP Code<br>Contact phone (214) 415-7911<br>Contact email hkg@gillespiesanford.com | Where should payments to the creditor be sent? (if different)<br><br>Name<br><br>Number        Street<br><br>City            State            ZIP Code<br>Contact phone<br>Contact email |
| | | Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | |

| | | | |
|---|---|---|---|
| 4. | Does this claim amend one already filed? | ☑ No<br>☐ Yes.   Claim number on court claims registry (if known) _____ | Filed on _____<br>MM / DD / YYYY |

| | | |
|---|---|---|
| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes.   Who made the earlier filing? _____ |

| | | |
|---|---|---|
| Official Form 410 | Proof of Claim | page 1 |

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

| 6. | **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |
|---|---|---|

| 7. | **How much is the claim?** | $_____ 11,875,000 . **Does this amount include interest or other charges?**<br>☐ No<br>☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
|---|---|---|

| 8. | **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>Unlawful discrimination, retaliation and termination. |
|---|---|---|

| 9. | **Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**          $_____<br>**Amount of the claim that is secured:**     $_____<br>**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:**    $_____<br><br>**Annual Interest Rate** (when case was filed)_____%<br>☐ Fixed<br>☐ Variable |
|---|---|---|

| 10. | **Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____ |
|---|---|---|

| 11. | **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |
|---|---|---|

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No

☑ Yes. *Check one:*

| | **Amount entitled to priority** |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☑ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ 10,000 |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    11/30/2020
MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Hal Keith Gillespie |
|---|---|
| | First name          Middle name          Last name |
| Title | Attorney for Bardia Dejban |
| Company | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 3403 Gaston Avenue |
| | Number      Street |
| | Dallas, Texas 75246 |
| | City                                State      ZIP Code |
| Contact phone | (214) 415-7911      Email hkg@gillespiesanford.com |

---

| Print | Save As... | Add Attachment | | Reset |
|---|---|---|---|---|

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | |

**Texas Workforce Commission Civil Rights Division** and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Cell Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Ms. Bardia Dejban** | **(818) 929-6818** | **1979** |

| Street Address | City, State and ZIP Code |
|---|---|
| **2907 Dover Pl, Austin, TX 78757** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **Volusion, LLC** | **About 170** | **(800) 646-3517** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1835-A Kramer Lane, Suite 100, Austin, TX 78758** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | **(800) 646-3517** |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☒ NATIONAL ORIGIN

☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION

☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE

Earliest: **June 8, 2020**    Latest: **July 27, 2020**

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

See Attachment A hereto.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br><br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

| November 29, 2020 | *signature* |
|---|---|
| Date | Charging Party Signature |

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| Texas Workforce Commission Civil Rights Division | and EEOC |
|---|---|

*State or local Agency, if any*

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

| Date | Charging Party Signature |
|---|---|

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so <u>within 15 days</u> of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

1

**Attachment A**

I.        **Personal Harm**

I am a male citizen of the United States and currently 41 years old.  I was born in Tehran, Iran in 1979.  My first name, Bardia, is a uniquely Iranian name.  My highest level of formal education is an MBA degree from Pepperdine University, which I obtained in 2012.

On January 29, 2015, Main Street Capital Corporation ("Main Street") announced it had recently led a new portfolio investment totaling $45.0 million of invested capital in Volusion, LLC ("Volusion"), with Main Street funding $31.5 million of the investment.  The proceeds of the investment were used to provide capital to fund Volusion's near-term growth opportunities.  Main Street's investment in Volusion included a combination of first-lien, senior secured term debt with equity warrant participation and a direct equity investment.  In addition, Main Street and its co-investor provided Volusion a commitment for up to $10.0 million of additional capital to support its future growth opportunities and have the ability to fund additional capital in the future if needed to continue to support Volusion's growth. The press release for this transaction stated, "Main Street's investment supports Volusion's current management team, which retained majority equity ownership of the company."

I received an offer letter dated December 23, 2015 from Volusion for the position of Chief Information Officer (CIO), with a start date of January 25, 2016.  I signed the offer letter to accept the position on December 28, 2015.  At the time the CEO of Volusion  was Kevin Sproles, who was the founder of the company.

My performance for Volusion was always outstanding.  Also, my results for Volusion were outstanding.  I started my employment with Volusion in February 2016.  Mr. Sproles changed my job title to Chief of Staff a week before I started.

•        Volusion paid me a relocation payment of $10,000 on February 11, 2016.

•        Volusion paid me a signing bonus of $250,000 and a performance bonus of $13,984.52 on May 5, 2016.

•        Volusion paid me a performance bonus of $23,211.54 on July 14, 2016.

I held the Chief of Staff position until October 2016, when I was promoted to Chief Technology Officer (CTO).   Mr. Sproles made the promotion decision.

On November 30, 2018 I was promoted to the position of Chief Operating Officer (COO).  Mr. Sproles made this promotion decision.

On January 15, 2019, all the members of the Board of Managers (the "Board") of Volusion adopted several resolutions. Pursuant to the resolutions Volusion approved a Transaction Incentive Retention Bonus Plan and designated me as a participant in the Plan. Under the Plan, I was awarded 1,534,956 units, with an exercise price of $0.69000, with a vesting commencement date of November 2, 2018 and a special vesting schedule. The next highest award to an existing employee went to Randon Kelly, with 345,000 units. My award was recognition of outstanding contributions to the company.

On August 19, 2019 Volusion announced my promotion to the position of CEO. This promotion was the decision of Mr. Sproles, with approval of Volusion's Board of Directors. Volusion announced that Sproles would stay on with the company "to guide produce and technology innovation."

• Volusion paid me a performance bonus of $75,000 on August 22, 2019.

By May 2020, I had completely turned around Volusion's performance. By that time Volusion was for the first time in 4 years running a positive EBITDA, and we had focused it for maximizing revenue from its legacy product. We were on course to launch Volusion's new product. Under my leadership, Volusion's cash reserves had increased from about $4 million to over $8 million. As of this date, Volusion had about 170 employees. Of these employees, only two, myself and the General Counsel of the company, Bahar Dejban, were of Iranian descent. Bahar Dejban, my twin sister, and I were born in Iran. Bahar Dejban became the General Counsel of Volusion in March 2019, when I was the company's COO. Until that time, I was unaware of any discrimination against employees born in Iran at Volusion.

On June 9, 2020, Main Street's COO, Dwayne Hyzak, notified me the CEO of Volusion, along with Mr. Kevin Sproles, Mr. Randon Kelly, and the Corporate Secretary of Volusion that it had changed the Board of Managers ("the Board") for Volusion and that the Board now was made up of Troy Pike, Jeremy Rosenthal, and Curt Lindeman. All three of these are Caucasian males, born in the United States.

After the new Board of Managers and CRO Tim Stallkamp arrived on the scene at Volusion, these four Caucasian born-in-the-United States males treated all the Volusion employees born in Iran badly, while treating born-in-the-United-States employees of Volusion well. The New Leaders implemented a discriminatory double standard. While Pike, Rosenthal, Lindeman and Stallkamp (collectively the "New Leaders") were demanding, unreasonable, condescending, abrupt and rude toward me and the other Iranian born employee of Volusion, my sister, Bahar Dejban (Volusion's General Counsel), the New Leaders treated the other Volusion leaders (non-Iranian born) politely and with deference. The remaining leadership at Volusion (non-Iranian born) were able to put off requests from the New Leaders for days and weeks. They could literally say, "I won't have time to talk until next week" and the response, time and again was "no problem. When next week." The demands on Bahar Dejban and me by the New Leaders, were abrupt, unreasonable and pretextual. The New Leaders made a deliberate effort to manufacture a false "reason" for termination so they could assert falsely that Bardia and Bahar Dejban were "disengaged and disobedient officers." Although the New Leaders did not give me a reason for

terminating me when they fired me by mail, "being disengaged and disobedient" is the false and pretextual reason that Volusion offered in its Disclosure Statement in Bankruptcy Court in the matter called In re Volusion, LLC, Chapter 11, Case No. 20-50082 (DRJ), in the United States Bankruptcy Court for the Southern District of Texas, Laredo Division.

Stallkamp's email to me of Thursday, June 11, 2020 at 8:49 AM stated:

By way of introduction, I have recently been retained as a senior advisor to assist the newly constituted Board and Volusion. I wanted to reach out to see if there would be the ability to connect in person today (or at least by phone if in person is not practical.) I have plans to be in Austin through mid-day tomorrow and can be flexible as to location, etc. My cell # is below – looking forward to meeting/speaking with you.

From that time until my termination by letter on July 27, 2020, I was engaged, obedient and cooperative with the New Leaders, despite the fact that one or more of them often treated me in an arbitrary, demanding, inconsistent and disrespectful manner. This mistreatment came at the time of the COVID-19 pandemic, and the New Leaders interfered with my ability to care for my two young sons with serious health issues that I advised them of orally and in writing. The New Leaders and Volusion discriminated against me, retaliated against me, and ultimately terminated me because of my efforts to exercise rights under the FMLA and the Family First Coronavirus Response Act (FFRCA) as well as my Iranian national origin. Volusion deliberately attempted to create a pretext for firing me, so it could assert that it fired me for being disengaged and disobedient.

At the same time, Volusion treated my lawful and protected efforts to care for young sons with serious (life threatening) medical issues – severe asthma and allergies – during the pandemic as foot dragging, delay, and insubordination. Volusion engaged in a **pattern or practice** of retaliation and interference, not only punishing and firing me for my protected efforts to care for my young sons, but also retaliating against and firing another Volusion employee, Bahar Dejban, due to her pregnancy when it learned of her pregnancy.

My first Board Meeting (the first with the New Leaders) began at noon on Monday, June 15, 2020. I called into the meeting. I told them when the meeting started that I still had family and personal things still going on and didn't realize video was mandatory. Historically, Volusion's board calls were phone with screen share optional. Jeremy Rosenthal said that next time we would do video and he made it sound mandatory.

Jeremy Rosenthal asked about my 818 phone number, and if I was bi-coastal. Then there was some casual talk about the weather. Troy Pike was late for the meeting. Jeremy Rosenthal talked about his cases.

4

When Troy Pike came onto the call, we started the meeting. Jeremy Rosenthal introduced himself as restructuring professional.

Troy Pike introduced himself as operating side guy, formerly a CEO.

Curt Lindeman introduced himself as a straddler between Jeremy and Troy, and then went on to talk about how he had been important at some firm then moved to securities law.

I introduced myself as a technologist, SAAS, SMB, involved in entrepreneurship.  I explained how I met Kevin Sproles and how I was there to fix the company. I told them I was Persian and came to the USA in 1979. When I told them that I was from Iran, the reaction was negative silence.  I told them I was married, that I had two young sons, that after meeting Kevin Sproles we moved to Austin, and that I have family in California.  At the end of the call, I let them know that my family and especially my sons needed extra care during this trying time. (From that point on, every time I mentioned needing time off for my kids, the New Leaders increased their requests to me and due dates, making sure the due dates were not doable.  When I mentioned my family health issues along with COVID-related topics that impacted my abilities, they would deliver punitive board resolutions within 48 hours.  When our General Counsel, Bahar Dejban, told them she was pregnant, they told her that a general counsel should drop anything she was doing to fulfill a board request in minutes.)

Jeremy Rosenthal said he relished the opportunity to work with me, to support me.

I provided an overview of the organization, what the key challenges were and are today.

The New Leaders asked for more information along the way: Google Drive with org chart, L10 meetings, etc.  I went over Volusion, metrics, revenue, cash in bank, etc.

Troy Pike went on to make assumptions that customers were negatively impacted by COVID.  I advised him that our customers were seeing phenomenal online growth due to COVID and their challenges were supply-chain related and not online sales.

The New Leaders asked about Joseph Essas and whether we had board meetings since March, when Main Street resigned from the board.

Rosenthal continued to ask more on this topic, and whether or not major board decisions were made in the May board meeting. He asked if Main Street was invited to the May board meeting, and I reminded him that they resigned.

They went on to ask about Kevin Sproles and how "critical" he was to the organization.

I painted Kevin in a very positive light and as instrumental to Volusion.

Troy Pike asked about the last merger and acquisition process.  We called it Velocity internally.

        Late in the call, I reminded the New Leaders that I had family matters to tend to and only
had 15 mins left. I let them know that Velocity was the way to get liquidity for Main Street.  I
told them that we selected Raymond James because they pitched producing a full-sale value of
$120 million or higher. I went through the details of that process, and how it failed because it
was over-marketed, and we never got an offer. I let them know Raymond James elected to bow
out of the contract because the situation got tense with them, due to not producing.

        Jeremy Rosenthal said he wanted to have a meet and greet with management to make
sure I was in a position to work with Tim Stallkamp and the document requests. They then told
me that Stallkamp was the priority, among all their requests. (The New Leaders turned this
around later and said everything they request is the priority.) The New Leaders then reiterated
the need to meet with management immediately. They wanted to set up a next meeting. I told
them I had family matters that started every afternoon, and that I would need to meet earlier than
2 CST.  **I told them that I had challenging family matters, alluding to COVID-19 and telling
them that I had two young sons, both with serious health issues.**  I told the New Leaders that
I was committed to getting them what they needed and working well with them.

### The New Leaders Begin to Set Me Up For Termination

        The day after my first board meeting with the New Leaders, on Tuesday, June 16, 2020 at
9:35 PM, Jeremy Rosenthal sent me an email with voluminous requests that would normally take
weeks, and provided a deadline of next day Friday, by 2 PM CST.  **This was a set up.**  First,
this began a pattern by the New Leaders of building a paper trail that they were seeking
documents and trying to show they were not getting sufficient cooperation, despite prompt and
diligent efforts by both Bahar Dejban and me.  Second, the whole feverish document search was
part of a pretext.  Prior to Main Street inserting its handpicked board (Pike, Rosenthal and
Lineman) and its CRO -- Stallkamp, not only was Main Street (through Main Street's CEO, no
less) a board member, but Volusion's leaders had held multiple talks with Main Street and
provided them with virtually all of the information that the New Leaders pressed to receive as if
an emergency.

        For the New Leaders to suddenly claim that they were in dire need of information and
documents and that it had none in its possession after being interviewed and handpicked by Main
Street, and presumably after they themselves considered the position they were being offered is
incredible.  They would have to claim that Main Street provided them with none of the
information in its possession and that they never sought any in accepting positions as the top
managers of Volusion. Their pretense that they took their positions without being provided with
or seeking any information or documents which were in the direct possession of their employer
(Main Street)  defies credulity.  Further, even assuming that the New Leaders were in need of
anything and that there was some huge urgency to obtain it, they could obtain the information
from their boss -- Main Street – and not declare an emergency that would override the efforts of
the existing leaders of Volusion to run the company.  The argument that these New Leaders
walked onto their jobs sight unseen as the chief managers of a company in such dire straits that it
was on the verge of bankruptcy is absurd.

I replied to Rosenthal the next day before his 2 PM deadline.  In my first reply I let them know I was taking my son to the doctor for an emergency, he had a severe ear infection and fever, and told Jeremy I would reply as soon as I was back.  My 9:18 AM email on June 17, 2020 said to Rosenthal:

Jeremy:

**Taking my son to the doctor, he has a severe ear infection.** I'll reply to your email immediately after I return.

Sincerely,

Bardia

(Emphasis added.)

My next email to Rosenthal was also ahead of his 2 pm deadline.  I sent my email at 11:18 AM.  It was an earnest attempt to cooperate and to work fast and also to remind the New Leaders of my sons' health issues and needs.  I let them know that he was not allowing enough time to turnaround requests under normal circumstances, and that I was going through extraordinary circumstances. Historically, the information Rosenthal requested would take an 8-week process to turnaround. I reiterated my family responsibilities, to my boys, aged 2 and 7. My email to Rosenthal said:

Jeremy:

As CEO, I need to balance operating the company as well as fulfilling these requests. I'm a very hands on leader, which is part of the reason I was elevated to CEO. I take great care to be involved in and shape each part of the organization to assure that it is heading for success.

Regardless, in just 24 hours, I've now met with all parties requesting meetings and begun preparing next steps. Based on our meetings, I felt like we are being collaborative and communicating openly, something foundational to our culture code.

While I am giving you and Tim my highest priority, there are other business items that I cannot merely ignore. **I'm moving as fast as physically possible to compile information and populate drives.** I'll be able to create a Google Drive for the Board and begin populating the requested information by the end of business today. I'm targeting to have all requested information by the end of this week, possibly Friday AM in preparation for our meeting on Monday.

I would appreciate the opportunity to correct the record in regards to Conway Mackenzie. I did not report that the information was readily available, I let Tim know our form NDA was readily available and that we would begin our PCI procedure, which starts with a background check. This is something we have never bypassed as a PCI compliant organization. All contractors that have access to the information he is requesting must go through this process. Is your instruction that we bypass this security process? My concern is that doing so may jeopardize our compliance status while only saving a few days. Candidly, historical board members at Volusion have also gone through this background check.

Given that he had not specified a length of time, and had shortly before the call sent me his document requests, Tim seemed amenable to the 30 minute meeting. **On the items Tim requested, I just wanted to give some background. It took us over 8 weeks to deliver that information to Raymond James last year during our process. During that time, I was the person responsible for aggregating a significant majority of that information, and can do so efficiently. While I'll work to expedite this process, it is likely going to be in batches over the next 4 weeks.** Also, Tim never requested to have unfettered access to anyone from leadership. Considering the above miscommunication, I will endeavor a better job of documenting future communications so as to avoid further miscommunication.

As I informed you during our meeting, based on the way Volusion has operated historically, I firmly believe that introducing and/or creating direct reports for Tim, or any of this structure by the management team at Volusion at this time will be incredibly disruptive, and will lead to a catastrophic deterioration in key metrics and hinder rock completion for the organization. This is the reason I asked to be allowed to think through how best to achieve this. I've been thinking through how to do this, and when, in an appropriate way. This will also personally tie me up with questions and uncertainties of the future of the organization, potentially leading to even further disruption and missed performance. This should be an area we dig into on Monday.

In general, **a majority of the management team is very focused and is taking on some additional roles, all part of the plan to rebuild the organization from within in preparation for our go-to-market with VOLT. There is an incredible new energy within the organization, but this is also an incredibly time consuming process for me, as CEO, to ramp up, cast vision and provide clear direction for each management team member, as well as establishing processes (EOS) as our guiding light to success for the organization.** As you stated, we want to all make Volusion successful. I ask a little of your indulgence considering my years of being immersed in this company, its business, and building its culture. **I'm taking your requests seriously and making them my top priority, while also balancing above. I also have to assure that this**

8

**process does not interfere with my responsibilities to my two boys, aged 2 and 6.**

Sincerely,

Bardia

(Emphasis added.)

On June 18, 2020 Troy Pike texted me at 6:48 PM, saying, "Please call me this evening if possible. If not possible, please let me know." I was still caring for my son with a severe ear infection. With COVID, my 2-year old's daycare was closed, so this became a huge challenge for us, trying to provide different levels of care for a sick 7-year-old and demanding 2-year-old, combined with COVID and their underlying health conditions (severe asthma, food allergies). I replied that evening: "With the kids. I can call you at 8 AM tomorrow."

Pike replied with pressure and a veiled threat: "My normal response would be yes, of course. But it is clear to me now that you aren't grasping how critical time is for you right now." I called Pike at 8 AM the next morning. He did not accept my call.

Then Pike sent me another text, making it sound like I failed to call him. Pike's text said: "Awaiting your call."

I called him again. He answered and was abusive. Pike told me on the phone call: "Either you don't understand the gravity of the situation or you don't care." He also told me, "There's a new sheriff in town."

This kind of talk was part of Pike's pattern and it was prompted by his national origin discrimination and his negative reaction to my efforts to care for the health of my family. Pike would pretend to be friendly then he would tell me I needed to do something right away or else. In that early phone call the morning of June 19, 2020, Pike asked me to introduce Tim Stallkamp and Wayne Scott. I did what he asked, and my response to Pike at 8:24 AM confirms that and notes his threat to me:

Troy:
I committed to introducing Tim and Wayne, and I did. You rejected my call today.
I don't understand why you have to threaten me?

Sincerely, Bardia

On June 19, 2020, the New Leaders passed a "Unanimous Written Consent of the Board of Managers of Volusion, LLC," a document that was directly retaliatory to my efforts to care for my sons' health issues during the pandemic – it severely limited my abilities to perform my job as CEO. Pike's email essentially admitted this retaliation. Pikes' June 19, 2020 (4:35:01 PM)

email stated: "your insufficient level of responsiveness and execution on board directives causes the board great concern."

### The New Leaders' Campaign Against Bahar Dejban

On June 19, 2020, the New Leaders began a campaign against Bahar Dejban, the General Counsel of Volusion.  One of the New Leaders, Curt Lindeman, wrote to Bahar Dejban, misstating her role (calling her "outside general counsel" when she was full time, but not "outside" General Counsel of Volusion).  Lindeman's email (of 8:59 AM) said:

> I am one of the members of the Board of Managers of Volusion (the other 2 are copied on this email). The Board asked David Snyder (also copied), with Jackson Walker (company counsel), to contact you. **I understand that you are operating as the full-time outside general counsel of Volusion.** We really need you to at least touch base with David this morning (preferably within the hour) so we can start to understand the legal issues currently facing the company.

> If there are significant legal issues that would prevent such a call this morning, we obviously need to know asap.

> I look forward to working with you.

(Emphasis added.)

Bahar Dejban responded to Lindeman on June 19, 2020 (at noon), referring to David Snyder as "David" as follows:

> I emailed David for available times. **Unfortunately, I have personal medical issues to tend to as I am pregnant**. David is welcome to contact me directly. I will endeavor to connect with him at the first possible time.

> Thank you for your consideration. I too look forward to working with you.

(Emphasis added.)

The New Leaders viewed the news that Bahar Dejban was pregnant negatively and with hostility.  None of the New Leaders ever congratulated Bahar on her pregnancy, asked her about accommodations she would need, or even asked her how far along she was – the first step in a discussion about accommodations.  In fact, none of the New Leaders ever mentioned her pregnancy except in a dismissive way that suggested that being pregnant was inconvenient and the same as not being pregnant but facing COVID issues with the rest of the population.  Lindeman said he could "understand and sympathize with family obligations" and dismissed her pregnancy (and my son's health issues) by saying, "We are all trying to juggle family obligations during this strange time."  Later he made a similar statement to me in a meeting when I talked about the

10

medical issues facing my sons that I was trying to handle – he said to me, "We're all in the same boat." We were not.

On July 8, 2020 (at 4:44 PM) , Lindeman wrote a condescending, critical, and dismissive email to Bahar and me. Lindeman's email stated:

> I can understand and sympathize with family obligations. **We are all trying to juggle family obligations with work during this strange time.** However, these delays by both you and Bahar for weeks are not acceptable. If these requests were made of me as a GC, I could send out the documents within minutes from anywhere there is a cell signal.
>
> If you can't do it, please direct people on your team to send me the documents today.

Bahar Dejban promptly responded, objecting to Lindeman's email and pointing out her pregnancy and the fact that she had been experiencing complications and difficulties with her pregnancy over the past weeks. Bahar Dejban's email of July 8, 2020 (at 5:39 PM) told Lindeman:

> Curt,
>
> **I do not appreciate your misrepresentations.** This is the first request I have received for contracts with major vendors or engagement letters with law firms. I was asked for a list of law firms that are or have recently been engaged. And I provided that to you last week.
>
> **I also informed you in our conference call that I do not have access to employment agreements, and nevertheless, you requested those from me.**
>
> **Finally, I have been working full time for Volusion, and as I have told you, I am pregnant and have experienced some complications and difficulties with my pregnancy over the past weeks.** Regardless, I have continued to respond to all of Tim's requests, including providing him with complete access to a drive of intellectual property material along with corresponding engagement letters last night.
>
> I can get you the retainer agreements for lawyers I have engaged, other than the patent lawyer which you now already have as of last night. I will have to search for agreements with lawyers that were engaged prior to my employment but that are still doing work for Volusion.
>
> I take my job as General Counsel of Volusion VERY seriously and would appreciate it if you wouldn't misstate things and conflate your previous role as GC with the work I am doing. We have different jobs and obviously different styles. I

have and will continue to timely respond to all requests while managing my other duties.

(Emphasis added.)  Bahar Dejban copied all the New Leaders on this email.

None of the New Leaders responded with any effort to accommodate the pregnancy and complications of Bahar Dejban.  Volusion's response, much like – "Oh, you're pregnant – thanks for that information – you're fired – we will replace you with a non-pregnant man" -- very shortly thereafter, was to fire Bahar Dejban without stating any reason and without prior warning on July 27, 2020.

### My Written Notice to the New Leaders of FMLA/ FFRCA Needs

On July 8, 2020  I put the New Leaders on written notice that I was taking time to care for my sons and that they suffered from "medical conditions that are directly impacted by COVID-19 and Stage 5" (referring to the shutdown that caused serious issues with obtaining essential food  for my sons that would not trigger severe allergic reactions).  At 7:04 PM on July 8, 2020 I sent this email to all 4 of the New Leaders:

Curt, Troy, Jeremy and Tim:

Replying to an email Tim had sent while I was on PTO.

**Just getting back from my son's doctors appointment. Earlier today, Austin confirmed Stage 5 approaching within the next couple days if not tonight.** I am spending the remainder of the week working on Q3 priorities with the executive team, and **taking care of my family in preparation for Stage 5. As I mentioned before, my children have medical conditions that are directly impacted by COVID-19 and Stage 5.**

Let's schedule a meeting by video for Monday, July 13th? I can free up any block of time that works for you. If we have time, I would also like to cover our VOLT go-to-market plans, including Q3 revenue stability, which I'm also finalizing.

Sincerely,

Bardia

(Emphasis added.)

None of the New Leaders responded with any effort to accommodate my FMLA/ FFRCA needs (instead, they responded with hostility).  Jeremy Rosenthal's email to me at 8:34 PM on July 8, 2020 deliberately missed the point – that my sons were especially impacted by COVID-19.  Rosenthal glibly said, "Please stay safe.  We understand that with Covid this is a very challenging time."  Generally, the emails from the New Leaders

12

treated my efforts to take care of my family as an inconvenience and/or as a lack of cooperation. Volusion's ultimate response, very shortly thereafter, was to fire me without stating any reason and without prior warning on July 27, 2020.

On July 13, 2020 via my 7:55 AM email, I put the New Leaders on further written notice of my FMLA/ FFRCA needs. I sent them this email letter:

Curt, Jeremy, Troy, Tim:

Wanted to get this to you first thing this AM. I mentioned Friday that I would be working over the weekend on various initiatives. As you know, Volusion measures success based on our 5+1. If you look at our financials and board materials, we have been targeting and exceeding EBITDA margin goals since Q4 2019; with Net Income posted in May for first time in over a year. Additionally, we have brought revenue green shoots online for partner and ecosystem lines, all part of the plan we had laid out late last year. While it's been great to see our plan working, we still have immediate revenue stabilization initiatives targeting ~$500k additional revenue through Q4. But our largest revenue driver will be VOLT GTM.

There are also key elements of the revenue stability plan and our VOLT GTM that need to be detailed. The management team feels that we are on the right path and results are already validating that belief. Our CFO had mentioned to Tim that he would have models by July 24th, which I've attempted to help accelerate. We are also finalizing June numbers this week. Once I receive all of those pieces of information, I'll need to incorporate them into the board presentation as well as implement into the overall organizational plans.

**At the same time I need to bring to your attention that my time this week will be diverted to speaking with several members of the leadership team in an effort to ameliorate some of the damage and reduce the anxiety that has occurred by the recent events. Of particular concern is the effect that Tim's communications have had on the management team. He has not only injected derogatory information, which is frankly unnecessary, but also has shared a board resolution document. To put it simply, they are now uncertain of the future of Volusion and their own commitment to what has been a less than clear and mixed message. This has significantly impacted the work environment, including directly impacting Q3 rocks.** The team as you must know, are critical members of the organization who were contacted against my advice and counsel.

Finally, it has been brought to my attention that legal representatives of various entities will be having a discussion tomorrow at 4 CST. I feel caught in the middle of this, but more importantly, need to have some understanding of what is going on so I can effectively perform my duties and continue the turnaround. Truthfully,

13

I am also separately troubled by the fact that the board, two members of which are attorneys, along with their counsel wish to have a meeting with me and insisting that I appear without counsel. I am extremely uncomfortable with the legal maneuvering and factions, and must admit that I am completely out of my element. It is crucial that I focus on my job to keep moving Volusion to increased profitability and growth, and leave the legal matters to the experts, at least until I have better clarity.

**Personally, as I have mentioned, COVID-19 continues to cause extreme uncertainty and anxiety for my family, especially given my young sons' health issues.** Also as I wrote Friday, Austin will be moved back to a Stage 5. Given all of these considerations combined with COVID-related family issues, I am asking that you move our meeting to the end-of-the month. In the meantime I will speak with Tim as scheduled this morning who I'm sure will report back on our conversation.

Sincerely,

Bardia

(Emphasis added.)

None of the New Leaders responded with any effort to accommodate my FMLA/ FFRCA needs. Emails from the New Leaders treated my efforts to take care of my family as an inconvenience and as a lack of cooperation. Volusion's ultimate response, very shortly thereafter, was to fire me without stating any reason and without prior warning on July 27, 2020.

### The New Leaders Terminate Bahar and Me For Unlawful Reasons And Try To Cover Up My National Origin

On July 17, 2020, I attended another Board meeting. Nothing was said at that meeting to alert me to the fact that the New Leaders were about to fire the General Counsel, Kevin Sproles and me and to put Volusion in bankruptcy, despite the fact that Volusion was doing well as a business and did not need to take bankruptcy to avoid foreclosure.

On July 23, 2020 at 1:46 PM, Stallkamp emailed Bahar Dejban about patent attorneys. At 2:21 PM, I emailed the New Leaders about the Board Meeting agenda for the board meeting that would take place later in the day. My email to them said:

Troy, Jeremy, Curt:

The agenda for today's call will be to focus on Q2 2020 preliminary 5+1 impact. If we have time, I'd also like to discuss VOLT.

I'm also attaching/responding to the following requests:

Volusion feature matrix (attached)

Market penetration in Apparel category

_     23% of our customers are in this segment today

-     $2m-50m GMV apparel merchants in U.S. is ~1,237

-     We have 200 today (16% market penetration)

Sincerely, Bardia

Troy Pike emailed in response five minutes later without any hint that anything was afoot. Pike's 2:26 PM email said:

Thank you, Bardia. We should also reserve five minutes to discuss the forbearance agreement and its objectives.
Best,
Troy

Pike's reference to the forbearance agreement related to the agreement Main Street, Volusion's lender, had made that it would not seek to foreclose on the loan due to default on payment obligations by Volusion. Despite this agreement, Tim Stallkamp (CRO) told me shortly before the Board meeting that he needed someone to wire over $800,000 to Main Street as a peace offering. He also said the Board gave him authority to sign the agreement but not to wire the funds. I asked why we had to pay anything to Main Street since we had a forbearance back in April. Stallkamp said it was different now that the new Board was here. I told him I would need to follow up with Kevin Sproles, the founder since I did not have bank account access. Tim told me Main Street would take action against Volusion if we did not do so by end of week. That made no sense in light of the forbearance agreement, and Stallkamp's suggestion that I wire this money was a transparent effort to set me up.

What Stallkamp was saying to me before the July 23 Board meeting was a transparent attempt to set me up as a pretext for firing me. This was obvious to me for several reasons. First, I had no rights over bank accounts. Second, the Board's resolutions made Stallkamp the boss of finance and the direct boss of Volusion's Director of Finance. Third, as Stallkamp knew, under the Board's resolutions, I was not authorized to spend more than $25,000. Fourth, if Main Street was going to foreclose on its loan, it would not have gone through the time and expense of putting the New Leaders in place. If that was the plan, Main Street would have just foreclosed. It would just send us a letter saying send us a specific amount of money, or we're going to foreclose. It had not done so. And fifth, as an officer of Volusion, I had had an obligation to protect the company and the majority shareholder, and as far as I was concerned, we had a forbearance with Main Street.

15

The Board meeting on Thursday, July 23, 2020 lasted less than 35 minutes. Stallkamp and his assistant joined this Board call as well. I had let them know that I would taking PTO (Paid Time Off) on Friday, to help with my boys' medical issues. They said nothing positive and seemed unhappy about this development, like they were tired of dealing with this inconvenience.

At the Board meeting of July 23, none of the New Leaders mentioned anything about Volusion filing for bankruptcy. They did not mention that they were considering firing Bahar Dejban, the General Counsel. They did not mention they were considering firing the Founder, Kevin Sproles. They did not mention that they were considering firing me or that this would be my last work day as an employee of Volusion.

I went through the details I had proposed in the agenda I had sent them before the meeting. The Board started by asking if we should discuss the payment to Main Street first, and I recommended moving along with the agenda I had proposed. The Board seemed disinterested in any topics I discussed, then the Board switched topics and asked me to wire the money to Mainstreet Capital. I told them I did not want to be put in the middle of Main Street and the founder (Kevin Sproles) and that I would need to talk with Kevin to understand where that all stood. Jeremy Rosenthal and Curt Lindeman asked me, "as the highest-ranking officer, you can't wire this payment?" I told them that I would follow-up after I had a chance to speak with the founder (who had bank account access) because I didn't want to get in the middle of legal challenges between the founder and Main Street. The last thing Troy Pike said was at the Board meeting was, "Gentlemen, the three of us should discuss what is going to happen Monday when Main Street doesn't receive their payment." Jeremy Rosenthal closed the meeting by saying "Thanks for your time Bardia."

At 5:53 pm, Bahar Dejban responded to Stallkamp's email – all in a normal, business-like way.

I got no communication from any of the New Leaders after the Thursday, June 23, 2020 Board meeting that had lasted 35 minutes. I took Friday, June 24, 2020 as a PTO day off to help with my boys, as I had told them I would do. Even when taking PTO, I checked emails. I started work early on Monday, July 27, 2020.

Troy Pike notified me I was fired by email. He called me in the afternoon on July 27, 2020. Pike left a voice message that said, "Hello Bardia, this is Troy Pike and I'm calling on behalf of Volusion's Board of Directors. I need to speak with you today uh very importantly on a matter regarding your employment with Volusion. I'll follow this directly with an email as well, but I'd appreciate you calling me back immediately." Then he left me his phone number. We did not talk on the phone that day. His email enclosed my termination letter. It did not provide a reason for termination. Pike's termination letter to me included this:

This letter follows up on my call to you earlier today. Your employment and any other relationship you have with Volusion, LLC ("Volusion") ended effective as of 9:15 a.m. Central Standard Time on July 27, 2020 (the "Termination Time").

Case 20-50082 Claim 23-1 Part 1 Filed 10/16/20 Desc Main Document Page 19 of 24
Case 20-50082 Doc 170-1 Filed 03/26/21 Page 101 of 25

16

After the Termination Time, you will no longer be entitled to any further compensation or benefits from Volusion and are no longer authorized to act on behalf of Volusion or represent yourself to be an employee or agent of Volusion. Also, you are no longer authorized to access any Volusion systems or accounts, including but not limited to email systems, voicemail systems, document management systems and financial accounts.

Also on July 27, 2020, and without prior consultation, counseling, or warning, the New Leaders fired Bahar Dejban by letter from Pike, effective as of 9:15 a.m. Central Standard Time on July 27, 2020.

The New Leaders promptly took actions and made statements that show the termination decision was motivated by hostility to the national origin of two of the three people (Bahar Dejban and me) that it fired in "leadership changes" it connected to its filing for bankruptcy the same day that it fired Bahar Dejban, Kevin Sproles, and me.

First, to make it seem like nothing was "wrong" at Volusion, the Company published information about its Chapter 11 bankruptcy filing under the heading "Frequently Asked Questions." Volusion's "answers" did not hint that the "reason" for firing Bahar Dejban or me was that it was facing "disengaged and disobedient officers." Instead, Volusion falsely stated that to get bankruptcy protection in place for Volusion,

we made some difficult, but necessary and immediate leadership changes. **Effective July 27, Kevin Sproles and Bardia Dejban are no longer with the company**. We know this may have a personal impact on some of you with long-standing relationships, as well as to our tight-knit organization overall. **Kevin and Bardia have been important leaders at Volusion and we are tremendously thankful for their significant contributions.** While they are no longer formally a part of Volusion, the belief in the company, **the importance of the culture and the mission they inspired will remain.** Our goal is to honor what they helped to create by making sure the restructuring process is successful and Volusion can thrive going forward.

(Emphasis added.)

As for the "reason" for the bankruptcy and its timing, Volusion's "answers" stated: "The company has matured debt and has not been able to make repayment terms." The "answers" did not assert the reason was insufficient collaboration or cooperation from any of existing management or that it was faced with "disengaged and disobedient officers."

At about the same time, Volusion took a deliberate action to hide my Iranian national origin from the public. When I became CEO of Volusion, the company posted a letter from me on its blog, for the viewing world's information. The title of the letter was "Day One – New CEO / Volusion." Page 1 of that letter contained this:

17



Dear Founders, Partners and Employees:

As I take this new role of CEO, I look back at the past three years and am thankful for the opportunity to work with so many of you directly. Today is an exciting and humbling day for me, and even though I've been a part of all the amazing changes at Volusion these past few years, it feels very much like a brand new day. Like all of you, I have a choice in what I do, and choosing Volusion to be a part of my future has very much been shaped by my past as well as my passion for entrepreneurship. These values are shared not only with our founder, Kevin, but also reJected by everything we do as an organization.

**I came to the United States in 1979 to escape turbulent times from Iran and grew up in Southern California.** I come from a hardworking family with the grit to launch and grow their own businesses. I've launched my own successful companies, brought hundreds of products to market, and have helped other founders and entrepreneurs do the same. I'm a devoted technologist with a diverse product and engineering background and have solid business experience (including failures). More importantly, I have a deep understanding of the needs of our thousands of customers and take great pride in helping them succeed. I currently live in Austin, Texas with my wife of eight years, two boys and 15-year old Jack Russell Terrier.

(Emphasis added.)

During my tenure with Volusion since I began in January 2016, when an employee left Volusion, we left their articles and content live on our digital footprint, most often times under their name. This was our way of honoring them and showing off the talent and culture of the company. **Within a week or two of my firing, Volusion removed my "Day One" letter from its website.**

18

Shortly after firing the company's only Iranian-born employees, Bahar Dejban and me on July 27, 2019, and announcing to the world that its "immediate and necessary leadership change" including Kevin Sproles no longer being with the company, Volusion rehired Sproles. So, its leadership changes eliminated only Iranian-born company employees.

Then Volusion lied to the public about the reason I was fired. In its public bankruptcy filing of November 2, 2020, signed by Troy Pike as Interim Chief Executive Officer, Volusion stated:

> Despite the restructuring efforts of the Debtor, **the reconstituted Board and CRO did not receive sufficient collaboration or cooperation from certain members of then (pre-petition) existing management**. It became increasingly more difficult for the Board to fulfill its duties and take the steps necessary to maintain the value of the Debtor. The Debtor was **faced with disengaged and disobedient officers** and Secured Lenders who had already exercised remedies with regards to its matured loan facility. As a result, **the Debtor filed this Chapter 11 Case to prevent a foreclosure from occurring** and to effectuate a restructuring, which will leave the Debtor's balance sheet strong and allow the Debtor to effectively address its matured loan facility and prevent further exercise of remedies by the Secured Lenders.

(Emphasis added.).

Mr. Pike's statements in the November 2, 2020 filing are false. With the forbearance agreement in place, filing for bankruptcy when Volusion did was not necessary to prevent foreclosure. The "disengaged and disobedient" reference to me is contrary to Volusion's "answers" shortly after firing me and is a lie Volusion is telling as a pretext for firing Bahar Dejban and me because of our national origin, because of Bahar Dejban's inconvenient and aggravating (to the New Leaders) pregnancy, and because of my inconvenient and aggravating (to the New Leaders) efforts to care for the serious medical issues of my young sons during the COVID-19 pandemic.

## DISCRIMINATION STATEMENT

I believe I have been discriminated against and terminated by Volusion because of my national origin in violation of Title VII of the Civil Rights Act of 1964 and the Texas Commission on Human Rights Act, TEX. LABOR CODE, § 21.001 *et seq.* and because of my efforts to care for the serious medical issues of my young sons during the COVID-19 pandemic, in violation of the Family Medical Leave Act (FMLA) and the Family First Coronavirus Response Act (FFRCA).

My name is Bardia Dejban, my date of birth is 1979, and my address is 2907 Dover Pl, Austin, Texas 78757, in the United States of America. I declare under penalty of perjury that the foregoing is true and correct.

19

Executed in Travis County, State of Texas, on the 29th day of November 2020.

Bardia Dejban