**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **VOUSION, LLC,** | § | **Chapter 11** |
| | § | |
| | § | **Case No. 20-50082 (DRJ)** |
| **Debtor.** | § | |

## <u>DECLARATION OF BARDIA DEJBAN</u>

STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

I hereby declare pursuant to 28 U.S.C § 1746:

1.     My name is Bardia Dejban.  I am over the age of eighteen (18) years, of sound mind, and fully capable of making this declaration.  I am fully competent to testify to the matters stated in this declaration, all of which is true, and of which I have personal knowledge.

2.     I live in the County of Los Angeles in the State of California.  I am a male citizen of the United States, born in Tehran, Iran.  Bardia, is a uniquely Iranian name.  I have read paragraph 13 of the unsworn "Factual Background" of Volusion's objections to my claim (Dkt. No. 170), that Volusion hired me originally as Chief Information Officer and that I began work in that role in February 2016.  In fact, I began employment at Volusion as Chief of Staff in February 2016.  Volusion contacted me in the State of California, where I lived before I started to work for Volusion.  At the time the CEO of Volusion was Kevin Sproles, who was the founder of Volusion.  At that time Main Street Capital Corporation ("Main Street") was a major lender and investor in Volusion.  During my employment at Volusion, I was promoted to Chief Technology Officer in September 2016, Chief Operating Officer (COO) in November 2018 and Chief Executive Officer

in August 2019.  All of those promotions involved approval by the Board of Managers, which at the time included Kevin Sproles (the founder and then the CEO) and Main Street by and through its CEO, Dwayne Hyzak.

3.      I have read paragraph 12 of the unsworn "Factual Background" of Volusion's objections to my claim (Dkt. No. 170), that, "[u]nder Mr. Dejban's watch, family members were engaged as independent contractors to represent the Debtor, providing no apparent value to the company." This is false.  Volusion hired my sister as an employee (not an independent contractor, despite any label she may have had), she was not hired "on my watch" (I was COO when she was hired) as she was hired by the Kevin Sproles (CEO, Founder, majority shareholder and board member) along with written board consent, there was great apparent (and real) value to Volusion in the hiring of Ms. Dejban and the consulting work of DK Strategic Consulting.

4.      Volusion contacted me in the State of California, where I lived before I started to work for Volusion.  At the time the CEO of Volusion was Clay Olivier, who was replaced by Kevin Sproles prior to my employment.  At that time Main Street Capital Corporation ("Main Street") was a major lender and investor in Volusion.  During my employment at Volusion, I was promoted to Chief Technology Officer in September 2016, Chief Operating Officer (COO) in November 2018, and Chief Executive Officer in August 2019.  All of those promotions involved approval by the Board of Managers, which at the time included Kevin Sproles (the founder and then the CEO) and Main Street by and through its CEO, Dwayne Hyzak.  On or about June 9, 2020, Jeremy Rosenthal, Curt Lindeman, Troy Pike became the new members of Volusion's board of directors and Tim Stallkamp was engaged by Volusion's Board (consisting of Rosenthal, Lindeman and Pike) to be the Chief Restructing Officer ("CRO") of Volusion.  I will refer to these four, Rosenthal, Lindeman, Pike and Stallkamp as the New Leaders of Volusion.

5.      On June 9, 2020, Main Street notified me that that it had changed the Board of Managers ("the Board") for Volusion and that the Board now was made up of Troy Pike, Jeremy Rosenthal, and Curt Lindeman.  As of the takeover of Volusion by the New Leaders, on or about June 9, 2020, of Volusion's 170 employees, only two, Bahar Dejban, my twin sister, and I were of Iranian descent.  Shawn Khorrami, my brother-in-law, who Kevin Sproles had brought on with Volusion as a consultant, is also of Iranian descent.  Since as CEO of Volusion after my promotion I was in the top tier of leadership at Volusion, I was similarly situated to others in the top tier, including Kevin Sproles (the Founder and former CEO), the General Counsel, Bahar Dejban, the V.P. of Finance, Randon Kelly, the Chief Technology Officer, Brett McLaughlin and the Chief Information Security Officer, Lance Wright.  Only Ms. Dejban and I, among the top tier of Volusion's leadership, were of Iranian ancestry.  In addition, all of us in the top tier were similarly situated because our employment status was determined by the same person – specifically – by the New Leaders.

6.      After the new Board of Managers and newly installed CRO Tim Stallkamp arrived at Volusion, these four Caucasian non-Iranian males implemented a discriminatory double standard, treating all the Volusion employees born in Iran badly and with disrespect, while treating non-Iranian employees of Volusion well and with respect.   I witnessed how the New Leaders were demanding, unreasonable, condescending, abrupt, rude, and badgering toward Volusion's only Iranian born employees, Bahar Dejban and me, while they treated the other Volusion leaders (non-Iranian born) well, politely and with deference.  The harassment and discrimination to which Individual Defendants Rosenthal, Lindeman, Pike and Stallkamp subjected me, so altered my working conditions as to make it more difficult for me to do my job.  This included creating unnecessary obstacles, and deadlines untethered to any legitimate business purpose.

7.      I also witnessed the double standard imposed by Volusion's New Leaders.  Under the double standard instituted and propagated by the New Leaders, the remaining employees at Volusion (all non-Iranian born) were permitted to put off requests from the New Leaders for days and weeks.  They could say, "I won't have time to talk until next week" and the response by the New Leaders, time and again was "no problem." The demands by the New Leaders on Bahar Dejban and me were abrupt, unreasonable and pretextual and the New Leaders coupled the requests with pressure and threats.

8.      My initial meeting with the New Leaders was on June 15, 2020.  Prior to the June 15, 2020 meeting, I had not informed any of the New Leaders that my two young sons had serious health conditions and that I would need to spend some of my time providing care for them.

9.      At the initial meeting on June 15, 2020, I introduced myself to the New Leaders as a technologist, as a person involved in technology and entrepreneurship, and as a person with subject matter expertise with SAAS and SMB.  I explained how I met Kevin Sproles and how I was at Volusion to fix the company. I told the New Leaders that I was Persian and that I came to the USA in 1979. When I told the New Leaders that I was from Iran, their reaction was hostile, it was negative silence.

10.      At the initial meeting between the New Leaders and me on June 15, 2020, I communicated to the New Leaders that my family and especially my two young sons needed extra care particularly during the COVID-19 pandemic.  I alerted the New Leaders to the fact that both of my sons, aged 2 and 7, had serious health conditions, including food allergies that were life threatening and that I would need to take time off to provide them care.  The New Leaders indicated their hostility and resistance to this by saying nothing supportive.  From that point on during my short tenure under the New Leaders, every time I mentioned needing time off for the serious health

conditions of my children, the New Leaders did the opposite of providing accommodation or signaling non-interference with my effort to provide family care and medical leave.  Retaliating against me for my efforts to take care of my family's medical needs, the New Leaders increased their requests to me and imposed generally undoable due dates.

11.     Almost immediately after the June 15, 2020 meeting where I made the disclosures about my Iranian ancestry and about my need to exercise my right to family care and medical leave, one of the New Leaders, Jeremy Rosenthal, emailed me at 9:35 PM on June 16, 2020, beginning to lay the foundation for terminating me on the pretext that I was slow in delivering requested documents. Rosenthal's email (signed by Rosenthal, Lindeman and Pike) contained a false assertion that I had advised that "all the requested information ready to go."

12.     The next morning, June 17, 2020 (at 9:18 AM), I sent an email to Rosenthal concerning my need to provide care for one of my sons with a serious medical condition.   I emailed, "Taking my son to the doctor, he has a severe ear infection.  I'll reply to your email immediately after I return."  Indicating their hostility and resistance to this, none of the New Leaders sent condolences or indicated concern about my son.

13.     At 11:18 AM on June 17, 2020, I sent Rosenthal (copying the other New Leaders) an email that further prompted the efforts of the New Leaders to retaliate against and terminate me because of my  efforts to provide care for my sons with serious medical conditions, along with hostility toward Bahar Dejban and me because of our race and ancestry, and for being Iranian (not – U.S.A) born.  My email included the following:

> As CEO, I need to balance operating the company as well as fulfilling these requests. I'm a very hands on leader, which is part of the reason I was elevated to CEO. I take great care to be involved in and shape each part of the organization to assure that it is heading for success.
>
> Regardless, in just 24 hours, I've now met with all parties requesting meetings

and begun preparing next steps. Based on our meetings, I felt like we are being collaborative and communicating openly, something foundational to our <u>culture code</u>.

While I am giving you and Tim my highest priority, there are other business items that I cannot merely ignore. **I'm moving as fast as physically possible to compile information and populate drives.** I'll be able to create a Google Drive for the Board and begin populating the requested information by the end of business today. I'm targeting to have all requested information by the end of this week, possibly Friday AM in preparation for our meeting on Monday.

**I would appreciate the opportunity to correct the record in regards to Conway Mackenzie. I did not report that the information was readily available,** I let Tim know our form NDA was readily available and that we would begin our PCI procedure, which starts with a background check.
. . .

Given that he had not specified a length of time, and had shortly before the call sent me his document requests, Tim seemed amenable to the 30 minute meeting. On the items Tim requested, I just wanted to give some background. It took us over 8 weeks to deliver that information to Raymond James last year during our process. During that time, I was the person responsible for aggregating a significant majority of that information, and can do so efficiently. While I'll work to expedite this process, it is likely going to be in batches over the next 4 weeks. .
. .

As you stated, we want to all make Volusion successful. I ask a little of your indulgence considering my years of being immersed in this company, its business, and building its culture. I'm taking your requests seriously and making them my top priority, while also balancing above. **I also have to assure that this process does not interfere with my responsibilities to my two boys, aged 2 and 6.**

(Emphasis added.)

14.     Pike acknowledged my email with a voicemail at 1:17 PM, directing me to call him back "today" to be sure they were on the same page.  Pike then sent me an email on June 17, 2020 at 2:00 PM, saying "Please call me at your earliest convenience today."

15.     Pike and I talked by phone the evening of June 17, 2020.  In the telephone conversation, I reminded Pike of the various obligations I had to the company and to my family, including my sons with serious medical conditions.  Pike responded in a threatening and bullying way, telling me, "There's a new sheriff in town."  Pike expressed no concern about the medical conditions of

my sons and made it plain to me that exercise my right to family care and medical leave would not be tolerated.

16.     The New Leaders reacted negatively to my information about my Iranian ancestry and my need to exercise my right to family care and medical leave.  Although the New Leaders did not say anything that I heard that was negative about my Iranian ancestry, none of the New Leaders remarked even in a neutral, much less in a positive way about this significant fact.  I believe that actions sometimes speak louder than words. Volusion's actions indicated hostility toward my Iranian ancestry.  Promptly after firing me, Volusion removed my statement on the Volusion website that prominently mentioned my Iranian ancestry.

17.     The reaction of the New Leaders to my expressed need to exercise my right to family care and medical leave was overtly negative.  They responded in a threatening manner, never offering leave or even time off without fear of reprisal.  They acted upset and angry with my efforts to care for my children.  The New Leaders treated my efforts to exercise my right to family care and medical leave as an annoying inconvenience. When I mentioned my family health issues along with COVID-related topics that impacted my work, the New Leaders responded swiftly with punitive board resolutions, one sent on June 19, 2020, and another sent on June 24, 2020.

18.     From the point of Board Manager Pike's "new sheriff" bullying threat to me the evening of June 17, 2020 (and even before) until the Board meeting I attended with the New Leaders on July 23, 2020, I did my best to cooperate with the New Leaders, to promptly provide the New Leaders with information they sought, and to successfully run Volusion.  The New Leaders engaged in a relentless effort to build a paper-trail against me, labeled me as "in trouble," and crippled my efforts to lead the company with two "Unanimous Consents" they delivered to me the first on June 19, 2020 and the second delivered to me on June 24, 2020), which they shared with

Volusion employees other than me.

19.     The New Leaders were targeting and bullying Volusion's other employee of Iranian ancestry as they were doing this to me.  Bahar Dejban began employment her at Volusion as General Counsel in March 2019. Volusion contacted her in the State of California, where she lived before she started to work for Volusion.  Volusion's Board of Managers, which at the time included Kevin Sproles (the founder and then the CEO) and Main Street, by and through its CEO, Dwayne Hyzak approved her hiring.  At that time, in addition to being one of three Board Members, Main Street was also a major shareholder and investor in Volusion, as well as its primary lender.

20.     I have read the unsworn "Factual Background" contained in Volusion's objection to the proofs of claim of Bahar Dejban (Dkt. 178).  Volusion asserts in Paragraph 12 of that document, "Sometime after his employment, Mr. Dejban cut a sweetheart deal for his twin sister, Ms. Dejban and her husband, the CEO's brother-in-law."  This statement is false.  This statement is also evidence of pretext, since Volusion made no assertion to me (or to my knowledge) to Ms. Dejban at any time before it fired us, and we accused Volusion of wrongful termination, that I "cut a sweetheart deal" or that there was any impropriety with her hiring and/or the consultancy of Mr. Khorrami.  Volusion came up with this false excuse after Ms. Dejban and I accused Volusion and the New Leaders of violating our statutory rights.  Here are the facts about the hiring of Ms. Dejban and the arrangement with Mr. Khorrami:

        a.     When Volusion hired Bahar Dejban as its General Counsel and obtaining the consulting services of my brother-in-law, Shawn Khorrami, I was not the CEO.  At that time I was the COO of Volusion, and this was absolutely not a "sweetheart deal."

        b.     When Volusion brought on Ms. Dejban as its General Counsel, Volusion needed a new General Counsel after the prior General Counsel, Derek Willis, gave notice a few months into

the Merger and Acquisition (M+A) process in about February 2019. This was just a few months after he had asked for a raise in his salary, which Kevin Sproles agreed to in order to keep him engaged and onboard. This was also just a short while after Mr. Willis drafted a bonus transaction incentive agreement for himself and for me. The bonus incentive agreement for Mr. Willis was rescinded because of his resignation.

c.      Mr. Willis was initially going to give 4 weeks' notice, but then also told the Founder (who was also CEO at the time), Kevin Sproles, that he would be willing to consult through May 2019 at an hourly rate that seemed high. Regardless of Mr. Willis's offer, two months was not enough time to get us through the entire M+A process.

d.      As Volusion's COO at the time, I was faced with a crisis, I shared responsibility for a search for a replacement General Counsel. I contacted two colleagues who were also friends as well as my sister about the crisis. Volusion had an urgent need for a replacement General Counsel. Volusion effectively needed an immediate transition to a new General Counsel.

e.      I could have conducted a three to six month search for a new GC, or brought a law firm on board, but it could have created problems for the M+A process that was nearing conclusion. I was not promoted to CEO until after the failed M+A attempt and after Volusion hired Ms. Dejban as new GC. I met with the Founder (Kevin Sproles) and the head of Finance several times. and we agreed that Bahar Dejban would be our general counsel. The board was provided written notice and could have objected, but did not. The lender, Main Street, could have objected, but did not. They never once messaged me with in concerns or expressed any concern about anything with the hiring of Ms. Dejban, including her experience, her qualifications, or her loyalties – not in a board meeting, a phone call, or an email. I also made it clear that I wanted to raise the issue with the Board and did so on phone calls and in emails. I explicitly sent an email to all Board members,

which included Bahar's bio and background. Mr. Sproles was provided a variety of information about Ms. Dejban and Mr. Khorrami, and the disbarment issue with Mr. Khorrami was not only discussed, but it is easily discoverable with a Google search.  None of the Board members raised an objection. Volusion's new argument (which is more evidence of pretext) about kinship between Ms Dejban and Mr. Khorrami and me was not seen as an obstacle by anyone involved in this process.  The mother and brother of the Founder, Mr. Sproles, had worked for Volusion for over ten years.  Mr. Sproles' mother has been running payroll for Volusion for about 16 years.  Mr. Sproles' brother was in IT and then in engineering – it was a family business.

f.      The initial agreement with Bahar Dejban and DK Strategic Solutions, LLC ("DK") was approved by Kevin Sproles. The General Counsel was to report to the CEO and COO, which was how the former general counsel worked as well.

g.      Prior to hiring Ms. Dejban as General Counsel, she made it clear that she would represent Volusion, and not me. In fact, there is not a single incident or issue that I raised to her that was personal in nature during her course of employment at Volusion.

h.      There was no "sweetheart" deal.  Ms. Dejban was compensated fairly, and less than her predecessor.  I never received any compensation, back-channel fees, or even a single paid meal or entertainment expense from Bahar Dejban or her firm in the history of her working with Volusion.

i.      No single company decision was ever made by Bahar Dejban that would benefit me.

j.      The hiring of Ms. Dejban was highly favorable to Volusion from a financial standpoint – it was a very good deal for Volusion.  I was getting multiple people that I trusted for the price of a fully burdened general counsel (Bahar Dejban, Shawn Khorrami and a subcontracting

team that was critical to the partner and marketing programs). Ms. Dejban's portion of the contract was actually a lot less than the prior general counsel's annual salary alone.

(i)      Derek Willis, the previous General Counsel of Volusion, was paid a $430,000 annual salary, with 15% for a fully burdened rate (expenses, office, insurance, perks, and benefits) of $494,500.

(ii)      Bahar Dejban's portion of the DK Strategies contract, which was split into 3 parts, was $30,000 flat fee a month. So this was an annual salary of $360,000, only 83 percent of what Volusion had paid Derek Willis in base salary.   Further, Ms. Dejban had minimal expenses. This was far less than a general counsel would have cost to find and hire.  Better yet,  Ms. Dejban achieved more in her time as general counsel than I had hoped, including: Building a patent portfolio, successfully handling a security incident in October 2019, quickly and favorably resolving a number of customer and vendor disputes, and amending all our terms and conditions and customer-facing agreements.

(iii)     The second portion of the DK contract was for marketing, sales and corporate development. Shawn Khorrami handled this, and also sub-contracted to an expert in this space that he worked with closely on a daily basis. That portion of the contract was $35,000 a month.  This was also a bargain and a very good deal financially for Volusion. Mr. Khorrami was able to renegotiate the lease agreement just a month or two before the board was replaced, saving Volusion about $700,000 or more. The team Mr. Khorrami assembled was really good, and in fact, I understand that Volusion personnel reached out to DK Strategic (Mr. Khorrami's consulting company) to ask if that team was available after DK Strategic was terminated.

(iv)     The third portion of the DK contract was to recoup cost savings, including the tail from Raymond James.  Again, Mr. Khorrami's performance was outstanding.  Mr. Khorrami

accomplished the Raymond James goal within 2 weeks of signing this third portion of the contract, negotiations with the lender and finally, negotiations with the landlord. For that service, there was a $100,000 retainer paid. In this instance, there was a tail on the contract with Raymond James that allowed them to get paid 10% (I believe) on any dollar amount raised or any sale of the company for a period of time (1-2 years). This was an outstanding result for Volusion.

21.     I have also read in Paragraph 14 of the unsworn "Factual Background" contained in Volusion's objection to the proofs of claim of Bahar Dejban (Dkt. 178) this sentence: "To the best of Debtor's knowledge, Ms. Dejban's experience is limited to personal injury work, and in particular, personal injury work with her husband's former firm." This sentence is also false and evidence of pretext. Before she was hired as its General Counsel, Ms. Dejban was fully vetted and disclosed that in addition to personal injury and mass torts legal work, she had worked on civil rights cases, on employment cases, on various class action cases including data breach cases, and had experience doing political work in the form of lobbying state and federal legislators to pass certain bills that protect consumers and the public. I am also aware from what Ms. Dejban has told me that after the New Leaders took over on or about June 9, 2020, in a conference call on June 23, 2020, they asked her about her background and suggested that her experience in Plaintiff's and consumer work made her unqualified to be General Counsel, but that Ms. Dejban provided them her background and explained that her experience was not limited to personal injury work.

22.     I have also read in Paragraph 25 of the unsworn "Objection" portion of Volusion's objection to the proofs of claim of Bahar Dejban (Dkt. 178), that Volusion asserts "Ms. Dejban's relationship with Debtor was, at most, that of an independent contractor" and that she "was never an employee." This is wrong. The Volusion General Counsel prior to Ms. Dejban, Mr. Willis, was an employee – not an independent contractor. Volusion had a right to control his work and

had comprehensive and immediate day-to-day authority over employment decisions concerning Mr. Willis, and then Ms. Dejban. From the time Bahar Dejban began working for Volusion until Volusion terminated her employment, Bahar Dejban was a full-time employee of Volusion. While Bahar Dejban served as General Counsel of Volusion, Volusion had control of her; while I was CEO, she reported directly to me, and I could and did give her direction. Volusion had the right to hire, fire, and supervise Bahar Dejban, and to set her schedule. Volusion also provided her with the equipment and tools that she needed to conduct her work.

23.     After the New Leaders met Ms. Dejban and me, and learned of our national origin, of my family medical leave needs and of Ms Dejban's pregnancy, they worked on building an excuse (a paper (or email) trail) to justify getting rid of us. On July 8, 2020 at 12:38 PM, Lindeman sent an email, copying the other New Leaders, harassing both Ms. Dejban and me and demanding a response "today." Lindeman said, "There are a number of documents that the board has been requesting from each of you for a number of weeks."

24.     At 2:24 PM on July 8, 2020, I responded with this email to Lindeman:

> We are gathering and uploading responsive documents to your requests. My understanding is that similar requests were made of Randon and he is also working to gather the same documentation. However, **as I am just returning from PTO this afternoon and had to bring my son to his doctors appointment, which I'm at now, it is physically not possible for us to meet your deadline of today.**
>
> I am following up with Randon to find out exactly where he is on the process. Rest assured that these are being gathered and will be provided to you.

(Emphasis added.)

25.     Minimizing and dismissing my family care and medical leave issues the same as typical "family obligations" of workers without family care and medical issues and entirely ignoring the pregnancy of Bahar Dejban, Lindeman sent this harassing email to me at 4:44 PM on July 8, 2020, with copies to Bahar Dejban and to the other New Leaders:

I can understand and **sympathize with family obligations. We are all trying to juggle family obligations with work during this strange time**. However, these delays by both you and Bahar for weeks are not acceptable. If these requests were made of me as a GC, I could send out the documents within minutes from anywhere there is a cell signal.

If you can't do it, please direct people on your team to send me the documents today.

(Emphasis added.)

26.     Lindeman's claims were an attempt to create a false narrative both as to his requests, and as to the medical conditions I raised.  Lindeman falsely was claiming that he had made requests of Ms. Dejban which had not been fulfilled and at the same time, comparing ordinary family obligations with pregnancy rights. Bahar Dejban emailed Lindeman at 5:39 PM on July 8, 2020 and pushed back on his harassment as follows:

**I do not appreciate your misrepresentations.**  This is the <u>first</u> request I have received for contracts with major vendors or engagement letters with law firms. I was asked for a list of law firms that are or have recently been engaged. And I provided that to you last week.

I also informed you in our conference call that I do not have access to employment agreements, and nevertheless, you requested those from me.

Finally, **I have been working full time for Volusion, and as I have told you, I am pregnant and have experienced some complications and difficulties with my pregnancy over the past weeks**. Regardless, I have continued to respond to all of Tim's requests, including providing him with complete access to a drive of intellectual property material along with corresponding engagement letters last night.

I can get you the retainer agreements for lawyers I have engaged, other than the patent lawyer which you now already have as of last night. I will have to search for agreements with lawyers that were engaged prior to my employment but that are still doing work for Volusion.

I take my job as General Counsel of Volusion VERY seriously and would appreciate it if you wouldn't misstate things and conflate your previous role as GC with the work I am doing. We have different jobs and obviously different styles. **I have and will continue to timely respond to all requests while managing my other duties.**

DECLARATION OF BARDIA DEJBAN            Page 14

(Emphasis added.)

27.     Lindeman never responded to any of Bahar Dejban's 5:39 PM message.

28.     Mr. Stallkamp was working in concert, as an agent of, and/or in collusion with the other New Leaders. Mr. Stallkamp would make requests that were substantially the same as those of the other New Leaders to create anxiety, stress, and pressure on Ms. Dejban. Ms. Dejban responded promptly to his requests.

29.     My email to the New Leaders at 7:04 PM on July 8, 2020 illustrates the way the New Leaders were building their paper-trail even as they knew I was taking Paid Time Off (PTO) to deal with family care and medical leave issues. My email said:

> Replying to an email Tim had sent while I was on PTO.
>
> **Just getting back from my son's doctors appointment.** Earlier today, Austin confirmed Stage 5 approaching within the next couple days if not tonight. I am spending the remainder of the week working on Q3 priorities with the executive team, and taking care of my family in preparation for Stage 5. As I mentioned before, my children have medical conditions that are directly impacted by COVID-19 and Stage 5.

(Emphasis added.)

30.     None of the New Leaders responded with any effort to accommodate my family care and medical leave needs. Rosenthal's email to me at 8:34 PM on July 8, 2020 seemed to deliberately miss the point – that my sons were especially impacted by COVID-19. Rosenthal said, "Please stay safe. We understand that with Covid this is a very challenging time." Generally, the emails from the New Leaders treated my efforts to take care of my family as an inconvenience and as a lack of cooperation.

31.     On July 13, 2020 via his 7:55 AM email, I complained of derogatory information Stallkamp had injected with the management team and put the New Leaders on further written notice of my family care and medical leave needs. I sent them this email letter:

> Curt, Jeremy, Troy, Tim:
>
> . . .

. . .  I need to bring to your attention that my time this week will be diverted to speaking with several members of the leadership team in an effort to ameliorate some of the damage and reduce the anxiety that has occurred by the recent events. **Of particular concern is the effect that Tim's communications have had on the management team. He has not only injected derogatory information, which is frankly unnecessary, but also has shared a board resolution document.** To put it simply, they are now uncertain of the future of Volusion and their own commitment to what has been a less than clear and mixed message. This has significantly impacted the work environment, including directly impacting Q3 rocks. The team as you must know, are critical members of the organization who were contacted against my advice and counsel.

. . .

**Personally, as I have mentioned, COVID-19 continues to cause extreme uncertainty and anxiety for my family, especially given my young sons' health issues.** Also as I wrote Friday, Austin will be moved back to a Stage 5. Given all of these considerations combined with COVID-related family issues, I am asking that you move our meeting to the end-of-the month. In the meantime I will speak with Tim as scheduled this morning who I'm sure will report back on our conversation.

32.     None of the New Leaders responded with any effort to accommodate my family care and medical leave needs.  The New Leaders failed to take any efforts to rectify the damage done to my leadership position by Stallkamp's injection of derogatory information about me with his management team.  Stallkamp sidestepped the sabotage issue by pretending in his email to the New Leaders and me on July 13, 2020 (7:58 AM) that my reference to injecting derogatory information meant that I was complaining that Stallkamp was secretly talking to Volusion employees and not allowing them to freely share what Stallkamp was telling them with me or other senior leaders.  At 9:32 AM on July 13, 2020, I emailed Stallkamp that "sharing information wasn't what I was bringing to your attention."  The New Leaders did nothing to further acknowledge, let alone to undo the damage with my team by injecting derogatory information.

33.     On July 17, 2020, I attended another Board meeting.  Nothing was said at that meeting to alert me to the fact that the New Leaders were about to fire the General Counsel (Bahar Dejban),

the Founder of Volusion, Kevin Sproles and  me, the CEO of Volusion and to put Volusion in bankruptcy, despite the fact that Volusion was doing well as a business and did not need to take bankruptcy to avoid foreclosure by Main Street.

34.     On July 23, 2020 at 2:21 PM, I emailed the New Leaders about the Board Meeting agenda for the board meeting that would take place later in the day.

35.     Troy Pike emailed in response on July 23, 2020 at 2:26 PM, without hinting that anything was afoot.  Pike added: "We should also reserve five minutes to discuss the forbearance agreement and its objectives."  Unbeknownst to me at the time, the New Leaders were trying to set me up for a pretextual discharge as shown below:

    a.     I have read Paragraph 12 of the unsworn "Factual Background" of Volusion's objection to my claim (Dkt. No. 170), where Debtor makes this misleading assertion:  "[U]nder Mr. Dejban's direction, the Debtor refused to fund its obligations under the initial forbearance agreement with Main Street . . . , which resulted in its Chapter 11 filing."  I have also read Debtor's misleading assertion in Paragraph 24 of its objection to my claim:  "Despite being expressly told to make [payment of $563,266.47], Mr. Dejban refused to do so, which resulted in the nullification of the Initial Forbearance Agreement."  Dkt. No. 170, p. 7, ¶ 24.

    b.     Pike's reference to the forbearance agreement related to the agreement Main Street, Volusion's lender, had made that it would not seek to foreclose on the loan due to default on payment obligations by Volusion.  Despite this forbearance agreement, Stallkamp told me shortly before the Board meeting that he needed someone to wire over about $800,000 to Main Street as a "peace offering."  Stallkamp also told me that the Board gave him authority to sign the agreement but not to wire the funds. I asked Stallkamp why Volusion had to pay anything to Main Street since it had a forbearance back in April.  Stallkamp said it was different now that the new Board

was here. I told Stallkamp that I would need to follow up with Kevin Sproles, the founder since I did not have bank account access.  This was the fact.  Stallkamp told me that Main Street would take action against Volusion if they did not have the payment by end of week.  This made no sense to me in light of the forbearance agreement.

       c.     Stallkamp's suggestion that I wire this money was an effort to set me up– a pretext to cover discriminatory firing the New Leaders were secretly planning with respect to Bahar Dejban and me.  If I had wired the money, I would have had to do so without authorization. And if I did not wire the money, the New Leaders and Volusion could accuse me of not cooperating.  I had no rights over bank accounts.  Also, the Board's resolutions after takeover by the new Board made Stallkamp the boss of finance and the direct boss of Volusion's Vice President of Finance which meant Stallkamp could have directed the wire to be made.  Also, as Stallkamp knew, under the Board's resolutions, I was not authorized to spend more than $25,000.

36.    The Board meeting on Thursday, July 23, 2020 lasted less than 35 minutes.  Stallkamp and his assistant joined the Board call as well.  I had let the New Leaders know that I would taking PTO on Friday, to help with my boys' medical issues.  The New Leaders said nothing positive and acted unhappy about this development, like they were tired of dealing with this inconvenience.

37.    At the Board meeting of July 23, 2020, none of the New Leaders mentioned anything about Volusion filing for bankruptcy.  They did not mention that they were considering firing Bahar Dejban, the General Counsel. They did not mention they were considering firing the Founder, Kevin Sproles.  They did not mention that they were considering firing me (the CEO) or that this would be my last workday as an employee of Volusion.

38.    At the Board meeting of July 23, 2020, I went through the details I had proposed in the agenda I had sent the New Leaders before the meeting.  The Board started by asking if they should

discuss the payment to Main Street first.   I recommended moving along with the agenda I had proposed. The Board seemed disinterested in any topics I discussed, then the Board switched topics and asked me to wire the money to Main Street. I did not "refuse" any direction by the Board.  I told them I did not want to be put in the middle of Main Street and the founder (Kevin Sproles) and that I would need to talk with Kevin to understand where that all stood. Jeremy Rosenthal and Curt Lindeman asked me, "as the highest-ranking officer, you can't wire this payment?" I told them that I would follow-up after I had a chance to speak with the founder (who had bank account access) because I did not want to get in the middle of legal challenges between the founder and Main Street. The last thing Troy Pike said at the Board meeting was, "Gentlemen, the three of us should discuss what is going to happen Monday when Main Street doesn't receive their payment." He was acting like they could not send the payment – and they certainly could, while it would have been misconduct for me to do so.  Jeremy Rosenthal closed the meeting by saying "Thanks for your time Bardia."

39.     At 1:46 PM on July 23, 2020 (after the Board meeting), Stallkamp emailed Bahar Dejban about legal matters – trademarks and patent applications.  At 5:53 pm, Bahar Dejban responded to Stallkamp's email – all in a normal, business-like way.

40.     I got no communication from any of the New Leaders after the Thursday, July 23, 2020 Board meeting until my termination on July 27.  I took a PTO day off on Friday, July 24, 2020, to help with my boys, as I had told the New Leaders I would do.  Even when taking PTO, I checked emails.  There were none to me from the New Leaders.  I started work early on Monday, July 27, 2020.

41.     Troy Pike fired me by email on July 27, 2020.  Pike called me at 11:37 AM on July 27, 2020.  Pike's voice message said, "Hello Bardia, this is Troy Pike and I'm calling on behalf of

Volusion's Board of Directors.   I need to speak with you today uh very importantly on a matter regarding your employment with Volusion.  I'll follow this directly with an email as well, but I'd appreciate you calling me back immediately."  Pike left his phone number.  Pike and I did not talk on the phone that day.  Pike's email enclosed me termination letter.  The New Leaders did not provide a reason for termination.

42.     After my termination, Volusion has shown that its termination of me was based on false, pretextual reasons in several ways.  I have read in the unsworn "Objection" part of Volusion's objection to my proof of claim (Dkt. 170) that Volusion now claims that as CEO, I was "Underperforming," "Uncooperative," "Insubordinate," "In breach of [my] fidicuary duties," and "Disloyal."  Dkt. 170, pp. 9-10, ¶ 31.  The "uncooperative" assertion relates to the pretextual efforts of the New Leaders to paper-trail me as I in fact cooperated with them.   The "insubordinate" assertion relates to the last minute pretextual effort by the New Leaders to set me up for termination in connection with wiring funds to Main Street.  The other claims – underperforming, in breach of my fiduciary duties, and disloyalty are all after-the-fact "reasons" – pretexts.   No one from Volusion raised these with me before or at my termination.  Besides being after-the-fact, these are pretextual because they are false.

        a.     I have read in the unsworn "Factual Background" part of Volusion's objection to my proof of claim (Dkt. 170) that claims under "Mr. Dejban's watch . . . due to a failed M&A process to sell the company."  Dkt. 170, p.4, ¶ 12.  The M&A process failed under the "watch" of then-CEO Kevin Sproles – not under my watch.  Further, the Board of Volusion at that time, which was effectively Main Street, approved my promotion to CEO right after the failed M+A process, approved hiring Bahar Dejban as General Counsel prior to me becoming CEO, and also approved a forbearance with Shawn Khorrami.  The failed M+A process was due to the fact the Founder

chose Raymond James to market the company (against my advice), then created a narrative where I would be CEO (against Raymond James' advice) after he was able to sell his company. One of Mainstreet's representatives, Todd Leitgeb, confirmed on a call in August 2019 that "we know this is Raymond James' fault; they did a horrible job with this sale."

b.      Debtor falsely accuses me of underperformance, citing "the failed M&A sale process and the Debtor's financial condition."  Dkt. No. 170, p.9, ¶ 31.

(i)      The failed M+A sale was not attributable to me, and the Debtor's performance under my leadership as CEO was good.  I was not CEO during the M+A process, nor did I make the decision to go-to-market with the process to begin with.  I told the Founder the timing was not right.  Even during the process itself, when the feedback was similar to what I anticipated, I urged the CEO and Founder to stop before too many institutions were contacted. He did not.

(ii)      Volusion recognized that my performance was outstanding (i.e. that I certainly was not underperforming as its CEO).  I have public testimonials on my LinkedIn from the various executive team members, including the head of finance Randon Kelly and the Founder (Sproles). Volusion experienced an increase in profitability and a revenue turnaround after took the reins. Within three quarters of me being CEO, the company was actually turning a net profit, had no need for external capital, worked out a forbearance with the lender, and had over $8 million cash in the bank. I was also able to attract and retain better top talent than in the previous 4 years, mostly C-Suite employees who resigned within months of the takeover by the New Leaders. After the New Leaders fired me, Volusion has lost at least 5,000 customers.  When I was CEO, we had a little over 16,600 total customers, and I believe they now have about 10,500 customers.

(iii)      Even after Volusion discharged me, it praised my contributions to the company. On its website Volusion published information about its Chapter 11 bankruptcy filing under the

heading "Frequently Asked Questions."  Volusion's "answers" did not hint that the "reason" for

firing Bahar Dejban or me was that it was facing "disengaged and disobedient officers."  (This is

what Debtor claimed in the pleading it filed on November 3, 2020 in Case 20-50028 – the

Bankruptcy proceeding).  Dkt. No. 103-1, p. 15, Art. III, ¶C(1).   Instead, Volusion stated that to

get bankruptcy protection in place for Volusion,

> we made some difficult, but necessary and immediate leadership changes.  **Effective July 27, Kevin Sproles and Bardia Dejban are no longer with the company**.  We know this may have a personal impact on some of you with long-standing relationships, as well as to our tight-knit organization overall.  **Kevin and Bardia have been important leaders at Volusion and we are tremendously thankful for their significant contributions.** While they are no longer formally a part of Volusion, the belief in the company, **the importance of the culture and the mission they inspired will remain.**  Our goal is to honor what they helped to create by making sure the restructuring process is successful and Volusion can thrive going forward.

(Emphasis added.)

(iv).     As for the "reason" for the bankruptcy and its timing, Volusion's "answers" stated:

"The company has matured debt and has not been able to make repayment terms."  The "answers"

did not disclose the fact that Volusion talked about not being able to make repayment terms while

Volusion had a forbearance with Main Street, and the "answers" did not assert the reason was

insufficient collaboration or cooperation from any of existing management or that it was faced

with "disengaged and disobedient officers."

c.     Debtor now (but not before my termination) accuses me of breach of my fiduciary

duties "as evidenced by the unreasonable and extraordinary expenditures and waste of company

assets."  Dkt. No. 170, p.10, ¶ 31.  The example Debtor provides in its unsworn "Factual

Background" is retaining two different law firms "purportedly on behalf of the Debtor to thwart

the reconstituted Board" and a claim that I "caused the Debtor to send these firms each a six-figure

retainer."  This is something I was not criticized about before I was fired and something that was

not an unreasonable and/or extraordinary expenditure.  After Mainstreet delivered notice of the board being replaced, I called Kevin Sproles (the Founder) and asked him what he wanted to do. He said fight it. I let him know what that would entail (lawyers and a hard process).  He agreed to it.  I decided for the good of the company to look into these issues.

(i)      Initially, I hired Spencer Fane and Geragos and Geragos around lender liability claims, among other things. It was hard for me to believe that this lender (Main Street), who was given more information than senior leaders in the company, and was also making decisions alongside us on the board would suddenly do this.

(ii)      The founder also separately had his own agreements with those two firms, in order to bring a derivative claim against the lender and the board in Chapter 11.

(iii)      I understand that the initial retainers were paid back to Volusion once Mr. Sproles decided to sign away his rights.  I understand that Spencer Fane deducted $12,000 or $18,000 from the refund and that Geragos and Geragos refunded the entire retainer.

(iv)      Mr. Sproles paid his own retainers and fees to those same firms to bring the derivative claim, separate from the amounts returned above.

(v)      If anything, it was to the founder's benefit to embark on this fight, since he was the majority shareholder (88% of the company). I had no stock in the company and no tangible incentive other than general employment. I consulted Sproles every step of the way and honored his wishes to look into this situation.

d.      Debtor now (but not before my termination) accuses me of being disloyal "as evidenced by [my] engagement of unqualified family members as independent contractors to the Debtor.  *Id*.  I have addressed above the engagement of Ms. Dejban (who was an employee of Volusion, regardless of  her independent contractor label).  The services performed by DK

Strategic (and Shawn Khorrami) were conducted with the full agreement of and initially under the supervision of the CEO, Kevin Sproles, and then under by supervision. Those included, among other things, creating the entire partner program for the company, a program which was essential to Volusion's viability, marketing and sales, as well as working with multiple departments to create and implement the go to market plan for Volusion's major offering, VOLT, which was also essential to Volusion's viability. In this way, Khorrami and his team were major contributors to the two programs that were crucial to Volusion's survival and growth. The amount of the contract was below what Volusion would have to pay for an in-house team to handle the same duties.

e.      Debtor's assertion (after my termination) about unqualified family members is false but ironic.  Besides the family aspect of Founder Kevin Sproles, his mother and his brother, Curt Lindeman, a lawyer and one of the New Leader board members, touts on his website the fact that he and his wife (who are business partners) bring "a family approach" to their work and their clients. Lindeman and his wife co-own a business providing general counsel services. Also, Volusion turned Troy Pike into the company after firing me as its CEO.  This is true despite the fact that Pike admitted to the leadership team of Volusion after he became one of the New Leaders as a Board member that he has no SaaS experience.  SaaS stands for "software as a service."  This is what Volusion does.  Meanwhile, I had the very combination of training and skills that are particularly important for SaaS companies. Specifically, I am a software engineer and I have a business degree. This allows me to have a deep understanding of the technologies involved, which in the case of a SaaS and Volusion are the product Volusion is selling, and at the same time I have a deep understanding of the business metrics. I am also fully trained on reading, understanding, and even creating financials and models. Not only are those rare skills and training, but I was the only person that Volusion had with these traits, a unique asset.

f.      Debtor's unsworn "Factual Background" falsely asserts I ignored communications related to a Notice of Default.  Dkt. No. 170, p. 5, ¶ 15.  First, the M+A process started in Q4 2018 and concluded at the beginning of Q2 2019. Debtor makes it sound like this is the only thing that was done, but in fact, we had brought a new product to market and initiated and finalized a major repricing initiative that increased our monthly recurring revenue by over 15%. The October 2019 notice of default was for a covenant that we had repeatedly asked Main Street to change to match our new operating model, which they did not. I believe we missed the covenant by less than 90 total stores, which was a drop in the bucket compared to the over 16,000 stores we had. Our head of finance told Main Street in a board meeting that "we could have purchased those stores for $2 each just to meet this covenant, but that is not our operating model any longer." I did not ignore these communications at all, I had met with Kevin Sproles, Randon Kelly (the head of finance) and Shawn Khorrami regularly to discuss this situation. In fact, I asked Main Street for a private meeting in November 2019, and drove to Houston to meet with and present how we would pay them back. In that meeting, I had a few requests, but Dwayne Hyzak from Mainstreet Capital never replied, responded or entertained them. Given I was a technologist, I realized that I perhaps did not speak the lenders language, but Mr. Khorrami did, having personal and professional experience in this, so he took over communications with Main Street. We had regular meetings, calls and quarterly board meetings with the lender.  We did not ignore their communications.

g.      Debtor's unsworn "Factual Background" provides incomplete and misleading information about an email from Main Street on November 16, 2019.  Dkt. No. 170, p. 5, ¶ 16.  I met with Mainstreet two weeks later, and informed them of the plan to hire a CFO to provide the best advice to Volusion and if need be, I would hire a CRO once the CFO provided his insights.

h.      Debtor's unsworn "Factual Background" now (but not before my termination)

falsely accuses me of being uncooperative and of suggesting use of an unqualified Shawn Khorrami as CFO/CRO.  Dkt. No. 170, pp. 5-6, ¶ ¶ 17 - 20.  Main Street's request changed from CFO, to CRO, then to CRO with an independent team of advisors. Mr. Khorrami was recommending the CFO since we (a) knew the company did not have the talent within, (b) it was Main Street's initial request, and  (c) it was a compromise to Main Street's amorphous requests. On "specific traits," we used Culture Index to measure the traits of individuals, so we wanted to make sure the traits of that individual were, quite frankly, nothing like the current head of finance who got the company in a tough position before I joined. At the time, Kevin Sproles was CEO, and he never could make sense of financials, so the role needed to "report to us," not him. The CFO needed to be "careful about the numbers they are producing" because historically, the VP of Finance would produce unreliable forecasts to Main Street, then the company would miss targets. We needed to make sure that did not continue to happen.  Mr. Khorrami brought in a team that were experts in partnership programs, marketing, and sales and specific to SaaS companies with particular emphasis on B2B. I knew that Mr. Khorrami started running his own business when he was in high school, that he received formal marketing education in college, and continued with that education after graduating from law school.  I knew that after starting his law firm, Mr. Khorrami was one of the first to conduct online advertising and brought the entire concept of affiliate marketing to the industry, a business which spun off from his firm.  It is not true that I refused to provide timely information to Main Street.

44.     I have read in the unsworn "Factual Background" part of Volusion's objection to my proof of claim (Dkt. 170) where Volusion states as if it is a fact that my Claims have nothing to do with alleged discrimination, are "sour grapes," and that on July 27, 2020, "the reconstituted Board determined 'that to ensure the appropriate functioning and decision-making in respect of [sic]

company assets and operations during the restructuring of the company . . . it is in the best interest of the company to terminate the engagement of (i) Bahar Dejban and Dejban Law, General Counsel of the Company ('Dejban Law'), (ii) Shawn Khorrami, counsel, negotiator and partner strategy for the Company, and (iii) any other contractor engagements of DK Strategic Solutions, LLC (such terminations, the 'Independent Contractor Terminations')."  Dkt. No. 170, pp. 4, 7-8, ¶ ¶ 11 & 25. The assertion that my Claims have nothing to do with alleged discrimination and are "sour grapes" are false – and at a minimum they are disputed facts.

45.     I have read in the unsworn "Factual Background" part of Volusion's objection to my proof of claim (Dkt. 170) where Volusion states that on July 27, 2020, the reconstituted Board "terminated Kevin Sproles' position as well."  Dkt. No. 170, p. 8, ¶ 25.  While I do not dispute that Volusion terminated Mr. Sproles on July 27, 2020, I know that Volusion has re-hired Mr. Sproles and that Mr. Sproles was similarly situated to me at Volusion, is not of Iranian ancestry, was not pregnant when fired or rehired by Volusion, and had not (as far as I know) sought accommodations for the medical leave needs of his family shortly before his termination and/or rehire.

46.     Further affiant said not.

        I hereby declare under penalty of perjury that the foregoing is true and correct.  Executed on April 30, 2021.

_____
Bardia Dejban