**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **VOUSION, LLC,** | § | **Chapter 11** |
| | § | |
| | § | **Case No. 20-50082 (DRJ)** |
| **Debtor.** | § | |

**<u>DECLARATION OF BAHAR DEJBAN</u>**

STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

I hereby declare pursuant to 28 U.S.C § 1746:

1.      My name is Bahar Dejban.  I am over the age of eighteen (18) years, of sound mind, and fully capable of making this declaration.  I am fully competent to testify to the matters stated in this declaration, all of which is true, and of which I have personal knowledge.

2.      I live in the County of Los Angeles in the State of California.  I am a female citizen of the United States, born in Tehran, Iran.  Bahar, is an Iranian name.

3.      I have read in paragraph 12 of the unsworn "Factual Background" of Volusion's objections to the claim of Bardia Dejban (Claim 15-1) (Dkt. No. 170), that, "[u]nder Mr. Dejban's watch, family members were engaged as independent contractors to represent the Debtor, providing no apparent value to the company."  This is false.  My understanding throughout my time with Volusion is and was that Volusion hired me as an employee (not an independent contractor, despite the independent contractor label).  Also, I was not hired under the "watch" of Bardia Dejban.  Mr.

Dejban was COO when Volusion hired me.  In fact, I was hired under the "watch" of Kevin

Sproles, the founder, board member, majority shareholder, and then CEO of Volusion. Also, there

was great apparent (and real) value to Volusion in my hiring.

4.      I began employment at Volusion as General Counsel in March 2019. Volusion contacted

me in the State of California, where I lived before I started to work for Volusion.  Volusion's

Board of Managers approved my hiring. At the time, the Board of Managers included Kevin

Sproles (the founder and then the CEO of Volusion), Main Street Capital Corporation ("Main

Street"), the major lender and investor in Volusion, and Joseph Essas, an independent board

member.  Incidentally, Main Street was represented on the Board by and through its CEO,

Dwayne Hyzak. Significantly, at no point during my employment, which spanned some 17

months, did any of my superiors or the Board, as a body or through any individual board

member, voice any objection to my hiring or the work that I was doing. Additionally, at no point

did any superior or the Board as a body nor any of its members individually voice any objection

or concern to my familial relationship to Mr. Dejban.

5.      On or about June 9, 2020, Jeremy Rosenthal, Curt Lindeman, Troy Pike became the new

members of Volusion's board of directors and Tim Stallkamp was engaged by Volusion's Board

(consisting of Rosenthal, Lindeman and Pike) to be the Chief Restructing Officer ("CRO") of

Volusion.  I will refer to these four, Rosenthal, Lindeman, Pike and Stallkamp as the New

Leaders of Volusion.

6.      As of the takeover of Volusion by the New Leaders, on or about June 9, 2020, of

Volusion's 170 employees, only two, Bardia Dejban and I, were of Iranian descent.

7.      From the time I began working for Volusion until Volusion terminated my employment, I

Dejban was a full-time employee of Volusion.  I went through the same onboarding process as

DECLARATION OF BAHAR DEJBAN            Page 2

other employees, which included, among other things, background checks. While I served as General Counsel of Volusion, Volusion had control of me.  Volusion had the right to hire, fire, and supervise me, and to set my schedule. Volusion also provided me with the equipment and tools that I needed to conduct my work.

8.      My performance and results for Volusion were always outstanding. Until the New Leaders took over, I had received very positive feedback about my performance and had increasingly been given greater management duties, including working directly with most departments within Volusion on a broad range of matters.  While I would work directly with the heads of each department on various matters, I would report to Bardia Dejban and at times Kevin Sproles.  When Bardia Dejban was promoted to CEO in or about September, 2019, I was at roughly the same level in Volusion as Mr. Sproles. Since we both reported to Bardia Dejban while he was the CEO, Mr. Sproles and I were similarly situated.  I was also similarly situated to Randon Kelly – the head of Finance – who reported to the CEO (Mr. Dejban) until near the date of my termination, when the New Leaders directed that Mr. Kelly would report to the CRO, Mr. Stallkamp.  The top tier at Volusion just prior to my firing also included the CEO, Bardia Dejban, the Chief Technology Officer, Brett McLaughlin and the Chief Information Security Officer, Lance Wright.  Only Mr. Dejban and I, among the top tier of Volusion's leadership, were of Iranian ancestry.  All of us in the top tier were similarly situated because our employment status was determined by the same person – specifically – by the New Leaders.

9.      The first communication between the New Leaders and me was on June 19, 2020, when at 8:59 AM Lindeman emailed me telling me that I needed to get in touch with David Snyder "preferably within the hour." Coming from the very top of the company, the implication was clear that I was to move with urgency, without regard to any duties or medical conditions. The demand

was also untethered to any real emergency. This initial contact was the first in a pattern of conduct by the New Leaders to harass, intimidate, discriminate, and attack me. I perceived that this was because of my Iranian ancestry, because I was a female (perceived by the New Leaders as being in a "man's job," and because I was pregnant.

10.     The unreasonable timeline notwithstanding, I responded swiftly, within the hour,  to Lindeman with copies to Snyder, Pike and Rosenthal. I informed them that I had emailed Snyder for available times. I added, "**Unfortunately, I have personal medical issues to tend to as I am pregnant**." None of the New Leaders ever asked me any questions related to my schedule, about any limitations I might have during my pregnancy, or even about my due date. I perceived this as hostile and intimidating. The New Leaders simply had no regard for the need to provide any accommodation for my personal medical condition - pregnancy. To the contrary, they made it clear to me that no accommodation would even be considered. In fact, from the outset, the New Leaders were quite dismissive of my pregnancy, and entirely with me as a woman. Instead of engaging in any kind of interactive discussion about accommodations, the New Leaders arranged a phone call with me for June 23rd as if it was business as usual.

11.     After the New Leaders learned of my Iranian Ancestry and of my pregnancy, they harassed me and failed to accommodate my pregnancy. The call on June 23, 2020 was originally arranged with and supposed to be between David Snyder and me. I knew that Mr. Snyder was a lawyer with the Jackson Walker law firm. Mr. Snyder himself had dispelled the notion that this communication with me was urgent,. Indeed, there was no urgency or emergency, contrary to the implication in Mr. Lindeman's email. In fact, in his voicemail to me, Mr. Snyder expressly set the call as an informal chat where Snyder would introduce himself and to discuss "corporate stuff" that was going on with Volusion.

DECLARATION OF BAHAR DEJBAN          Page 4

12.     The New Leaders flipped the script again, turning this second contact into a second opportunity to harass, intimidate, and discriminate. Once I got on the call, I was surprised to learn that Snyder was not even present on the call. In fact, completely without warning,  the three Board members (Rosenthal, Lindeman and Pike) ambushed me. The New Leaders' behavior on the call was akin to a firing squad. There was no agenda for the call. The New Leaders, ignoring the fact that they were attacking a pregnant woman, and without regard for any related health issues or risks (something I had specifically mentioned in my email of June 19, 2020), unleashed a relentless barrage of questions at me. The New Leaders were aggressive, insensitive, humiliating, badgering and harassing.

13.     The New Leaders ambushed me in an outright attempt to harass me and to aggravate my health issues.  The New Leaders asked about my background and suggested that my experience in Plaintiff's and consumer work made me unqualified to be General Counsel.  Overall, the tone of the call was unfriendly. The New Leaders drilled me for about an hour.  This was the start of a pattern of such behavior where not only did they treat me according to a double standard that was not applied to the rest of Volusion's employees or leadership, but they also did so in a manner to badger, harass, attack, humiliate me and to cause me anxiety, all the while knowing that I was pregnant and that such conduct could be detrimental to me and to my unborn child.

14.     Snyder, who finally arrived on the call at some point well after it was initiated, never asked me a single question. I felt harassed. I got the feeling from the way they talked to me during the call that because I was a woman, pregnant and Iranian, these Caucasian men did not take me seriously as Volusion's General Counsel and wanted me gone.  It occurred to me that there was no other reason they would act that way. This was the only phone call I had with any of the New Leaders and I never met with any of them in person.

DECLARATION OF BAHAR DEJBAN          Page 5

15.     On June 25, 2020 (at 9:44 AM), Defendant Lindeman emailed me about "deliverables,"
saying, 'The first four items on the list should be very easy to deliver" and "Please send those to
us today."  Referring to my  pregnancy, I emailed Lindeman at 4:45 PM, starting with this: "**I was
on unexpected bed rest yesterday**" and then detailing critical work issues I was dealing with that
day. In that same email I provided a partial response to the "deliverables" and advised that I would
provide another email after I dealt with those work issues.  Lindeman did not offer support on June
25th, again ignoring my pregnancy, the need for any accommodation, and instead, doubling down
on his deadlines and demands, which again, were untethered to any work emergency.  On June 29,
2020, I emailed Lindeman and provided more information on the deliverables. In response to my
email, on June 30, 2020, Lindeman finally emailed this message: "Thanks, Bahar.  I hope you are
feeling better.  Before getting into the past litigation, can you please provide the other information."

16.     In addition to requests made by the Board, Tim Stallkamp would send inquiries or requests
via email to me for information.  I always responded to those requests the same day.

17.     The New Leaders continued to build a paper (or email) trail against me, and them
terminated me without warning and for pretextual reasons.  On July 8, 2020 at 12:38 PM,
Lindeman sent an email, copying the other New Leaders, harassing both Bardia Dejban and me
and demanding a response "today."  Lindeman said, "There are a number of documents that the
board has been requesting from each of you for a number of weeks."

18.     In fact, Lindeman's claims were all a ruse and a transparent attempt to create a false
narrative both as to his requests, and as to the medical conditions which are specifically protected
under the law. Lindeman falsely was claiming that he had made requests of me which I had not
fulfilled and at the same time, comparing ordinary family obligations with legally protected
pregnancy rights. I emailed Lindeman at 5:39 PM on July 8, 2020 and pushed back on his

harassment as follows:

> **I do not appreciate your misrepresentations.** This is the <u>first</u> request I have received for contracts with major vendors or engagement letters with law firms. I was asked for a list of law firms that are or have recently been engaged. And I provided that to you last week.
>
> I also informed you in our conference call that I do not have access to employment agreements, and nevertheless, you requested those from me.
>
> Finally, **I have been working full time for Volusion, and as I have told you, I am pregnant and have experienced some complications and difficulties with my pregnancy over the past weeks**. Regardless, I have continued to respond to all of Tim's requests, including providing him with complete access to a drive of intellectual property material along with corresponding engagement letters last night.
>
> I can get you the retainer agreements for lawyers I have engaged, other than the patent lawyer which you now already have as of last night. I will have to search for agreements with lawyers that were engaged prior to my employment but that are still doing work for Volusion.
>
> I take my job as General Counsel of Volusion VERY seriously and would appreciate it if you wouldn't misstate things and conflate your previous role as GC with the work I am doing. We have different jobs and obviously different styles. **I have and will continue to timely respond to all requests while managing my other duties.**

(Emphasis added.)

19.     Lindeman never responded to any of my 5:39 PM message. Lindeman's message served no other purpose but to harass and create anxiety, which I feared would be detrimental to both me and my unborn child.

20.     At 1:46 PM on July 23, 2020 Stallkamp emailed me about legal matters – trademarks and patent applications. At 5:53 pm, I responded to Stallkamp's email – all in a normal, business-like way. None of the New Leaders hinted to me that I was "in trouble" with them or that I was about to be terminated.

21.     I received no communication from any of the New Leaders after the 1:46 PM email from

DECLARATION OF BAHAR DEJBAN          Page 7

Stallkamp on Thursday, July 23, 2020.

22.     By email on July 27, 2020 (at 6:04 PM), and without prior consultation, counseling, or

warning, the New Leaders fired me.  Pike attached two letters with his email to me.  Both letters

said termination was effective as of 9:15 a.m. Central Standard Time on July 27, 2020.  One of

the enclosed letters was addressed to Bahar Dejban; the other was addressed to DK Strategic

Solutions LLC.

23.     I have now read Paragraph 14 of the unsworn "Factual Background" of Volusion's

objections to my claim in bankruptcy (Claim 16-1) (Dkt. No. 178):

> "To the best of Debtor's knowledge, Ms. Dejban's experience as a lawyer is limited to
> personal injury work, and in particular, personal injury work with her husband's former
> firm. Ms. Dejban had no experience performing general counsel services for a company,
> much less a tech services company like the Debtor. Ms. Dejban was not familiar with
> Debtor's business or industry. Ms. Dejban was unqualified to provide general counsel
> services on behalf of the Debtor"

    a.     In fact, the Debtor went through a full review of my experience and had the

opportunity to inquire as to any concerns which it had. The same was true of Debtor's Board of

Managers who, at no time, raised any objections regarding my experience. Indeed, the hiring

decision was made by Mr. Sproles as CEO and member of the Board of Managers of the Debtor.

Debtor's unsworn assertion cites to no specific instance of poor work performance on my part,

not even by the New Leaders.

    b.     My experience includes employment matters, class actions (including data

breaches) as well as negotiating complex contracts and management roles, as well as HR related

matters.  This includes my own practice for which I have had for almost 6 years. As stated

above, my qualifications were subject to review by the CEO and the Board of Volusion. I began

work only after those qualifications had been approved without objection and unanimously.  In

March of 2019, I met with the entire leadership of Volusion and presented to them my experience and qualifications as General Counsel. Throughout the more than 17 months that I was employed, I received universal praise for my work. I was never reprimanded, nor was my work questioned. I received no complaints from any source, employees, superiors, or the Board. Further, I have been a business owner and manager for a number of years. In its objections, Debtor does nothing more than make general, conclusory, and false statements about my qualifications, completely untethered to any facts or evidence.

24.    I have now read in paragraph 20 of the unsworn "Factual Background" of Volusion's objections to my claim in bankruptcy (Claim 16-1) (Dkt. No. 178):

> The Board's decision with respect to Ms. Dejban and her law firm Dejban Law was threefold.  First, Ms. Dejban was unqualified to render general counsel services. Second, Ms. Dejban's loyalty laid with her brother and husband, and not the Debtor. Third, the Board desired to undo Mr. Dejban's misdeeds, including entering into independent contractor agreements with family members to serve Mr. Dejban and not the Debtor.

Dkt. No. 178, p. 7, ¶ 20.

a.    As shown above and in the declaration of Mr. Dejban, I was qualified to render general counsel services.  The unsworn assertion is conclusory and false.  Additionally, Dejban Law was never contracted to perform any services for Volusion. I had a fifteen month history at Volusion prior to the New Leaders, with a spotless record, with a list of accomplishments, and with no valid criticism of me by the New Leaders during their short time on the job at Volusion. They had a chance to learn two big things – my Iranian ancestry and that I was pregnant with medical issues.  Though they grilled me in a harassing way in our one meeting, they did not accuse me of lack of qualifications, and my good work for Volusion showed otherwise.

b.    The unsworn disloyalty assertion is also conclusory, false, and unsupported by any

fact or evidence. Additionally, it was not raised before I asserted my termination was wrongful. Volusion, its CEO, its founder, and its Board, among other leadership at Volusion were all aware of my familial relationship to Mr. Dejban at all times relevant, from the time I was considered for the position and throughout my seventeen months at Volusion.

        c.      The unsworn assertion about undoing Mr. Dejban's "misdeeds" is conclusory, false and unsupported by any fact or evidence – and never raised before I asserted my termination was wrongful.

        d.      Meanwhile – these new, unsworn, excuses conflict with the old (but false) excuse Volusion came up with just after my termination.  After Volusion discharged me, it praised the contributions of Mr. Dejban to the company and it did not accuse him of any "misdeeds."  On its website Volusion published information about its Chapter 11 bankruptcy filing under the heading "Frequently Asked Questions."  Volusion's "answers" did not hint that the "reason" for firing Bardia Dejban or me was that it was facing "disengaged and disobedient officers."  (This is what Debtor claimed in the pleading it filed on November 3, 2020 in Case 20-50028 – the Bankruptcy proceeding).  Dkt. No. 103-1, p. 15, Art. III, ¶C(1).  Instead, Volusion stated that to get bankruptcy protection in place for Volusion,

> we made some difficult, but necessary and immediate leadership changes.  **Effective July 27, Kevin Sproles and Bardia Dejban are no longer with the company**.  We know this may have a personal impact on some of you with long-standing relationships, as well as to our tight-knit organization overall.  **Kevin and Bardia have been important leaders at Volusion and we are tremendously thankful for their significant contributions.**  While they are no longer formally a part of Volusion, the belief in the company, **the importance of the culture and the mission they inspired will remain.**  Our goal is to honor what they helped to create by making sure the restructuring process is successful and Volusion can thrive going forward.

(Emphasis added.)

25.    All of these unsworn claims surfaced for the first time after I filed my proof of claim accusing Volusion and the New Leaders of discrimination and are contrary to all

DECLARATION OF BAHAR DEJBAN       Page 10

facts and evidence in this matter. In fact, throughout my tenure with Volusion, I had a variety of accomplishments and added significant value. Among many other things, I was responsible for the following:

- Putting together its patent portfolio and managing its trademark portfolio.

- I took a leading role in addressing the security incident of October 2019 at Volusion. This included working with outside counsel in responding to and handling the class action that was filed against Volusion.

- I worked with the sales and partnership departments on various programs and guided the terms of sales and partner contracts and programs. This included updating the pricing and checkout pages on Volusion's website and customer facing dashboards. This also included updating our online partner terms.

- I revised the various terms and conditions associated with company products and agreements.

- I revised and/or created virtually all of the customer facing agreements.

- I worked with various departments on customer issues, including resolving potential legal disputes. In fact, I had successfully thwarted a number of legal threats for Volusion.

- I worked on a variety of HR matters, including policies and practices and, layoffs and terminations.

- I was engaged in managing Volusion's insurance policies.

- I worked with the engineering department to update the Volusion website to ensure we were in compliance with all applicable laws including proper language regarding cookies.

- I worked with the CISO to ensure Volusion was in compliance with all applicable privacy laws such as the CCPA and GDPR. This included updating our protocols and procedures as well as our security and privacy policies. In fact, the day of my termination I was scheduled to meet with the CISO to finalize the then most recent updates to Volusion's policies.

I hereby declare under penalty of perjury that the foregoing is true and correct.  Executed on April 30, 2021.

Bahar Dejban