# Exhibit A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| VOUSION, LLC, | § | Chapter 11 |
| | § | |
| | § | Case No. 20-50082 (DRJ) |
| Debtor. | § | |

**DECLARATION OF BAHAR DEJBAN**

STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

  I hereby declare pursuant to 28 U.S.C § 1746:

1. My name is Bahar Dejban. I am over the age of eighteen (18) years, of sound mind, and fully capable of making this declaration. I am fully competent to testify to the matters stated in this declaration, all of which is true, and of which I have personal knowledge.

2. I live in the County of Los Angeles in the State of California.

3. I have read "Reorganized Debtor's Motion for Summary Judgment with Respect to Proof of Claim Filed by Bahar Dejban" (Doc. No. 276) and the declaration of Timothy Stallkamp dated August 6, 2021 attached thereto. I will refer in this declaration to Doc. No. 276 as "Volusion's Motion" and to Mr. Stallkamp's declaration dated August 6, 2021 as "Stallkamp's Declaration." The assertion by Volusion, LLC (hereinafter "Volusion" or "Debtor") and Mr. Stallkamp that I was never an employee of Debtor, but was instead merely an independent contractor, is incorrect.

4. Volusion hired me as an employee (not an independent contractor, despite the independent contractor label). From the time I began working for Volusion until Volusion terminated my employment, I was a full-time employee of Volusion. While I served as General Counsel of

DECLARATION OF BAHAR DEJBAN    Page 1

Volusion, Volusion had control of me. Volusion had the right to hire, fire, and supervise me, and to set my schedule. Volusion also provided me with the equipment and tools that I needed to conduct my work.

5. Although he says that it is, Mr. Stallkamp's declaration is not based on his personal knowledge, either as to his assertion that my relationship with Debtor was not an employment relationship or his testimony about the reasons for the "Board's decision with respect to Ms. Dejban and her law firm." Stallkamp Decl., p. 3, ¶ 12. In fact, my total interactions with Mr. Stallkamp were limited to two phone calls and a handful of emails where he made requests and I responded the same day. Mr. Stallkamp was not involved in my day to day work as GC of Volusion.

6. In many ways my relationship with Volusion from the time I became its General Counsel until July 27, 2020 when Volusion terminated me was that of an employee, over whom Volusion had control, and not that of an independent contractor. During this time:

    a. Volusion included me on company-wide emails, for example about special company events, birthdays, etc.

    b. Volusion included me on employee-only Slack channels.

    c. Volusion invited me to employee-only company-wide meetings.

    d. I was invited to Volusion's employee-only holiday party.

    e. When I was hired, Volusion provided me a designated office at its headquarters in Austin. I used that office regularly, whenever I was in Austin, from morning until after business hours many times. My office at the Volusion headquarters building was located directly next to that of Volusion's founder, Kevin Sproles, who was also the CEO of Volusion when I was hired. Mr. Sproles was directly involved in my hiring, and my hiring was not a "sweetheart deal."

  f. At the Volusion headquarters in Austin, I had full access to all Volusion facilities, including conference rooms.

  g. Volusion included me in the nice benefit of free food and snacks that were provided to other employees.

  h. I was invited to and attended weekly social functions, such as taco breakfasts and Volusion Story Time.

  i. I was invited to and attended breakfast with other Volusion employees before Friday meetings.  (Volusion was a good place to work.)

  j. Volusion supplied me with a computer.  Volusion owned all the equipment I used in my job with Volusion.

  k. Volusion supplied me with a physical phone.  My physical phone was the same kind that was on the desk of all Volusion employees.  I had a direct phone number with voicemail where I received messages.

  l. Volusion supplied me a Volusion email address and signature line and access to Volution's Google Drive.  I was added to the same company-wide email/Slack channels that other employees were on such as All Hands, SM Beats, Culture emails.

  m. I had use of the following Volusion software, which required employee-level training and access:

- Google Workplace (formerly GSuite)
    - Includes Drive, Gmail, Slides, Forms, etc.
- Slack
- Intercom (Volusion's customer chat, email and messaging software)
- Whitepages (Volusion's internal customer relationship management)
- Salesforce
- Traction.tools (Volusion's operating system)
- Wistia (product demo videos)

  n. I was always under the direction and control of my boss at Volusion.  My boss at

Volusion, throughout my time with Volusion, had a comprehensive and immediate level of day-to-day authority over employment decisions concerning me. I could not simply set my own schedule; I had to be working at a minimum during Volusion's business hours. I was usually in California, but I had to be available and working during Volusion's CST business hours. That was the expectation. I would get emails and Slack messages regularly throughout the workday.  I could not pay myself with company funds.  At first that boss was Kevin Sproles, while he was CEO.  Then it was Bardia Dejban, after he became CEO.  They could tell me what to do, what not to do, give me assignments and priorities, and control my time.  I was not a person who rendered service for a specified recompense for a specified result, and I was not under the control of my boss only as to the result of my work and not as to the means by which I did my work.  My compensation did not depend on my managerial skill.  I was paid a monthly salary of $30,000.  My pay was not tethered to any project or time limitation. I was given work and responsibility as needed, and was paid the same salary regardless of whether I put in 40, 60 or 80 hours a week.  I did not have an opportunity for profit or loss depending on my managerial skill.

  o. I did not employ any helpers.

  p. I was entitled to take paid annual leave, though I never took any because I was so busy working for Volusion during my entire time with the company.

  q. My job was "permanent," not temporary or short-term.  From the time that I was hired, as far as I know there was no plan for me to leave Volusion.  I was never told that my employment with Volusion was temporary or interim.

7. At work as General Counsel for Volusion, the service I rendered was an integral part of Volusion's business – I was not just an ad hoc provider of legal services.  My work included but was not limited to:

- Reviewing, drafting and negotiating all contracts with vendors, customers, partners, and all other third parties.

- Dealing with all customer, vendor, partner and employee disputes. At the time of termination, I was in the middle of a settlement with a customer, and a negotiation with Microsoft on a major billing dispute.

- Managing compliance requirements for the company including Privacy, Data and ADA. In fact, the day of my termination, I was scheduled to meet with our CISO and GRC analyst to finalize our data policy as well as the system we had put together for data requests under GDPR and CCPA (as well as future regulations that are sure to come).

- Handling trademark and patent work. After the date of my termination, on approx. (10/4/20), I received a call from the trademark attorney seeking my assistance on a deadline. She had not been informed of my termination and had been emailing me at Volusion with no response.

- Handling/managing most legal claims. I would either try to get them disposed of in house and if not possible, I would submit to insurance if applicable. At the time of my termination, I was managing the security breach that had occurred in October of 2019. This included micro-managing the messaging and communication that was going out publicly and to our customers, communicating with insurance and working with outside counsel. After my termination, I received a call from outside legal counsel informing me that they had been trying to reach me and couldn't. They had not been informed of my departure and I had been working with them on a class action that had been filed against Volusion.

- Working with the sales department on the implementation of any price changes.

- Working with the accounting department on whether we need to dispute/pay certain invoices.

- Working with the Billing department closely regarding any questions/concerns customers had with charges.

- Working with the Partner dept on contract terms with our partners.

- Working with the marketing department on appropriate marketing methods that do not violate any anti-spam regulations.

- Being generally available to all employees via email/phone and Slack for any questions/concerns they have.

- Assisting People and Culture with HR issues. At the time of my termination, I was in the process of reviewing and updating the Employee Handbook for 2021. Prior to that I had assisted with updating our policies as they relate to Covid.

DECLARATION OF BAHAR DEJBAN            Page 5

- Updating Volusion's online Terms of Service and Privacy Policies. I had recently updated those due to changes from CCPA as well as new Partner Program we had initiated in approximately April of 2020.

- I would have weekly meetings with the CEO (every Friday at 11am CST) to update on all of the above.

8. **Exhibit 1** attached hereto is a description, based on my personal knowledge, of how my work as General Counsel of Volusion was an integral part of its business. The common things I list in **Exhibit 1** are not an exhaustive list of everything I worked on within each department; I worked on a huge amount of things that were integral to Volusion's business. When I started at Volusion, I made it clear to everyone that I had an open-door policy for everyone regardless of their position at Volusion. I encouraged anyone who needed anything to come directly to me, so during my time at Volusion I would interact with everyone from the CEO to the receptionist. During my time at Volusion, I worked exclusively for Volusion, as its full-time employee. I did not do "other work." I distinctly remember one employee at Volusion sending over a contract for a food truck business he was starting. He wanted to know if I would review it for him on the side. I replied to him that I work for Volusion, but that I would be happy to review it for him as a friend for free.

9. I have read the unsworn assertion in Paragraph 25 of Volusion's Motion that Debtor did not train me or have any obligation to do so. This is false, and Mr. Stallkamp, whose declaration is attached to Volusion's Motion does not say this, and he would not know this as I did not work with Mr. Stallkamp. In fact, I was provided training by Volusion. I worked with Volusion's prior General Counsel for at least 2 weeks prior to his departure. During that time he prepared a memo and we went over all of the files, pending issues, where things were, who were the contacts to work with, and who to notify for what. I also got trained on google drive and slack which were two

products I had not used before. I was also trained on other software such as Notion and Volusion's customer database software.

9. Even though there was an "Independent Contractor Agreement" between Volusion and DK Strategic Solutions, LLC, ("DK") a company of which I was a part owner, when I was hired as Volusion's General Counsel, it was my understanding that I would work for Volusion as an employee, like other employees, including Volusion's previous General Counsel ("GC"), who was an employee – not an independent contractor. That was also Volusion's intent. I was told upon my hiring that that Volusion's intention was to replace the previous GC of Volusion, who was an employee. The role and expectations for the GC did not change from the previous GC to me. The former CEO of Volusion, Kevin Sproles, and the former COO of Volusion, Bardia Dejban (who later became CEO and my boss), and others involved in my hiring should testify if deposed (discovery in this case has not lasted long enough for such depositions) that Volusion intended me to have an employee relationship when I was hired and during my time as GC, and that I was hired as a regular, permanent employee, not on some kind of short term stint. That was my intent. And when Volusion fired me, those involved in my termination acted as though they were aware that I was an employee. On my day of termination, July 27, 220, Troy Pike, a member of Volusion's Board of Directors and Volusion's new CEO upon termination of Bardia Dejban, sent me an email, attaching two termination letters. True and correct copies of that email and of those two termination letters are attached as **Exhibits 2 - 4** hereto. Mr. Pike's emails says, "Thank you for your service to Volusion, LLC." **Exhibit 2**. Mr. Pike addressed one of the termination letters to me personally. **Exhibit 4.** Mr. Pike falsely stated in the first sentence of that letter that Volusion's Board of Managers "understands that you have been providing services to Volusion through an independent contractor relationship." *Id.* While it is true that Volusion and DK had a signed

contract, Mr. Pike and Volusion's Board of Managers were aware that I was Volusion's full time General Counsel and that my relationship was that of a regular employee, not an independent contractor. Mr. Pike's termination letter to me disclosed some of the evidence that I was an employee, and not an independent contractor. Pike's letter was addressed to me and, as if I had been a Volusion employee, said, "You must return all property belonging to Volusion, such as identification cards or badges, access codes or devices, keys, laptops, computers, telephones, mobile phones, hand-held electronic devices, credit cards, passwords, electronically stored documents or files, physical files and any other Volusion property and information in your possession (the "Company Property") on or before July 31, 2020." **Exhibit 4** (emphasis in original). In addition to the way Mr. Pike's termination letter to me is evidence of my employee relationship, Mr. Pike's statement about the Board's "understanding" is false. I met by telephone with the Board (including Mr. Pike) on June 23, 2020. I told the Board in that meeting that I was the full-time General Counsel for Volusion and was paid a salary just like the previous GC. No one pushed back or disputed me when I said this. Also, on July 8, 2020, in my email to Board Member Lindeman, I reminded him that I had been working full time for Volusion.

10. In Paragraphs 7 and 10 of Volusion's Motion, Volusion mentions my husband, Shawn Khorrami ("Khorrami"). In Paragraph 7, Volusion asserts Khorrami "would allegedly perform" negotiation and management services under the Independent Contractor Agreement. In fact, Khorrami did perform negotiation and management services. Khorrami's relationship to Volusion during the time that he performed such services was very different from mine. Khorrami was not, in my opinion, an "employee" of Volusion, since Volusion did not "control" him, and in many other ways his relationship with Volusion was very different from mine. Even though we were husband and wife, Khorrami did not have the conditions and benefits I had as listed in Paragraph

6 above and he was not under the direction and control of a boss at Volusion with a comprehensive and immediate level of day-to-day authority over employment decisions concerning him.

11. Further affiant said not.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed on August 26, 2021.

_____
Bahar Dejban